# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Concilio de Salud Integral de Loiza, Inc.    )
Apartado 509    )
Carretera No. 188 Int. No. 187    )
Loiza, Puerto Rico 00772,    )
    )
      and    )
    )
Junta del Centro de Salud Comunal    )
Dr. José S. Belaval, Inc.    )
Oficina Director Ejecutivo    )
P.O. Box 14457    )
Santurce, Puerto Rico 00916,    )
    )
      Federally-qualified health    )
      center plaintiffs,    )
    )
      and    )
    )
Ricardo Pizarro Carrasquillo    )
Board Member    )
Concilio de Salud Integral de Loiza, Inc.    )
Apartado 509    )
Carretera No. 188 Int. No. 187    )
Loiza, Puerto Rico 00772,    )
    )
      and    )
    )
Rebeca Fuentes    )
Board Member    )
Concilio de Salud Integral de Loiza, Inc.    )
Apartado 509    )
Carretera No. 188 Int. No. 187    )
Loiza, Puerto Rico 00772,    )
    )
      and    )
    )

Juan Cruz                                              )
Board Member                                           )
Junta del Centro de Salud Comunal                      )
Dr. José S. Belaval, Inc.                              )
Oficina Director Ejecutivo                             )
P.O. Box 14457                                         )
Santurce, Puerto Rico 00916,                           )
                                                       )
    and                            )
                                                       )
Sonia Laviena                                          )
Board Member                                           )
Junta del Centro de Salud Comunal                      )
Dr. José S. Belaval, Inc.                              )
Oficina Director Ejecutivo                             )
P.O. Box 14457                                         )
Santurce, Puerto Rico 00916,                           )
                                                       )
    and                            )
                                                       )
Irma Garay                                             )
Board Member                                           )
Junta del Centro de Salud Comunal                      )
Dr. José S. Belaval, Inc.                              )
Oficina Director Ejecutivo                             )
P.O. Box 14457                                         )
Santurce, Puerto Rico 00916,                           )
                                                       )
    and                            )
                                                       )
Maria Carrion                                          )
Board Member                                           )
Junta del Centro de Salud Comunal                      )
Dr. José S. Belaval, Inc.                              )
Oficina Director Ejecutivo                             )
P.O. Box 14457                                         )
Santurce, Puerto Rico 00916,                           )
                                                       )
    and                            )
                                                       )

Lourdes Lorenzana                              )
Board Member                                   )
Junta del Centro de Salud Comunal             )
Dr. José S. Belaval, Inc.                     )
Oficina Director Ejecutivo                     )
P.O. Box 14457                                 )
Santurce, Puerto Rico 00916,                  )
                                               )
     **Individual Plaintiffs,**    )
                                               )
     **v.**                          )        Case No.
                                               )
U.S. Department of Health and Human           )
 Services                                    )
200 Independence Avenue, S.W.                  )
Washington, D.C. 20201,                        )
                                               )
     **and**                         )
                                               )
Michael Leavitt, Secretary                    )
U.S. Department of Health and Human           )
 Services                                    )
200 Independence Avenue, S.W.                  )
Washington, D.C. 20201                         )
                                               )
     **Defendants.**                 )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The source of the problems that give rise to this action is the Commonwealth of

Puerto Rico's Medicaid managed care program, known as *"Reforma"*. *Reforma* was initiated in

and around 1993 and was similar to several other Statewide Medicaid managed care initiatives

launched in the 1990s in which the States contracted with managed care entities to provide the

services of doctors, hospitals, *etc.* to Medicaid beneficiaries.

2.    Contracts with these entities are something of a Faustian bargain. The entities, all

private profit-making insurers, will not participate In Medicaid unless they can make a profit.

The question for State Medicaid programs in deciding to deal with these entities is whether that profit will be offset by other benefits, most importantly (but not exclusively), lower overall costs.

3.     Puerto Rico's Medicaid program contracts with HMOs (one of the kinds of entities eligible for Medicaid managed care contracts). To assure those HMOs profits, the program authorized the HMOs to "download" much of their insurance risk to private doctor groups, which (among other things) act as patient care "gatekeepers" in that they provide generalized, or primary, care and control referrals of patients/ Medicaid beneficiaries to specialists, hospitals, *etc*. With limited exception (*e.g.*, medical emergencies), Medicaid coverage for such other services depends on those doctor groups making the referral in the first instance.

4.     The risk the HMOs downloaded on such doctor groups was and is far in excess of what federal law permits. The result has been that the doctor groups on whom such unlawfully excessive risk was downloaded are able to manage such risk only by limiting beneficiary referrals. Such groups do, in fact, unduly limit such referrals and Medicaid beneficiaries are thereby deprived of care required by the Medicaid statute and good medical practice.

5.     The Federally-qualified health center ("FQHC") plaintiffs receive the same downloaded risk contracts as the doctor groups. Unlike those groups, the FQHCs do not and cannot unduly limit referrals or otherwise ration care. The result is that they find themselves in a situation where, even despite their separate (from Medicaid) federal grant funding, they are on, or past, the brink of insolvency because of the risk the HMO contracts impose. Suffice it to say that the risk also violates payment duties all Medicaid program HMOs have toward FQHCs under federal law.

6.     Many of Puerto Rico's FQHCs are on the verge of losing their federal grants because of the insolvency the HMO risk contracts produce.  If they do lose those grants, they will be out of business because they depend on those grants, and the status in Medicaid those grants create, to provide them the funds they need.  Medicaid beneficiaries for whom FQHCs are their one safe haven from the (non) referral techniques doctor groups employ will lose that safe haven.  Federal grant funds to start up replacement entities are not in prospect.  Those funds come *via* discretionary grants for which many other areas of the nation have great need.  Unless Puerto Rico's Medicaid program pays the FQHCs what is legally required, that grant funding, approximately $38 million per year, will dry up.  There is no purpose in further funding entities that in the end cannot remain solvent when they, as the grant statute requires them to do, treat Medicaid patients.

