# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al*. | ) | |
| | ) | |
| *Individual Plaintiffs*, | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07-cv-1034 (RMC)** |
| | ) | |
| U.S. Department of Health and Human Services, | ) ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| Michael Leavitt, Secretary U.S. Department of Health and Human Services | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 31(h), plaintiffs' Concilio de Salud de Loiza, Inc. and Junta del Centro de Salud Comunal Dr. Jose S. Belaval, Inc. hereby submit this Motion for Partial Summary Judgment. This motion is styled as partial because it seeks relief only with respect to the plaintiffs and the communities served by the plaintiff health centers. A memorandum in support of this motion, a statement of material facts as to which there is no genuine dispute, and a proposed order are submitted herewith.

Pursuant to Local Rule 7(f), plaintiffs respectfully request an oral hearing as to this motion.

Respectfully submitted,

Date: September 24, 2007          /s/ Kathy S. Ghiladi
                                 James L. Feldesman ( D.C. Bar No. 23796)
                                 jfeldesman@ftlf.com
                                 Kathy S. Ghiladi (D.C. Bar No. 435484)
                                 kghiladi@ftlf.com
                                 Robert A. Graham (D.C. Bar No. 450345)
                                 rgraham@ftlf.com


                                 Feldesman Tucker Leifer Fidell LLP
                                 2001 L Street, N.W., Second Floor
                                 Washington, D.C.  20036
                                 (202) 466-8960 (telephone)
                                 (202) 293-8103 (facsimile)

                                 *Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al.* | ) | |
| | ) | |
| *Individual Plaintiffs*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:07-cv-1034 (RMC)** |
| | ) | |
| U.S. Department of Health and Human Services, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael Leavitt, Secretary | ) | |
| U.S. Department of Health and Human Services | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AND**
**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

The arguments in defendants'[1] dismissal motion and that motion's hand-wringing over what would happen to Medicaid beneficiaries in Puerto Rico were we to prevail in this case begin and end with a misconception of the law this case involves. In *this* case (unlike those HHS cites), the law on which we principally rely[2] states that HHS "shall" make "no payment". . .to a State with respect to expenditures incurred by [that State] for payment" to a managed care entity under a Medicaid risk contract "unless" HHS has given its "prior approval" to that contract in

---

[1] Defendants are referred to throughout as "HHS".

[2] 42 U.S.C. § 1396b(m)(2)(A), a provision of the Medicaid statute, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*

accordance with certain statutorily enumerated criteria.  We allege that HHS failed to review and approve such contracts with the plaintiffs (and other similar entities) as the law requires.[3]

When last we looked, Article I, Section 9, of the U.S. Constitution made expenditures of funds from the Treasury contingent on the laws passed by Congress.  No prosecutorial or other brand of discretion allows HHS to ignore or get around this Constitutional limitation on its authority.  Congress has limited HHS authority to spend Medicaid funds on managed care contracts.  HHS has unconstitutionally exceeded those limits.

If HHS does what it must under federal law and refuses to approve or make payments for managed care contracts, and a managed care system, that violates what the law and regulations require, Puerto Rico either will make the changes needed to receive the required statutory approval and continue to use managed care entities in its Medicaid program or will not make those changes, in which case its Medicaid program will be operated on the traditional fee for medical services basis that the Medicaid program began with and most States still utilize. Following the law will not cause the sky to fall.

## STATEMENT OF FACTS

## THE PARTIES

### Federally-Qualified Health Center Plaintiffs

FQHC plaintiffs are nonprofit Commonwealth of Puerto Rico corporations designated under the Medicaid statute as "Federally-qualified health centers".  Both are located within Puerto Rico.  Each such FQHC is a "health center" that receives a grant under Section 330 of the

---

[3] The motion advanced herein is styled as one for "partial" summary judgment.  Our reason for referring to it as "partial" is because we ask the Court to grant relief only to the two health center plaintiffs and their patients and communities, not to all patients and communities served by similar centers.

Public Health Service Act, 42 U.S.C. § 254b.  Plaintiff Concilio de Salud Integral de Loiza, Inc. ("Loiza") operates a Section 330 funded health center that provides services principally within the poor, medically underserved community of Loiza, on the northeast coast of Puerto Rico. Plaintiff Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval") operates in San Juan, where it is headquartered, and on the Isle of Culebra.

## Background

The source of the problems that give rise to this action is the Commonwealth of Puerto Rico's Medicaid managed care program, known as "*Reforma*."  *Reforma* was initiated in and around 1993 and is similar to several other Statewide Medicaid managed care initiatives launched in the 1990s in which the States contracted with managed care entities to provide the services of doctors, hospitals, *etc.* to Medicaid beneficiaries.  Although HHS and its division that is responsible for the Medicaid program -- the Centers for Medicare and Medicaid Services ("CMS")[4] -- will be loathe to admit it, those initiatives (including Puerto Rico) were politically motivated.  Provisions of law this case rests on as well as others that apply to those initiatives were, at the very best, loosely followed or enforced.

CMS' less than diligent efforts in enforcing the Medicaid statute's requirements against States involved in those initiatives, although lamentable, was directly attributable to the history of and rationale behind those initiatives -- the Medicaid statute at the time was inhospitable to managed care and without waivers of otherwise applicable legal requirements (as well as the

---

[4] CMS was previously named the Health Care Financing Administration ("HCFA").  All references herein will be to the current title of this HHS division.

blind eye and deaf ear turned by CMS toward those that were not waived), the managed care initiatives could not have been launched.[5]

In 1997, the legal situation that occasioned the managed care initiatives and less than diligent performance of oversight changed.  Congress passed a new section of the Medicaid statute[6] (and conforming amendments elsewhere) authorizing all States to use managed care by assigning all beneficiaries to a managed care entity in order to receive Medicaid services.  42 U.S.C. § 1396u-2(a)(1)(A)(i).  As explained below, the new section (among other things) incorporated the prior approval requirements of 42 U.S.C. § 1396b(m) which also were amended by the same law to mesh with the new section.  What is notable is the new section's (§ 1396u-2's) exact phraseology in authorizing managed care -- "may require an individual who is eligible for medical assistance under [Medicaid]. . .to enroll with a managed care entity as a condition of receiving such assistance".  (Section 1396u-2(a)(1)(A)(i)).  This language could have no other meaning than that the conditions the new section imposed or incorporated were for the protection of Medicaid beneficiaries.

## Health Centers

Health centers eligible to receive grant funds under Section 330 of the Public Health Service ("PHS") Act must have been determined by appropriate officials of HHS to:  (1) be located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) be community-based --a majority of its Board of Directors must be patients of the center, "who, as a group, represent the individuals being served by the center . . . "

---

[5] Puerto Rico's initiative received no waivers but certainly got the blind eye/deaf ear treatment. Whether waivers were nonetheless required is debatable, but no longer relevant.

[6] The section, 1932 of the Social Security Act, 42 U.S.C. § 1396u-2, actually replaced a section having nothing to do with the subject matter of the 1997 provision.

(42 U.S.C. § 254b(j)(3)(H)(i))[7]; (3) provide an especially comprehensive range of primary health services to its patients through staffs of physicians and other health care providers (rarely, if ever, available from an ordinary physician's group) (42 U.S.C. §§ 254b(a)(1)(A) and 254b(j)(3)(A)); (4) provide health care services to Medicaid recipients (42 U.S.C. § 254b(j)(3)(E); and (5) serve all residents of their communities, regardless of any resident's/patient's ability to pay.  42 U.S.C. §§ 254b(a)(1) and 254b(j)(3)(G)(i).  FQHC plaintiffs are current recipients of Section 330 grants and, as such, have been found by those officials to meet the foregoing requirements.

## THE MEDICAID PROGRAM IN GENERAL

The Medicaid program began under law enacted in 1965.  Activities under the program are carried out by States. (The Medicaid statute's definition of "State" includes the Commonwealth of Puerto Rico.  42 U.S.C. § 1301(a)(1)).  A State's Medicaid program, by engaging the services of hospitals, clinics, physicians, *etc.*, makes health care available to poor women, children and certain other individuals eligible to become a program beneficiary. Participation in the Medicaid program by any State is voluntary.  However, once such an election is made, the State must comply with all federal requirements.  Puerto Rico has made an election to participate in the Medicaid program.

Any State that has elected to participate in the Medicaid program must submit and have approved a State Medicaid plan, which contains provisions and requirements regarding groups of individuals covered, eligibility conditions, medical care and services, payment and compliance with program requirements.  *See, generally*, 42 U.S.C. §§ 1396a(a)(1)-(65) and 42 C.F.R. §§ 430 *et seq*.  A State plan also "must describe the policy and methods to be used in setting payment rates for each type of service included in the State's Medicaid program."  42 C.F.R. § 447.201(b).

---

[7] Health center boards, therefore, represent not only current patients of the health centers but the entire health center community.

## ESTABLISHMENT OF FQHCS AND
## FQHC SERVICES IN THE MEDICAID PROGRAM

The Medicaid statute requires certain services to be provided by a State as a condition of its participation in the Medicaid program.  42 U.S.C. § 1396a(a)(10)(A).  (States may opt for certain additional services.)  The Omnibus Budget Reconciliation Act ("OBRA") of 1989, Pub. L. No. 101-239, created a new kind of entity labeled  a "Federally-qualified health center" or "FQHC", and made "Federally-qualified health center services . . . and any other ambulatory services offered by a federally qualified health center" one more "mandatory" Medicaid service to which all Medicaid beneficiaries are entitled.  42 U.S.C. §§ 1396d(a)(2)(C), 1396a(a)(10)(A), and 1396d(l)(2)(A).  Health centers that are or were recipients of Section 330 PHS grants automatically become Medicaid FQHCs.  (A few other entities that meet the requirements for receiving a Section 330 PHS Act grant (so-called FQHC "look-alikes") also qualify as FQHCs. 42 U.S.C. § 1396d(l)(2)(B).

## FQHC MEDICAID PAYMENT REQUIREMENTS

### Reasonable Costs

### Fee for Service

In creating FQHC status within the Medicaid program in 1989 and continuing FQHC legislation thereafter, Congress imposed special requirements for the payments States must make to FQHCs.  OBRA 1989 required reimbursement of FQHCs at "100 percent of [each FQHC's] costs which are reasonable . . ."  42 U.S.C. § 1396a(a)(13)(E), later reclassified at 42 U.S.C. § 1396a(a)(13)(C).  Through December 31, 2000, the Medicaid statute continued to require States to pay reasonable costs to FQHCs.  Congress' purpose in requiring special FQHC payment provisions under the Medicaid program was stated in legislative history:

> The Subcommittee on Health and the Environment heard testimony that, on average, Medicaid payment levels to Federally funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients. The role of [health centers] . . . is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay. *To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is comprising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.*

> \* \* \*

> To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing these services. (Emphasis added.)

H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.

### **Managed Care**

Medicaid's special payment for FQHCs became more difficult to implement when a number of States adopted "managed care" for their Medicaid programs. In Medicaid managed care, the State Medicaid agency (or a designee of that agency, as is the case in Puerto Rico) contracts with managed care entities. (In Puerto Rico those entities are all health maintenance organizations, or "HMOs".) These entities arrange for the delivery of health care services to Medicaid patients by, in the case of Puerto Rico's HMOs, contracting with doctors, other health professionals and various entities such as hospitals and laboratories.[8] Each such entity is paid a fixed monthly sum ("capitation") for each Medicaid beneficiary assigned to the entity (an "enrollee"). With that fixed sum or capitation, the entity is responsible for providing covered (by

---

[8] A few such entities employ all the doctors and own most of the facilities its enrollees use.

Medicaid) care to each such enrollee.  In short, the entity assumes the insurance risk that its premiums, or, in Medicaid, its capitations, may produce less revenue than its costs for paying and managing its insureds' claims.

The problem managed care created where FQHC payments are concerned is this:  the entities replace the State Medicaid agency as the one that contracts with and pays service providers, including FQHCs, for Medicaid services, and since these entities, all private businesses, expect to pay FQHCs a "market rate," not a special rate uniquely created by federal Medicaid law, those entities, if left to their own devices, undoubtedly would pay FQHCs amounts they pay others for the same service.  As a result, the cost of the comprehensive services FQHCs uniquely provide would likely not be fully covered.  And, the further result would likely be that the subsidy to the Medicaid program with grant funds Congress sought to end with its FQHC legislation would continue.

To deal with the managed care issue, Congress initially amended the Medicaid statute to require States to pay HMOs "something extra" to enable the entities, in turn, to pay FQHCs on the basis of reasonable costs and not lose money in doing so.  Although these requirements worked "on paper," as a practical matter, they were ineffective.  The entities tended to keep all or a part of that something extra for themselves and pay FQHCs what they paid everyone else.  Unsurprisingly, those payments were invariably less than what the Medicaid statute required.  Less than vigilant State Medicaid agencies (and CMS) did nothing about it.

In the Balanced Budget Act ("BBA") of 1997, section 4712, Congress sought to get around the entities' failure to transfer the extra funds to FQHCs and the absence of enforcement by State and federal governments.  The 1997 law removed the entities' financial responsibility to pay FQHCs a special rate and instead required them to pay FQHCs "not less than the level and

amount . . . the [HMO] would make for the services if the services were furnished by [another provider than the] FQHC . . ."   42 U.S.C. § 1396b(m)(2)(A)(ix).

### Medicaid FQHC Prospective Payment System ("PPS")

In December 2000, Congress changed the FQHCs' special payment under the Medicaid statute.  H.R. 5661, section 702, as enacted in Pub. L. No. 106-554 (Dec. 21, 2000), now codified at 42 U.S.C. §1396a(bb).  Under the 2000 law, instead of paying FQHCs reasonable costs, States calculated each FQHC's average 100 percent reasonable costs for fiscal years 1999 and 2000 and converted that result into a per-visit rate.  On January 1, 2001 and afterward, States were required to pay FQHCs that per-visit rate.  The law also required the per-visit rate to be adjusted each year by the percentage increase in the prior fiscal year's Medicare Economic Index ("MEI").  The 2000 law retained State responsibility for making supplemental or wraparound payments to FQHCs.  Thus, under current law, whenever FQHC payments from managed care entities (in managed care States) are less than would be due under the particular FQHC's per-visit rate, the State has to wrap-around the difference.  42 U.S.C. §1396a(bb)(5).  The managed care entity payment requirement to FQHCs remained intact under that 2000 law.

### MEDICAID MANAGED CARE AFTER 1997 AMENDMENTS

The previously mentioned 1997 Medicaid amendments made numerous changes in addition to those affecting FQHCs.  One of those amendments, previously described, replaced an old section of the Medicaid statute with a new section, 42 U.S.C. § 1396u-2 whose purpose was to provide the States an option to utilize managed care.  Section 1396u-2(a)(1)'s focus was on a State's ability to require its Medicaid beneficiaries "to enroll with a managed care entity" to receive Medicaid benefits, § 1396u-2(a)(1)(A)(i).  With this grant of authority to compel beneficiaries to sign up with an HMO (or similar entity) came certain conditions.  The

"applicable requirements in section 1396u-2 and section 1396b(m)" had to be met by "the

[managed care] entity and the contract with the State" as well as all § 1396u-2 "requirements

described in succeeding paragraphs of this subsection . . ."  42 U.S.C. § 1396u-2(a)(1)(A)(i)(I)

and (II).

　　　　As a complement, the 1997 law also amended 42 U.S.C. § 1396b(m)(2)(A) by adding a

new condition (xii) for CMS' prior approval of a managed care contract.  Under that new

condition, the managed care contract to be approved by CMS as well as "the [managed care]

entity [must] comp[ly] with the applicable requirements of section 1396u-2."  Section 1396u-

2(a)(1)(A)(i)(I) returned the favor by requiring that the managed care "entity and the contract

with the State meet [not just] the applicable requirements of [§ 1396u-2] [but also] section

1396b(m). . ."

　　　　Accordingly, for Puerto Rico (or any other State), if either the Medicaid contract with the

HMO or the HMO's compliance with § 1396u-2's or § 1396b(m)'s requirements is other than

what those sections or implementing regulations call for, HHS can neither approve the contract

nor make a payment that would be used for the contract, and Puerto Rico cannot force Medicaid

beneficiaries to enroll with that HMO to receive Medicaid services.

### ARGUMENT:  LEGAL VIOLATIONS

A.　　**Standards of Review**

　　　　1.　　**Motion to Dismiss**

　　　　For purposes of ruling on a motion to dismiss, this Court (and any reviewing court) must

accept as true all material allegations of the complaint, and must construe the complaint in favor

of the compelling party.  *Warth v. Seldin*, 422 U.S. 490, 501, 45 L. Ed. 2d 343, 95 S. Ct. 2197

(1975).  Dismissal of a complaint is appropriate only if it appears beyond doubt that the plaintiff

can prove no set of facts in support of the plaintiff's claims. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)).  As long as plaintiffs' Complaint is fairly read (not misconstrued), it easily meets the foregoing test and, moreover, easily counters HHS' other arguments related to plaintiffs' suitability to bring this action.

    2.    **Motion for Summary Judgment**

    Summary judgment is to be granted where the parties' submissions reveal "there is no genuine issue as to any material fact," and the moving party is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  The initial inquiry that must be made is whether there exists "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  Once the moving party has met its burden of establishing the absence of a genuine issue of material fact, "its opposition must do more than simply show that there is some metaphysical doubt as to material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

    As demonstrated below, under the foregoing standards, this case may not be dismissed and is ripe for partial summary judgment as to the two health center plaintiffs and the communities they serve.  Before discussing why, we turn to certain of HHS' arguments concerning why plaintiffs may not bring this case at all.

B.    __Waiver of Sovereign Immunity Under the APA__

Defendants assert (at 13) that the Complaint should be dismissed because "it fails to state any source of law that waives the Secretary's sovereign immunity." The Complaint, however refers (at ¶ 11) to the APA and asserts (at ¶ 10) that the Court has federal question jurisdiction under 28 U.S.C. § 1331. *See also* Compl. at ¶ 51 (citing to APA's prohibition against agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law). As explained throughout the Complaint, the primary federal question is the lawfulness of HHS' actions under the provisions of the Medicaid Act in connection with HHS' review of (or lack thereof), approval of, and payments relative to the *Reforma* Medicaid managed care program. As set forth in the Complaint, the main statutory provisions at issue in this case are contained in 42 U.S.C. § 1396b(m)(2)(A) and 42 U.S.C. § 1396u-2(a)(1).

The APA is not just a waiver of sovereign immunity but also embodies a "basic presumption of judicial review." *Lincoln v. Vigil*, 508 U.S.182, 113 S. Ct. 2024, 2030, 124 L. Ed. 2d 101 (1993)(quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 87 S. Ct. 1507, 1511, 18 L. Ed. 2d 681 (1967)). Absent an explicit statutory bar, judicial review of agency action is available except 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Webster v. Doe*, 486 U.S. 592, 599, 108 C. Ct 2047, 2051, 100 L. Ed 2d 632 (1988) and 'a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S. Ct. 1649, 1655, 84 L. Ed. 2d 714 (1985).

Here, the statutory provisions relating to Medicaid managed care that are at issue in this case and are clearly intended for plaintiffs' and plaintiffs' patients and communities' benefit - - as

well as specific findings made by Congress relating to the importance of full and correct

Medicaid payments to FQHCs (and supplemented by Anti-Deficiency Act provisions) - - supply

the meaningful standards for this Court to apply.   The APA also provides ample authority for the

remedies plaintiffs seek.  It authorizes the "reviewing court [to] compel agency action unlawfully

withheld. . .and/or hold unlawful and set aside [agency] action, findings, and conclusions" it

determines to have violated the APA's requirements.  5 U.S.C. § 706(1) and (2).

C.    **Plaintiffs' Standing and the Nature of Their Injuries**

In order to assess plaintiffs' standing to seek redress in this case, it must be understood

that the focus of this case is not on the payments that have been at issue in the *Rio Grande* case

(Defs. Motion at 17), nor is this a case in which plaintiffs seek an "enforcement action" or

"compliance hearing" by HHS as to the Commonwealth or its *Reforma* HMOs pursuant to 42

U.S.C. § 1396c (Defs. Motion at 24).   What the Complaint and evidence accompanying this

filing shows relative to standing, injuries, and relief requested follows.