7.     Apart from the severe health issues the HMOs' doctor group/FQHC contracts create, the contracts and the practices surrounding those contracts violate numerous provisions of federal law, to the extent that the HMO contracts are legally null and void.  Defendants are aware of such issues, problems and violations.  In the face of mandatory duties and responsibilities to correct these violations, defendants have failed utterly to take any corrective action.

8.     In this case, plaintiffs seek to require the U.S. Department of Health and Human Services and its Secretary, Michael Leavitt, to take such required corrective action.  The most obvious such action is to cease making federal payments to support the unlawful managed care contracts that have been entered into by the Commonwealth of Puerto Rico's Medicaid program.  Accordingly, Federally-qualified health center ("FQHC") plaintiffs and all Medicaid beneficiaries within the Class represented by the individual plaintiffs herein ask the Court to

enjoin defendants from making these payments, thereby forcing an end to the legal abuses

caused by the Commonwealth's managed care Medicaid program.

## JURISDICTION, VENUE AND RELATED AUTHORITIES

9.      This action arises under the provisions of Title XIX of the Social Security Act, 42

U.S.C. § 1396 *et seq.* (hereinafter the "Medicaid statute") and Section 330 of the Public Health

Service Act (hereinafter "the PHS Act" or "Section 330"), codified at 42 U.S.C. § 254b.

10.     The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3) and (4).  Venue is proper in this District under 28 U.S.C. § 1391.

11.     The declaratory and injunctive and other relief sought in this action is authorized

under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.  Equitable relief is available under 28

U.S.C. § 1651.  Authority for this action lies under 5 U.S.C. § 702.

## THE PARTIES

### Federally-Qualified Health Center Plaintiffs

12.     Both FQHC plaintiffs are nonprofit Commonwealth of Puerto Rico corporations

designated under the Medicaid statute as "Federally-qualified health centers".  Both are located

and provide services within the Commonwealth of Puerto Rico.  Each such FQHC is a "health

center" that receives federal grant funds under Section 330 of the Public Health Service Act.

13.     Plaintiff Concilio de Salud Integral de Loiza, Inc. ("Loiza") operates a Section

330 funded health center that provides services principally within the poor, medically

underserved community of Loiza, on the northeast coast of Puerto Rico.

14.     Plaintiff Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval")

operates a Section 330 funded health center in San Juan, where it is headquartered, and on the

Isle of Culebra.

6

**Individual Plaintiffs**

15.    Individual plaintiffs are all patients of one of the two FQHC plaintiffs and members of one of the two FQHC plaintiffs' Boards of Directors.  Several are Medicaid beneficiaries.

16.    Plaintiffs Carrasquillo and Fuentes reside in Loiza, Puerto Rico.

17.    Plaintiffs Cruz, Laviena, Garay, Carrion and Lorenzana reside in San Juan, Puerto Rico.

18.    Individual plaintiffs bring this action on behalf of themselves, the FQHCs from which they receive services (and with which they are affiliated), and other beneficiaries of Puerto Rico's Medicaid program or other individuals not enrolled in Medicaid who are patients of, or wish to be patients of, FQHCs.  Regarding all such persons, their rights under federal law are adversely affected by the unlawful actions of Puerto Rico's Medicaid program and the failings of defendants to carry out their statutory responsibilities to correct such unlawful actions.  The basis for the class action is further described below.

**Defendants**

19.    Defendant, Department of Health and Human Services ("HHS"), administers the PHS Act grant and Medicaid programs with which this action is concerned.  The Section 330 PHS Act program is assigned to HHS' Health Services and Resources Administration ("HRSA"), which, in turn, has delegated certain authority over that program to its Bureau of Primary Health Care ("BPHC").  The Medicaid program has been assigned to the Centers for Medicare and Medicaid Services, designated by HHS as "CMS".  (CMS previously was named the Health Care Financing Administration ("HCFA").  For purposes of simplicity, all references herein to CMS also refer to HCFA.)

20.     Defendant Michael Leavitt is the Secretary of the Department of Health and

Human Services and, as such, is the one who is ultimately responsible for the Medicare,

Medicaid and Public Health Service Act programs that are the subject of this action.  He is sued

in his official capacity.  (For purposes of simplicity, all references below to HHS also apply to

defendant Leavitt.)

## Class Action

21.     Insofar as the complaints of individual plaintiffs are concerned, this action meets

the prerequisites of a class action under Fed. R. Civ. P. 23 in the following respects.  *First*, the

class as defined above -- all Medicaid beneficiaries and actual or potential FQHC patients whose

interests in and rights under federal law are being impaired by the unlawful actions of the Puerto

Rico Medicaid program and HHS' failure to carry out mandatory duties regarding such actions --

is so numerous that joinder of all members is impracticable consistent with Fed. R. Civ. P.

23(a)(1).  The number of such beneficiaries/patients is in the hundreds of thousands and

obviously too large a population for joinder to be practicable.  The disposition of the claims of

these class members in a single class action will provide substantial benefits to all parties and to

the Court.  *Second*, there are questions of law and fact raised herein that are common to the class.

*Third*, the named plaintiffs will fairly and adequately protect the interests of the class.  Evidence

for this proposition is that the FQHC plaintiffs and counsel here are the same ones who have

been involved in other, successful, litigation (described below) with respect to the abuses of

Puerto Rico's Medicaid managed care program.  *Finally*, individual plaintiffs' claims and the

harms they have suffered (and continue to suffer) that are at issue herein are typical of the claims

of and injuries to all other class members within Puerto Rico.