1.    **Commonwealth and MCOs' Failures to Make Full FQHC Payment**

a.    **Unlawful HMO Payment**

In implementing the Reforma program, Puerto Rico's Department of Health divided the

Commonwealth into ten regions.  For each of these regions, the Department of Health awarded a

single HMO the exclusive territory.  Ex A, July 24, 2002 Final Kelleher Report at 1-2, attached

to November 15, 2002 Letter of HRSA Associate Administrator.  The HMOs do not pay FQHCs

as they are required to do under the Medicaid statute and in fact pay FQHCs, at best, little or

nothing and, at worst, charge the FQHCs for the FQHCs' provision of Medicaid services instead

of paying them.  Compl. at ¶ 44; Ex. A, Kelleher Report at 1-2.  Plaintiffs know and can prove

this not only from that Report or their direct, first-hand experience, but through a Director of one

of the *Reforma* HMOs who provided a Declaration on payments his HMO made in connection

with the *Rio Grande* litigation.  His Declaration is especially significant because at the time it

was introduced into the record of that case, by a motion from the Puerto Rico Health Department

(the defendant), HHS, was a party in that case, having been interpled therein by FQHC plaintiffs

(here and there).[9]  In that Declaration, the Director describes the contract his HMO utilizes under

*Reforma* for Loiza (and Belaval):

> 2.    Under the terms of the contract, Loiza is paid for the
> assumption of this health services financial risk in the form of a
> monthly per beneficiary fee - - denominated as a "capitation
> payment."  The capitation amount reflects the contractually agreed
> per beneficiary payment multiplied by the number of IPA
> Beneficiaries.
>
> 3.    The contract providers that the capitation payment is to be
> allocated among a Medical Services Fund and an Institutional
> Health Services Fund and that claims submitted by IPA and non-
> IPA (specialist) physicians and hospitals, and other providers for
> services rendered to the IPA Beneficiaries are to be charged against
> these funds prior to the final distribution of the remaining funds.
> The contract also provides that, in the calculation of the surplus
> and deficit of the Medical Services Fund, an adjustment is to be
> made for claims which are incurred but not yet reported ("IBNR
> adjustment").
>
> 4.    Under the contract, after the claims are paid and the IBNR
> adjustment is made, surplus in the Medical Services Fund is
> retained by Loiza and surplus in the Institutional Health Services
> fund retained [by] Loiza.
>
> 5.    Under the contract, before final distribution of sums from
> the Medical Services Fund, any surplus is to be used to off-set any
> deficit in the Institutional Health Services Fund. Likewise, the
> contract provides that, before distribution of surplus in the
> Institutional Health Services Fund, such surplus shall be used to
> off-set any financial responsibility for deficits in the Institutional
> Health Services Fund to the amounts available as surplus in the
> Medical Health Service Fund.

---

[9] HHS was later dismissed.

6.    During the time period in question (January 2004 – June 2005) the capitation amounts paid under the contract to accounts maintained to effect these arrangements have, in the aggregate been $6,764,181.70 ($4,001,947.04 to the Medical Services Fund and $2,762,234.66 to the Institutional Health Services Fund). However, during this period the amounts charged under the contract against the Medical Services Fund and Institutional Health Services Fund have, in the aggregate, exceeded the amounts available in such funds. Thus, under the contract's terms, Loiza is currently in debt to MCO-HMO for deficits in the Medical Services Fund during that period.

Ex. B, November 22, 2005 Declaration of Hector L. Cruz Batista at ¶¶ 2-6; Compl. ¶ 44(B).

The absolutely incredible meaning of Mr. Cruz's Declaration bears emphasis.  What he is attesting to is that even though Loiza has been providing Medicaid services to enrollees of MCS, it is MCS' position that Loiza owes it money under its contract with MCS for Loiza's services. Mr. Cruz's Declaration could just as well have stated that MCS engaged counsel to represent it in a lawsuit and that at the conclusion of counsel's entirely satisfactory work on its behalf, counsel owed MCS, the client, money, not *vice versa*.

Our reason for using the term "absolutely incredible" is that what Mr. Cruz describes is a complete reversal of the fundamental economic notion that one who performs satisfactory services for another receives compensation or its equivalent for so doing.  As we have alleged in our Complaint, MCS' upside-down payments to plaintiffs are the same they make to private doctor groups for similar services.  Compl. at ¶ 44(C).  *See* SF 5, 7-8.

The reason for the upside-down result is that the payments to plaintiffs and doctor groups are made on a risk basis that imposes a level of risk for other care that the FQHC or doctor group itself provides.  Compl. at ¶44 (D); Ex A, Kelleher Report at 8-9.  In Puerto Rico, once the FQHCs or doctor groups designate a patient for a referral (or the patient goes to an emergency

17

room and needs further care), the HMO takes over and independently pays the other providers or institutions who/which provide the other care (including the emergency room).

CMS and the Puerto Rico Medicaid agency have been aware of the legal and practical problems the HMO contracts with FQHCs create for years (*see e.g*., Ex A, Kelleher Report at 9-10) and have failed to enforce the requirements being violated despite the harm to beneficiaries and FQHCs that result from those violations. Indeed, on November 15, 2002, the Associate Administrator of HHS' Health Services and Resources Administration("HRSA"), the official directly in charge of the Section 330 PHS Act grant programs, advised all Puerto Rico health centers by letter that:

> We are . . . concerned that the [PHS Act Section] 330 grant dollars may be paying for services to the health care reform population that are beyond the scope of services for which the funds are intended. These funds are primarily intended for primary care services. Therefore, we are encouraging all health centers in Puerto Rico, with the assistance of the Primary Care Association (PCA) and the Puerto Rico Sub-Field Office, to begin discussions to renegotiate the current contracts with the HMOs and regulatory authorities. These discussions should focus on the elimination of financial risk for services over which the health center and its providers have no financial and utilization control.

Ex A, November 15, 2002 Associate Administrator letter at 1. His letter further stated that:

> . . . the health centers should consider not renewing any future contracts since the HMOs have structured a program that essentially transfers financial risk for most health center costs to the federally-funded health centers in Puerto Rico. In order to implement this contract termination if negotiations are unsuccessful, each center should send to each managed care company with which they contract, a letter of intent to terminate the contract. The letter should be sent in accordance with the termination clause of each contract. Most contracts require a notice of termination, ranging from 30 to 90 days prior to the renewal date of the contract.

*Id.* at 2.  The Associate Administrator's assumption that the HMOs could or would renegotiate the contracts proved to be false.  The HMOs refused to renegotiate their FQHC contracts,[10] and no wonder.  As Mr. Cruz also states in his Declaration, the Commonwealth's agency responsible for the administration of the Medicaid managed care contracts ("ASES" which is the Spanish acronym for the Puerto Rico Health Insurance Administration) reviewed and approved the terms of the contract between MCS-HMO and Loiza.  SF ¶ 6.

Plaintiffs' contracts with the Medicaid HMO, MCS, are obviously violative of federal law.  The use of Section 330 funds to pay for the obligations that should rightfully be paid for by the State Medicaid program was in and of itself banned by Congress when, in 1989, it amended the Medicaid statute for the specific purpose of ensuring against such augmentation of Medicaid funding.  Congress' requirement for reimbursement of FQHC reasonable costs was predicated on its finding that access to medical care is compromised when Medicaid is not paying its "fair share":

> To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is comprising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.

H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.[11]

---

[10] SF ¶ 11.

[11] Congress's specific concern that the PHS grant program should not wind up subsidizing Medicaid is but one example of a concern that is commonly expressed in federal appropriations law.  When Congress enacts grant legislation and provides appropriations to fund the grants, it is exercising the spending power conferred upon it by the Constitution.  Executive agencies are prohibited from augmenting those appropriations from other sources without specific statutory authority.  *See* 31 U.S.C. § 1301(a) (restricting use of appropriated funds to their intended purposes); *see also* HHS' duties under the U.S. Constitution and the Antideficiency Act, 42 U.S.C. § 1341.  "When Congress makes an appropriation, it is telling the agency that it cannot operate beyond the level it can finance under its appropriation[, and to] permit an agency to operate beyond this level with funds derived from some other source without specific

The MCS contract with plaintiffs also clearly violates 42 U.S.C. § 1396b(m)(2)(A)(ix), which requires HMOs in MCS' position to pay FQHCs at "level[s] and amount[s]. . .the entity would make for the [FQHC] *services*, if the *services* were furnished by" another party than an FQHC.  (Emphasis added.)  The payment contemplated by this language is a direct payment for services provided and certainly not a risk-based deal where whatever that may be left over from payments MCS makes to everyone else than the FQHC is what the FQHC gets for its services and if the payments to everyone else exceed the capitation, the FQHC owes MCS money.

### b.    Inadequate Payments Despite Related Litigation

The Puerto Rico Medicaid program has never paid FQHCs the special rate required by the Medicaid statute.  Neither the program nor its HMOs has paid FQHCs the sums to which they are entitled from the court-ordered payments to the named FQHC plaintiffs here in a separate federal lawsuit (*Rio Grande Community Health Center, Inc., et al. v. Rosa Perez-Perdomo, Secretary, Department of Health*, case No. 03-1640 (District Court of the District of Puerto Rico)) and appeals thereof (*Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005); *Dr. José S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33 (1st Cir. 2006) and *Dr. Jose S. Belaval, Inc., et al. v. Hon. Rosa Perez-Perdomo, et al.*, _____ F.3d _____ 2007, WL 145931 (1st Cir. May 18, 2007)) have fallen well short of what the Medicaid statute commands.

---

congressional sanction would amount to a usurpation of the congressional prerogative." Government Accountability Office, *Principles of Federal Appropriations Law*, Vol. II at 6-103. "Another way of stating the augmentation rule is that when Congress appropriates funds for an activity, the appropriation represents a limitation Congress has fixed for that activity, and all expenditures for that activity must come from that appropriation absent express authority to the contrary."  *Id.* at 6-155.

For our purposes here, we refer to SF ¶¶ 12-13, which is based on a Declaration of a Certified Public Accountant familiar with the Puerto Rico FQHCs and the *Reforma* program. We also submit relevant excerpts from the *Rio Grande* docket demonstrating that neither plaintiff is currently receiving any payment from the program despite District Court final orders that it do so. In addition, the District Court's final payment orders, on their face, provide plaintiffs with less than what Medicaid law requires.[12]  Significantly, those orders only direct the Department of Health to pay the FQHCs, and do not remedy, or attempt to remedy, the failure of the HMO to pay the FQHCs what the law requires. In the case of plaintiff Loiza, the Court's orders do nothing to deal with Loiza's "debt" to MCS which the Cruz Declaration verifies. The District Court's orders are pegged to whatever the HMO actually pays the FQHCs. If it pays them less than zero, Loiza's situation, the orders do not compensate for the loss.

**c.  Listing of Violations**

Following is a listing of the violations alleged in our Complaint and supported by evidence submitted herewith.

1.  Section 1396b(m)(2)(A)(iii) --

Statutory Requirement -- The HMO contracts must receive HHS' prior approval and the rates paid to HMOs must be "actuarially sound".

Allegations -- The rates being paid the HMOs are not actuarially sound and the requisite actuarial findings and certifications required by regulation, at 42 C.F.R. § 438.6, are lacking.

Complaint -- ¶ 46(A).

---

[12] If HHS seeks to show that plaintiffs and plaintiffs' patients are not currently being harmed, it should be required, as the agency that oversees the Medicaid program, to explain how the Court's orders (if followed) would comport with what the Medicaid statute requires.

<u>Evidence</u> -- the exhibit supporting SF ¶ 14, which is the above-mentioned interrogatory response from the Puerto Rico Department of Health in the *Rio Grande* case admitting that there was no such prior approval.

      2.      <u>Section 1396b(m)(2)(A)(vi)</u> --

<u>Statutory requirement</u> -- beneficiaries must have certain disenrollment rights.

<u>Allegation</u> -- Those rights are nonexistent because beneficiaries have no alternative HMO to select and must enroll with an HMO to receive Medicaid services.

<u>Complaint reference</u> -- ¶ 46(B).

<u>Evidence</u> -- Kelleher Report (Ex. A) at 1-2; SF ¶ 3.

      3.      <u>Section 1396b(m)(2)(A)(vii)</u> --

<u>Statutory requirement</u> -- in *urgent care* situations where beneficiaries have a medical need -- *i.e.*, where care is "immediately required due to an unforeseen illness, injury or condition" -- beneficiaries have the right to go out of network for the service they need and either the State or HMO must pay the service provider (including, where applicable, the FQHC). (The United States Court of Appeals for the Fourth Circuit recently held that this right must be addressed in the contract between the State and the HMO. *Three Lower Counties Community Health Services Inc. v. Maryland*, No. 06-1552 (4th Cir. 8/24/07)).

<u>Allegation</u> -- No such right exists in Puerto Rico.

<u>Complaint reference</u> -- ¶ 46(C).

<u>Evidence</u> -- SF ¶ 16.

      4.      <u>Section 1396b(m)(2)(A)(ix)</u> --

<u>Statutory requirement</u> -- the State-HMO contract must require HMOs to pay FQHCs "not less than the level and amount of payment which the [HMO] would make ... if the services [provided] were furnished by a [non-FQHC] . . ."

<u>Allegations</u> -- The contract does not fulfill this requirement. The HMO has forced the FQHC plaintiffs to take risk contracts under which they either receive close to nothing for their services to Medicaid patients (Belaval) or go further into debt to the HMO in so doing (Loiza). HHS was specifically placed on notice of the financial terms of the HMO contracts with FQHC plaintiffs in the course of the *Rio Grande* litigation.

<u>Complaint references</u> -- ¶ 46(D).

<u>Evidence</u> -- Discussion above and Cruz Declaration (Ex. B), Kelleher Rpt. (Ex. A) and HRSA letter to FQHCs (Ex. A).

5.    <u>Section 1396b(m)(2)(A)(x)</u> --

<u>Statutory requirement</u> -- risk contracts with physicians or physician groups must limit the risk to ensure (among other things) that the physician/group will not fail to treat or refer a patient because of the risk imposed.

<u>Complaint Allegation</u> -- the risk imposed by the HMOs violates 42 U.S.C. § 1395mm(i)(8) (incorporated by referenced into § 1396b(m)(2)(A)(x)) and 42 C.F.R. § 438.210(e)).

<u>Complaint Reference</u> -- ¶ 46(E).

Evidence and Argument -- The evidence concerning the risk contract and its impact is presented in previous discussion and the Cruz Declaration (Ex. B), the Kelleher report (Ex. A) and HRSA letter (Ex. A) and SF ¶¶ 5, 7-8 (Colon decl.).[13]

6.    Section 1396b(m)(2)(A)(xii) --

Statutory Requirement -- the HMO contract and the HMO must be in compliance with § 1396u-2.

Complaint Allegation -- There is no such actual compliance just because of the foregoing violations of § 1396b(m) and also because of the further violations described below.

Complaint Reference -- ¶ 46(F).

7.    Section 1396u-2(a)(3) --

Statutory Requirement -- in general, Medicaid beneficiaries must have at least two HMOs from which to choose; with certain limited exceptions.

---

[13] In its dismissal motion, HHS challenges the relevance of this statutory requirement to plaintiffs' circumstances, contending that the requirement does not apply to FQHCs. Putting aside (but not waiving) the argument that HHS' "interpretation" of this provision not to apply to FQHCs is an unlawful *post hoc* justification, a violation nonetheless harms FQHCs. HHS' challenge ignores the history behind the FQHC payment requirement imposed on managed care entities. As explained in an April 20, 1998 State Medicaid Director Letter ("SMDL") issued by CMS' Director for Medicaid and State Operations, the requirement, enacted in 1997, was a complement to the "wraparound" requirement in the same law. Its purpose as stated there was to "encourage contracting" between FQHCs and MCOs and to provide incentives to contract with FQHCs. Ex. F, April 20, 1998 SMDL at 2. The problem is that if, as is the case here, an HMO is permitted to violate the statutory requirement limiting the risk it imposes on doctor groups that provide the same basic services FQHCs do, the statutory protection to FQHCs is undone. This is the case here, where the Puerto Rico HMO's contracts with those groups unload a high percentage of the HMOs' risk for all the services they have contracted to provide. From the HMO's standpoint, the risk contract is extremely profitable. If it would have to abandon that contract where FQHCs are concerned and just pay them a fee for their services, the FQHC contract would be significantly disadvantageous. In short, the provision Congress adopted to make FQHCs attractive as HMO contractors, because of statutory violations by HMOs, makes them unattractive. It likewise means that HMOs allowed to create such (unlawful) circumstances will bob and weave to avoid contracting with FQHCs (or as is the situation in Puerto Rico, refuse to pay FQHCs what federal law requires).

Complaint Allegation and Evidence -- There is only one HMO available within each of the Puerto Rico Medicaid program's 10 regions.  Ex A, Kelleher Report at 1.  The limited exceptions to the statutory rule requiring at least two such entities are not met.

8.    Sections 1396u-2(e)(1)(A)(i), 1396b(m)(2)(A) and 1396d(a)(4)(D)(ii)(I) --

Statutory Requirement -- FQHC services, legally required under § 1396d(a)(2)(C), must be made available to all Medicaid beneficiaries by the Puerto Rico HMOs.

Allegations -- The FQHCs, under their Section 330 grants, are available to provide their services in a number of areas with respect to which the HMOs have refused to contract with those FQHCs because the HMOs already have contracted with doctor group(s) for those areas.  Both FQHC plaintiffs are currently so limited.  Regarding areas from which Puerto Rico FQHCs are so excluded, Medicaid beneficiaries located therein are not permitted by the HMO to receive the FQHC's services.  Puerto Rico's Medicaid agency has advised FQHCs and Medicaid beneficiaries who have complained about refusals of HMOs to contract with an FQHC for services in these areas that there is nothing that agency can do about it.  Adding to these problems, plaintiff Belaval has been informed that its HMO is no longer assigning it any patients.

Complaint references -- ¶ 46(H).

Evidence -- SF § 19.

## PROSECUTORIAL DISCRETION

The actions (and inactions) of HHS in ignoring all these violations by making HMO payments (among other things) constitute "agency action" that was and is "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law . . . contrary to constitutional rights, power, privilege [and] immunity [and] in excess of statutory jurisdiction, authority, or

limitations [as well as] short of statutory right" under 5 U.S.C. § 706(2)(A)-(C). It is well-established that an agency is bound to follow its own rules, regulations, policies, and procedures, even where they operate to inconvenience the government. *See e.g. National Family Planning and Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992); *see also Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (agency must "supply a reasoned analysis" for changing policies). There is no prosecutorial discretion that permits the agency to ignore its legal duties in the context of this case where payments made in the face of such violations are prohibited by the law.

In addition, and far more importantly, the Appropriations Clause of the United States Constitution is literally being violated by HHS' managed care payments. That Clause provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I § 9, cl. 7. As such, money from the federal treasury may only be appropriated pursuant to Congressional action. *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 185, 295 U.S. App. D.C. 121, 126 (CADC. 1992) (holding that Congress controls the availability of federal treasury funds) (citing *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). Here, Congressional action exists in the form of 42 U.S.C. § 1396b(m)(1) and (2). Congress therein conditions its authorization to HHS to pay funds to State Medicaid programs for the purpose of Medicaid on HHS' pre-approvals of contracts. Without such approval (and the review accompanying that approval), such payments are unauthorized. For HHS or this Court to allow these payments to be nonetheless made would give HHS officials "a most dangerous discretion" in the use of federally appropriated funds. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 425, 110 S.Ct. 2465, 2472 (1990) (holding statutory authority is

required for appropriation of Federal funds) (quoting *Reeside v. Walker,* 11 How. 272, 291

(1851)).

In addition to being in excess of HHS' Constitutional authority, the payments at issue

violate the Antideficiency Act, 31 U.S.C. § 1341.  The Antideficiency Act states that:

 (a)(1) An officer or employee of the United States Government or of the District
of Columbia government may not-

(A) make or authorize an expenditure or obligation exceeding an amount
available in an appropriation or fund for the expenditure or obligation;

(B) involve either government in a contract or obligation for the payment of
money before an appropriation is made unless authorized by law[.]  *Id.*

As noted above, payments made toward the Puerto Rico Medicaid HMO contracts are not

authorized by law because HHS failed to pre-approve the contracts pursuant to 42 U.S.C. §

1396b(m)(1) and (2).  Congress has not authorized payments for unapproved contracts; therefore,

such payments also would violate the Antideficiency Act.

Lastly, CMS' claim to discretion is directly at odds with its promise in promulgating the

Final Rule for the Medicaid managed care program (66 *Fed. Reg.* 6227, January 19, 2001).  In

that rulemaking, CMS explained why it believed it did not need to issue regulations addressing

the recent statutory FQHC-related payment obligations (of the States and MCOs) in that specific

rulemaking.  66 *Fed. Reg.* 6372-3.  In responding to comments, CMS stated:

Moreover, we do not believe regulations are necessary, as the
statutory requirements are straightforward and self-implemented,
and HCFA has provided guidance to all States, through State
Medicaid Director Letters . . . .We disagree with the commenter
that there is no "enforcement mechanism" for these requirements.
The requirements in question, as interpreted by HCFA in State
Medicaid Director Letters, are fully enforceable.