**HEALTH CENTERS**

22.     "Health centers" that are eligible to receive grant funds under Section 330 of the

Public Health Service ("PHS") Act, 42 U.S.C. § 254b, must have been determined by appropriate

officials of HHS to:  (1) be located in a medically underserved area or serving a medically

underserved population (42 U.S.C. § 254b(a)(1)); (2) be community-based --a majority of its

Board of Directors must be patients of the center, "who, as a group, represent the individuals

being served by the center . . . " (42 U.S.C. § 254b(j)(3)(H)(i)); (3) provide an especially

comprehensive range of primary health services to its patients through staffs of physicians and

other health care providers (rarely, if ever, available from an ordinary physician's group) (42

U.S.C. §§ 254b(a)(1)(A) and 254b(j)(3)(A)); (4) provide health care services to Medicaid

recipients (42 U.S.C. § 254b(j)(3)(E); and (5) serve all residents of their communities, regardless

of any resident's/patient's ability to pay.  42 U.S.C. §§ 254b(a)(1) and 254b(j)(3)(G)(i).  FQHC

plaintiffs are current recipients of Section 330 grants and, as such, have been found by those

officials to meet the foregoing requirements.

23.     Neither of the two FQHC plaintiffs has a "profit stream."  With the exception of

*de minimus* fees from uninsured patients, their revenues are limited to their Section 330 PHS Act

grants and whatever revenues they receive from the Commonwealth of Puerto Rico's Medicaid

program (and to a very limited extent Medicare).   Neither has funds available to pay the costs of

treating Medicaid patients that are not reimbursed by the State's Medicaid program, other than

funds from their Section 330 PHS Act grants.

**THE MEDICAID PROGRAM IN GENERAL**

24.     The Medicaid program began under law enacted in 1965.  Activities under the

program are carried out by States. (The Medicaid statute's definition of "State" includes the

Commonwealth of Puerto Rico. 42 U.S.C. § 1301(a)(1)). A State's Medicaid program, by

engaging the services of hospitals, clinics, physicians, *etc.*, makes health care available to poor

women, children and certain other individuals eligible to become a program beneficiary.

Participation in the Medicaid program by any State is voluntary. However, once such an election

is made, the State must comply with all federal requirements. Puerto Rico has made an election

to participate in the Medicaid program.

25.     Any State that has elected to participate in the Medicaid program must submit and

have approved a State Medicaid plan, which contains provisions and requirements regarding

groups of individuals covered, eligibility conditions, medical care and services, payment and

compliance with program requirements. *See, generally*, 42 U.S.C. §§ 1396a(a)(1)-(65) and 42

C.F.R. §§ 430 *et seq*. A State plan also "must describe the policy and methods to be used in

setting payment rates for each type of service included in the State's Medicaid program." 42

C.F.R. § 447.201(b).

26.     CMS regulates and otherwise oversees State administration of the Medicaid

program. The Medicaid statute and regulations promulgated thereunder and other requirements

of, and approvals by, HHS and/or CMS constitute the federal requirements that govern a State's

conduct of its Medicaid program.

## ESTABLISHMENT OF FQHCS AND
## FQHC SERVICES IN THE MEDICAID PROGRAM

27.     Under the Medicaid statute, certain services must be provided by a State as a

condition of its participation in the Medicaid program. 42 U.S.C. § 1396a(a)(10)(A). The

Omnibus Budget Reconciliation Act ("OBRA") of 1989, Pub. L. No. 101-239, created a new

kind of entity labeled  a "Federally-qualified health center" or "FQHC", and made "Federally-

qualified health center services . . . and any other ambulatory services offered by a federally

10

qualified health center" one more "mandatory" Medicaid service to which all Medicaid

beneficiaries are entitled.  42 U.S.C. §§ 1396d(a)(2)(C), 1396a(a)(10)(A), and 1396d(l)(2)(A).

Health centers that are or were recipients of Section 330 PHS grants automatically become

Medicaid FQHCs.  (A few other entities that meet the requirements for receiving a Section 330

PHS Act grant (so-called FQHC "look-alikes") also qualify as FQHCs (42 U.S.C. §

1396d(l)(2)(B)).)  As noted in the introductory parts of this Complaint, each FQHC plaintiff is an

FQHC by virtue of its receipt of Section 330 PHS Act funds.

**FQHC MEDICAID PAYMENT REQUIREMENTS**

**Reasonable Costs**

28.     In creating FQHC status within the Medicaid program in 1989 and continuing

FQHC legislation thereafter, Congress has imposed special requirements for the payments States

must make to FQHCs.  OBRA 1989 required reimbursement of FQHCs at "100 percent of [each

FQHC's] costs which are reasonable . . ."  42 U.S.C. § 1396a(a)(13)(E), later reclassified at 42

U.S.C. § 1396a(a)(13)(C).

29.     Through December 31, 2000, the Medicaid statute continued to require States to

pay reasonable costs to FQHCs.  The State reimbursement process was intended to follow the

process employed by the Medi*care* program for *its* companion FQHC program, and worked as

follows:  an FQHC would first file a claim with a State's Medicaid agency (typically for the

preceding month) for each "visit" to the FQHC by a Medicaid-eligible patient.  In return, the

State would pay (generally within a required 30 days) the FQHC a previously determined

"interim" rate for that visit.  At the end of the FQHC's fiscal year, the FQHC would file a cost

report with the State Medicaid agency reflecting the FQHC's total allowable costs for the year;

such allowable costs being those expended by the FQHC for the kind of services Medicaid

11

covers to *all* (not just Medicaid) patients of the FQHC. The FQHC's allowable costs would be divided by the number of visits (involving such Medicaid-covered services) provided to all of the FQHC's patients to produce a per-visit rate. The per-visit rate resulting from this calculation would be multiplied by the number of visits provided by the FQHC to Medicaid patients. If the sum were more than the amount paid to the FQHC under the interim rate, the State would pay the FQHC the difference. To simplify, assume that:

(A)    An FQHC received interim payments of $450 from the State Medicaid agency for all of its Medicaid visits for the previous year.

(B)    During that prior year, there were 100 visits in which services of the type covered by Medicaid were provided by the FQHC to *all* of its (Medicaid and other) patients, *of which 50 visits were for treatment of Medicaid patients*.

(C)    The total reasonable costs the FQHC incurred during that previous year for *all* such visits amounted to $1,000.

(D)    The FQHC's per visit rate would be $1,000/100 total visits = $10 per visit; and the total amount owed the FQHC by the State Medicaid agency would be 50 Medicaid visits x $10 = $500.