* * *

If an MCO fails to comply with section 1903(m)(2)(A)(ix) by

27

>paying at least what it pays other providers, HCFA would disallow
>Federal financial participation (FFP) in payments under the MCO's
>contract.  Thus, the FQHC/RHC requirements in questions are self-
>implementing and fully enforceable.

66 *Fed. Reg.* 6373 (Jan. 19, 2001).  CMS' disallowance would be the case where the managed

care entity promises to do what the law requires in a contract that properly reflects that law, and

CMS has no reason to think otherwise.  In that circumstance, CMS would approve the contract

and later enforce by disallowing all HMO payments.  If, as is the case here, CMS knows in

advance the requirement will not be met, it must do what the law requires -- not approve the

contract in the first instance and not approve (further) payments in the second.

### THE CLASS -- STANDING

We only briefly address defendant's challenge to the Class because we have narrowed the

relief sought now and do not need the Class to support that relief -- for the reasons discussed in

the next section.  We have asked the Court to allow us the time to petition for class certification

and present all relevant argument there.

In the meantime, we begin our brief class discussion by noting that HHS challenges the

commonality and typicality of the proposed class and also contends that the named plaintiffs are

not adequate class representatives.

As to commonality, HHS contends that the plaintiff class lacks common questions of fact

and law required to achieve class certification basing this claim on the various payments the

various named plaintiffs received relating to the *Rio Grande* case.  For the reasons expressed

previously, the *Rio Grande* payments to plaintiffs do not come close to satisfying Medicaid

requirements and are currently not even being made.

As to typicality, HHS contends that the proposed class does not meet the requirement

because the class is overbroad by including non-Medicaid beneficiaries and individuals who are

not yet patients of the Puerto Rico FQHCs.  Their stake in this case is discussed in the next

section.

HHS also contends that the named plaintiffs have not been injured in the manner of the

proposed class because the "[named] [p]laintiff FQHCs have been paid by the Commonwealth"

as a result of the *Rio Grande* case.  The answer to this is that the *Rio Grande* payments are

deficient on their face and currently nonexistent.  Moreover, our complaint focuses on the

unlawful HMO contracts and HHS' failure to enforce the law to stop funding such contracts.  In

this regard, all FQHCs and patients are similarly affected.  FQHCs receive virtually no payments

or less than zero and the patients are unlawfully forced into managed care and are in jeopardy of

losing their FQHCs.

## THE UNIQUE CHARACTER OF HEALTH CENTER FQHCS

The unique character of FQHCs looms large in justifying how and why plaintiffs (along

with their patients and communities) are especially qualified to bring this case and obtain the

relief sought through partial summary judgment.  It begins with the language of Section 330 of

the Public Health Service ("PHS") Act, 42 U.S.C. § 254b, and accompanying regulations at 42

C.F.R. §§ 51c.101-51c.507.  Section 330 authorizes grants only to "health centers" (defined in

§ 254b(a)) that " that provide health services to medically underserved populations".

§ 254b(e)(1)(A).  As defined in regulations, at § 51c.102(e):

> *Medically underserved population* means the population of an
> urban or rural area designated by the Secretary as an area with a
> shortage of personal health services or a population group
> designated by the Secretary as having a shortage of such services.
> Medically underserved areas will be designated by the Secretary
> and a list of those designated will be published in *Federal Register*
> from time to time, taking into consideration the following factors,
> among others:

(1) Available health resources in relation to size of the area and its populations, including appropriate ratios of primary care physicians in general or family practice, internal medicine, pediatrics, or obstetrics and gynecology to population;

(2) Health indices for the population of the area, such as infant mortality rate;

(3) Economic factors affecting the population's access to health services, such as percentage of the population with incomes below the poverty level; and

(4) Demographic factors affecting the population's need and demand for health services, such as percentage of the population age 65 and over.

Accordingly, the populations health centers serve and the areas within which the centers are located are, to put it simply, starved for doctors and other health care providers because their populations are too poor to attract an adequate complement of those providers. The purpose of the Section 330 grant is to alleviate the shortage. As such, Section 330 centers must serve all residents of their communities, regardless of any resident's/patient's ability to pay. 42 U.S.C. §§ 254b(a)(1) and 254b(i)(3)(G). As explained in 42 C.F.R. § 51c.303(f), health centers must:

Have prepared a schedule of fees or payments for the provision of its services designed to cover its reasonable costs of operation and a corresponding schedule of discounts adjusted on the basis of the patient's ability to pay. *Provided*, That such schedule of discounts shall provide for a full discount to individuals and families with annual incomes at or below those set forth in the most recent CSA Poverty Income Guidelines (45 C.F.R. 1060.2) and for no discount to individuals and families with annual incomes greater than twice those set forth in such Guidelines, except that nominal fees for services may be collected from individuals with annual incomes at or below such levels where imposition of such fees is consistent with project goals

Section 330 centers also must have a Board of Directors, a majority of whom are "individuals who are or will be served by the center and who, as a group, *represent the individuals being or to be served*…" 42 C.F.R. § 51c.304(b) (emphasis added). Among the

30

Board's specific duties is to assure "that the center is operating in compliance with applicable Federal…laws and regulations…" *Id*. at 51c.304(v).

Section 330 centers are required to participate in the Medicaid and Medicare programs. 42 U.S.C. § 254b(k)(3)(E).  Their use of revenue derived from that participation is strictly limited to actions permitted with Section 330 grant funds or that "benefit the objectives of the [Section 330] project".  42 U.S.C. § 254b(e)(5)(D).  Section 330's other requirements *vis-à-vis* such participation include:

> …mak[ing]…and…continu[ing] to make *every reasonable effort* to collect appropriate reimbursement for its costs in providing health services to persons who are  [among others, Medicaid and Medicare beneficiaries]."

42 U.S.C. § 254b(k)(3)(F) (emphasis added).  The same full fees against which a center's schedule of discounts to poor patients is based must be charged to Medicare and Medicaid under § 254b(k)(3)(G)(i).  The center must "make every reasonable effort…(II) to collect reimbursement for health services to [among others, Medicaid and Medicare beneficiaries] on the basis of the full amount of fees and payments for such services *without application of any discount*…"  (Emphasis added.)

For the last seventeen years, the Medicaid program has been statutorily required to pay those full fees Section 330 requires the centers "to collect".  As previously explained, the FQHC Medi*caid* legislation in 1989 -- under the 1989 Omnibus Budget Reconciliation Act. Pub. L. No. 101-239, (*see* 42 U.S.C. § 1396(a)(2)(C) (and related sections of the Medicaid required statute) -- was what merged Section 330's collection of revenues requirement with Medicaid's payment. The same 1989 legislation created "Federally-qualified health centers" ("FQHCs") (Section 330 centers and a few "look-alikes") as a mandatory category of service.  The services of FQHCs *must* be available to Medicaid beneficiaries who want to receive them.

Because FQHC services became a right of Medicaid beneficiaries to receive, those beneficiaries also became entitled to the other benefits Section 330 centers offer.  Center services such as case management, transportation and translation, patient education (all at Section 330(b)(iii)(iv) and (v)) and provision of information on health plans for which a patient may be eligible (at Section 330(k)(3)(M)) and paid by Section 330 became extra benefits to those Medicaid patients.

In meshing Section 330 and Medicaid, Congress made it clear in legislative history that whenever Medicaid paid less than its fair share, a Section 330 center uninsured and poor patients suffered because that failure drained the center's limited resources to serve these patients.

The foregoing description of Section 330 health center services, rights, entitlements, benefits, patients, Boards, *etc.* leads to several conclusions relevant to plaintiffs' entitlement to the relief they seek herein.  They are:

(1)    Health center services are a Medicaid patient's right.  To the extent FQHCs are not assigned patients or are financially weakened and deprived (wholly or partially) of their ability to serve that patient, Medicaid beneficiaries' rights are imperiled.

(2)    The services and benefits they provide to Medicaid and other patients are unique and far more extensive than any other comparable provider.

(3)    The access of the community or communities served by the center to adequate care is also imperiled by shortfalls in Medicaid payments.

(4)    If Medicaid pays less than its fair share of center costs for an FQHC's treatment of its beneficiaries, harm befalls other Medicaid beneficiaries in the center's

community who would be helped by center services but because of revenue shortfalls never receive them.

(5)     Likewise, if Medicaid pays less than its fair share of center costs, persons other than Medicaid beneficiaries who are otherwise eligible for and would benefit from center services do not receive them.

(6)     Centers uniquely represent their communities' interests not only because their presence is essential to the provision of adequate care but also because their Boards are formed and structured with such representation in mind.  Moreover, many persons (Medicaid beneficiaries and others) who do not receive center services because of Medicaid payment shortfalls do not even know, nor could they, that they are victims of such deprivation.  If centers or center Boards do not undertake to represent their interests, no one else, including such persons, will.

(7)     The lack of health center care that arises whenever Medicaid fails to pay its fair share is not only a continuing harm but one that will not and cannot automatically be remedied by later relief.  Whoever has not been served and should have been will suffer the consequences.

All plaintiffs here challenge actions of HHS that have unlawfully put into effect a system that fails to pay FQHCs adequately (and as the law requires) for the FQHCs' services, has reduced the availability of those services and threatens, in the end, to entirely eliminate those services.  The system unconscionably shifts funds designated for health services to the poor to the balance of profit-making HMOs.

If plaintiff FQHCs are forced out of business, their *Reforma* patients will be assigned to doctor groups, who/which, lacking grant funds, unduly restrict their patient referrals to other

providers.  Those patients not eligible for *Reforma* likely will have no other provider to turn to, except for an emergency room, when their condition has become sufficiently desparate.  Clearly, the FQHCs and their Board members and patients have standing to challenge HHS' violations of law that directly cause them financial or other harm and places the FQHCs' patients in jeopardy of losing access to quality care.  Clearly, also, the injury this harm has caused and will continue to cause plaintiffs' patients and others who would, if they could, become such patients is "injury in fact".  This injury is not just what we allege; it is what Congress specifically found.

Surely, the right the Supreme Court accorded Dr. Rust in *Rust v. Sullivan*, 500 U.S. 173 (1991), to bring that action on his patients' behalf -- a right accorded by that Court and others in numerous other cases where a doctor's patients' interests are at stake -- is no less pertinent here where plaintiffs are their patients' doctor as well as their designated by Congress representatives.

## CONCLUSION

Plaintiffs' Complaint is more than sufficient to demonstrate plaintiffs' ability to seek, *inter alia*: (1) a declaration from the Court that HHS' payment of further monies under the Medicaid statute for Medicaid managed care contracts with the HMOs in Puerto Rico is unlawful and will remain unlawful until and unless those contracts and the HMOs or other entities receiving them fully conform to all of the relevant requirements of the Medicaid statute and regulations, and (2) an injunction preventing HHS from making any further payments in support of these HMOs unlawful contracts until and unless HHS is able to demonstrate to the Court full compliance with all relevant statutory and regulatory conditions.

For the foregoing reasons, plaintiffs respectfully request that the defendants' Motion to Dismiss and to Strike All Class Claims be denied and that its summary judgment motion be granted.

Respectfully submitted,

Date: September 24, 2007                    /s/ Kathy S. Ghiladi
                                           James L. Feldesman ( D.C. Bar No. 23796)
                                           jfeldesman@ftlf.com
                                           Kathy S. Ghiladi (D.C. Bar No. 435484)
                                           kghiladi@ftlf.com
                                           Robert A. Graham (D.C. Bar No. 450345)
                                           rgraham@ftlf.com

                                           Feldesman Tucker Leifer Fidell LLP
                                           2001 L Street, N.W., Second Floor
                                           Washington, D.C.  20036
                                           (202) 466-8960 (telephone)
                                           (202) 293-8103 (facsimile)

                                           *Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al*. | ) | |
| | ) | |
| *Individual Plaintiffs*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:07-cv-1034 (RMC)** |
| | ) | |
| U.S. Department of Health and Human Services, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael Leavitt, Secretary | ) | |
| U.S. Department of Health and Human Services | ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiffs' Conciliion de Salud de Loiza, Inc. ("Loiza" and Junta del Centro de Salud Comunal Dr. Jose S. Belaval, Inc. ("Belaval") hereby submit this Statement of Material Facts in support of their motion for partial summary judgment.

1.      Plaintiff Concilio de Salud Integral de Loiza, Inc. ("Loiza") operates a Section 330 funded health center that provides services principally within the poor, medically underserved community of Loiza, on the northeast coast of Puerto Rico.   See *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005); *Dr. José S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33 (1st Cir. 2006).  .

2.      Plaintiff Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval")

operates in San Juan, where it is headquartered, and on the Isle of Culebra.  *Id.*

3.      In implementing the Medicaid managed care program known as "Reforma"

Puerto Rico's Department of Health divided the Commonwealth into ten regions.  For each of

these regions, the Department of Health awarded a single HMO the exclusive territory.  Ex __,

July 24, 2002 Final Kelleher Report  attached to November 15, 2002 Letter of HRSA Associate

Administrator.

4.      The HMOs do not pay FQHCs as they are required to do under the Medicaid

statute .  Ex __, Kelleher Report at 1-2.

5.      A Director of one of the Reforma HMOs provided a Declaration  in connection

with the *Rio Grande* litigation during the time that HHS was interpled as  a party in the case.  In

that Declaration, Mr. Cruz describes the arrangement between an HMO called MCS and Loiza:

>       2.      Under the terms of the contract, Loiza is paid for the assumption of this
> health services financial risk in the form of a monthly per beneficiary fee - -
> denominated as a "capitation payment."  The capitation amount reflects the
> contractually agreed per beneficiary payment multiplied by the number of IPA
> Beneficiaries.
>
>       3.      The contract providers that the capitation payment is to be allocated
> among a Medical Services Fund and an Institutional Health Services Fund and
> that claims submitted by IPA and non-IPA (specialist) physicians and hospitals,
> and other providers for services rendered to the IPA Beneficiaries are to be
> charged against these funds prior to the final distribution of the remaining funds.
> The contract also provides that, in the calculation of the surplus and deficit of the
> Medical Services Fund, an adjustment is to be made for claims which are incurred
> but not yet reported ("IBNR adjustment").
>
>       4.      Under the contract, after the claims are paid and the IBNR adjustment is
> made, surplus in the Medical Services Fund is retained by Loiza and surplus in
> the Institutional Health Services fund retained [by] Loiza.
>
>       5.      Under the contract, before final distribution of sums from the Medical
> Services Fund, any surplus is to be used to off-set any deficit in the Institutional
> Health Services Fund. Likewise, the contract provides that, before distribution of

surplus in the Institutional Health Services Fund, such surplus shall be used to off-set any financial responsibility for deficits in the Institutional Health Services Fund to the amounts available as surplus in the Medical Health Service Fund.

6.      During the time period in question (January 2004 – June 2005) the capitation amounts paid under the contract to accounts maintained to effect these arrangements have, in the aggregate been $6,764,181.70 ($4,001,947.04 to the Medical Services Fund and $2,762,234.66 to the Institutional Health Services Fund).  However, during this period the amounts charged under the contract against the Medical Services Fund and Institutional Health Services Fund have, in the aggregate, exceeded the amounts available in such funds. Thus, under the contract's terms, Loiza is currently in debt to MCO-HMO for deficits in the Medical Services Fund during that period.

Ex. __ , November 22, 2005 Declaration of Hector L. Cruz Batista at ¶¶ 2-6.

6.      According to Mr. Cruz, the Commonwealth's agency responsible for the administration of the Medicaid managed care contracts ("ASES" which is the Spanish acronym for the Puerto Rico Health Insurance Administration) reviewed and approved the terms of the contract between MCS-HMO and Loiza.  *Id*. at ¶ 1.

7.      The MCO  payments to FQHCs and doctor groups are made on a risk basis that imposes a level of risk so high as to violate statutory requirements relating to such risk imposition.  Ex __, Kelleher Report at 8-9; Ex. __, Declaration of Jose Orlando Colon at ¶ __.

8.      The FQHC plaintiffs receive the same downloaded risk contracts as the doctor groups.  Unlike those groups, the FQHCs do not and cannot unduly limit referrals or otherwise ration care.  Ex __, Kelleher Report at ___; Ex __, Declaration of Jose Orlando Colon at ¶___.

9.      CMS and the Puerto Rico Medicaid agency have been aware of these violations in connection with the MCO contracts for years (*see e.g*., Ex __, Kelleher Report at 9-10).

10.     All FQHCs in Puerto Rico were instructed by a senior official in HRSA to renegotiate their HMO contracts because of the risk they imposed. On November 15, 2002

HRSA's Associate Administrator in charge of the Section 330 PHS Act grant programs advised all Puerto Rico health centers by letter that:

> We are . . . concerned that the [PHS Act Section] 330 grant dollars may be paying for services to the health care reform population that are beyond the scope of services for which the funds are intended. These funds are primarily intended for primary care services. Therefore, we are encouraging all health centers in Puerto Rico, with the assistance of the Primary Care Association (PCA) and the Puerto Rico Sub-Field Office, to begin discussions to renegotiate the current contracts with the HMOs and regulatory authorities. These discussions should focus on the elimination of financial risk for services over which the health center and its providers have no financial and utilization control.

Ex __, November 15, 2002 Associate Administrator letter at 1. His letter further stated that:

> . . . the health centers should consider not renewing any future contracts since the HMOs have structured a program that essentially transfers financial risk for most health center costs to the federally-funded health centers in Puerto Rico. In order to implement this contract termination if negotiations are unsuccessful, each center should send to each managed care company with which they contract, a letter of intent to terminate the contract. The letter should be sent in accordance with the termination clause of each contract. Most contracts require a notice of termination, ranging from 30 to 90 days prior to the renewal date of the contract.

*Id*. at 2.

11.     The HMOs refused to renegotiate with the result that the FQHCs with such HMO contracts are now living with those contracts and thereby running the risk of doing what that letter suggests is unlawful. Ex ___, Declaration of Jose Orlando Colon at ¶ __.

12.     Although the court ordered payments in the *Rio Grande* cases, the actual payments made were far deficient relative to the FQHCs' actual entitlement. *See Rio Grande*, case No. 03-1640 (District Court of the District of Puerto Rico). The court described a formula for prospective payments ordered by preliminary injunction. *Id.* The formula would account for

average Medicaid patient costs per quarter. *Id.* The Medicaid patient cost would then be reduced

by the actual amount the FQHCs received from the HMO. *Id.* While the formula demanded

adequate wraparound payment, Puerto Rico provided a payment far less than required. Puerto

Rico's payment was 30% less than the required cost and only counted 55% of the Medicaid

population. Furthermore, the payments failed to provide for inflation. The payments also

reduced Medicaid cost by the amount owed by the HMO as opposed to the amount the HMO

actually paid the FQHCs. Overall, the Commonwealth's supplemental payments fell well below

the quantity required to make plaintiffs whole. Ex C, Declaration of Jose Orlando Colon at ¶ 4.

13.    In March 2007, the District Court vacated the preliminary injunction due to the

Commonwealth's establishment of a PPS Office; however, the court still ordered the

Commonwealth to continue making payments using 2001 baseline calculation data. July 3, 2007

Belaval Order. Despite the establishment of the PPS Office, the plaintiff FQHCs have not

received any supplemental payments from the Commonwealth since the court vacated the

preliminary injunction. Ex C, Declaration of Jose Orlando Colon at ¶¶ 4-5.

14.    CMS has neither reviewed nor approved *any* current, or *any* prior, HMO contract

entered into by the Commonwealth's Medicaid program as required by 42 U.S.C.

§ 1396b(m)(2)(A), even though it has continued to pay Puerto Rico monies being used by the

Commonwealth for those contracts and has likewise continued to permit the Commonwealth to

force Medicaid beneficiaries to sign up with the HMOs operating under such (unlawful)

contracts as a condition of receiving Medicaid services. On December 22, 2006, the Secretary of

the Commonwealth's Department of Health responded to the following Interrogatories of the

health centers Interrogatories in the *Rio Grande* litigation:

> *Interrogatory No. 12*: Describe in detail the process of review and approval, if
> any, by HHS, CMS, DOH and/ or ASES if rates of payment to MCOs under the

Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico.

*Response:* There is no review of the rates established by the MCOs, the Commonwealth operates under a capitated environment with risk sharing where MCOs set the values for risk and revenue.

*Interrogatory No. 13*: Describe in detail the process of review and approval, if any, by HHS, CMS, DOH and/or ASES of agreements(s) between ASES and MCOs under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico.