(E)    Because the FQHC already received $450 from the State Medicaid agency during that previous year, it would be now owed an additional $50 from the Medicaid program to equal the $500 due.

(F)    In the following year, the FQHC's interim rate would be the $10 per-visit rate calculated for the previous year, subject (at the end of that year) to the same reconciliation process just described.

30.    Congress' purpose in requiring special FQHC payment provisions under the

Medicaid program was stated in the Report of the House Budget Committee accompanying H.R.

3299 (the House version of the 1989 OBRA):

> The Subcommittee on Health and the Environment heard
> testimony that, on average, Medicaid payment levels to Federally
> funded health centers cover less than 70 percent of the costs
> incurred by the centers in serving Medicaid patients.  The role of
> [health centers] . . . is to deliver comprehensive primary care
> services to underserved populations or areas without regard to
> ability to pay. *To the extent that the Medicaid program is not
> covering the cost of treating its own beneficiaries, it is comprising
> the ability of the centers to meet the primary care needs of those
> without any public or private coverage whatsoever.*
>
> * * *
>
> To ensure that Federal PHS Act grant funds are not used to
> subsidize health center or program services to Medicaid
> beneficiaries, States would be required to make payment for these
> [FQHC] services at 100 percent of the costs which are reasonable
> and related to the cost of furnishing these services.  (Emphasis
> added.)

H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.

31.    The payment method for FQHCs became more complicated when a number of

States adopted "managed care" for their Medicaid programs.  In Medicaid managed care, the

State Medicaid agency contracts with managed care organizations.  As stated previously, so far,

Puerto Rico has contracted with only one type of such organization -- HMOs.  (Although HMOs

are referred to below in a more general context than just Puerto Rico, we use the term in such

other contexts as a proxy for all similar entities in Medicaid managed care.)  The HMOs in

Puerto Rico arrange for the delivery of health care services to Medicaid patients through

independent doctors, other health professionals and the various entities such as hospitals and

FQHCs that provide the actual medical services.  Each such HMO is paid a fixed monthly sum

("capitation") by Puerto Rico for each Medicaid beneficiary assigned to the HMO (an

"enrollee"). With that fixed sum or capitation, the HMO is responsible for providing covered (by

Medicaid) care to each such enrollee. In short, the HMO assumes the risk all insurers assume --

that its premiums, or, in Medicaid, its capitations, may produce less revenue than its costs for its

insured's claims.

32.    The problem managed care created where FQHC payments are concerned is this:

because HMOs replace the State Medicaid agency as the entity that contracts with and pays

FQHCs for Medicaid services, and since HMOs, all private businesses, expect to pay FQHCs a

"market rate," not a special rate uniquely created by federal Medicaid law, HMOs, if left to their

own devices, would pay FQHCs amounts that they pay others for the same specific service (*e.g.*,

a simple visit to a physician by a sick person). The cost of the comprehensive services FQHCs

uniquely provide would likely not be fully covered. And, the result would likely be that the rate

the HMO paid for the specific service would be less than the special 100 percent reasonable cost

rate Congress set for FQHCs.

33.    To deal with this issue, Congress initially amended the Medicaid statute to require

States to pay HMOs "something extra" to enable the HMOs, in turn, to pay FQHCs on the basis

of reasonable costs and not lose money in doing so. Although these requirements worked "on

paper," as a practical matter, they were ineffective. HMOs tended to keep all or a part of that

something extra for themselves and pay FQHCs what they paid everyone else. Unsurprisingly,

those payments were invariably less than what the Medicaid statute required. Less than vigilant

State Medicaid agencies (and CMS) did nothing about it.

34.    In the Balanced Budget Act ("BBA") of 1997, section 4712, Congress sought to

get around the HMOs' failure to transfer the extra funds to FQHCs and the absence of

enforcement by State and federal governments. The 1997 law removed the HMOs' financial

responsibility to pay FQHCs a special rate and instead required them to pay FQHCs "not less"

than they would pay for non-FQHC providers for the same medical services. To ensure FQHCs

were reimbursed their reasonable costs, the BBA also required States to make "a supplemental

payment [to FQHCs] equal to the amount . . . by which" an FQHC's reasonable costs "exceed[ed]

the amount of payments" FQHCs received from HMOs. 42 U.S.C. § 1396a(a)(13)(C) (1999).

This supplemental payment is commonly referred to as "wraparound."

35.     Puerto Rico has had a Medicaid managed care program in effect (at least) since

the 1997 FQHC payment amendments. It has accordingly, been required for ten years to make

wraparound payments to FQHCs to cover any difference between what the FQHCs were or are

paid by the HMOs and the special payment levels to which FQHCs are entitled under federal

law.

36.     Similarly, since the BBA's enactment, Puerto Rico's HMOs have been required to

pay FQHCs (as restated in the 2000 legislation) "not less than the level and amount . . . the

[HMO] would make for the services if the services were furnished by [another provider than the]

FQHC . . ." 42 U.S.C. § 1396b(m)(2)(A)(ix).

## Medicaid FQHC Prospective Payment System ("PPS")

37.     In December 2000, Congress changed the FQHCs' special payment under the

Medicaid statute. H.R. 5661, section 702, as enacted in Pub. L. No. 106-554 (Dec. 21, 2000),

now codified at 42 U.S.C. §1396a(bb). Under the 2000 law, instead of paying FQHCs

reasonable costs, States were required to calculate each FQHC's average reasonable costs for

fiscal years 1999 and 2000 and convert that result into a per-visit rate. On January 1, 2001 and

afterward, FQHCs were required to be paid (by the State) that per-visit rate. The law also

required the per-visit rate to be adjusted each year by the percentage increase in the prior fiscal year's Medicare Economic Index ("MEI"). The 2000 law retained State responsibility for making supplemental or wraparound payments to FQHCs. Thus, under current law, whenever FQHC payments from HMOs (in managed care States) are less than would be due under the particular FQHC's per-visit rate, the State has to wrap-around the difference. 42 U.S.C. §1396a(bb)(5).