*Response*: There is no review process because the PRHIA [ASES] is a sub-grantee that manages the budget by setting premiums and monitoring use/cost reports of each contracted organization.

*Interrogatory No. 14*: Describe in detail the process of review and approval, if any, by HHS, CMS, DOH, and/or ASES of rates of payment to providers (including, but not limited to, FQHCs) by MCOs under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico, including, but not limited to, manner in which MCOs' contracts with FQHCs require those FQHCs to accept risk for costs incurred by other health care providers as well as the particular FQHC and the MCO's practice of assigning IBNR tot heir contracts with FQHCs (and retaining that IBNR despite the FQHCs' performance).

*Response:* There is no review/approval from HHS, CMS, DOH and/or PRHIA of any issue related to payments and contracting since the MCO is a private business that negotiates with their network. The specific process can be explained by the PRHIA.

See Interrogatory Response Nos. 12-14 in Defendant's Answer to Plaintiff's First Set of Interrogatories to Defendant Hon. Rosa Perez Perdomo attached as Ex E.

15.    There is only one HMO available within each of the Puerto Rico Medicaid program's 10 regions. Ex A, Kelleher Report at 1. As such, Medicaid beneficiaries in Puerto Rico have no alternative HMO to select and must enroll with an HMO to receive Medicaid services.

16.    Medicaid beneficiaries in Puerto Rico are not able to in urgent care situations where beneficiaries have a medical need -- *i.e.*, where care is "immediately required due to an

unforeseen illness, injury or condition" -- go out of network for the service they need and either

the State or HMO must pay the service provider (including, where applicable, the FQHC).

17.    The Reforma HMOs' risk contracts with physicians or physician groups do not

limit the risk to ensure (among other things) that the physician/group will not fail to treat or refer

a patient because of the risk imposed.  Ex A, Kelleher Report at 1-2.

18.    The levels of risk is imposed on the FQHCs by the HMOs with the knowledge

and explicit approval of the Commonwealth.   Ex. C, Colon Decl. at ¶ 10.

19.    Belaval has been informed that its HMO is no longer assigning it any patients.

Respectfully submitted,


Date: September 24, 2007              /s/ Kathy S. Ghiladi
                                      James L. Feldesman ( D.C. Bar No. 23796)
                                      jfeldesman@ftlf.com
                                      Kathy S. Ghiladi (D.C. Bar No. 435484)
                                      kghiladi@ftlf.com
                                      Robert A. Graham (D.C. Bar No. 450345)
                                      rgraham@ftlf.com

                                      Feldesman Tucker Leifer Fidell LLP
                                      2001 L Street, N.W., Second Floor
                                      Washington, D.C.  20036
                                      (202) 466-8960 (telephone)
                                      (202) 293-8103 (facsimile)

                                      *Attorneys for Plaintiffs*

EXHIBIT A

DEPARTMENT OF HEALTH & HUMAN SERVICES        Public Health Service

---

Health Resources and
Services Administration
Bethesda MD 20814

NOV 1 5 2002

Mr. Leida A. Nazario
Executive Director and CEO
Barceloneta Primary Health Services, Inc.
PO Box 2045
Barceloneta, Puerto Rico 00617

Dear Mr. Nazario:

Over the last 2 years members of my staff have met with health centers in Puerto Rico to discuss the health care reform initiative. Health Reform greatly changed the health care landscape in Puerto Rico, as the Commonwealth transferred the responsibility of providing health services for Medicaid eligible beneficiaries from the public to the private sector. We have been very concerned that the Managed Care Organizations (MCOs), under contract to Puerto Rico's Health Insurance Administration, require health centers to accept financial risk for most services (hospital, pharmacy, specialty care and primary care).

We believe the current arrangements have had a negative effect on health centers throughout Puerto Rico. We have provided technical assistance on a variety of key areas, managed care issues, the development of Medicare and Medicaid cost reports and other contract issues to minimize the financial impact, yet center after center continues to experience financial problems. Recently we asked David Kelleher, an experienced managed care consultant, to determine the magnitude of the problem, the nature and extent of the losses and the causes of the financial difficulties facing the health centers. Mr. Kelleher's report is included with this letter.

We have reviewed his findings carefully and believe that if the issues he has identified are not addressed quickly, the financial stability of all health centers in Puerto Rico will be at risk. We are also concerned that the 330 grant dollars may be paying for services to the health care reform population that are beyond the scope of services for which these funds are intended. These funds are primarily intended for primary care services. Therefore, we are encouraging all health centers in Puerto Rico, with the assistance of the Primary Care Association (PCA) and the Puerto Rico Sub-Field Office, to begin discussions to renegotiate the current contracts with the MCOs and regulatory authorities. These discussions should focus on the elimination of financial risk for services over which the health center and its providers have no financial and utilization control.

Page 2 - Mr. Leida A. Nazario

If these negotiations fail, we believe health centers should consider not renewing any future contracts since the MCOs have structured a program that essentially transfers financial risk for most health center costs to the federally-funded health centers in Puerto Rico. In order to implement this contract termination if negotiations are unsuccessful, each center should send to each managed care company with which they contract, a letter of intent to terminate the contract. The letter should be sent in accordance with the termination clause of each contract. Most contracts require a notice of termination, ranging from 30 to 90 days prior to the renewal date of the contract.

We are prepared to offer additional technical assistance, including the possibility of having David Kelleher return to work with the health centers as a group. Please continue to work closely with the Sub-Field Office and the PCA in the months ahead.

Sincerely,

Sam S. Shekar, M.D., M.P.H.
Assistant Surgeon General and
Associate Administrator for Primary Health Care

Enclosure

cc: HRSA New York Field Office

*July 24, 2002*

### Final Report
### FQHC Financial Experience With Health Reform Patients
### In Puerto Rico

Federally Qualified Health Centers (FQHCs) are reporting significant financial losses as a result of Health Reform in Puerto Rico. This study was undertaken at the request of HRSA to determine the magnitude of these losses and, to the extent possible, the causes of the financial difficulties reported by the health centers.

## Brief Background

To implement health reform, the Department of Health (DOH) divided the commonwealth into 10 regions. Each of these 10 regions has a different per capita funding rate (capitation) for physical health and behavioral health services. HMO funding rates for physical health range from a low of $49.75 pmpm to a high of $69.85 pmpm.[1] For each of these regions, DOH selected one HMO to provide services on an at-risk basis. The program covers Medicaid eligibles and certain low-income non-Medicaid recipients, including Medicare beneficiaries. Benefits are reasonably comprehensive and include prescription medications. Co-payment levels start at $0 for all services and rise very modestly as beneficiary income increases. Significantly, for prescription medications, co-payment levels rise above $3 per prescription only at the very highest income level and, at this level, are only $5 for generic and $10 for branded drugs.

As a result of the implementation of health reform, FQHCs must contract with an HMO that has been awarded an exclusive territory by DOH. The HMOs offer the FQHCs the same terms and compensation as other providers of service. Each HMO deducts administrative expense and other amounts for selected "carve out" services. The balance remaining after these deductions is

---

[1] Undated presentation provided by HRSA.

offered to primary care groups. There are some differences in funding methodologies among HMOs. Some offer a flat capitation rate (e.g. $30 pmpm) regardless of the type of member enrolled. Others offer multiple capitation rates based upon the age, gender and eligibility category of the enrollee.

But all of the HMOs offer contracts to primary care groups (often called IPAs or HCOs) on a take-it-or-leave-it basis and all contracts require primary care groups to accept full risk for a comprehensive set of benefits. For any primary care group, the choice is between full risk (without a guarantee of payment for internally provided services) and no payment for this covered population.

**Methods**

In preparing this report, we reviewed a number (but not all) of the HMO contracts between FQHCs and HMOs, summary descriptions of the health reform process, selected reviews of contracts developed by consultants to HRSA and a 1997 contract between the government and PCA. We then asked FQHCs to report the financial results of their HMO contracts for reform patients for the period October 2001 through April 2002. These reports consisted of two parts. The first section reported member months, HMO funding (budget) rates and then claims and reserve deductions made by the HMOs from these funds. The second report covered internal costs. Finally, we met in San Juan with the majority of the community health centers to gain their input.

We had considerable contact with the centers as they were developing the information. It was apparent that most of the centers did not routinely develop a "contract P&L" for this population. We performed tests of reasonableness on the reports and used these results to clarify reporting issues but we did not audit the reports.

## Payment Process

Each HMO receives capitation funding from the government. It then deducts amounts for administration and for selected services whose costs remain the responsibility of the HMO. Examples of retained responsibilities include dental coverage and the cost of selected high cost services. The remaining funds (constituting about 50% of the government capitation) are established as the risk target for primary care groups. These funds are intended to cover most hospitalizations, outpatient hospital care, specialty care, primary care and prescription medications. From this budget, the HMO deducts the cost of the claims it pays for services that are the responsibility of the primary care group, including a reserve for IBNR. The remaining amounts are paid to the primary care group.

It is important to understand, when evaluating the attached reports, that the FQHC often has a choice between paying for services directly or having the HMO pay for certain services, which are then deducted from the balances available to the center. This means that some differences in the FQHC reports between the cost of internal services and claims deductions are the result of decisions by FQHCs. It should also be noted that patients have freedom of choice as to hospital, specialty physician and pharmacy among all of the providers that contract with any HMO. The result is that capitation agreements for services, other than primary care, are difficult to arrange.

## Financial Results

10 organizations reported for a total of 13 HMO contracts. These reports cover 122,927 reform patients, 829,455 exposure months (i.e., member months) and $27 million in capitation payments (annualized at about $54 million). This represents just under 50% of the reform members enrolled in the 19 FQHCs. The reports are shown in Exhibit 1 and summarized here.

The organizations differ markedly in size of contract. The average risk pool covers just under 9,500 patients with a high of 40,000 and a low of 3,100. The median is 7,500 members. The

weighted average capitation budget is $32.46 with a range of $29.68 to $35.83. The median is $30.68 because the largest center receives funding that is above the average.

On average, and including IBNR, the claims deductions totaled $24.93 pmpm, leaving only $7.53 available for the centers. The amount available to the centers is highly volatile, with a median of $7.00 but a range of

| Reform Patients | Totals | Average | High | Low | Median |
|---|---|---|---|---|---|
| Members in April | 122,927 | 9,456 | 40,233 | 3,130 | 7,518 |
| Member Months | 829,455 | | | | |
| Net Capitation | $26,923,744 | $32.46 | $35.83 | $29.68 | $30.68 |
| Claims Expense | | | | | |
| Specialty Referrals | $2,551,610 | $3.08 | | | |
| Hospital Care | $5,769,331 | $6.96 | | | |
| Other Medical | $1,716,412 | $2.07 | | | |
| Reserves & Retention | $2,415,426 | $2.91 | | | |
| Rx Coverage | $8,228,607 | $9.92 | | | |
| Total Claims Expense | $20,681,386 | $24.93 | $45.69 | $16.35 | $25.70 |
| Net to FQHC | $6,242,358 | $7.53 | $13.88 | -$15.41 | $7.00 |
| Cost to FQHC | $15,753,025 | $18.99 | $35.65 | $7.60 | $20.99 |
| Gain | ($9,510,667) | -$11.47 | $0.11 | -$37.19 | -$19.05 |

**minus** $15.41 to a positive $13.88.[2] The average internal cost of serving these members (which includes payment for hospital care, specialty services, lab, radiology, 24-7 ER and internal pharmacy services) is $18.99 pmpm with a range of $7.60 to $35.65 and a median of $20.99.

*For this six-month period, all contracts except one are reporting losses (*we exclude one plan that reported earnings because it did not report the costs of internally provided prescriptions*).* The weighted average loss is $11.47 pmpm but *the median loss is $19.05 pmpm* (again, reflecting a more modest loss by the largest contractor).

**Issues**

There are a number of issues raised by this review of the structure of the program and the experience of the primary care contractors. We will review the most important here.

1. *Monopoly and its results.* The government has established a payment monopoly in each region. In three important respects this monopoly is unregulated:

---

[2] The FQHC with the largest negative reported unusually high hospital claims expenditures and its enrollment was below the median. These facts raise the questions as to proper pool size and the use of stop loss coverage.

- The government does not control the amount retained by the HMOs for "carve out" services. As a result, it appears that somewhere near 50% of the government's funds are retained by the HMOs. The amount retained appears to be at the discretion of the HMO without governmental input and without regard for the cost of medical services retained by the HMO. This critical, and apparently unregulated, retention substantially affects the funding available to at-risk providers. Medical expenses typically consume between 84% of premium (for-profit plans) to 90% (non-profit). Since we don't know what the HMOs spend for "carve out" services, we don't know their full loss ratios.

- The 1997 government contract required HMOs to pay HCOs (their term for at-risk providers) on a reasonable basis that "does not jeopardize or infringe upon the quality of services provided." However, this requirement "will be reinforced through the establishment of different alternatives in order to ensure that HCOs, HCO's network of participating providers and insurers participating providers are paid in full for contracted services in accordance with established budgets." The FQHCs are not aware of any such alternative reimbursement options and the contracts do not provide parity between HCOs and other providers. In fact, the HCOs (primary care groups) are paid last and only what remains (if anything) after other contractors have been paid in full. They alone bear risk for the cost of services.

- The government does not control the risk-transfer environment in two important respects. First, we can find no controls on the size of risk pools in the government contract with HMOs. HMOs appear to be free to transfer full risk on enrollment pools as low as 3,100 patients. Second, we find no government oversight of the services for which HCOs are held responsible. The most significant issue here is the cost of prescription medications, which will be discussed below. Finally, we find no required provisions for stop loss.[3]

---

[3] A general caution applies here. The government-HMO contract we reviewed was dated in 1997. Some features could have changed since that time. For example, we understand the government now controls the HMO's administrative retention amount which it did not in 1997. However, it does not appear that this control extends to other important aspects of the HMOs' relationships with risk bearing providers.

This is especially important given the small size of the risk pools resulting from the contract structure.

The government appears to have granted the HMOs a monopoly that is unregulated with respect to critical features affecting primary care providers. The expected result of this monopoly is to ensure profitability at the HMO level and losses at the risk-bearing provider level. No other options are available to primary care providers who traditionally serve the needs of indigent patients.

This HMO market power is apparent in many of the contract features noted by experts reviewing the HMO contracts on behalf of HRSA. Features such as short periods for claims submissions and appeals by providers but relatively long payment timeframes for HMOs, comprehensive one-sided indemnification provisions and non-compete clauses (that extend beyond the contract period) suggest the power that HMOs derive from their state-established monopoly position.

2. *Prescription Medications*. The single most important *financial* issue for most FQHCs is the cost of prescription medications. For the 10 contracts where we have sufficient information to separate these costs from other expense, we have the following results:

The patient is not required to use the internal FQHC pharmacy and any participating physician can write prescriptions (but these must be approved by the

| Reform Patients | Totals | High | Low | Median |
|---|---|---|---|---|
| Members in April | 100,083 | | | |
| Member Months | 680,920 | | | |
| Budget | $32.49 | | | |
| Rx Costs | | | | |
| Claims | $10.90 | | | |
| Internal | $7.04 | | | |
| Total Rx | $17.94 | $25.79 | $13.29 | $19.75 |
| Funding Net of Rx | $14.55 | | | |

PCP – causing further difficulties). The resulting costs consume, on average, over 54% of the total amount available for all of the (very comprehensive) services for which the primary care groups are responsible.

Only four centers were able to report funding levels and prescription costs separately for Medicare beneficiaries. For these centers, the reported cost of prescriptions for seniors exceeded the total HMO-provided funding (budget) for all services *in all cases* by a wide margin. The government is simply not adequately funding an unlimited prescription medication benefit for this population at $0 to $3 co-payment levels. The HMOs all require primary care groups to fully absorb this loss. And the situation will probably become much worse over time. Prescription medication costs are increasing faster than other medical expense and faster than the government is increasing its capitation to HMOs.

The chart at the right shows what happens if the government (and HMOs) increase

| Effect of Rx Inflation | Current | Assumed Inflation | Year 2 | Assumed Inflation | Year 3 |
|---|---|---|---|---|---|
| Governement Payment | $65.00 | 4% | $67.60 | 4% | $70.30 |
| HMO Retention | $34.00 | 4% | $35.36 | 4% | $36.77 |
| Capitation to HCOs | $31.00 | | $32.24 | | $33.53 |
| Prescription Costs | $17.00 | 11% | $18.87 | 11% | $20.95 |
| $ for all of other care | $14.00 | | $13.37 | | $12.58 |

payment and carve out prices by 4% a year while prescription costs increase at 11% per year The latter is about the mid range of Rx inflation forecasts. The 4% may be overly generous, as the Commonwealth did not increase capitation rates over the last year. The effect will be to markedly reduce the amount available for all other care even though this amount is currently insufficient to cover the costs of these benefits. Note also that if the Medicare population increases, the situation will deteriorate even further.

3. *Free Choice of Providers*. The government requires that all patients have free choice of provider – specialist, hospital, pharmacy. For this reason risk-bearing primary care providers cannot manage significant aspects of the costs for which they are held responsible. A review of the exhibit will show that the majority of these costs (see claims section) are generated by outside providers, where payment levels are negotiated between the HMO and the provider – not between the HCO and the provider.

This issue goes beyond the issue of price levels. The result is that the community health center must pay other parties for services such as pharmacy, laboratory, and radiology while

also maintaining the internal capacity to provide these services where marginal costs are substantially below payment levels.

An especially costly requirement for the FQHCs is that they maintain a 24/7 emergency room. This requirement, combined with free choice, greatly increases the burden of this program to FQHCs.

4. *Health Status Adjustments*. None of the HMOs adjust payment or pool funding for significant differences in health status. Some use age/gender/program-specific capitation funding rates but these capture very little of the variation in costs among groups of patients – certainly less than 20%. As traditional providers-of-service to medically indigent patients, we would expect FQHCs to experience adverse selection.

The modern health status adjustment systems (also called, predictive modeling), which combine diagnosis with demographics, are becoming powerful and they are inexpensive to use. Their use is exploding in the United States because they provide a more level playing field for both health plans (when used by employers to adjust premium contributions) and provides (when used by health plans to adjust payment or evaluate performance).

5. *HMO Reporting*. I reviewed reports to FQHCs from some of the HMOs. I found the reports confusing and missing significant information I see in other similar environments. It is often difficult to determine how much has been earned by an FQHC in any given period – who owes what to whom. The reports lack comparative information (how am I doing compared to other HCOs) and utilization information. They give few signals to FQHCs as to how their practice patterns differ from "successful" practices.

6. *Risk Contract*. Probably the most significant defect of the HMO contracts is that there is no guarantee of any payment to the HCO. Risk is unlimited and the FQHC can be asked to pay the HMO even as it provides services to the HMO's members. As noted above in the

"government" section, all other providers are paid their negotiated fees. Primary care groups are, by design, last in line and many receive nothing in return for the services they provide.

## Conclusions

Based upon the information we reviewed, it appears that the benefits offered to indigent residents of Puerto Rico by the government cost more, at prevailing HMO fee levels and current utilization levels, than the government is able to pay. Some party must suffer a loss. The present government-designated structure pushes these losses down to primary care providers. The government is protected from loss by its contracts with HMOs. The HMOs are protected from loss by their grant of unsupervised monopoly power. On the provider side, the structure is lacking important aspects of parity. Specialty physicians, hospitals, pharmacies and other providers who have a claim paid by the HMO are guaranteed their full negotiated fees. Primary care providers absorb the full cost of inadequate funding. FQHCs are particularly vulnerable in this setting because they have few non-reform patients that could offset these losses. If the majority FQHCs are to survive, the financial "pain" needs to be shared by other participants on some equitable basis.

This "sharing" can be initiated by the government along a number of dimensions. It could begin to enforce its contract provisions requiring "actuarially sound" provider payment structures from HMOs, by enforcing contract provisions that payment be equitable or by extending controls to HMO carve out retentions. It could address the issues of stop loss, pool size, the types of services that primary care providers can be held responsible for, and guaranteed payments for primary care services as discussed above.

Or the government could change the monopoly aspects of the HMO contracts by allowing more than one HMO to serve each market. This "market based" approach would change the balance of power between primary care groups and HMOs that is now so one-sided.

If the government does not act to provide some protection for primary care providers, these providers will continue to bear the full burden of the imbalance between the government's desire to provide comprehensive services and its inability to pay for these services. HRSA will be faced with a decision. Its funds are now being used to subsidize care for reform patients. If these funds cease, many of the community health centers will not be able to continue to operate. This may happen even without action by HRSA. The losses reported for less than half of the reform patients served by community health centers for a six-month period of time totaled $9.5 million. If we extrapolate this to a full year and the full population (263,600), annual losses may approach $38 million. This exceeds HRSA funding by about $6 million.