### Prior HHS Approval of Managed Care Contracts

38.     Generally speaking, the Medicaid statute places a good bit of discretion, and trust, in the hands of a State once HHS approves the State's Medicaid plan. A glaring exception to this general proposition is what the Medicaid statute requires when States such as Puerto Rico opt for managed care. For such a State, the statute specifies the kinds of entities (HMOs and others) that are eligible to receive capitated managed care contracts and, most importantly for this case, requires HHS to approve all State contracts with HMOs *in advance* based on certain statutorily specified conditions. *See* 42 U.S.C. § 1396b(m)(1) and (2). (There is a dollar threshold for HHS' prior approval, but it is so low in comparison to the multi-millions of dollars these contracts typically involve (only $1 million plus an inflation factor after 1998) that to all intents and purposes prior approval is required for all such contracts. All Puerto Rico HMO contracts here at issue are in the millions of dollars). Unless such prior approval is granted, "no payment shall be made [by HHS] to a State with respect to expenditures incurred by it for payment . . . for services provided by [the HMO] . . ."

### Medicaid Managed Care After 1997 Amendments

39.     The 1997 Medicaid amendments  made numerous changes in addition to those affecting FQHCs. One of these was to replace an old section of the Medicaid statute with a new

16

section, 42 U.S.C. § 1396u-2, that for the first time gave State Medicaid programs permission to institute managed care with a broad range of managed care entities and without limits that would either significantly curtail the number of such entities or discourage their involvement, as previous law had done.

40.    Consistent with the foregoing, § 1396u-2(a)(1) allowed a State to require its Medicaid beneficiaries "to enroll with a managed care entity" to receive Medicaid benefits, § 1396u-2(a)(1)(A)(i).  With this broad grant of authority to compel beneficiaries to sign up with an HMO (or similar entity) came certain conditions.  The "applicable requirements in section 1396u-2 and section 1396b(m)" had to be met by "the [managed care] entity and the contract with the State" as well as all § 1396u-2 "requirements described in succeeding paragraphs of this subsection . . ." 42 U.S.C. § 1396u-2(a)(1)(A)(i)(I) and (II).

41.    As a complement, the 1997 law also amended 42 U.S.C. § 1396b(m)(2)(A) by adding a new condition (xii) for CMS prior approval of a managed care contract.  Under that new condition, the managed care contract to be approved by CMS as well as "the [managed care] entity [must] comp[ly] with the applicable requirements of section 1396u-2." Section 1396u-2(a)(1)(A)(i)(I) returned the favor in one of its key conditions to requiring beneficiaries to enroll in managed care.  It required that the managed care "entity and the contract with the State meet [not just] the applicable requirements of [§ 1396u-2] [but also] section 1396b(m). . ."

42.    Accordingly, for any State, including Puerto Rico, if either the Medicaid contract with the HMO or the HMO's compliance with § 1396u-2's or § 1396b(m)'s requirements is other than what those sections or implementing regulations call for, HHS can neither approve the contract nor make a payment that would be used for the contract and Medicaid beneficiaries cannot be required by the State to enroll with that HMO to receive Medicaid services.

43.    To pay its managed care HMOs, Puerto Rico's Medicaid program (with the possible exception of covering some administrative costs of its Medicaid agency, the Department of Health) passes 100 percent of its federal payment through to a Commonwealth agency established to directly contract with and oversee the HMOs. That agency, in turn, passes those federal funds to the HMOs to support the contracts that agency has entered into with those HMOs for Medicaid managed care services. As a consequence, any funds HHS pays to the Commonwealth as the federal share of the Commonwealth's Medicaid program are used (at least in substantial part) to pay managed care entities. HHS is fully aware of this fact.

## LEGAL VIOLATIONS

### Background To This Case

44.    What gives rise to this case is that:

(A)    the Puerto Rico Medicaid program has never paid the FQHCs the special rate the Medicaid statute requires and, since 1997, has not paid FQHCs any wraparound during the (now) 10 years that wraparound requirement has been in place (except for court-ordered payments to FQHC plaintiffs here in a separate federal lawsuit (*Rio Grande Community Health Center, Inc., et al. v. Rosa Perez-Perdomo, Secretary, Department of Health*, Case No. 03-1640 (District Court of the District of Puerto Rico) and appeals thereof (*Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005); *Dr. José S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33 (1st Cir. 2006) and *Dr. Jose S. Belaval, Inc., et al. v. Hon. Rosa Perez-Perdomo, et al.*, _____ F.3d _____ 2007, WL 145931 (1st Cir. May 18, 2007)), and some token payments in late 2006 or early 2007 to a few other FQHCs to look good to the District Court which is presiding over the *Rio Grande* case as well as other FQHC cases filed after FQHC plaintiffs' successes in *Rio Grande* and appeals thereof;

18

(B)     the HMOs do not pay FQHCs as they are required to do under the Medicaid statute and in fact pay FQHCs, at best, little or nothing and, at worst, charge the FQHCs for the FQHCs' provision of Medicaid services instead of paying them;

(C)     the HMOs payment to the FQHCs is the same as their payment to private doctor groups for the same or similar specific services the FQHCs provide;

(D)     the payments to FQHCs and doctor groups are made on a risk basis that imposes a level of risk so high as to violate statutory requirements relating to such risk imposition;

(E)     CMS and the Puerto Rico Medicaid agency have been aware of these violations for years and have failed to enforce the requirements being violated despite the harm to beneficiaries and FQHCs that result from those violations;

(F)     as evidenced by a letter described and quoted below, all FQHCs in Puerto Rico were instructed by a senior official in HRSA to renegotiate their HMO contracts because of the risk they imposed, but the HMOs refused to renegotiate with the result that the FQHCs with such HMO contracts are now living with those contracts and thereby doing what that letter suggests is unlawful -- an uncomfortable position at best;

(G)     all FQHCs in Puerto Rico, including plaintiffs, face the likelihood of insolvency unless the federal courts force HHS and/or Puerto Rico to do what federal law requires; and

(H)     notwithstanding the above-described problems and the numerous other violations of law within Puerto Rico's Medicaid program described below, CMS has taken no enforcement action regarding these violations, has paid Puerto Rico for its HMO contract

expenditures and has permitted Puerto Rico to deprive Medicaid beneficiaries of services unless

they first enroll with an HMO and receive all services through that HMO.