If this situation is not ameliorated, reform and other indigent patients, especially in the non-metropolitan areas of Puerto Rico, will lose a significant access to health care services.

David E. Kelleher
HealthCare Options, Inc.

Exhibit 1
Page 1

**FQHC Experience with Reform Patients**
**October 2001 - April 2002**
**Self Reported Information**

| Name of CHIC | 1 | 2 | 3 | 4(a) | 4(b) | 5 | 6(a) | 6(b) | 7 | 8(a) | 8(b) | 9 | 10 | Totals Averages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Members in April | 40,233 | 7,887 | 7,198 | 7,759 | 5,929 | 5,127 | 2,641 | 7,518 | 13,703 | 9,219 | 3,130 | 4,678 | 7,905 | 122,927 |
| Member Months | 290,563 | 53,807 | 50,619 | 44,109 | 41,693 | 36,182 | 18,973 | 53,822 | 112,458 | 26,854 | 9,447 | 33,210 | 57,718 | 829,455 |
| Net Capitation | $10,129,803 | $1,614,383 | $1,605,157 | $1,380,244 | $1,252,638 | $1,074,027 | $711,190 | $1,711,000 | $3,492,792 | $805,620 | $283,410 | $993,838 | $1,783,643 | $26,923,744 |
| **Claims Expense** | | | | | | | | | | | | | | |
| Specialty Referrals | $1,007,429 | $138,975 | $71,515 | $121,645 | $100,094 | $63,978 | $15,857 | $162,261 | $651,356 | $17,412 | $15,063 | $49,092 | $106,033 | $2,551,610 |
| Hospital Care | $1,316,646 | $465,516 | $533,420 | $362,022 | $1,091,213 | $347,884 | $177,349 | $270,420 | $560,898 | $41,864 | $39,625 | $218,564 | $343,311 | $5,769,331 |
| Other Medical | $413,322 | $25,500 | $90,343 | $166,336 | $254,338 | $90,623 | $45,947 | $37,433 | $148,730 | $22,334 | $8,413 | $213,552 | $109,441 | $1,716,412 |
| Reserves & Retention | $548,882 | $346,133 | $128,211 | $83,804 | $95,591 | $57,656 | $3,991 | $242,614 | $481,454 | $186,637 | $60,551 | $29,281 | $198,621 | $2,415,426 |
| Rx Coverage | $2,809,524 | $223,860 | $184,348 | $398,999 | $362,806 | $523,926 | $211,150 | $664,105 | $1,406,669 | $138,911 | $73,167 | $441,212 | $789,936 | $8,228,697 |
| Total Claims Expense | $6,095,803 | $1,199,984 | $1,007,836 | $1,131,405 | $1,904,942 | $1,034,067 | $454,294 | $1,376,833 | $3,249,107 | $439,158 | $196,913 | $951,701 | $1,617,342 | $20,681,386 |
| **PMPM** | | | | | | | | | | | | | | |
| Net Capitation | $34.86 | $30.00 | $31.71 | $35.83 | $30.28 | $29.68 | $30.95 | $31.79 | $31.06 | $30.00 | $30.00 | $29.93 | $30.90 | $32.46 |
| **Claims Expense** | | | | | | | | | | | | | | |
| Specialty Referrals | $3.47 | $2.58 | $1.41 | $2.76 | $2.42 | $1.77 | $0.84 | $3.01 | $5.79 | $1.77 | $1.59 | $1.48 | $1.84 | $3.08 |
| Hospital Care | $4.53 | $8.65 | $10.54 | $8.22 | $26.17 | $9.61 | $9.35 | $5.02 | $4.99 | $1.56 | $4.19 | $6.58 | $5.95 | $6.96 |
| Other Medical | $1.42 | $0.47 | $1.78 | $3.77 | $6.10 | $2.50 | $2.42 | $0.70 | $1.32 | $0.83 | $0.90 | $6.43 | $3.46 | $2.07 |
| Reserves & Retention | $1.89 | $6.43 | $2.53 | $1.90 | $2.29 | $0.21 | $0.21 | $4.51 | $4.28 | $7.02 | $6.41 | $0.88 | $3.44 | $2.91 |
| Rx Coverage | $9.67 | $4.16 | $3.64 | $9.05 | $8.70 | $14.48 | $11.13 | $12.34 | $12.51 | $5.17 | $7.74 | $13.29 | $13.69 | $9.92 |
| Total Claims Expense | $20.98 | $22.30 | $19.91 | $25.70 | $45.69 | $28.58 | $23.94 | $25.58 | $28.89 | $16.35 | $20.84 | $28.66 | $28.37 | $24.93 |
| **Gain** | | | | | | | | | | | | | | |
| Net to FQHC | $4,034,000 | $414,399 | $597,320 | $446,838 | ($642,304) | $39,960 | $132,896 | $334,167 | $243,685 | $366,462 | $86,697 | $42,137 | $146,301 | $6,242,358 |
| Cost to FQHC | $4,229,743 | $408,723 | $976,518 | $410,800 | $908,336 | $1,005,729 | $634,645 | $1,788,569 | $2,360,586 | $957,295 | $143,438 | $692,870 | $1,245,663 | $15,753,025 |
| Gain | ($195,743) | $5,676 | ($379,198) | $35,948 | ($1,550,640) | ($965,769) | ($501,749) | ($1,454,402) | ($2,116,901) | ($590,833) | ($56,961) | ($640,733) | ($1,099,362) | ($9,510,667) |
| **PMPM** | | | | | | | | | | | | | | |
| Net to FQHC | $13.88 | $7.70 | $11.80 | $10.13 | -$15.41 | $1.10 | $7.00 | $6.21 | $2.17 | $13.65 | $9.16 | $1.27 | $2.53 | $7.53 |
| Cost to FQHC | $14.56 | $7.60 | $19.29 | $9.32 | $21.79 | $27.80 | $33.45 | $33.23 | $20.99 | $35.65 | $15.19 | $20.36 | $21.58 | $18.99 |
| Gain | -$0.67 | $0.11 | -$7.49 | $0.81 | -$37.19 | -$26.69 | -$26.45 | -$27.02 | -$18.82 | -$22.00 | -$6.03 | -$19.29 | -$19.05 | -$11.47 |

| **Budget** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Members in April | 40,233 | 7,887 | 7,198 | 7,759 | 5,929 | 5,127 | 2,641 | 7,518 | 13,703 | 9,219 | 3,130 | 4,678 | 7,905 | 100,083 |
| Member Months | 290,563 | 53,807 | 50,619 | 44,109 | 41,693 | 36,182 | 18,973 | 53,822 | 112,458 | 26,854 | 9,447 | 33,210 | 57,718 | 680,920 |
| Budget | $34.86 | $30.00 | $31.71 | $33.83 | $30.28 | $29.68 | $30.95 | $31.79 | $31.06 | $30.00 | $30.00 | $29.93 | $30.90 | $32.40 |
| **Rx Costs** | | | | | | | | | | | | | | |
| Claims | $9.67 | $4.16 | $3.66 | $9.05 | $8.70 | $11.13 | $11.13 | $12.34 | $12.51 | $5.17 | $7.74 | $13.29 | $13.69 | $10.90 |
| Internal | $5.45 | $2.62 | $3.66 | $0.00 | $12.07 | $3.13 | $11.03 | $10.96 | $6.20 | $12.96 | $5.55 | $8.90 | $1.81 | $7.04 |
| Total Rx | $15.12 | $6.83 | $4.27 | $9.05 | $20.78 | $11.31 | $22.16 | $23.30 | $18.71 | $18.13 | $13.29 | $22.20 | $15.50 | $17.94 |
| Funding Net of Rx | $19.75 | $23.17 | $27.44 | $26.78 | $9.51 | $3.89 | $8.79 | $8.49 | $12.35 | $11.87 | $16.71 | $7.72 | $15.41 | $14.55 |

Notes:

| 80% of IBNR to kx per discussion | Can't break kx reserves | Internal - can't separate Rx from other | Can't find internal Rx |
|---|---|---|---|

EXHIBIT B

## DECLARATION

I, Hector L. Cruz Batista, Director for the IPA Administration Department for MCS-HMO, declare under penalty of perjury and to the best of my knowledge and understanding as follows:

1. MCS-HMO has a contract with Concilio de Salud Integral de Loiza, Inc. ("Loiza") under which Loiza arranges for, or provides for medical services to, beneficiaries of the Commonwealth Health Insurance Plan known as Reforma who have selected a Loiza physician as their primary care physician ("IPA Beneficiaries") and Loiza assumes financial responsibility ("risk") for such medical services. Under that contract, Loiza also assumes the financial risk for institutional health services rendered to the IPA Beneficiaries. The contract holds Loiza harmless from the financial impact of IPA beneficiaries with certain catastrophic illnesses. The contract's terms were reviewed and approved by ASES.

2. Under the terms of the contract, Loiza is paid for the assumption of this health services financial risk in the form of a monthly per beneficiary fee -- denominated a "capitation payment." The capitation amount reflects the contractually agreed per beneficiary payment multiplied by the number of IPA Beneficiaries.

3. The contract provides that the capitation payment is to be allocated among a Medical Services Fund and an Institutional Health Services Fund and that claims submitted by IPA and non-IPA (specialist) physicians and hospitals, and other providers for services rendered to the IPA Beneficiaries are to be charged against these funds prior to the final distribution of the remaining funds. The contract also provides that, in the calculation of the surplus and deficit of the Medical Services Fund, an adjustment is to be made for claims which are incurred but not yet reported ("IBNR adjustment").

4. Under the contract, after the claims are paid and the IBNR adjustment is made, surplus in the Medical Services Fund is retained by Loiza and surplus in the Institutional Health Services fund retained Loiza.

5. Under the contract, before final distribution of sums from the Medical Services Fund, any surplus is to be used to off-set any deficit in the Institutional Health Services Fund. Likewise, the contract provides that, before distribution of surplus in the Institutional Health Services Fund, such surplus shall be used to off-set any deficit in the Medical Services Fund. The contract does not limits Loiza's financial responsibility for deficits in the Institutional Health Services Fund to the amounts available as surplus in the Medical Health Service Fund.

6. During the time period in question (January 2004-June 2005) the capitation amounts paid under the contract to accounts maintained to effect these arrangements have, in the aggregate, been $6,764,181.70 ($4,001,947.04 to the Medical Services Fund and $2,762,234.66 to the Institutional Health Services Fund). However, during this period the amounts charged under the contract against the Medical Services Fund and Institutional Health Services Fund have, in the aggregate, exceeded the amounts available in such funds. Thus, under the contract's terms, Loiza is currently in debt to MCS-HMO for deficits in the Medical Services Fund during that period.

Hector L. Cruz Batista
Director IPA Administrative Department
MCS-HMO

Date: 11/22/05

EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 07-1034 (RMC) |
| | ) | |
| Michael Leavitt, Secretary, et al. | ) | |
| U.S. Department of Health and Human | ) | |
| Services | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201 | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JOSE ORLANDO COLON

I, Jose Orlando Colon, declare under penalty of perjury as follows:

1.     My name is Jose Orlando Colon.  I am a Certified Public Accountant performing

accounting and auditing services in the Commonwealth of Puerto Rico.

2.     The information presented below is based on personal knowledge, experience in

dealing with and acting on behalf of Federally-qualified health centers ("FQHCs") in Puerto

Rico and work on matters relating to Puerto Rico's *Reforma* program for clients other than

FQHCs.  For more than 20 years, I have audited numerous FQHCs in Puerto Rico.  Those annual

audits have been conducted in accordance with federal law, including audit requirements under

Section 330 of the Public Health Service Act (from which Puerto Rico's FQHCs derive grant

funding) and the Single Audit Act.  I have, additionally, provided financial advice to virtually all

of the FQHCs in Puerto Rico.  I also, for approximately one year, was in charge of a health

center in New York City, which was in the process of being merged with another larger center.

3.    The remainder of this declaration is designed to answer questions put to me by lead counsel in the above-captioned case.

4.    **QUESTION 1 -- Are the two health center plaintiffs in this case -- Loiza and Belaval -- currently receiving payment for the services they are providing under Puerto Rico's Medicaid program?** The answer to this question is no. Although the District Court in Puerto Rico in the case of *Rio Grande Community Health Center, Inv. V. Rose Perez Perdomo, Secretary, Department of Health*, Case No. 03-1640 ("Rio Grande") issued final orders for payment to both FQHCs, the FQHCs are not currently being paid by the Medicaid program. Both FQHCs submitted payment requests to the office within the Puerto Rico Department of Health designated to review and approve FQHC payments after the District Court's final order (as to each). They followed that office's procedure, but utilized the payment formula the District Court's orders required. Both FQHCs were refused payment by that office. Loiza's most recent payment request was for second quarter 2007. Belaval's most recent request was also for second quarter 2007. The District Court, for reasons that I do not understand, has refused to enforce its payment orders on those two FQHCs' behalf. Unless these FQHCs obtain judicial relief, there is no reason to believe they will receive payments based on the District Court's final orders.

A.    **QUESTION 2 -- Did the District Court's payment orders award full compensation to the two FQHCs as required by the FQHC payment provisions in the Medicaid statute?** Again, the answer to this question is no. For both FQHCs, the District Court issued orders that did not comport with those payment provisions as I understand them. (I assume for this purpose that the orders are based on the Court's prior payment formula. Our counsel suggests that even this is not clear.) In the first place, the orders provided payment based on an assumption that each FQHC's Medicaid enrollment was 56.5% of its total number of

2

*Reforma* enrollees. (*Reforma* is Puerto Rico's managed care program aimed at the Medicaid population and certain other poor residents.) Both centers treat far more Medicaid patients than the arbitrarily assumed 56.5%. A second problem with the District Court's payment orders is that they provide for an arbitrary 30% reduction in payments that would otherwise be due. Finally, they make no adjustments for inflation, even though the law requires such adjustments. I describe the 30 percent reduction as "arbitrary" because the District Court has never provided a rationale for imposing it, and despite numerous attempts by counsel to remove it, the District Court has continued to utilize it (even though the Court, for some preliminary injunctive orders, did not impose it, but stated no specific reason as to why, other than to imply that it was in the nature of punishment for the failure to make payment in the first place).

5.        **QUESTION 3 -- Do the Puerto Rico HMOs pay the FQHCs the amounts to which they are entitled by virtue of the Medicaid statute?** The answer to this question again is no. Section 1396b(m)(2)(A)(ix), of Title 42 of the United States Code provides that a Medicaid managed care entity (such as Puerto Rico's HMOs) that contracts with an FQHC "shall provide payment [to the FQHC] that is not less than the level and amount of payment which the [HMO] would make for the [FQHC] services if the services were furnished by a provider which is not a Federally-qualified health center…" As I understand that provision, the payment the Medicaid HMO has to make would be that which it would have to make for the specific FQHC services the FQHC provided under the HMO's contract to another provider than the (or an) FQHC. In short, the required payment is a direct payment for the specific services provided.

None of the Puerto Rico HMOs, including the HMO that contracts with the plaintiffs in this case, makes such payment or enters into contracts with the FQHCs that call for such payments. Instead, as the Complaint in this case reflects, the HMOs enter into risk-based

contracts with the FQHCs pursuant to which the FQHCs are given a monthly fee, or "capitation", per enrollee from which the FQHC and providers of services other than FQHC services must be paid. These other services are those provided by specialists, hospitals, radiological clinics, independent laboratories, *etc.* In essence, the contract turns the FQHCs into mini insurance companies for virtually all of the services Puerto Rico provides to the Medicaid beneficiaries the FQHCs are assigned. However, unlike insurance companies, the HMO, not the FQHC, negotiates and enters into the contracts with those service providers. These other providers also submit invoices for payment directly to the HMO, not the FQHC. The FQHC has no say in approving payments to those other providers, nor does it have any say as to the terms of the contract the HMOs enters into with those other providers.

There are several results of this risk-based contracting approach: (1) the FQHCs only control over the risk aspect of the contracts is not to refer patients to other providers. (Except for emergencies (and certain other isolated situations), the primary care function the FQHCs perform puts them in the position where, unless they refer the enrollees to another provider, the HMO will not pay for any services the enrollee receives from another provider), and (2) to the extent they benefit from their HMO contracts, it is because there is something left over for them after their capitations are used to pay the other providers' claims (or plaintiff Belaval's situation, described below).

In the case of plaintiff Loiza, the payouts of funds to the other providers are greater than Loiza's total capitation payments. Thus, Loiza literally loses money for every enrollee assigned to its care. In the case of Belaval, it has been paid something, but only because Belaval also contracts for certain specialty services for which the HMO pays a fee for service rate. (In effect, Belaval becomes another provider, receives a separate fee contract from the HMO (from is basic

4

contract) for those services and then refers to itself.) The irony is that when Belaval receives a

payment for such other services, the payment amount is deducted from its basic capitation under

its original contract. In effect, therefore, Belaval is paying itself for the specialty service.

Belaval's payments from the HMO have been shrinking. It is my belief that Belaval soon will be

in Loiza's position where it will actually lose money for every enrollee the HMO assigns to its

care.

6.     **QUESTION 4 -- Is the contract the FQHC plaintiffs receive for basic services**

**from the *Reforma* HMO the same one the HMOs enter into with private doctor groups or**

**IPAs (independent physician associations) for such basic services?** Yes. It is the same.

However, the doctor groups have no Section 330 grant to fall back on when the HMO effectively

fails to pay them for their services. Accordingly, unlike the FQHCs, which (fortunately) ignore

the financial consequences of referrals and make them where medically indicated, the groups

tend to withhold referrals in all but extreme cases.

7.     **QUESTION 5 -- Is the *Reforma* HMO referring all enrollees in Belaval's**

**service area to Belaval?** No. The HMO, according to reports made to Belaval by recent

*Reforma* enrollees who sought to be assigned to Belaval for primary care (and other services), is

refusing to make assignments to Belaval.

8.     **QUESTION 6 -- Can plaintiffs serve enrollees outside their service area (or**

**in their area, but assigned to another provider)?** No. The HMOs do not permit their

enrollees to obtain care from other primary care providers than the one to which the enrollee is

assigned. This is even true where the enrollee shows up at an FQHC and seeks care for a

problem that could not have been anticipated and reports that his/her assigned provider has told

him/her that it (or he/she) has no time to see the patient that day. If the FQHC sees and treats the

5

enrollee anyway, and all of them will and do, the HMO will not pay them for the service. (There is no provision for payment by the Commonwealth in such a situation.)

9.    **QUESTION 7 -- Have *Reforma* HMOs refused to contract with FQHCs?**
Yes. I know of at least two cases where FQHCs sought contracts for their service areas or portions of their service areas and were refused by the HMO. Because there is only one *Reforma* HMO with which to contract,[1] the FQHCs were effectively disqualified from serving Medicaid patients in those areas. At least one of these FQHCs asked the Health Department to direct the HMO to contract with the center. The Department advised that it had no authority to so direct the HMO.

10.    **QUESTION 8 -- Are CMS and the Puerto Rico Department of Health (the State Medicaid agency) aware of the manner in which the FQHCs are being paid?** I know the Department of Health is fully aware of how the FQHCs are being paid, not just because of the *Rio Grande* lawsuit (and other legal actions other FQHCs have brought regarding their HMO contracts) but also because I attempted to secure for the FQHCs different contractual arrangements before any of the FQHCs brought any legal actions over their HMO contracts. I dealt with, among others, Department of Health officials and complained to them about the effect of the contracts the HMOs were imposing on the FQHCs. Those officials refused to provide any assistance to me and told me that they had no authority to tell the HMOs how to contract with FQHCs. As to CMS, I know that the Bureau of Primary Health Care within the Department of Health and Human Services' health care financing administration was well aware of how the HMOs were contracting with the FQHCs and the problems those contracts were causing.

---

[1] Of Puerto Rico's 10 regions for *Reforma*, all but one (and then very recently through limited demonstrations) has only one HMO.

Indeed, that Bureau, which oversees the Section 330 Public Health Service Act grant program, sent consultant after consultant to Puerto Rico either to analyze the problems that the FQHCs were encountering or to help the FQHCs file requests for payment with the Health Department. It was my understanding that Bureau representatives reported the problems to CMS and sought CMS' help. Obviously, they were unsuccessful because the problems continue.