### Violations Directly Related to HMO Contract Approval

45.　　On information and belief, in part including an interrogatory response of the

Puerto Rico Department of Health in the *Rio Grande* case cited above, CMS has neither

reviewed nor approved *any* current, or *any* prior, HMO contract entered into by the

Commonwealth's Medicaid program as required by 42 U.S.C. § 1396b(m)(2)(A), even though it

has continued to pay Puerto Rico monies being used by the Commonwealth for those contracts

and has likewise continued to permit the Commonwealth to force Medicaid beneficiaries to sign

up with the HMOs operating under such (unlawful) contracts as a condition of receiving

Medicaid services.

46.　　Virtually all the statutory and regulatory criteria that govern CMS managed care

contract approvals have been, and continue to be, materially violated by the Puerto Rico

Medicaid program and/or the Medicaid HMOs.  CMS has explicit knowledge of such violations.

Following are examples of some of these violations of which CMS is aware:

(A)　　Section 1396b(m)(2)(A)(iii) -- rates paid to HMOs must be "actuarially

sound".  The rates being paid the HMOs are not actuarially sound and the requisite actuarial

findings and certifications required by regulation, at 42 C.F.R. § 438.6, are lacking.

(B)　　Section 1396b(m)(2)(A)(vi) -- beneficiaries must have certain

disenrollment rights.  Those rights are nonexistent because beneficiaries have no alternative

HMO to select and must enroll with an HMO to receive Medicaid services.

(C)　　Section 1396b(m)(2)(A)(vii) -- in *urgent care* situations where

beneficiaries have a medical need -- *i.e.*, where care is "immediately required due to an

unforeseen illness, injury or condition" -- beneficiaries have the right to go out of network for the service they need and either the State or HMO must pay the service provider. No such right exists.

        (D)    <u>Section 1396b(m)(2)(A)(ix)</u> -- the State-HMO contract must require HMOs to pay FQHCs "not less than the level and amount of payment which the [HMO] would make ... if the services [provided] were furnished by a [non-FQHC] . . ." The contract does not fulfill this requirement. The HMO has forced the FQHC plaintiffs to take risk contracts under which they either receive close to nothing for their services to Medicaid patients (Belaval) or go further into debt to the HMO in so doing (Loiza). HHS was specifically placed on notice of the financial terms of the HMO contracts with FQHC plaintiffs in the course of the *Rio Grande* litigation.

        (E)    <u>Section 1396b(m)(2)(A)(x)</u> -- risk contracts with physicians or physician groups must limit the risk to ensure (among other things) that the physician/group will not fail to treat or refer a patient because of the risk imposed. The risk imposed by the HMOs violates 42 U.S.C. § 1395mm(i)(8) (incorporated by referenced into § 1396b(m)(2)(A)(x)) and the regulations promulgated thereunder, at 42 C.F.R. § 417.478, in that the risk is a "substantial financial risk" as defined therein and the safeguards required by § 417.478 either have not been implemented, or have been improperly implemented, because the result of the risk actually imposed could not exist under those safeguards. The risk actually imposed by the HMOs with the explicit approval of the Commonwealth also clearly violates 42 C.F.R. § 438.50(c)(6) (because the physician groups with which the HMOs contract cannot meet standards referenced therein for eligibility to receive a risk contract in the first place) and § 438.210(e) (under which any risk imposed on such doctor groups cannot leave them in a situation where they can only

manage that risk -- to produce a reasonable payment in their favor -- by refraining from making

referrals of Medicaid beneficiaries to hospitals, specialists and the like, which is exactly the

position the risk contracts place them in).

      (F)    Section 1396b(m)(2)(A)(xii) -- the HMO contract and the HMO must be

in compliance with § 1396u-2. There is no such actual compliance just because of the foregoing

violations of § 1396b(m) and also because of the further violations described below.

      (G)    Section 1396u-2(a)(3) -- in general, Medicaid beneficiaries must have at

least two HMOs from which to choose; with certain limited exceptions. There is only one HMO

available within each of the Puerto Rico Medicaid program's 10 regions. The limited exceptions

to the statutory rule requiring at least two such entities are not met.

      (H)    Sections 1396u-2(e)(1)(A)(i), 1396b(m)(2)(A) and 1396d(a)(4)(D)(ii)(I) --

FQHC services, legally required under § 1396d(a)(2)(C), must be made available to all Medicaid

beneficiaries by the Puerto Rico HMOs. The FQHCs, under their Section 330 grants, are

available to provide their services in a number of areas with respect to which the HMOs have

refused to contract with those FQHCs because the HMOs already have contracted with doctor

group(s) for those areas. Both FQHC plaintiffs are currently so limited. Regarding areas from

which Puerto Rico FQHCs are so excluded, Medicaid beneficiaries located therein are not

permitted by the HMO to receive the FQHC's services. Puerto Rico's Medicaid agency has

advised FQHCs and Medicaid beneficiaries who have complained about refusals of HMOs to

contract with an FQHC for services in these areas that there is nothing that agency can do about

it. Adding to these problems, plaintiff Belaval has been informed that its HMO is no longer

assigning it any patients. All patients in its contractually designated area are instead being

assigned to a municipal facility under an arrangement that, as explained below, violates criminal

and civil penalty laws applicable to the Medicaid program. (This last violation of the Medicaid statute may not be actually known by HHS.)

### HHS' FAILURES TO DO WHAT LAW AND REGULATION REQUIRE

### Violations By CMS/HHS

47.    CMS, in the face of the circumstances and violations of law described herein, has (beyond perhaps an informal expression of concern) taken no action to enforce such laws and regulations.