11.   **QUESTION 9 -- Will the *Reforma* HMOs contract with the FQHCs on any other basis?** No. I have on a number of occasions, including after the FQHCs were told (in 2002) by a HRSA official to modify the contracts and remove the risk, asked the HMOs to issue different contracts to the FQHCs. I was told each time that the contracts, as written, were "take it or leave it" and that the HMOs would not modify them.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

*9-24 2007*
Date

Jose Orlando Colón

7

EXHIBIT D

*Exhibit A*

1
2

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

3   RIO GRANDE COMMUNITY HEALTH
    CENTER, INC., et al.,
4       Plaintiffs,

5       v.                                         CIVIL NO. 03-1640(JAG)

6   JOHNNY RULLAN, SECRETARY,
    DEPARTMENT OF HEALTH,
7       Defendant

8

9   <u>OPINION AND ORDER</u>

10        Before the Court's consideration is plaintiff Concilio de Salud Integral de Loiza, Inc.'s

11  Motion for Temporary Restraining Order (Docket No. 31). Said motion was treated as one for

12  preliminary injunctive relief by Magistrate-Judge Gustavo A. Gelpí, who held a hearing on the

13  matter on March 15, 2004 (<u>see</u> transcript of hearing (Docket No. 41)). Although the matter was

14  originally referred to the magistrate for a report and recommendation, the urgency and importance

15  of the relief sought by the appearing plaintiff have prompted this Court to act immediately on the

16  motion.[1] More so, the Court need not consider matters outside of the hearing transcript (Docket No.

17  41), parties' memoranda (Docket Nos. 36, 37) and supplemental memoranda (Docket Nos. 42, 44),

18  which are in the record.

19        In the matter now before the Court, Concilio de Salud Integral de Loiza, Inc. (hereinafter

20  "Loiza") seeks an emergency payment from the Commonwealth Department of Health ("DOH")

21  under the Medicaid program, which is extensive to this jurisdiction. At the outset, the Court notes

22  that this case does not present Eleventh Amendment immunity problems for two reasons. First, the

23  plaintiffs do not seek monetary damages from the Commonwealth or any of its officials. Second,

24  the Secretary of the DOH, Dr. Rullán, is sued only so that he will fulfill his prospective duty to

25  comply with federal law. This Court thus has the authority to act on the matter and enjoin the state

26  official. See <u>Ramirez v. Puerto Rico Fire Service</u>, 715 F.2d 694, 697 (1ˢᵗ Cir. 1983); <u>N.P.P. v.</u>

27

28

[1]The other motions for preliminary injunctive relief referred to Magistrate Gelpí for report
and recommendation, however, remain under his consideration. See Docket Nos. 30, 37, 43, 45.

1 | **CIVIL NO. 03-1640(JAG)**                    2

2 | Hernández-Colón, 779 F. Supp. 646, 652 (D.P.R. 1991).

3 |       The Medicaid statute has, since January 1, 2001, required a supplemental payment to be

4 | made quarterly to every federally qualified health center ("FQHC") in the Commonwealth's

5 | Medicaid program. See 42 U.S.C. §§ 1396a(bb)(1)-(5). Up to date no such payments have been

6 | made to any FQHC, including Loiza. See Transcript of hearing at page 124, lines 14-15. In this

7 | respect, plaintiff has shown a likelihood of success on the merits of his claim. The Court notes that

8 | defendant does not contest the alleged lack of Medicaid payments to FQHC's, particularly here,

9 | Loiza. Rather, he notes that as a consequence of a parallel case before the Commonwealth Court

10 | of First Instance, he is conducting an audit of all FQHCs, which is expected to conclude by the end

11 | of May, 2004 – two (2) months from now.[2] See Defendant's Supplemental Memorandum (Docket

12 | No. 44) at ¶¶ 8, 9, 12, 17. The Court notes that the relief sought in the sister state court case differs

13 | from that sought in the present case, inasmuch as the present plaintiffs solely seek prospective

14 | injunctive relief. In the local case, plaintiffs also seek backpay of all unpaid Medicaid payments.

15 | As plaintiff herein only seeks prospective corrective action based on a violation of federal law,

16 | abstention under Younger v. Harris, 401 U.S. 37 (1971) and Colorado River Water Conservation

17 | District v. United States, 424 U.S. 800 (1976) is inappropriate. Further a stay based on comity

18 | principles is also unwarranted at this time since this action is not a vehicle to sidestep an unfavorable

19 | state court ruling which has been unfavorably appealed to an intermediate appellate court and is now

20 | before the state's highest tribunal. Cf. Cruz v. Melecio, 204 F.3d 14 (1st Cir. 2000).

21 |       The Court has also considered the parties' respective hardships should it issue any injunctive

22 | relief, as well as the public interest involved. In this case the balance clearly tips toward's Loiza's

23 | side. If no payment is promptly received by Loiza, it will have to close its doors. If this occurs,

24 | hundreds of Medicaid patients, in turn, will also be affected. On the other hand, the issuance of

25 | quarterly payments, during the time the defendant's audit is conducted, will not drastically affect

26 | the public fisc.

27 | ────────────

28 |

    [2]The partial judgment in the local case, however, is not final, the same having been appealed by the Commonwealth defendants.

1   CIVIL NO. 03-1640(JAG)                    3

2           Wherefore, in light of the aforestated, the Court hereby orders the following prospective

3   injunctive relief:

4           1.      Dr. Rullán shall cause the DOH to make the first quarter 2004 FQHC payment due
                    to Loiza(for the months of January, February and March of 2004) on or before April
5                   7, 2004.

6           2.      In computing the first quarter payment, Dr. Rullán shall use the number of Medicaid
                    patients annually served by Loiza during 1999-2000, to wit, 8009.[3]
7
            3.      The above number shall be multiplied by one fourth (1/4) of the annual total average
8                   of Medicaid patient cost incurred by Loiza during 1999-2000, to wit, $ 644.49.  This
                    fraction amounts to $ 161.17.
9
            4.      Dr. Rullán, may in turn, deduct any sums paid to Loiza by a managed care entity for
10                  the provisions of services to Medicaid during the first quarter of 2004.

11          5.      Dr. Rullán shall not deduct grant funds Loiza has received under the Public Service
                    Health Act.
12
            6.      If Dr. Rullán cannot be rapidly and effectively calculate items 4-5 above, he shall
13                  base his payment amount exclusively on the numbers in items 2-3, above.

14          7.      Plaintiff, Loiza, through its board of directors, in turn, shall immediately provide,
                    upon defendant's request and order from this Court, a certified statement along with
15                  the corresponding evidence as to how the funds disbursed to it by Dr. Rullán are
                    managed.
16
            8.      Upon receipt of the funds, the Directors of Loiza's Board of Directors, and the
17                  corporation's Executive Officers, in their individual capacities, are accepting this
                    order, and are subject to this Court's jurisdiction in regards to any matters stemming
18                  from the present order.

19          The Court expects full and prompt compliance with this order.  Counsel for Dr. Rullán shall

20  immediately inform him of the same.  Counsel for Loiza shall immediately do the same with respect

21  to the members of its Board of Directors and Executive Officers.

22          Should plaintiffs or defendants fail to comply with this order, the affected party is authorized

23  to seek from Magistrate Judge Gelpí any immediate remedy such as, but not limited to, attachment.

24  If the remedy sought involves contempt of court, the magistrate shall issue a report and

25  recommendation.

26

27  _____

28
            [3]This figure, as well as that in item 3, was provided by the DOH auditor at the hearing before
    Magistrate Gelpí.

CIVIL NO. 03-1640(JAG)                    4

A request for payment of second quarter FQHC funds may be made by Loiza should the DOH audit not be completed by the end of said period, and/or payment for said period does not appear to be forthcoming.

SO ORDERED.

In San Juan, Puerto Rico this 31st day of March, 2004

S/Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge

1
2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

3   RIO GRAND COMMUNITY HEALTH
    CENTER, INC., et al.
4
        Plaintiffs,
5                                               **CIVIL NO.**  03-1640 (JAG)
            v.
6
    JOHNNY RULLAN, SECRETARY,
7   DEPARTMENT OF HEALTH,
8       Defendant.
9

10                          **REPORT & RECOMMENDATION**

11   _____This is an action for injunctive relief brought by Rio Grande Community Health Center,

12   Inc., and others, against Johnny Rullán in his capacity as the Secretary for the Department of

13   Health.  Plaintiffs bring this action under 42 U.S.C. § 1396, alleging that the defendant has failed

14   to issue quarterly payments in violation of the federal Medicaid statute and Puerto Rico's Medicaid

15   program.  See 42 U.S.C. § 1396(a)(bb)(1)-(3).   Plaintiffs seek prospective injunctive relief to

16   compel the defendant to implement a "wraparound" payment system as required by Title 42 of the

17   United States Code, section 1396a(bb)(5).

18       Before the Court are plaintiffs' motion for preliminary injunction (Docket No. 30) and

19   defendant's motion to dismiss (Docket No. 37).

20   **I. Background**

21       The plaintiffs to this action are three (3) incorporated health care providers located within

22   the Commonwealth of Puerto Rico, specifically, Rio Grande Community Health Care Center, Inc.,

23   Concilio de Salud Integral de Loiza, Inc., and Junta Del Centro De Salud Comunal, Dr. José S.

24   Belaval, Inc..  Plaintiffs provide health care services to members of the low-income community

25   who lack medical insurance and cannot obtain health care from private sector physicians or clinics.

26   (Docket 1, p. 3 ¶ 5).  As with most health care providers, plaintiffs receive funding and

27   reimbursement from numerous governmental agencies that administer federal and state Medicaid

28   programs.

**CASE NO.** 03-1640 (JAG)                    2

    A. <u>Community Health Centers and FQHCs</u>

       Health care providers that qualify as "community health centers" are eligible to receive federal funding under Section 330 of the Public Health Service Act ("PHSA"). 42 U.S.C. § 254(b). All three (3) plaintiffs qualify under PHSA, and have received and continue to receive Section 330 grants. (Docket 1, p. 4 ¶ 11). Section 330 grants are designated for patients who lack any type of medical insurance, Medicaid or otherwise. (Docket 1, p. 5 ¶ 14).

       In addition, health care providers that qualify as "federally qualified health centers" ("FQHCs") are eligible to receive reimbursement for treating patients who are covered by Medicaid. Under the Omnibus Budget Reconciliation Act ("OBRA") of 1989, any health care provider that receives Section 330 grants automatically qualifies as a FQHC under the Medicaid program. 42 U.S.C. § 1396d(1)(2)(B); 42 U.S.C. § 254(b). Thus, each plaintiff is also an FQHC.

       According to OBRA, states that participate in the Medicaid program must fully reimburse FQHCs for all costs that are reasonably related to the treatment of Medicaid-eligible patients. (Docket 1, p. 7 ¶ 20). Since 1989, the year of OBRA's enactment, until December 31, 2000, the FQHCs would receive reimbursement for Medicaid-eligible patients by first filing a request with the state's Medicaid agency. The state would then issue the FQHC an "interim" payment, which was an estimate of services rendered. At the end of the fiscal year, each FQHC would file a cost report with the state Medicaid agency reporting the FQHC's total "allowable" costs for the year. <u>Id</u>. Allowable costs, as defined by OBRA and the Medicaid statute, were costs expended by the FQHCs, which included all Medicaid-covered services, regardless of whether each Medicaid-eligible patient eventually qualified for coverage. <u>Id</u>. The FQHCs' allowable costs were then divided by the number of patient visits to produce a per-visit rate. Once a per-visit rate was established, that rate was multiplied by the number of total FQHC visits by Medicaid patients. If the resulting sum was more than the amount paid to the FQHC through interim payments, the state would pay the FQHC the difference. <u>Id</u>.

    B. <u>The introduction of Managed Care in Puerto Rico</u>

       This payment system became complicated when states, including Puerto Rico, adopted

1  **CASE NO**. 03-1640 (JAG)                3

2  "managed care" for their Medicaid programs.  Under managed care, the state Medicaid agency

3  contracted with managed care organizations ("MCOs") to arrange for the delivery of health care

4  services to Medicaid patients.  The state pays each MCO a fixed monthly sum for each person

5  assigned to the MCO.  Upon accepting the fixed sum, the MCO is responsible for absorbing the

6  cost of all Medicaid-covered services to each assigned individual.  If the MCO's costs are less than

7  the fixed sum per person, than the MCO retains the difference as profit.  If the fixed sum is less than

8  the cost the MCO's expends for care per person, the MCO must pay the difference.  Thus, MCOs

9  were originally designed to absorb the insurance risk.

10       Under the managed care scenario, the MCOs contract directly with the FQHCs.  Thus, the

11  FQHCs receive payment directly from the MCO for Medicaid services, and not from the state

12  Medicaid agency.  As a private entity, the MCO only pays the FQHCs the "market rate" for

13  services rendered because MCOs are not restricted by the regulations of OBRA, which required full

14  (100%) cost reimbursement to FQHCs providing treatment to Medicaid patients.    Thus, MCO

15  payments to FQHCs were significantly lower than the congressionally-required amount under

16  OBRA.

17       C. The Balanced Budget Act of 1997

18       In 1997, Congress sought to ensure that FQHCs received 100% cost reimbursement in

19  managed care states through the Balanced Budget Act of 1997 ("BBA").  Section 4712 of the BBA

20  requires that MCOs must pay FQHCs "not less" than they pay other non-FQHC providers.  42

21  U.S.C. § 1396b(m)(2)(A).  The state is therefore required to assume the responsibility of directly

22  providing each FQHC with a "supplemental payment equal to the amount . . . by which the FQHCs'

23  reasonable costs exceed the amount of payments the FQHC receives from the MCO."  42 U.S.C.

24  § 1396a(A)(13)(C).  This supplemental payment is known as the "wraparound."

25       In December 2000, Congress again altered the terms of FQHC reimbursement.  42 U.S.C.

26  § 1396a(bb).  Under the new law, each FQHC's reasonable cost for fiscal years 1999 and 2000 were

27  calculated and converted to a per-visit rate, much like the pre-MCO arrangement that existed

28  between the FQHCs and the state Medicaid agency.  After January 1, 2001, FQHCs must be paid

1   **CASE NO**. 03-1640 (JAG)        4

2   the per-visit rate. The 2000 law retained state responsibility for making wraparound payments to

3   FQHCs. Because FQHC payments from MCOs will be less than would be due under the particular

4   FQHC's per visit rate, the state must pay the difference. 42 U.S.C. § 1396a(bb)(5). Accordingly,

5   the Commonwealth of Puerto Rico has been required to issue federally-mandated wraparound

6   payments to FQHCs.

7        D. <u>Wraparound payments and FQHCs located in Puerto Rico</u>

8        Up to this date, no payments have been made to any FQHC, including plaintiffs. (<u>See</u> Tr.

9   at 124, 14-15). In addition, the defendant does not contest its obligation to issue wraparound

10   payments to qualified FQHCs. <u>Id</u>.

11        On March 31, 2004, after a hearing on the matter, the Court (García-Gregrory, J.) granted

12   plaintiff Concilio de Salud Integral de Loiza's ("Loiza") motion for temporary restraining order

13   (Docket No. 31), which this Court treated as a motion for preliminary injunctive relief. (Docket

14   48). The Court ordered the defendant, Dr. Rullán, to cause the Department of Health (DOH) to

15   make the first-quarter 2004 FQHC payment due to Loiza on or before April 7, 2004. (Docket 48).

16   Said payment was made on April 23, 2004. (Docket No. 56).

17        This opinion will address the remainder of plaintiffs' claims, and defendant's objections

18   thereto.

19   **II. <u>Standards of Review</u>**

20        A. <u>The Preliminary Injunction Standard</u>

21        The preliminary injunction standard requires a trial court confronted with a motion for

22   preliminary injunction to consider four (4) elements: 1) the probability of the movant's success on

23   the merits; 2) the prospect of irreparable harm absent the injunction; 3) the balance of the relevant

24   equities; and 4) the effect of the court's action on the public interest. <u>Rosario-Urdaz v. Rivera-</u>

25   <u>Hernández</u>, 350 F.3d 219, 221 (1st Cir. 2003).

26        B. <u>The Motion to Dismiss Standard</u>

27        When ruling on a 12(b)(6) motion, a court must accept all well-pled factual averments as

28   true and must draw all reasonable inferences in the plaintiffs' favor. <u>Berezin v. Regency Sav.</u>

CASE NO. 03-1640 (JAG)                    5

Bank., 234 F.3d 68, 70 (1st Cir. 2000).  A court should not dismiss a complaint for failure to state

a claim or for lack of subject matter jurisdiction unless it is clear that plaintiff will be unable to

recover under any viable theory. LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir.

1998); Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992).  The First

Circuit has stated that "a complaint must set forth a factual allegation either direct or inferential

respecting each element necessary to sustain recovery under some actionable legal theory." Berner

v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997).  "However, a Court will not accept a plaintiff's

unsupported conclusions or interpretations of the law" and is free to ignore "periphrastic

circumlocutions and the like." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

        Because defendant's motion to dismiss raises jurisdictional and prudential issues, this Court

must first examine whether plaintiffs' action is properly before the Court  before it can examine

whether plaintiffs have a substantial likelihood of success on the merits.  The Court also notes that

the standard plaintiffs' must surpass in order to succeed on their preliminary injunction motion,

likelihood of success on the merits, is higher than the one they must surpass to defeat defendants'

motion to dismiss.  Quiles Rodríguez v. Calderón, 172 F. Supp. 2d 334, 339 (D.P.R. 2001).

**III. Analysis**

        The Court first notes that plaintiffs' cause of action is not barred by the Eleventh

Amendment, as the Supreme Court has ruled that a suit challenging the legality of a state official's

actions is not a suit against the state.  See Ex Parte Young, 209 U.S.  123, 125 (1908).  This

principle is limited to prospective injunctive relief.  In addition, this Court has the authority to

enjoin a state official who fails to comply with federal law.  See Ramírez v. P.R. Fire Serv., 715

F.2d 694, 697 (1st Cir. 1983); N.P.P. v. Hernández-Colón, 779 F. Supp. 646, 652 (D.P.R. 1991).

Plaintiffs do not seek monetary damages from the Commonwealth or any of its officials in the

present action.  Plaintiffs' seek only to ensure that Dr. Rullán, as Secretary to the Department of

Heath, fulfills his prospective duty to comply with federal law.  See generally, Ex Parte Young,

209 U.S. at 125.

        A. Defendant's motion to dismiss

**CASE NO.** 03-1640 (JAG)                                    6

The defendant has moved this Court to dismiss plaintiffs' action on four grounds: 1) lack of subject matter jurisdiction; 2) lack of standing under the Medicaid statute; 3) abstention under Younger v. Harris; and 4) mootness. (Docket No. 37). The Court will address each of defendant's arguments in turn.

### 1. Lack of Subject Matter Jurisdiction

Defendant fails to properly develop this argument. Defendant simply states that this Court lacks subject matter jurisdiction because "the plaintiffs fail to state a claim upon which relief can be granted." (Docket 37, p. 2 ¶ 3). The plaintiffs have invoked federal jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). As this claim arises under 42 U.S. § 1396, specifically, administration of the federal Medicaid statute, this Court finds that federal jurisdiction is appropriate.

### 2. Lack of Standing

According to the defendant, plaintiffs lack standing under 42 U.S.C. § 1396 because plaintiffs are no longer FQHCs. If plaintiffs are no longer designated FQHCs, than the defendant cannot be responsible for plaintiffs' ongoing injury because it was not required to issue further payments under the Medicaid statute. (Docket 37, p. 10 ¶ 2).

Article III standing imposes three strict requirements on the party invoking federal jurisdiction: 1) plaintiff must suffer an injury in-fact; 2) the injury suffered is fairly traceable to the defendant's alleged unlawful conduct; and 3) plaintiff's requested relief is redressable by the courts. Allen v. Wright, 468 U.S. 737, 751 (1984). In short, if plaintiffs no longer receive Section 330 funds, then they have lost their designation as FQHCs, thus, the plaintiffs have failed to satisfy the causation element of Article III standing.

Defendant's argument fails for several reasons. First, 42 U.S.C. § 1396d(1)(2)(B) accords FQHC status to an entity that meets the requirements *to receive* Section 330 grants. Thus, plaintiffs would qualify as FQHCs merely by meeting the eligibility requirements for Section 330 funding. All three plaintiffs have done so. (Docket 51, p. 2 ¶ 2). Second, the defendant has failed to present

CASE NO. 03-1640 (JAG)                    7

evidence that demonstrates plaintiffs' loss of FQHC status past mere speculation. Defendant's only

evidentiary support for this allegation is a letter received by Río Grande, which threatens to revoke

its Section 330 funding. There is no evidence in the record that plaintiffs' Section 330 funding was

actually revoked. In addition, defendants failed to challenge plaintiffs' FQHC status during the

March 15, 2004 evidentiary hearing. The Court finds that plaintiffs have retained their FQHC

status, and thus have standing to bring this action under 42 U.S.C. § 1396.