48.    In the process, it has continued to make payments to the Puerto Rico Medicaid program that it well knows will be paid by that program to HMOs under contracts CMS has not approved and which could not, in any event, be approved because the statutory and regulatory conditions for such approval are not being met and CMS knows it.

49.    Likewise, CMS has effectively authorized Puerto Rico to compel Medicaid beneficiaries to enroll with the HMOs even though neither those HMOs, nor the contracts those HMOs have received from the Commonwealth, meet relevant statutory and regulatory conditions.

50.    These actions not only violate HHS' duties and responsibilities under the Medicaid statute described previously (and later) herein. They also violate HHS' duties under the U.S. Constitution and the Antideficiency Act, 42 U.S.C. § 1341 (because HHS is paying Puerto Rico funds that Congress has neither authorized nor appropriated to be used in the manner involved); provisions of the Medicaid statute at 42 U.S.C. § 1308, limiting funds paid to Puerto Rico for its Medicaid program (by permitting Puerto Rico to add Section 330 funds to its Medicaid program in addition to that limit because that program forces FQHCs to use those funds to cover costs the HMOs and/or the Commonwealth are required to pay); and, as further

explained below, criminal and civil penalty laws applicable to the manner in which the HMOs

have dealt with FQHCs and similar providers (and in which violations Puerto Rico's Medicaid

officials have been complicit).

51.     The actions (and inactions) of HHS regarding all such violations (among other

things) constitute "agency action" that was and is "arbitrary, capricious, an abuse of discretion

[and] otherwise not in accordance with law . . . contrary to constitutional rights, power, privilege

[and] immunity [and] in excess of statutory jurisdiction, authority, or limitations [as well as]

short of statutory right" under 5 U.S.C. § 706(2)(A)-(C).

### Failures of HRSA/HHS

52.     On November 15, 2002 HRSA's Associate Administrator in charge of the Section

330 PHS Act grant programs advised all Puerto Rico health centers by letter that:

> We are . . . concerned that the [PHS Act Section] 330 grant dollars
> may be paying for services to the health care reform population
> that are beyond the scope of services for which the funds are
> intended.  These funds are primarily intended for primary care
> services.  Therefore, we are encouraging all health centers in
> Puerto Rico, with the assistance of the Primary Care Association
> (PCA) and the Puerto Rico Sub-Field Office, to begin discussions
> to renegotiate the current contracts with the HMOs and regulatory
> authorities.  These discussions should focus on the elimination of
> financial risk for services over which the health center and its
> providers have no financial and utilization control.

November 15, 2002 Associate Administrator letter at 1.  His letter further stated that:

> . . . the health centers should consider not renewing any future
> contracts since the HMOs have structured a program that
> essentially transfers financial risk for most health center costs to
> the federally-funded health centers in Puerto Rico.  In order to
> implement this contract termination if negotiations are
> unsuccessful, each center should send to each managed care
> company with which they contract, a letter of intent to terminate
> the contract.  The letter should be sent in accordance with the
> termination clause of each contract.  Most contracts require a
> notice of termination, ranging from 30 to 90 days prior to the

renewal date of the contract.

53.    In addition to the foregoing letter, HRSA officials' other actions toward the affected FQHCs have been to place pressure on them to (somehow) deal with the violations of Section 330 the HMO contracts cause or face a Section 330 funding termination because the grant law violations not only are "violations of law" that in and of themselves raise enforcement (for HHS) issues but also cause the FQHCs to run out of Section 330 funds in paying for what the State Medicaid programs should pay for and thereby to become insolvent.  HRSA, of course, does not want to make grants to insolvent entities.

54.    The only FQHC to do what the HRSA letter implied had to be done -- refuse further Medicaid HMO contracts when the HMO refused to renegotiate -- had its Section 330 grant terminated because of such an insolvency (even though it was financially better off by severing its HMO relationship) and also because the FQHC had no contract with the "State" for Medicaid services, as Section 330 requires.

55.    The insolvency the Puerto Rico FQHCs are experiencing is a direct result of the failure of CMS/HHS to carry out their duties and responsibilities under the Medicaid statute.  As such, for HHS to punish the FQHCs for its own failings is to commit a further violation, or violations, of 5 U.S.C. § 706.  Furthermore, as a matter of government contract common law, a breach caused by a contractor's failure to comply with the contract that is caused by the actions of the government cannot be used to take action against the contractor for that failure.  The same is true for government grants (that by nature and decisions of the Supreme Court, among others) are also "contracts".

## HARM TO PUERTO RICO FQHCS

56.    Since the inception of Puerto Rico's managed care program until today, the HMOs have offered Medicaid contracts to FQHCs only on a "take-it-or-leave-it" basis. All such HMO contracts have (as explained above) required FQHCs to accept "risk" for the FQHCs' Medicaid patients. Unless FQHCs receive and sign the HMO contract, they will be assigned no Medicaid patients. In short, FQHCs have had no choice but to accept an HMO's "take-it-or-leave-it" contract, including that contract's assignment of risk.

57.    This risk the FQHCs were forced to accept in the HMO contracts was nearly the identical insurance risk each HMO accepted in its Medicaid managed care contract with the State. Although HMOs were required in *their* Medicaid contracts with the State to provide care to Medicaid patients for a sum certain (capitation), through their contracts with the FQHCs those HMOs pushed a substantial part of the risk they undertook in their State contracts down to the FQHCs. Stated otherwise, under their "take-it-or-leave-it" contracts with the FQHCs, the HMOs assigned Medicaid patients to the FQHCs, and once those patients were so assigned, the FQHCs inherited a high percentage of the financial responsibility for providing those patients with care. Such financial responsibility did not end when the FQHC itself did not supply such care; for example, where a patient had to be hospitalized. The costs of such hospitalization became the responsibility of the FQHC. In order to pay for such hospital care, the HMOs simply deducted the hospitals' bills from the next FQHC payment due.