    3. Younger Abstention

    The defendant has requested this Court to refrain from ruling in this case based on the

principles of abstention outlined in Younger v. Harris. 401 U.S. 37 (1971). The defendant argues

that plaintiffs have a similar proceeding pending in state court and any ruling by this Court would

interfere with the state court's proceedings. (Docket 37, p. 8 ¶ 3). Younger is a court-made rule

of abstention built around the principle that, with limited exceptions, federal courts should refrain

from issuing injunctions that interfere with ongoing state-court litigation, or, in some cases, with

state administrative proceedings. 401 U.S. 37, 44. Younger abstention is appropriate where there

is a ongoing state proceeding that implicates important state interests, and the state court proceeding

affords an adequate opportunity to raise constitutional claims. Middlesex County Ethics Comm.

v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982).

    Although plaintiffs are a party to an ongoing state proceeding involving FQHC claims, the

relief plaintiffs seek in this venue is quite different from the relief they seek at the state level. Here,

plaintiffs seek only prospective injunctive relief to compel the defendant to implement the

statutorily required FQHC payment system. Specifically, plaintiffs' seek to ensure that Dr. Rullán,

as Secretary to the Department of Heath, fulfills his prospective duty to comply with federal law.

In the state court proceeding, plaintiffs seek backpay damages for the defendant's failure to issue

wraparound payments allegedly due since 1997. In addition, the prospective relief sought is based

on the defendant's violation of federal law. Plaintiffs seek only corrective relief to ensure that Dr.

Rullán  implements a "wraparound" payment system in accordance with Title 42 of the United

States Code, section 1396a(bb)(5). Thus abstention under Younger is inappropriate. 401 U.S. 37,

45 (1971). Further, a stay based on comity principles is also inappropriate because this action is

**CASE NO.** 03-1640 (JAG)                    8

not a vehicle to sidestep an unfavorable state court ruling that is now before the state's highest

tribunal. See Cruz v. Melecio, 204 F.3d 14, 16 (1st Cir. 2000).

    4.) Mootness

    Finally, the defendant argues that plaintiffs' motion for preliminary injunction is moot,

basing his argument on largely the same reasoning he uses in favor of abstention. (Docket 37, p.

11 ¶ 3). Plaintiffs' motion for preliminary injunction would be rendered moot only if the

prospective relief sought occurred before this Court could rule on the motion. Almond v. Capital

Properties, Inc., 212 F.3d 20, 23 (1st Cir. 2000). To date, defendant has yet to demonstrate to this

Court that he has implemented the statutorily required FQHC payment system. Moreover, the

defendant admitted during the March 15, 2004 hearing that no wraparound payments had ever been

issued to plaintiffs. (See Tr. at 124). The prospective relief sought has not occurred, thus, plaintiffs

request for relief is not moot.

    For the reasons stated herein, this Court must **DENY** the defendant's motion to dismiss

(Docket No. 37).

    B. Plaintiffs' Motion for Preliminary Injunction

    As one noted commentator explains, "a preliminary injunction is an injunction that is issued

to protect plaintiffs from irreparable injury and to preserve the court's power to render a meaningful

decision after a trial on the merits." 11 Wright & Miller, Federal Practice and Procedure § 2948

(2d ed. 1987). Equitable remedies should be granted with discretion and only when the Court is

satisfied that certain requirements are met. Anheuser-Bush, Inc. v. Teamsters Local No. 633, 511

F.2d 1097, 1098 (1st Cir. 1975).

    Evidentiary hearings are often desirable at the preliminary injunction stage. Aoude v.

Mobile Oil Corp., 862 F.2d 890, 894 (1st Cir. 1988). If the trial court has before it competing

submissions of evidentiary quality or if the answer to the likelihood-of-success inquiry is readily

apparent, than respect ordinarily will be afforded to a court's decision not to convene an evidentiary

hearing. Id. If there is any doubt by the presider, however, such doubt should be resolved in favor

**CASE NO.** 03-1640 (JAG)              9

of taking evidence. Id. This Court held an evidentiary hearing on the March 15, 2004, to provide the parties with an opportunity to present their arguments and allow for a meaningful assessment of plaintiffs' likelihood of success.

### 1. Plaintiffs' Likelihood of Success

Plaintiffs have a strong likelihood of success on the merits. Since the BBA's enactment in 1997, the Medicaid statute has required the Commonwealth to issue federally-mandated wraparound payments to qualified FQHCs. Up to this date, no payments have been made to any FQHC, including plaintiffs. (See Tr. at 124, 14-15). The defendant does not contest its obligation to issue wraparound payments to qualified FQHCs, and plaintiffs have provided sufficient evidence to demonstrate their status as FQHCs. Id. "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). The defendant has failed to raise any meaningful substantive argument to contest its obligation under the statute. The Court finds that plaintiffs' have shown a substantial likelihood of success on the merits.

### 2. Irreparable Injury

The plaintiffs' have also show the prospect of irreparable harm absent the preliminary injunction. Witness testimony during the March 15, 2004, hearing indicates that plaintiffs will be forced to close their doors if the defendant continues to ignore the wraparound payment system mandated by 42 U.S.C. § 1396a(bb)(5). Plaintiffs provide health care services to low-income persons who do not have access to other health care providers. (Docket 1, p. 3 ¶ 5). If plaintiffs are forced to close their doors, existing patients would loose their access to even the most basic health care. Accordingly, plaintiffs have shown irreparable injury.

### 3. Balance of Harm

The harm weighs heavy upon plaintiffs. If prospective injunctive relief is not granted, plaintiffs will be forced to close their doors, and a large percentage of the low-income population would loose their access to health care. The Commonwealth, on the other hand, would only be

**CASE NO.** 03-1640 (JAG)                10

compelled to comply with the federal Medicaid program - a program in which it elected participation. Thus, plaintiffs bear the greater risk if injunctive relief is not granted.

    4. <u>Public Interest</u>

    Granting plaintiffs' motion for preliminary injunction weighs in favor of the public interest. Health care for low-income persons is vital to the well being of the community. If plaintiffs' doors were shut, current patients would forgo basic and/or preventative health care. Forgoing such preventative care would only lead to increased health complications and an unhealthy population. Moreover, the Commonwealth's continued failure to issue payments would have a chilling effect on health care providers that would otherwise consider accepting low-income and/or Medicaid patients.

    For the reasons stated herein, this Court must **GRANT** plaintiffs' motion for preliminary injunction (Docket 30).

    Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of the Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. See <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985), <u>reh'g denied</u>, 474 U.S. 1111 (1986); <u>Davet v. Maccorone</u>, 973 F. 2d 22, 30/31 (1st Cir. 1992).

    **SO RECOMMENDED**
In San Juan, Puerto Rico, this 29th day of April, 2004.

                    S/ **Gustavo A. Gelpi**
                    **GUSTAVO A. GELPI**
                    United States Magistrate-Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RIO GRANDE COMMUNITY HEALTH
CENTER, et al
    **Plaintiff(s)**

      v.

COMMONWEALTH OF PR, et al
    **Defendant(s)**

**CIVIL NO.** 03-1640(JAG)

## ORDER

Having reviewed Magistrate Judge Gelpí's Report and Recommendation (Docket No. 63), as well as the Defendant's Objections thereto (Docket No. 77) and Plaintiff's Response (Docket Nos. 80 and 81), the Court hereby ADOPTS the same.

As did Magistrate Judge Gelpí, this Court also concludes that defendant has failed to issue to plaintiffs quarterly payments in violation of the federal Medicaid statute, 42 U.S.C. § 1396(a)(bb)(1)-(3). Thus, plaintiffs are entitled to a preliminary injunction ordering defendant to promptly implement the "wraparound" payment system required by 42 U.S.C. § 1396a(bb)(5).

In light of the above, the Court hereby ORDERS the following:

i.   Defendant shall, on or before November 30, 2004, fully implement its "wraparound" payment system, so as to fully comply with the FQHC requirements of the Medicaid statute, for the purpose of providing such payments thereunder to plaintiffs.

ii.  The defendant shall certify to the Court no later than November 30, 2004, that its "wraparound" payment plan is in effect.

iii. On or before December 10, 2004, defendant shall pay to the appearing plaintiffs which are currently operating all pending supplemental payments for 2004.

iv.  Costs and attorney fees are awarded to plaintiffs

Civil No.  03-1640 (JAG)                                        2

    This Court hereby announces that this order will not be stayed.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 1st day of November, 2004.

                                S/Jay A. Garcia-Gregory
                                JAY A. GARCIA-GREGORY
                                United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

Rio Grande Community Health Center, Inc., *et al.*,    )
                                                        )
              *Plaintiffs*,                             )
                                                        )
       v.                                               ) Civil No. 03-1640 (JAG)(GAG)
                                                        )
Johnny Rullan, Secretary, Department of Health,         )
                                                        )
              *Defendant.*                              )
                                                        )
_____)

## PLAINTIFF'S MOTION FOR CONTEMPT AND COMPLIANCE WITH COURT'S ORDER AND MEMORANDUM IN SUPPORT

### I. INTRODUCTION

Plaintiffs submit this Motion for Contempt and Compliance with the Court's November 1, 2004 Order both in response and in opposition to defendant's December 10, 2004 Motion in Compliance with Order, and having just received the Court's December 22, 2004 Order to Show Cause.

### II. ARGUMENT

A.    **Defendant Has Failed to Comply With the Court's November 1, 2004 Order in Several Material Respects**

On November 1, 2004, this Court entered an Order requiring defendant to fully implement a supplemental payment system in accordance with the requirements of federal law, including a system that would allow defendant to make quarterly supplemental payments to

1

both plaintiff Concilio de Salud Integral de Loiza ("Loiza") and plaintiff Dr. Jose S. Belaval ("Belaval"). Specifically, this Court's November 1, 2004 Order required defendant to ". . . on or before November 30, 2004, fully implement its "wraproundd" payment system, so as to fully comply with the FQHC requirements of the Medicaid statute . . . " Order at 1. That Order also required defendant to " . . . certify to the Court no later than November 30, 2004, that its "wraparound" payment plan is in effect." *Id.* Finally, the Court required the defendant to "pay to the appearing plaintiffs which are currently operating all pending supplemental payments for 2004." *Id.*

On November 30, 2004, defendant filed a "Motion in Compliance with Order" asserting that a "wraparound payment plan" was in effect. Plaintiff reserved the right to comment on that submission pending defendant's required December 10, 2004 payments to the Loiza and Belaval health centers.

On December 10, 2004, defendant filed another Motion in Compliance with Order representing two facts to the Court: (1) he had made a deposit of $670,749.00 into the Court registry with respect to the Commonwealth's outstanding payment amount for Loiza and (2) no deposit would be made with respect to Belaval. The payment for Loiza (far too little), coupled with the failure to pay Belaval at all, unarguably demonstrate defendant's lack of compliance with both elements (implement a system and pay proper amounts) of the Court's November 1, 2004 Order.

2

1.    The December 10, 2004 Deposit into the
      Court Registry For Loiza is Inadequate

Defendant has deposited $ 670,749.00[1] into the Court registry in order to pay Loiza for

all pending 2004 supplemental payments.  That amount is far less the amount plaintiffs had

calculated and submitted to defendant on December 2, 2004.  On December 2, 2004, plaintiffs

submitted to this Court and defendant's counsel a provisional statement of the sums they

believed were due to them together with a letter outlining the various issues that the defendant

needed to resolve as part of fully implementing a wraparound system and indicating plaintiffs'

willingness to work on these issues with defendant.  *See* December 2, 2004 Notice of Filing and

attachment thereto setting forth provisional calculations of wraparound amounts.  Defendant

counsel's made contact with plaintiffs' counsel concerning the issues raised in the letter.

The formula used by defendant to calculate Loiza's supplemental payments apparently is

the one defendant used to pay Loiza under the Court's earlier preliminary injunction.  Not only

was it never accepted by the plaintiffs for the purposes of a final calculation but it was incorrect

even for the purpose of the earlier injunction.  Plaintiffs pointed this out in its May 6, 2004

Further Motion for Contempt and to Compel Compliance.  Regardless, the formula defendant

used for the correct payment to Loiza is legally wrong for two reasons.  First, it deducts

payments to the health centers when by statute the only deduction that can be made is for

managed care payments that were received in the corresponding quarter for which supplemental

payments are being calculated.  Second, it deducts for managed care payments made in 1999 and

---

[1]    Even though plaintiff Loiza disputes the accuracy of this figure, plaintiff is separately
submitting a motion for withdrawal of these funds in order to receive at least in part what
defendant owes without further delay, subject to a reservation of rights to receive the full amount
as quickly as possible.

3

2000, not the corresponding quarter.[2] The formula also understates those individuals the number of enrollees in the Medicaid program for whom FQHC payments must be made. Third, instead of using an average cost per visit (during 1999 - 2000) as the basis of payment, defendant proposes to use an average annual cost per Medicaid patient. The problem is that the statute requires that the FQHC payments be based on cost per visit.[3]

By contrast, the statement submitted in connection with plaintiffs' December 2, 2004 Notice of Filing is their best and good faith calculation of what the supplemental payments to both Loiza and Belaval should be.

### 2.     Defendant Has Utterly and Inexcusably Failed to Comply with the Court's Order With Respect to Belaval

The excuses defendant supplies in order to explain why he has not made even a single supplemental payment to Belaval are proof positive that the Commonwealth has not implemented the required FQHC payment system. If the Commonwealth had such a system up and running none of the issues the Commonwealth raises would impede its ability to make payment to Belaval. A genuine system would address such issues as which individuals are Medicaid-eligible and would therefore trigger a supplemental payment by the Commonwealth when services were provided by any Federally-qualified health center ("FQHC"). such as Loiza and Belaval.

---

[2]     This issue is one that must eventually be addressed by the Court in this case.

[3]     The statute also requries States to add an inflation factor, the "MEI" or "Medicare Economic Index", to each year's per visit rates. Plaintiffs' statement added this factor. Defendant's formula ignores it.

4

**B.    A Finding of Contempt is Warranted**

On December 8, 2004, the Court issued an Order ruling on the defendant's Motion to Alter or Amend the November 1, 2004 Order. The December 8 Order reiterated that defendant should pay to the currently operating plaintiffs all pending supplemental payments for 2004 by December 10, 2004, with the additional caution of "under penalty of contempt." December 8, 2004 Order at 2. Given that the defendant has failed in several material respects to comply with the Court's November 1, 2004 Order, a finding of contempt by the Court is warranted and integral to its inherent ability to enforce that Order. *See Reebok Int'l Ltd., et al. v. Sebelen*, 959 F. Supp. 553, 559 (D.P.R. 1997)(finding of civil contempt appropriate where defendants had knowledge and were bound by prior order).

## III. RELIEF

At minimum, defendant should be ordered to make immediate payment to the two FQHCs in the amount of plaintiff's December 2, 2004 statement, *i.e.*, $ 2,824,722.74 for Loiza and $ 4,024,379.84 for Belaval. To ensure against a recurrence of defendant's failure to implement a system and make proper payment, plaintiffs are submitting herewith a proposed Order directing the parties to participate in an orderly process with respect to each quarter. The proposed Order contemplates that the formula to be provisionally used by the parties pending full implementation is the one used by plaintiffs in their December 2, 2004 statement attached to their Notice of Filing. This process would be put into effect provisionally - - until a real FQHC payment "system" is implemented by the Commonwealth.

Respectfully submitted,

5

Date: December 22, 2004

Ramon Alfaro
211 Domenech Avenue, 2nd Floor
Hato Rey, PR 00918
(787) 763-8062 (telephone)


/S James L. Feldesman
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C.  20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiffs*

6

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will sent notification of such filing to the following:

Ivette M.. Berrios Hernandez
Landron & Vera LLP
PMB 150, 138 Winston Churchill
San Juan, PR 00926 - 6023

At Washington, D.C., December 22, 2004    S/ James L. Feldesman

James L. Feldesman, Esq., Pro Hac Vice
Attorney for Plaintiffs
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Suite 200
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
jfeldesman@feldesmantucker.com

7

1     **IN THE UNITED STATES DISTRICT COURT**
2         **FOR THE DISTRICT OF PUERTO RICO**

3    Dr. Jose S. Belaval, Inc.,

4        Plaintiff,

5          v.                 **Civil No. 03-1640 (GAG)**

6    Hon. Rosa Pérez Perdomo, Secretary of
7    Health of the Commonwealth of Puerto Rico
    in her official capacity,

8        Defendant.

9

10                 **JUDGMENT**

11       Pursuant to the Court's July 3, 2007 Order (Docket No. 553), judgment is hereby entered

12 **VACATING** in part the preliminary injunction in this case as it pertains to defendant establishing

13 a PPS system. The Department of Health, however, is hereby permanently enjoined and

14 **ORDERED** forthwith to continue using the 2001 baseline calculation data adopted by the Court,

15 and hence, shall under its PPS system continue making payments accordingly.

16      **SO ORDERED**.

17     In San Juan, Puerto Rico this 3rd day of July 2007.

18

19                          S/Gustavo A. Gelpi

20                      GUSTAVO A. GELPI
                    United States District Judge

21

22

23

24

25

26

27

28

1

2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

3

4

Concilio de Salud Integral de Loíza,

    Plaintiff,

5

6

    v.

Civil No. 03-1640 (GAG)

7

Hon. Rosa Pérez Perdomo, Secretary of
Health of the Commonwealth of Puerto Rico
in her official capacity,

8

    Defendant.

9

10

## SECOND AMENDED JUDGMENT NUNC PRO TUNC

11

Pursuant to the Court's March 27, 2007 Opinion and Order (Docket No. 499) and Order of

12

May 2, 2007 (Docket No. 510), judgment is hereby entered **VACATING** in part the preliminary

13

injunction in this case as it pertains to defendant establishing a PPS system. The Department of

14

Health, however, is hereby permanently enjoined and **ORDERED** forthwith to continue using the

15

2001 baseline calculation data adopted by the court, and hence, shall under its PPS system continue

16

making payments accordingly. Because all further relief sought in the complaint has now become

17

a moot matter, this case is hereby closed.

18

**SO ORDERED**.

19

In San Juan, Puerto Rico this 3rd day of July 2007.

20

21

S/Gustavo A. Gelpí

22

GUSTAVO A. GELPI
United States District Judge

23

24

25

26

27

28

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RIO GRANDE COMMUNITY HEALTH
CENTER, CONCILIO DE SALUD INTEGRAL
DE LOIZA, AND DR. JOSE S. BELAVAL,

**Plaintiffs**

v.

**CIVIL NO. 03-1640 (GAG)**

HON. ROSA PEREZ PERDOMO, IN HER
OFFICIAL CAPACITY AS SECRETARY OF
THE DEPARTMENT OF HEALTH

**Defendant**

## DEFENDANT'S ANSWER TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT HON. ROSA PÉREZ PERDOMO

Now Comes, Dr. Aida González de Gregory, in her official capacity as Interim Secretary

of the Department of Health of the Commonwealth of Puerto, and under the pains and penalties

of perjury answers plaintiffs' first set of interrogatories:

1. Describe in detail the role of DOH as the "single state agency" for the Commonwealth in

   operating and/or administering the Medicaid program Title XIX of the Social Security

   Act in the Commonwealth of Puerto Rico, including, but not limited to, its role (if any)

   in: (A) the preparation of the Commonwealth's "states plan" and any amendments thereto

   under Section 1902 of title XIX of the Social Security Act (codified at 42 U.S.C. 1396A);

   ABD (B) applying to HHS for waivers of legal requirements under Section 1115 of Title

   XI and/or Section 1915 of Title XIX of the Social Security Act (codified at 42 U.S.C.

   1315 1396n) or for any other action HHS might take to authorize an action or practice

that provisions of federal law and regulations governing the Medicaid program would or might other prohibit or limit.

*Response:*

The single state agency develops and keeps the state plan updated in compliance with the federal regulation; it submits amendments and required information, waivers, reports or new programs when deemed necessary by the regulatory agencies.

The Department of Health as the single state agency for the Commonwealth of Puerto Rico is responsible for the following as stated in the 1992 Collaborative Agreement with the Puerto Rico Health Insurance Administration (hereinafter referred to as "PRHIA" or "ASES" for its Spanish acronym):

FIRST: The single state agency has the legal authority to administer Title XIX State Plan and make rules and regulations that it follows. Within the single state agency, the Medicaid Program determines the eligibility for families and for individuals under 21 years, and for the aged, blind or disabled. As stated on 42 CFR, Subpart 431.10 (c) (f) and (ii) (e) (2) (3). The authority of the agency must not be impaired if any of its rules, regulations, or decisions are subject to review, clearance, or similar action by other agencies of the State. If other State or local agencies or offices perform services for the Medicaid agency, they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency.