58.    Both FQHC plaintiffs are now operating (and in the past have operated) under such risk contracts, which HRSA regards as a violation of Section 330. Furthermore, but for court orders in the above-referenced federal litigation these plaintiffs have brought, they would have received no "wraparound" payments from the Commonwealth. As such, their Section 330

grants would bear the entire cost of their services to Medicaid beneficiaries. Their grants were and are too small to bear that burden. At least Loiza would have been out of business by now but for the payments its litigation has yielded.

59.    Because the other FQHCs in Puerto Rico have not (yet) obtained wraparound funds in their federal lawsuits, except for some token payments, they, too, are in the same or similar positions to these plaintiffs would be in without such payment orders.

60.    At least ten of Puerto Rico's current FQHCs (all Section 330-grantees) are effectively insolvent as a result of the way Puerto Rico's Medicaid program allows HMOs to extract risk contracts and that program's failure to pay wraparound. The remainder of the FQHCs are on their way to the same plight. HRSA officials are fully aware of this and have repeatedly expressed their concerns about the situation to CMS officials.

## HARM TO CLASS

61.    As a result of the unlawful actions of Puerto Rico's Medicaid program and HHS' failure to carry out responsibilities described in this Complaint, that program's Medicaid beneficiaries are: (A) already cut off from FQHC services to which they are entitled and those with FQHC services still available face the prospect of diminishing access to those FQHC services; (B) forced to sign up with HMOs for Medicaid services that do not possess lawful contracts and fail to meet numerous statutory conditions designed (among other things) to ensure protection of such beneficiaries; and (C) being (or with declining availability of FQHC services, soon will be) cut off from FQHC services, and forced to accept care from doctor groups with HMO contracts under which those groups act as "gatekeepers" with respect to the care these beneficiaries may receive (and still be covered by Medicaid) from specialists, hospitals and other essential care providers and, in doing so, restrict referrals for such other care even where those

beneficiaries' medical needs warrant a referral.  Regarding members of the Class who are not in

Medicaid, their medical needs in fact and as already determined by HRSA -- in designating the

area they reside in as medically underserved -- are not likely to be met without the presence of

the FQHC from which they receive services.  The HMO contracts FQHCs are forced to accept,

which divert grant funds away from services to such patients, reduce care available to those class

members.  As FQHCs dedicate more and more funds to Medicaid losses or fall by the wayside as

a result of the continued adverse impact of the HMO contracts they receive, the class will have

increasingly less access to FQHC services.

### VIOLATIONS OF CRIMINAL AND CIVIL PENALTY LAW

62.    The Puerto Rico HMO contracts described above require doctor groups and

FQHCs to accept unlawfully high risk.  In so doing, they (at least) violate the Medicare-

Medicaid Anti-Kickback statute at 42 U.S.C. § 1320a-7b(b) as well as the civil monetary

provisions of 42 U.S.C. § 1320a-7a(a)(7) and criminal provisions aimed at preventing extortion

under 18 U.S.C. § 1951(a) and (b).  Regarding certain Municipalities of Puerto Rico, HMOs also

limit the doctor groups/FQHCs with which they contract for gatekeeper and other services to

those who/which have been selected by the Municipality to occupy a Municipal health facility.

In at least one such case -- the Municipality of San Juan -- the HMO automatically subtracts a set

amount per member/per month from the monthly capitation payment it makes (or is supposed to

make) to the doctor group/FQHC occupying the facility and pays that amount directly to the

Municipality.  The "arrangement" violates (at least) the same provisions of federal criminal and

civil penalty laws.  HHS is aware of the foregoing.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court enter an order:

63.    Declaring that HHS' payment of further monies under the Medicaid statute for Medicaid managed care contracts with the HMOs in Puerto Rico is unlawful and will remain unlawful until and unless those contracts and the HMOs or other entities receiving them fully conform to all of the relevant requirements of the Medicaid statute and regulations.

64.    Enjoining HHS from making any further payments in support of these HMOs unlawful contracts until and unless HHS is able to demonstrate to the Court full compliance with all relevant statutory and regulatory conditions.

65.    Declaring that assigning Medicaid beneficiaries to an HMO with such an unlawful contract is itself unlawful.

66.    Ordering HHS to inform both Puerto Rico and all Puerto Rico Medicaid beneficiaries that those beneficiaries no longer are required to receive their Medicaid benefits through such HMOs.

67.    Ordering HHS, through HRSA, not to take adverse action of any kind against Section 330 grantees in Puerto Rico that is in any way related to an unlawful Medicaid HMO contract.

68.    Directing the payment of attorneys' fees and costs to plaintiffs for the bringing of this action and for monitoring defendants' actions under any Orders of this Court.

69.    Retaining jurisdiction over this action to ensure that defendant fulfills all of the requirements of any of this Court's Orders.

70.    Providing such other and further relief as the Court may deem just and proper, or appropriate in the circumstances.

Respectfully submitted,

Date: June 8, 2007

James L. Feldesman
DC Bar No. 23796
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C.  20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorney for Plaintiffs*

*C 07 1034 RMC*

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Concilio de Salud Integral de Loiza, Inc., et al.  *9779* *88888* | U.S. Department of Health and Human Services, et al. |

| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF |
|---|---|

| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>James L. Feldesman, Esquire<br>Feldesman Tucker Leifer Fidell LLP<br>2001 L Street, NW, Second Floor<br>Washington, DC 20036<br>(202) 466-8960 | Case: 1:07-cv-01034<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 6/8/2007<br>Description: Admn. Agency Review |
|---|---|

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

⊙ 2 U.S. Government Defendant

O 3 Federal Question
(U.S. Government Not a Party)

O 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | ⊙ 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | ⊙ 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**⊙ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

**O D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**O E. General Civil (Other)** OR **O F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
5 U.S.C. § 702. Declaratory and injunctive relief to require defendants to address violations of Medicaid program.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23    **DEMAND $** _____ Check YES only if demanded in complaint    **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**  N.A.    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE   June 8, 2007    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.