SECOND:  PRHIA, a public corporation with full autonomy as established by Law 72 of September 7, 1993, as amended, is responsible for implementing administering and negotiating with health insurance system, through contracts with insurance underwriters that will eventually give all Island residents access to quality medial and hospital care, regardless of their financial condition and capacity to pay.

THIRD:  The Medicaid program will maintain an updated master file of federally eligible enrollees, as stated in the Code of Federal Regulations, number 42, parts 430 to end.  This master file will be available to PRHIA on a monthly basis.  The PRHIA must maintain the standards of confidentiality that are comparable to those of the Medicaid Program.

FOURTH:  The PRHIA, upon receipt of the Medicaid's federally eligible master file, proceeds to provide comprehensive health care service through their contracted health insurance entities/insurers.  Early and Periodic Screening, Diagnostic and Treatment Benefit must be made available to all Medicaid eligible individuals under age 21.  OBRA 89 amended SS 1902 (a) (43) and 1905 (a) (4) (B) and created SS 1905 (r) of the Social Security Act. Under the EPSDT benefit it is mandatory to provide for screening, vision, hearing and dental services at intervals which meet reasonable standards of medical and dental practice established after consultation with recognized medical and dental organization involved in child health care.  Services to pregnant women and children must not be delayed, regardless of eligibility status.

FIFTH: The Medicaid Program is responsible for the interpretation and observance of federal regulations whose implementation is mandated in order to receive Federal financial participation (FFP) from Title XIX, at federally established percentage of 50%.

3

SIXTH: The PRHIA, as the legal entity that carries out the provisions of Law Number 72, negotiates and establishes reasonable health insurance premiums with the contracted health entities / insurers.

SEVENTH: The Medicaid Program will be responsible for 50% of the established insurance premiums, on a monthly basis.

EIGHTH: The PRHIA will perform quality assurance reviews and/or audits at the region or health area it will serve. Such audits will be available on a yearly basis to the Medicaid Program, of its federally eligible enrollees.

NINTH: The PRHIA will provide the Medicaid Program a monthly report on federally eligible enrollee who has been rejected by the entity / insurer contracted to cover health services.

TENTH: The Medicaid program will audit, through the Quality Control System the monthly report of federally qualified enrollees rejected by the entity / insurer contracted to cover health services.

ELEVENTH: The PRHIA will on a monthly basis send a report to the Medicaid Program or covered federally qualified enrollees whose health identification cards have been issued.

TWELFTH: The Medicaid Program will continue to perform PRO reviews on its inpatient federally qualified enrollees, and will share reports on findings with PRHIA on a yearly basis.

THIRTEENTH: The PRHIA will produce reports on health care services rendered to federally qualified enrollees, and will send such reports in a six months period, to the Medicaid Program. PRHIA will produce annual report on EPSDT screening, vision,

4

hearing and dental services provided for individuals less than 21 years of age. Such report is due to Medicaid Program every year in the month of March.

2. Describe in detail the role of ASES in operating and/or administering the Medicaid program under Title XIX of the Social Security in the Commonwealth of Puerto Rico.

*Response:*

See response to interrogatory number 1.

3. Describe in detail the legal and/or contractual basis for ASES's authority to operate and/or administer any or all of the Medicaid program under title XIX of the Social Security Act in the Commonwealth of Puerto Rico, including, but not limited to, any delegation of authority from DOH permitting or directing ASES to operate and/or administer any or all of the Medicaid program under Title XIX of the Social Security in the Commonwealth of Puerto Rico or any waiver or other action described in Interrogatory No. 1 above.

*Response:*

The legal and/or contractual basis for PRHIA to have authority to operate and/or administer the Medicaid program under title XIX, is by virtue of by Law 72 of September 7, 1993, as amended.

4. Describe in detail DOH's role (if any) in supervising and/or directing AES in carrying our activities under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico.

*Response:*

5

The Department of Health as the single state agency for the Commonwealth of Puerto Rico keeps who monitors the activities performed by ASES regarding quality of care and funds management.

5. Describe in detail DOH's role (if any) in supervising and/or directing any MCO in carrying out activities under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico and/or Reforma, including, but not limited to, review and/or approval of contracts between (a) any MCO and the Commonwealth and/or (B) any MCO and an FQHC.

*Response:*

The Department of Health as the single state agency for the Commonwealth of Puerto Rico does not supervise, nor directs any MCO in carrying out activities related to contracting processes, nor fee schedules. It does perform audits to contracts in order to keep the regulatory agency abreast of changes in compliance with the federal regulation.

6. Describe in detail the terms and conditions of (a) any Medicaid State Plan amendments for the Commonwealth of Puerto Rico approved by HHS and/or CMS and (b) any waiver of legal requirements under Section 1115 of Title XI and/or Section 1915 of Title XIX of the Social Security Act (codified at 42 U.S.C. 1315, 1396n) granted to the Commonwealth by HHS and/or CMS from January 1, 1993 to the present, including, but not limited to, those relating to the composition of the Medicaid-eligible population in the Commonwealth of Puerto Rico and implementation OF THE Commonwealth's Medicaid program through a managed care scheme.

*Response:*

6

In January 1, 2006, the United Status Department of Health and Human Services updated the federal poverty level income guidelines.

There are no waivers under section 1115 approved by HHS/CMS to the Commonwealth of Puerto Rico Medicaid program; except for one to provide a health plan for Hurricane Katrina's refugees relocated in Puerto Rico.

7.  Define the terms "purely Medicaid" and "pure Medicaid" as you have used those terms in this action in reference to classification of Reforma enrollees, specifically stating the significance of such terms in determining FQHC wraparound payments.

*Response:*

 Pure Medicaid beneficiary is one that meets category (aged, blind, disabled, needy kid, dependent kid) and income criteria (less than $400 income) and resources or assets.

Reforma's patients are patients between the ages of 19 and 64 years old that only meets income criteria. The FQHC wraparound payment only applies to visits and services provided to Pure Medicaid beneficiary and not the Reforma patients.

8.  State the total number of enrollees participating in Reforma as of December 31, 1999, December 31, 2000, and June 30, 2006, separately identifying the total number of "purely Medicaid" or "pure Medicaid" enrollees within the total number of participants as of each of those dates. State the total number of Reforma enrollees currently assigned to plaintiffs in the action, breaking down that total by categories of such enrollees including, but not limited to "purely Medicaid" or "pure Medicaid" as described in the first sentence of this Interrogatory.

*Response:*

The information requested is kept by the PRHIA not the Department of Health.

7

9.  Describe in detail the method amount of payment to MCOs pursuant to any agreement(s) between such MCOs and the Commonwealth of Puerto Rico engaging and/or authorizing such MCOs to carry out activities under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico.

*Response:*

The information requested is kept by the PRHIA not the Department of Health.

10. Describe in detail the method(s) (including, but not limited to, actuarial analyses) of setting rates of payment to MCOs under the Medicaid program and/or Reforma in the Commonwealth of Puerto Rico.

*Response:*

The information requested is kept by the PRHIA not the Department of Health.

11. Describe in detail the method(s) (including, but not limited to, actuarial analyses) of setting rates payment to providers (including, but not limited to, FQHCs) by MCOs under the Medicaid program and/or Reforma in the Commonwealth of Puerto Rico.

*Response:*

The information requested is kept by the PRHIA not the Department of Health.

12. Described in detail the process of review and approval, if any, by HHS, CMS, DOH, and/or ASES of rates of payment to MCOs under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico.

*Response:*

There is no review of the rates established by the MCOs, the Commonwealth operates under a capitated environment with risk sharing where MCOS's set the values for risks and revenue.

8

13. Describe in detail the process of review and approval, if any, by HHS, CMS, DOH, and/or ASES of agreement(s) between ASES and MCOs under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico.

*Response:*

There is no review process by because the PRHIA is a sub-grantee that manages the budget by setting premiums and monitoring use/cost reports of each contracted organization

14. Describe in detail the process of review and approval, if any, by HHS, CMS, DOH, and/or ASES of rates of payment to providers (including, but not limited to, FQHCs) by MCOs under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico, including, but not limited to, manner in which MCOs' contracts with FQHCs require those FQHCs to accept risk for costs incurred by other health care providers as well as the particular FQHC and the MCO's practice of assigning IBMR to their contracts with FQHCs (and retaining that IBMR despite the FQHCs' performance).

*Response:*

There is no review/approval from HHS, CMS, DOH and or PRHIA of any issue related to payments and contracting since the MCO is a private business that negotiates with their network. The specific process can be explained by the PRHIA.

15. Describe in detail the process of review and approval, if any, by HHS, CMS, SOH, and/or ASES of agreement(s) between providers (including, but not limited to FQHCs) and MSCOs under the Medicaid program under Title XIX of the Social Security Act in the Commonwealth of Puerto Rico.

*Response:*

9

This process is managed by the PRHIA who can provide with specificity a response to this question.

I hereby CERTIFY under penalty of perjury, that the following information is correct.

In San Juan Puerto Rico, this 22 of December, 2006

AIDA GONZALEZ DE GREGORY
SUB-SECRETARY OF THE
DEPARTMENT OF HEALTH

10

# EXHIBIT F

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Health Care Financing Administration

Center for Medicaid and State Operations
7500 Security Boulevard
Baltimore, MD 21244-1850

April 20, 1998

Dear State Medicaid Director:

This letter is one of a series that provides guidance on the implementation of the Balanced Budget Act of 1997 (BBA). The purpose of this letter is to provide initial guidance on changes in Federally Qualified Health Center (FQHC) and Rural Health Clinic (RHC) requirements stemming from BBA. In addition, we are including (as an attachment) a section which clarifies certain managed care contracting and cost-based reimbursement issues that were in effect prior to the BBA provisions.

### New Reimbursement Provisions

#### Supplemental Payments

For services furnished on or after October 1, 1997, FQHCs and RHCs are entitled to reasonable cost-based reimbursement as subcontractors of section 1903(m) organizations. States are required to make supplemental payments, at least on a quarterly basis, for the difference between the rates paid by a 1903(m) organization (such as an HMO or HIO) to an FQHC or RHC and the reasonable cost of FQHC or RHC subcontracts with the 1903(m) organization. Beginning in Fiscal Year 2000, the difference States will be required to pay begins to phase-down from 100 percent; specifically, 95 percent of reasonable cost in FY 2000, 90 percent in FY 2001, 85 percent in FY 2002, and 70 percent in FY 2003.

The issue of election of cost-based reimbursement for these specific contractual arrangements (between FQHCs/RHCs and 1903(m) organizations) is a moot point since, beginning October 1, 1997, the election process is no longer required. Before States assess the need for a supplemental payment, States should work with FQHCs and RHCs to determine what the reasonable cost levels are for each FQHC/RHC expected to participate in the program. Then, based upon the State's assessment of whether or not the rate negotiated between the FQHC or RHC and the 1903(m) organization covers the FQHC's or RHC's reasonable costs, a supplemental payment may or may not be triggered.

#### Prohibition of Delegation of Supplemental Payment Requirement to MCOs

Section 4712(b) of BBA requires States to make up the difference, if any, between the amounts paid FQHCs or RHCs by MCOs with which they have a contractual relationship, and the amount the FQHC or RHC would have received under the reasonable cost-based reimbursement provision contained in section 1902(a)(13)(C)(I) of the Social Security Act. The language in that section specifically requires States to make these supplemental payments. It is our conclusion that this requirement cannot and should not be delegated to an MCO, and that each State must determine any differences in payment and make up these amounts.

#### Development of Comparison Rates

Section 4712(b)(2) requires that rates of payment between FQHCs/RHCs and MCOs shall not be less than the amount of payment for a similar set of services with a non-FQHC/RHC. The intention of this provision is to ensure that managed care entities negotiate rates of payment with FQHCs and RHCs that are comparable to the rates paid to similar providers that do not have an FQHC or RHC designation and thereby protects the State against negotiated rates that are excessively low in comparison to the community standard.

There are two issues that are relevant here in terms of comparison rates: 1) How does the State determine what the FQHC's/RHC's costs are in order to assess whether or not there is a need for a supplemental payment; and 2) How does the State make a determination of whether the level of payment between the MCO and FQHC/RHC is not less than the rates paid for a similar set of services provided by a non-FQHC/RHC?

On the first issue, States already have in place, as part of their existing State Plans, approved methodologies for determining an FQHC's/RHC's costs (and, as noted earlier, these costs should be determined in advance of assessing the need for a supplemental payment). If a State chooses to develop an alternative methodology for the purposes of BBA, it may do so but it must also submit a State Plan Amendment. The State payment system for the supplemental payments may utilize prospectively determined rates or may pay interim rates subject to reconciliation. Irrespective of the type of payment method utilized, the rates must cover the FQHC's/RHC's reasonable costs.

On the second issue, a State has the flexibility to develop its own methodology for determining whether rates paid by MCOs to FQHCs/RHCs are not less than to other similar providers of services.

**Phase-Out of Cost-Based Reimbursement**

Beginning in fiscal year 2000 (as noted above), as part of a phase-out of cost-based reimbursement, levels of reimbursement will be reduced both for FQHCs/RHCs participating in fee-for-service (unrestricted or as PCCM providers), and those receiving supplemental payments as HMO or HIO subcontractors. In addition, cost-based reimbursement requirements consistent with BBA remain in effect for primary care case management programs until fiscal year 2000, at which point the statutory phase-out provisions become effective. Further, FQHC cost-based provisions as required by BBA are applicable in States that have both PCCM and MCO programs. States may, at their option, continue to provide reasonable cost-based reimbursement beyond this point in time, but are not required to do so.

**Prohibition of Requirement for Higher Payments By MCOs**

Under the pre-BBA law, States were allowed to delegate the requirement for cost-based reimbursement to MCOs. While section 4712(b)(2) of BBA places a floor on payments, it does not put a ceiling on payments (the law is silent). While the literal text of BBA does not impose an upper limit on what a State may require an MCO to pay FQHC/RHC contractors, we recognize that permitting States to impose such requirements could result in access problems and have the opposite impact on MCO-FQHC/RHC contracting arrangements than what was intended by Congress. (That is, Congress intended to encourage contracting between FQHCs/RHCs and MCOs and to remove financial barriers to this contracting.) Therefore, it is our conclusion that States cannot impose any requirement on MCOs for payments to FQHCs/RHCs other than those contained in 4712(b)(2).

**Alternative Reimbursement Agreements**

Based upon a review of the BBA FQHC/RHC reimbursement provisions, it is our conclusion that these provisions preclude any alternative reimbursement arrangements (between a State, 1903(m) organizations, and FQHCs and RHCs, or any combination thereof) that are inconsistent with the requirements of BBA. In other words, HCFA will not approve any FQHC/RHC reimbursement arrangements that do not meet the requirements of section 4712(a), (b), and (c).

**Effective Dates**

Unlike other BBA provisions that are effective with contracts beginning on or after October 1, 1997, the FQHC/RHC provisions under BBA affect contracts that existed prior to October 1, 1997 (e.g., July 1, 1997 - June 30, 1998) by applying to services furnished on or after October 1, 1997. All contracts (between the State and MCO and the MCO and FQHC/RHC) which this affects should be appropriately amended to reflect all the relevant changes in FQHC/RHC law and policy as noted above.

If you have any questions, please contact Sidney Trieger at (410) 786-6612 or Matt Barry at (410) 786-1176.

Sincerely,

/s/

Sally K. Richardson
Director
Center for Medicaid and State Operations

Attachment

cc:

Dr. Earl Fox, HRSA Administrator  HCFA Regional Administrators  PHS Regional Administrators  Jennifer Baxendell, NGA  Lee Partridge, APWA  Joy Wilson, NCSL  National Association of Community Health Centers  State Health Commissioners  HCFA Press Office

**ATTACHMENT**

**FQHC Contracts and Cost-Based Reimbursement: Pre-October 1, 1997**

Prior to the effective date of the FQHC provisions contained in BBA, the rules surrounding FQHC access and cost-based reimbursement were governed by statute (section 4704(b) of OBRA 1990 amended sections 1903(m)(2)(A) and 1905(a)(2)(C)) and through HCFA policy that was issued on February 8, 1996. It is the intent of this policy statement to provide further guidance on these "old" FQHC rules in the event there are outstanding or unresolved issues with potential retroactive (pre-October 1, 1997) implications.

As stated in the February 1996 policy, appropriate contract language between the State and the managed care organization (MCO) and between the MCO and the FQHC will help to assure the receipt of cost-based reimbursement under managed care. The absence of such contractual language providing for cost reimbursement for FQHC services has been at the heart of most of the issues HCFA had to address over the past few years on FQHC policy. Typically, when FQHCs contracted for other than reasonable cost-based reimbursement, the contracts did not specify that the FQHCs waived their right to reasonable cost-based reimbursement; rather, they reflected the negotiated agreed upon payment rates. In some instances, FQHCs questioned the binding nature of their signed contracts, and whether the contracts could have been amended at the point in time which the FQHC wishes to elect reasonable cost-based reimbursement. Our guidance on this specific issue is:

The terms and conditions of contractual agreements which were entered into between FQHCs and managed care organizations are binding upon both parties. To assure that all parties in the contracting process were fully informed of the terms and conditions, including provisions surrounding cost-based reimbursement, the State should have included language in its contracts with MCOs on this (and any other) specific issue. Further, a decision (a signed contract) to contract for payments other than reasonable cost is binding on both parties (absent any additional measures by the State to reimburse FQHCs) and the contracts do not need to have specific language specifying that an FQHC is withdrawing its right to reasonable cost reimbursement. By signing such contracts, an FQHC is deemed to have waived its rights to cost-based reimbursement.

An additional concern involves the timing of the reasonable cost election for FQHCs which previously elected otherwise. Specifically, does the new election take place at the next contract renewal period, or if the original contracts provide for a redetermination of rates, can it take place at the time of the redetermination? Our guidance on this specific issue is:

If, during the course of an existing contract, an FQHC exercised its right to cost reimbursement (in writing), payments constituting cost should have then been applied at the next contract renewal or if the existing contracts had a clause where rates were redetermined (other than for automatic items such as cost-of-living adjustments or inflation), at the time of redetermination. This assumes that the FQHC negotiated appropriate contract terms at this point in time.

Where concerns remain over a State's implementation of these policies prior to October 1, 1997, HCFA is willing to consider such instances on a case-by-case basis. In such situations, HCFA strongly recommends that any such case be documented to the maximum extent possible since any HCFA decision would be based on a review and assessment of the relevant paper trail (e.g., contracts, letters between parties).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Concilio de Salud Integral de Loiza, Inc.**, *et al*. | ) | |
| | ) | |
| *Individual Plaintiffs*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:07-cv-1034 (RMC)** |
| | ) | |
| **U.S. Department of Health and Human** | ) | |
| **Services,** | | |
| | ) | |
| **and** | ) | |
| | ) | |
| **Michael Leavitt, Secretary** | ) | |
| **U.S. Department of Health and Human** | ) | |
| **Services** | ) | |
| | ) | |
| *Defendants*. | ) | |

## PROPOSED PARTIAL SUMMARY JUDGMENT ORDER

Upon consideration of Defendant's Motion to Dismiss and to Strike All Class Claims, Plaintiffs' Opposition to the Motion to Dismiss and to Strike All Class Claims and Motion for Partial Summary Judgment and the subsequent briefing associated with those submissions, and a hearing held by the Court on _____, 2007, the Court finds that the defendants have failed to oversee the Commonwealth of Puerto Rico's Medicaid managed care program as required by the Medicaid statute, and, in particular improperly made payments to Puerto Rico that will support managed care contracts that have not been approved, but were required by that statute (at 42 U.S.C., § 1396b(m)(2)(A)).

IT IS THEREFORE ORDERED that:

(1) Defendants' Motion to Dismiss and to Strike All Class Claims is DENIED;

(2) Payment by the United States Department of Health and Human Services ("HHS") of further monies under the Medicaid statute for Medicaid managed care contracts with the health maintenance organizations ("HMOs") in Puerto Rico that contract with plaintiffs Concilio de Salud Integral de Loiza, Inc. ("Loiza") and Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval") is unlawful and will remain unlawful until and unless those contracts and the HMOs or other entities receiving them fully conform to all of the relevant requirements of the Medicaid statute and regulations and HHS makes findings of such compliance and approves such contracts as required by the statute;

(3) HHS is hereby enjoined from making any further payments in support of these unlawful HMO contracts with plaintiffs Loiza and Belaval until and unless HHS is able to demonstrate to the Court full compliance with all relevant statutory and regulatory conditions.

(4)  Plaintiffs have thirty (30) days from the entry of this Order to submit their Local Rule 23 Motion for Class Certification, at which time the plaintiffs' class action allegations will be addressed.


_____
The Honorable Rosemary M. Collyer
United States District Court Judge

2