IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONCILIO DE SALUD INTEGRAL DE      )
LOIZA, INC., ET AL.                )
                                   )
                                   )
           Plaintiffs,             )
                                   )
      v.                           )    Case No.07-01034 (RMC)
                                   )
MICHAEL O. LEAVITT,                )
Secretary, United States Department of  )
Health and Human Services,         )
                                   )
           Defendant.              )
_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Michael O. Leavitt, Secretary of the United States Department of Health and Human Services (the "Secretary"), by and through undersigned counsel, respectfully moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. As set forth in the accompanying Memorandum of Points and Authorities, there are no issues of material fact, and the Secretary is entitled to judgment as a matter of law. The Secretary respectfully requests that the Court grant this motion and enter judgment in his favor.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

_____/s/_____
CHARLOTTE ABEL
D.C. Bar No. 388582
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-307-2332


DEBORAH M. CHASAN-SLOAN
D.C. Bar No. 480560
Attorney
Office of the General Counsel
Department of Health and Human Services
Room 5309, Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201
202-619-2603

OF COUNSEL:

DANIEL MERON
General Counsel

CAROL J. BENNETT
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONCILIO DE SALUD INTEGRAL DE    )
LOIZA, INC., ET AL.    )
    )
    )
            Plaintiffs,    )
    )
    v.    )    Case No.07-01034 (RMC)
    )
MICHAEL O. LEAVITT,    )
Secretary, United States Department of    )
Health and Human Services,    )
    )
            Defendant.    )
_____)

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS AND
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT
OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

This matter presents the continuing effort by two federally-qualified health centers

("FQHCs") in Puerto Rico, Concilio de Salud Integral de Loiza, Inc. ("Loiza") and Junta del

Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval") (collectively "FQHC Plaintiffs"),

to change the Medicaid payment system currently utilized by the Commonwealth of Puerto Rico

("Puerto Rico" or "the Commonwealth").[1]  These two FQHC Plaintiffs have recently sued the

Commonwealth in the federal district court for Puerto Rico for an alleged failure to make

statutorily required supplemental payments, called "wraparound payments," to FQHCs for

services provided to Medicaid patients.  That court entered an order designed to ensure such

---

[1]The individual Plaintiffs named in the complaint are all members of the Board of Directors and patients of
one of the two FQHC Plaintiffs. Pls.' Compl. ¶15.  (FQHC and individual Plaintiffs are referred to collectively as
"Plaintiffs").

payments were made.  When Plaintiff FQHCs sought to convert the preliminary injunction into a permanent one, the court denied Plaintiffs' request and instead vacated the preliminary injunction, finding that the Commonwealth had come into compliance with the wraparound requirement.

Seeking a new angle to redress their continuing dissatisfaction with the payments they receive from the Medicaid health maintenance organizations ("HMOs") in Puerto Rico, Plaintiff FQHCs are now suing the Secretary of the U.S. Department of Health and Human Services ("the Secretary," "HHS," or "Defendant"), hoping to overturn the Medicaid payment structure in the Commonwealth.  If Plaintiffs prevail in this rather unusual lawsuit, Puerto Rico will no longer receive the federal share of Medicaid payments that it currently receives to operate its Medicaid managed care system.  As a result, beneficiaries would not be able to access essential health care services; the requested relief would undoubtedly have dire consequences for both health care providers and Medicaid enrollees in Puerto Rico.  Nonetheless, it appears that they seek this draconian result in a last ditch effort to change the payment methodologies and further their self-interests over the long term.

Plaintiffs mount their challenge on the back of an assertion that the Secretary has not complied with a requirement of the Medicaid statute that he provide prior approval of Puerto Rico's managed care contracts with Medicaid HMOs.  They suggest that the Secretary has been remiss in failing to perform this function, and they ask the Court to intervene by requiring the Secretary to take an enforcement action against the Commonwealth, essentially cutting off all federal funding for the island's Medicaid program.  Plaintiffs' assertions have no basis in fact or law.  First, the Secretary *has* reviewed the contracts between the Commonwealth and the HMOs

and provided prior approval as required by the Medicaid statute.  Second, Plaintiffs'

dissatisfaction is not with the contracts between the Commonwealth and the HMOs, but rather

with the *subcontracts* between the HMOs and themselves (as providers of service to Medicaid

beneficiaries), which are not reviewed by the Secretary.

Moreover, as a threshold matter, for all of the reasons set forth in the Secretary's Motion

to Dismiss and herein, the Court lacks subject matter jurisdiction to grant Plaintiffs' request, and

the complaint fails to state a claim upon which relief can be granted.  Accordingly, this case

should be dismissed.  First, Plaintiffs are still unable to identify any source of law which would

waive the federal government's immunity to Plaintiffs' claims - no such waiver of sovereign

immunity exists.  Second, Plaintiffs have no standing to bring this action because they have

endured no injury in fact that is fairly traceable to the Secretary, and the relief sought -

withholding federal payments to Puerto Rico's Medicaid managed care program - would not

likely redress any injury alleged.  Third, longstanding case law demonstrates that the decision

whether to take an enforcement action against the Commonwealth, which is the relief sought by

Plaintiffs herein, is committed to agency discretion by law and is unreviewable by the Court.

If Plaintiffs' complaint is not dismissed on jurisdictional grounds, this Court should deny

Plaintiffs' Motion for Partial Summary Judgment because they cannot show that they are entitled

to summary judgment as a matter of law.  Plaintiffs assert that they are entitled to a declaration

that federal Medicaid payments to Puerto Rico in support of its contracts with HMOs are

unlawful and an injunction preventing any such further payments because the Secretary has not

given prior approval to these contracts.  Plaintiffs, however, present no evidence that the

Secretary has failed to review the necessary contracts; their allegation is based upon pure

conjecture.  Moreover, as demonstrated in the attached declaration of Ms. Sue Kelly, their

conjecture is simply wrong.  HHS (through the Centers for Medicare & Medicaid Services) has

provided prior approval of all of Puerto Rico's managed care contracts, as required by law.  See

42 U.S.C. § 1396b(m)(2)(A)(iii); 42 C.F.R. §§ 438.6, 438.806.  Therefore, Plaintiffs' argument

that Puerto Rico's Medicaid managed care contracts are unlawful because they have not received

prior approval from HHS must fail.  Accordingly, this Court should deny Plaintiffs' Motion for

Partial Summary Judgment and instead grant the Secretary's Cross-Motion for Summary

Judgment.

## II. BACKGROUND

### A.____STATUTORY AND REGULATORY BACKGROUND

#### _____1.____MEDICAID GENERALLY

The Medicaid program, under Title XIX of the Social Security Act, is a federal-state

cooperative cost-sharing program that provides medical assistance to families and individuals

with insufficient income and resources.  42 U.S.C. § 1396 et seq.  While a state's participation in

Medicaid is not mandatory, once a state does decide to participate, it must comply with all

applicable federal statutory and regulatory requirements.[2]  See id. § 1396a; 42 C.F.R. Part 430 et

seq.  A participating state administers its Medicaid program pursuant to a "state plan" that must

be approved by the Secretary.  42 U.S.C. § 1396a.  The Secretary performs this function through

the Centers for Medicare & Medicaid Services ("CMS").  42 C.F.R. Part 430 Subpart B.

Upon approval of its state plan, a state or territory becomes entitled to reimbursement by

---

[2]The Commonwealth of Puerto Rico is considered a State for purposes of the Medicaid Act, unless
otherwise indicated.  Id. § 1301(a)(1).

the federal government for a portion of its payments to hospitals and other providers of medical

assistance to Medicaid recipients.  42 U.S.C. § 1396b(a).  This federal contribution to a State's

Medicaid expenses is termed federal financial participation ("FFP").  Id. §§ 1396a, 1396b; 42

C.F.R. Part 430.  Puerto Rico and other territories are distinct from the states participating in the

Medicaid program in that the amount FFP payable to each territory in any given fiscal year is

capped at a specified amount.  See 42 U.S.C. § 1308(c).  Medicaid programs are administered by

the states and territories, not the federal government.  For example, within the broad bounds of

federal statutory and regulatory requirements, the states or territories enter into agreements with

providers of services and establish the level of reimbursement paid to providers.  See id.

§§ 1396a(a)(13)(A), 1396a(a)(27).

     2.     **MEDICAID MANAGED CARE**

     States have the alternative of contracting with managed care organizations ("MCOs"),

such as HMOs or other "risk-bearing" organizations, to provide some or all of the covered

services in exchange for payment under a prepaid capitation rate or some other risk-based

arrangement.  Id. § 1396b(m).  Under this arrangement, the managed care organizations receive

predetermined periodic payments in return for providing for the required services.  Id.

§ 1396b(m)(2)(A); see also 42 C.F.R. Part 438.  In order to meet their responsibility to the state

to provide covered services, HMOs generally contract with health care providers to actually

provide services to Medicaid patients in exchange for a contractually agreed upon payment rate.

     The federal government has limited oversight of a state or territory's administration of its

Medicaid program.  If the Secretary finds that a State is not in compliance with its plan, the

Secretary may take certain steps such as withholding further payments to the State.  42 U.S.C.

§ 1396c.  However, the Secretary has discretion to impose sanctions, and before taking any

compliance action, the Medicaid Act requires the Secretary to provide the State with "reasonable

notice and opportunity for hearing."  Id.; see also 42 C.F.R. § 430.35 (CMS withholds payments

to the State, in whole or in part, only if, after giving the agency reasonable notice and opportunity

for a hearing in accordance with subpart D, the Administrator finds that the plan no longer

complies with the provisions of 42 U.S.C. § 1396a; or that in the administration of the plan, there

is failure to comply substantially with any of those provisions); see also 42 C.F.R. Part 430

Subpart D (Hearings on Conformity of State Medicaid Plans and Practice to Federal

Requirements).

Federal law sets forth several conditions that must be met in order for payment to be

made to a state for expenditures it incurs in its operation of a Medicaid managed care program.

See 42 U.S.C. § 1396b(m)(2)(A).  For example, services under the state's Medicaid managed

care program must be provided in accordance with a contract between the state and the managed

care entity "under which prepaid payments to the entity are made on an actuarially sound basis

and under which the Secretary must provide prior approval . . . ."  Id. § 1396b(m)(2)(A)(iii).

Another provision requires contracts between the state and the HMO (or other type of managed

care entity) to provide that if the HMO enters into a subcontract with an FQHC to provide

services, the HMO shall "provide payment that is not less than the level and amount of payment

which the entity would make for the services if the services were furnished by a provider which

is not a Federally-qualified health center . . . ."  Id. § 1396b(m)(2)(A)(ix).   Another provision,

for example, requires that any physician incentive plan ("PIP")[3] must comply with the PIP

requirements applicable to Medicare managed care organizations.  See id. § 1396b(m)(2)(A)(x).

Yet another provision requires contracts between the state and the HMO to ensure that in urgent

care situations where an individual receives services from an out-of-network provider, either the

HMO or the state will provide reimbursement for those services.  See id. § 1396b(m)(2)(A)(vii).

Finally, the law generally requires that contracts between the state and the HMOs comply with

the applicable requirements of 42 U.S.C. § 1396u-2, which sets forth several provisions related to

managed care.  See id. § 1396b(m)(2)(A)(xii).

### 3.    MEDICAID MANAGED CARE AND FEDERALLY-QUALIFIED HEALTH CENTERS

An FQHC is a not-for-profit entity that provides primary and other health care services to

"medically underserved" populations and meets certain other statutory requirements.  Id.

§ 1396d(1)(2).  Entities that receive section 330 Public Health Service ("PHS") grants under 42

U.S.C. § 254b, or are found by the Secretary to meet the requirements for such funding, are

considered FQHCs.  State Medicaid programs are required to offer FQHC services and "any

other ambulatory services" offered by an FQHC which are otherwise included in the state's plan

to categorically needy Medicaid beneficiaries and may offer those services to medically needy

beneficiaries.  Id. §§ 1396a(a)(10)(A), 1396d(a)(2)(C) and 1396d(l)(2)(A).  Each state plan must

include, among its numerous details, a provision for payments to FQHCs.  Id. § 1396a(bb).

In 2000, Congress amended the Medicaid Act to replace cost-based reimbursement for

---

[3]"Physician incentive plan" means a compensation arrangement between an HMO and a physician or physician group that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the organization."  Id. § 1395mm(i)(8)(B).

FQHCs with a prospective payment system ("PPS") with payment calculated on a per-visit basis.

Medicare, Medicaid and SCHIP Benefits Improvement Act of 2000, Pub. L. N. 106-554 (Dec.

21, 2000), codified at 42 U.S.C. § 1396a(bb).  Section 1396a(bb)(5) provides that

> in the case of services furnished by a Federally-qualified health center or rural health clinic pursuant to a contract between the center or clinic and a managed care entity . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided under the contract.

Id.  Thus, under current law, if FQHC payments from Medicaid managed care entities are less

than would be due under the particular FQHC's per-visit rate, the state is required to pay the

FQHC the difference.  Id.  This supplemental payment by the state to the FQHC is known as a

"wraparound payment."

### 4.    PUERTO RICO'S MEDICAID MANAGED CARE PROGRAM

In 1994, the Commonwealth instituted a managed care approach to the delivery of

Medicaid-funded services; the Medicaid managed care program is known as *Reforma*.  The

Commonwealth, through the Puerto Rico Health Insurance Administration (known through its

Spanish acronym as "ASES"), contracts with private HMOs to arrange for the delivery of health

care services to Medicaid recipients and pays each HMO a fixed monthly sum per Medicaid

patient assigned to that HMO.  In return, the HMOs agree to provide all covered services to each

beneficiary.  Rio Grande Comm. Health Ctr. v. Rullan, 397 F. 3d 56, 62 (1st Cir. 2005).  The

HMOs earn a profit if their costs are less than the fixed monthly sum; they suffer a loss if their

costs are more.  Id.  To actually provide services to the beneficiaries assigned to them, Puerto

Rico HMOs subcontract with providers, such as Plaintiff FQHCs, to directly provide care.  Id.

The Medicaid statute requires states, including Puerto Rico, to provide assurances that the

subcontracts between the HMOs and providers will comply with certain statutory conditions. 42 U.S.C. § 1396b(m)(2)(A). However, the statute does not contemplate, and the Secretary does not require, these subcontracts to be reviewed by the Secretary. Indeed, these agreements are left largely to the discretion of the HMOs and the providers, subject to broad protections provided by the Medicaid statute. Id.

## B.    FACTUAL BACKGROUND

As described in greater detail in the Motion to Dismiss, Plaintiffs filed suit against the Commonwealth in June, 2003 in the United States District Court for the District of Puerto Rico alleging that the Commonwealth had illegally failed to establish a Prospective Payment System office and to make the wraparound payments required by 42 U.S.C. § 1396a(bb)(5). On March 31, 2004, that Court entered a preliminary injunction against the Commonwealth ordering Puerto Rico's Secretary of Health to make wraparound payments to the FQHCs. See Rio Grande Community Health Center, Inc. et al. v. Rullan, No. 03-1640, 2004 WL 3202761 (D.P.R. March 31, 2004). The Commonwealth complied with that order by both establishing a PPS office and by making wraparound payments to both FQHC Plaintiffs. See Concilio de Salud Integral de Loiza v. Perez Perdomo, 479 F. Supp. 2d 247 (D.P.R. 2007). Despite the Commonwealth's compliance with the order, Plaintiff Loiza asked the court to convert its preliminary injunction into a permanent injunction. Id. The court denied Loiza's request stating that " . . . the [Puerto Rico] Secretary of Health has always fully complied with this court's orders to make wraparound payments to plaintiffs Loiza and Belaval." Id. at 250-51.

Plaintiffs also attempted to interplead the Secretary into the Puerto Rico litigation purportedly to protect section 330 grant funds from alleged claims by the Commonwealth and the

HMOs.  The motion for interpleader was denied, however, on the grounds that ". . . plaintiffs'
concern of a future claim to the Section 330 funds by the federal defendants, is purely
conjectural."  See Rio Grande Community Health Center, Inc. v. Puerto Rico, No. 03-1640, 2006
WL 1514332, at *1 (D.P.R. May 25, 2006).

Plaintiffs then filed the complaint before this Court on June 11, 2007.  Although
somewhat unclear from the complaint, Plaintiffs now assert in their brief that the subject of the
instant litigation is not the wraparound payments at issue in the Rio Grande and earlier Loiza
cases, but rather CMS' alleged failure to approve Puerto Rico's Medicaid managed care contracts
with HMOs.  Pls.' Br. at 15.  Plaintiffs also state in their brief that they are alleging that HHS
failed to review the subcontracts with the FQHCs.  See id. at 4.  Plaintiffs are clearly dissatisfied
with the terms of their subcontracts with the Medicaid HMOs.[4]  However, the avenue Plaintiffs
have chosen to resolve this dissatisfaction - a lawsuit against the Secretary for allowing the
Commonwealth to establish this HMO system - rests upon an erroneous factual and legal
predicate.  The Secretary has properly approved the state-HMO contracts, but has no authority
over the HMO-provider subcontracts.  The Secretary has done what is required of him under the
Medicaid statute; Plaintiffs have pointed to no failed legal obligation that would warrant a
reduction in FFP to the Commonwealth.

---

[4]Plaintiff Belaval has filed another suit in the federal district court for Puerto Rico.  That suit raises claims
with respect to monies made available to FQHCs under the Public Health Service Act, 42 U.S.C. § 254b, and
attempts to interplead the Secretary.  Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. v. Municipality of
San Juan, et al., No. 07-1722 (D.P.R. filed Aug. 27, 2007).

## III. ARGUMENT

**A.     PLAINTIFFS' COMPLAINT MUST BE DISMISSED BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION TO HEAR PLAINTIFFS' CLAIMS AND, IN THE ALTERNATIVE, PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

In considering a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure Rule 12(b)(1), a court must accept as true all material factual allegations in the complaint.  Scheuer v. Rhodes, 416 U.S. 232 (1974).  However, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn."  Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd., 968 F. 2d 196, 198 (2d Cir. 1992).  The burden of establishing the existence of federal jurisdiction is on the party seeking to invoke it.  N.J. Hosp. Ass'n v. United States, 23 F. Supp. 2d 497, 500 (D.N.J. 1998).

It is well settled that jurisdiction must be established as a threshold requirement before the Court may address the merits, and absent jurisdiction, the suit must be dismissed.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  Here the Court lacks subject matter jurisdiction because Congress has not waived sovereign immunity, Plaintiffs lack standing to bring this suit, and the Secretary's determination as to whether to bring an enforcement action against the Commonwealth is an action committed to agency discretion by law and is not reviewable.

Furthermore, a motion to dismiss brought pursuant to Rule 12(b)(6) should be granted if it is beyond doubt that a plaintiff can demonstrate no set of facts that supports his claim entitling him to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1117 (D.C. Cir. 2000).  Like a motion to dismiss for lack of subject

-11-

matter jurisdiction, although the plaintiff is given the benefit of all inferences that reasonably can

be derived from the facts alleged in the complaint, the court need not accept inferences that are

not supported by such facts, nor must the court accept plaintiff's legal conclusions cast in the

form of factual allegations.  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C.

Cir. 1994).

### 1.     PLAINTIFFS DO NOT RELY ON ANY STATUTE THAT WAIVES THE SOVEREIGN IMMUNITY OF THE FEDERAL GOVERNMENT

_____Plaintiffs' suit should be dismissed because they have still failed to enumerate any source

of law which would waive the federal government's sovereign immunity from being sued over

the role of the Secretary in making Medicaid FFP payments to a state.  "Absent a waiver,

sovereign immunity shields the federal government and its agencies from suit."  Loeffler v.

Frank, 486 U.S. 549, 554 (1988); Federal Housing Admin. v. Burr, 309 U.S. 242, 244 (1940).

The Supreme Court has stated that "[i]t is axiomatic that the United States may not be sued

without its consent and that the existence of consent is a prerequisite for jurisdiction."  United

States v. Navajo Nation, 537 U.S. 488, 502 (2003) (quoting United States v. Mitchell, 463 U.S.

206, 212 (1983)).  Sovereign immunity may not be impliedly waived, and "the United States and

its agencies are immune from suit absent its _explicit_ consent to be sued."  See Anderson v. Fed.

Bureau of Prisons, -- F.Supp.2d --, 2007 WL 2701128, at *1 (D.D.C. Sept. 17, 2007) (citing

Lehman v. Nakshian, 453 U.S. 156, 160 (1981); Kugel v. United States, 947 F.2d 1504, 1506

(D.C.Cir. 1991)).

In their opposition brief, Plaintiffs purport to rely on provisions of the Medicaid Act,

specifically 42 U.S.C. § 1396b(m)(2)(A) and 42 U.S.C. § 1396u-2(a)(1), for their cause of action

against the Secretary.  Pls.' Br. at 14.  However, this argument must fail because neither of these

provisions (nor any others in the Medicaid Act) provide for a private right of action against the

Secretary for the claims raised by the Plaintiffs.  No authority exists for a third party to sue the

Secretary for making FFP payments to a state.

Plaintiffs' attempt to rely on the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-

706, for jurisdiction in this case is similarly unavailing.  Indeed, the Supreme Court has made

clear that the APA is not an independent grant of jurisdiction in federal court.  See Your Home

Visiting Nurses Servs., Inc. v. Shalala, 525 U.S. 449, 457-458 (1999) ("[W]e have long held that

[the APA] is not an independent grant of subject-matter jurisdiction."); Califano v. Sanders, 430

U.S. 99 (1977).  Nonetheless, Plaintiffs assert that the Secretary's payments to the

Commonwealth's Medicaid managed care program constitute an "agency action" that is

"'arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with the

law . . . .'" Pls.' Br. at 25, citing 5 U.S.C. § 706(2)(A)-(C).  However, with no statutory basis for

jurisdiction over their Medicaid assertions, this APA claim is irrelevant.

Moreover, in their attempt to rely upon the APA for a waiver of sovereign immunity,

Plaintiffs ignore that the governing statute - the Medicaid Act - and its implementing regulations

set forth a comprehensive scheme under which a state dissatisfied with the Secretary's action

concerning payment of FFP can obtain administrative and judicial review.  Under the scheme, if

the Secretary concludes that a state's administration of its Medicaid state plan is in "substantial"

noncompliance with Federal requirements, the Secretary (through CMS) will initiate proceedings

to terminate FFP by providing the state with notice and an opportunity for hearing.  See 42

U.S.C. § 1396c; 42 C.F.R. §§ 430.35, 430.42; see generally Bowen v. Massachussetts, 487 U.S.

-13-

879, 885 (1988).  If CMS concludes that claims for any item or class of items are not allowable

under the Medicaid statute, CMS "disallows" such claims.  <u>Bowen</u> at 885.  When CMS makes

these determinations, it sends the state a letter detailing the legal and factual basis for the

enforcement action and providing notice of the state's right to request review.  42 C.F.R.

§ 430.42.  The <u>state</u> is entitled to reconsideration of a disallowance by filing an appeal with the

HHS Departmental Appeals Board ("Board").  42 U.S.C. § 1316(d); 42 C.F.R. §§ 430.42(b),

431.865(f)(1); 45 C.F.R. §§ <u>et</u> <u>seq</u>.  The <u>state</u> may obtain judicial review of a final decision to

disallow the state's FFP claim.  42 U.S.C. § 1316(a)(3); 42 C.F.R. § 430.38; <u>see</u> <u>also</u>, <u>Bowen</u>,

487 U.S. at 880.  Congress' creation of an express right of action for states to challenge an

unfavorable decision concerning FFP precludes the existence of a private right of action for a

provider to challenge a favorable one.  Indeed, Plaintiffs point to nothing that gives a private

party the right to force the Secretary to take an action against a state, or the right to appeal the

Secretary's decision not to take action against a state.  The Medicaid statute contemplates rights

between the state and the Secretary; no similar rights are vested in private parties.

In <u>Block v. Community Nutrition Institute</u>, 467 U.S. 340 (1984), the Supreme Court held

that such a comprehensive remedial scheme, which gave milk processors a right to judicial

review of milk-marketing orders, denied a private cause of action to consumers under the APA.

<u>Id.</u> at 346-53.  "[A]t least when a statute provides a detailed mechanism for judicial consideration

of particular issues at the behest of particular persons," the Court stated, "judicial review of those

issues at the behest of other persons may be found to be impliedly precluded."  <u>Id.</u> at 349.  In

<u>Syntex (USA) Inc. v. United States Patent & Trademark Office</u>, 882 F.2d 1570 (Fed. Cir. 1989),

the court applied this principle to deny a private cause of action in a case similar to this one,

where a third party sought to challenge an administrative "reexamination decision" that was favorable to a patent owner.  The statutory scheme gave the patent owner a right to seek judicial review of unfavorable decisions, but gave no comparable right to his competitors to challenge favorable outcomes.  Id. at 1573.  "In view of such a clear, comprehensive statutory scheme," the court held that "Congress intended to limit appeals from final reexamination decisions to those initiated by patent owners seeking to reverse an unfavorable decision."  Id. at 1573-74.

In this case, the Medicaid statutory scheme expressly gives states the right to challenge the Secretary's decision to withhold federal Medicaid payments, 42 U.S.C. § 1316(d), and ultimately to seek judicial review if they are dissatisfied with the outcome.  42 U.S.C. § 1316(a)(3).   No corresponding right is given to providers to challenge the Secretary's decision to not withhold FFP.  See Wilder v. Va. Hosp. Ass'n, 496 U.S. 488, 521 (1990) ("The Medicaid Act contains no comparable provision for private judicial or administrative enforcement").  The Community Nutrition and Syntex analyses therefore lead to the conclusion that Congress did not intend to confer on Plaintiffs here a right to challenge the Secretary's payment of FFP to a state. APA review of CMS' payment of FFP to the Commonwealth is therefore precluded.  See 5 U.S.C. § 701(a)(1).

## 2.     PLAINTIFFS LACK STANDING TO BRING THIS SUIT

In their attempt to establish standing in this suit against the Secretary, seeking to enjoin the Secretary from making federal payments to Puerto Rico in support of its Medicaid managed care program, Plaintiffs highlight why they in fact they do not meet Article III's minimum requirements for standing.  To meet Article III's standing requirements, a party must show "at an irreducible minimum," (1) a direct and palpable injury; (2) that can fairly be traced to the

challenged action of the defendant; and (3) is likely to be redressed if the relief sought is granted. Lujan v. Defenders of Wildlife, et al., 504 U.S. 555, 560-61 (1992).

>   a.   Plaintiffs Have Not Shown That They Have Suffered Any Direct and Palpable
>        Injury That Can Be Fairly Traced to the Challenged Action of CMS

In their brief, Plaintiffs allege that the Commonwealth and HMOs have failed to pay them the full amount to which they believe they are entitled. Specifically, they claim that their subcontracts with MCS Health Management Options, one of the HMOs with which Puerto Rico contracts, are unlawful. They also allege that Puerto Rico has not fully paid them the court-ordered payments they are owed from their successful litigation concerning supplemental "wraparound payments" in federal district court in Puerto Rico. Even if Plaintiffs have suffered the injuries they allege, they still would not have standing to bring this suit because the injuries are not fairly traceable to CMS' actions.

In Lujan, the Court emphasized that there must be a "causal connection between the injury and the conduct complained of - the injury has to be 'fairly . .. trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" 504 U.S. at 560 (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976)). In this case, the allegedly unlawful subcontracts were entered into by Plaintiffs and the HMO, not Plaintiffs and the Secretary (or CMS). CMS' broad oversight over a state's administration of its Medicaid program is not sufficient to confer standing to sue CMS on such subcontracts. See, e.g., Am. Health Care Ass'n v. Sullivan, 1991 WL 187456 (D.D.C.) (Plaintiff's speculative injuries are not "directly traceable to the Secretary's level of scrutiny over state plans . . . "). Neither the Medicaid Act nor the regulations authorize

CMS to modify the private subcontracts between Plaintiffs and the HMOs.  See generally, 42

U.S.C. § 1396c; 42 C.F.R. §§ 430.35, 430.42.

The section of Plaintiffs' brief dedicated to describing their alleged injuries states that

"[t]he HMOs do not pay FQHCs as they are required to do under the Medicaid statute . . . ."  Pls.'

Br. at 15.  Plaintiffs cite at length the declaration of Hector L. Cruz Batista, the director of the

MCS HMO, who describes the nature of the allegedly "unlawful" subcontract between MCS and

Plaintiff Loiza.  Id. at 15-17.  Plaintiffs' highlight Mr. Cruz's statement that ASES, the

Commonwealth's agency responsible for the administration of Medicaid managed care contracts,

reviewed and approved the terms of the contract between MCS and Loiza.  Id. at 19.  Nothing

Plaintiffs (nor Mr. Cruz) have said, however, alleges any injury that is "fairly traceable" to the

actions of CMS.  CMS has no authority over the contracts that HMOs enter into with health care

providers, including Plaintiffs.  See Ex. A, Kelly Decl. ¶ 9.  Plaintiffs may be dissatisfied with

their subcontracts with the HMO, but no injury allegedly resulting from these subcontracts is

traceable to the actions of the CMS.  As required by the Medicaid statute, CMS reviews contracts

between the Commonwealth and the HMOs.  It similarly requires the Commonwealth to provide

several basic assurances of its program.  CMS has fulfilled its obligations.  Plaintiffs' complaint

is with the HMOs, not CMS.  Their assertion that CMS' failure to provide oversight as

contemplated by the Medicaid statute has allowed them to be harmed is not only factually and

legally wrong, but it is legally insufficient to confer standing.[5]

---

[5]To the extent that Plaintiffs also assert that the Commonwealth has not paid them the full amount of the
court-ordered payments to which they are entitled in their separate federal lawsuit in Puerto Rico concerning
statutorily required "wraparound payments" (Rio Grande Community Health Center, Inc. et al. v. Rosa Perez-
Perdomo, Secretary, Department of Health, Case No. 03-1640 (D.P.R.)) and appeals thereof, (Rio Grande

(continued...)

b.      The Relief Sought By Plaintiffs Would Not Likely Redress Any Alleged Injury

Even if Plaintiffs' alleged injury was fairly traceable to some federal action, Plaintiffs

would still lack standing because the relief they seek - withholding FFP from Puerto Rico -

would not likely redress Plaintiffs' alleged financial harm resulting from their subcontracts with

the HMOs.  Withholding FFP will not necessarily lead to the result Plaintiffs desire.  The

Secretary cannot reach down several layers into the operational structures of Puerto Rico's health

care system to affirmatively compel the HMOs to release some FQHCs from contracts they have

signed.  Nor can he require the state to change its payment system.  The Secretary's authority is

limited to specifically enumerated actions, such as withholding FFP for certain classes of

nonallowable costs or withholding of FFP after the Secretary determines that a state is

"substantially" noncompliant with the Medicaid Act.  See Arthur C. Logan Mem'l Hosp. v. Toia,

441 F. Supp. 26, 27 (S.D.N.Y. 1977) (Secretary cannot compel state compliance).  He can simply

deny FFP where a clear violation of federal law has occurred, in hopes of triggering change;

however, no such violation of federal law has occurred here.

Plaintiffs boldly assert that if the Secretary denies FFP to Puerto Rico for its Medicaid

managed care contracts, Puerto Rico will either make the changes that Plaintiffs claim need to be

made to assist the Plaintiffs, or will not make the changes and revert to a traditional fee-for-

---

[5](...continued)

Community Health Center, Inc. v. Rullan, 397 F.3d 56 (1st Cir. 2005); Dr. Jose S. Belaval, Inc. v. Perez-Perdomo,
465 F.3d 33 (1st Cir. 2006)), the appropriate recourse is to raise the issue with that court, not to file a separate lawsuit
against the Secretary here.  In any event, the Puerto Rico federal district court found recently that Puerto Rico "has
always fully complied with this court's orders to make wraparound payments to plaintiffs Loiza and Belaval."
Concilio Salud Integral de Loiza, 479 F.Supp.2d at 25.  The court vacated its earlier preliminary injunction against
the Puerto Rico Medicaid program and denied Loiza's request to convert the preliminary injunction to a permanent
one.  Id. at 251.  Thus, any attempt to raise the same issues and prayer for relief that were litigated in the earlier Rio
Grande or Loiza cases would be barred by the doctrine of collateral estoppel.  Irish Lesbian and Gay Org. v.
Giuliani, 143 F.3d 638, 645 (2d Cir. 1998).

-18-

service basis for its Medicaid program.  Pls.' Br. at 4.  This assertion in purely conjectural.  Even if, *assuming arguendo*, the Secretary were to find that the Commonwealth's administration of its Medicaid program is in substantial noncompliance with its state plan and exercised his discretion under 42 U.S.C. § 1396c to disallow FFP, Medicaid providers, including Plaintiffs (and other FQHCs), would likely not be reimbursed (in whole or in part) for their services, and needy beneficiaries would likely have increased trouble accessing services.  Beyond that, the reaction of the Commonwealth is an open question,  Indeed, if the Commonwealth were out of compliance with the federal rules, there would be a myriad of ways it could resolve the problems; nothing would require Puerto Rico to make the choices desired by Plaintiffs, and the Secretary cannot force those changes.  Thus, it is far from clear that reducing FFP to the Commonwealth would necessarily redress any alleged injury suffered by Plaintiffs.  In fact, Plaintiffs would likely incur harm if the Court grants the relief they seek by enjoining the Secretary from providing FFP in support of Puerto Rico's Medicaid managed care contracts.   Plaintiffs, therefore, cannot meet the requirement of showing that their alleged injuries are likely to be redressed if the relief sought is granted and, thus, cannot meet this required element for standing.  Lujan, 504 U.S. at 560-61.

3.    **THE DECISION WHETHER TO TAKE AN ENFORCEMENT ACTION AGAINST THE COMMONWEALTH IS COMMITTED TO AGENCY DISCRETION AND IS PRESUMPTIVELY UNREVIEWABLE**

Plaintiffs' suit against the Secretary suffers from an additional legal deficiency: the decision to withhold federal payments in support of Puerto Rico's Medicaid managed care contracts is an enforcement action that is committed to the Secretary's discretion and is presumptively unreviewable.  In addition to the fact that this Court lacks jurisdiction to hear this

suit because there is no waiver of sovereign immunity under the Medicaid statute to hear

Plaintiffs' claims (see supra Part III.A.1), the "agency action" here - making HMO payments to

Puerto Rico instead of taking an enforcement action against the Commonwealth - is

unreviewable.  As the Supreme Court explained in Heckler v. Chaney, 470 U.S. 821, 831 (1985),

"an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a

decision generally committed to an agency's absolute discretion.  This recognition of the

existence of discretion is attributable in no small part to the general unsuitability for judicial

review of agency decisions to refuse enforcement."  Courts have recognized that this principle

applies to the Secretary's decision whether to initiate an enforcement action against a state

Medicaid program.  See, e.g., Phoenix Baptist Hosp. & Med. Ctr. v. United States, 973 F.2d 452

(9th Cir. 1991) (Secretary has discretion as to whether to withdraw funding from a state Medicaid

program for failure to comply with federal requirements); Steels by Steele v. Magnant, 796 F.

Supp. 1143 (N.D. Ind. 1992); Arthur C. Logan Mem'l Hosp., 441 F. Supp. at 26.

Plaintiffs here ignore the Supreme Court's opinion on this matter and seem to argue that

simply because *they* allege that Puerto Rico violated provisions of the Medicaid Act in the

administration of its Medicaid managed care program, CMS should have withheld federal

payments for Puerto Rico's program.  Plaintiffs ignore that the determination of whether the

statutory requirements for Medicaid managed care payments have been met and whether to

withhold FFP from a state is committed to CMS' discretion.  See 42 U.S.C.

§§ 1396c, 1396b(m)(2)(A)(iii); 42 C.F.R. §§ 430.35, 430.42, 438.6.[6]  CMS, not Plaintiffs, have

---

[6]Plaintiffs also ignore the statutory requirements for notice and opportunity to be heard before CMS may withhold FFP for noncompliance with federal requirements.  42 U.S.C. § 1396c; 42 C.F.R. §§ 430.35, 430.42.

the authority to determine whether a state has administered its Medicaid program in such a way

that it no longer complies with federal requirements.  As detailed below, see infra Part II.B, CMS

did not "ignore" its legal duties, but performed its responsibilities to review Puerto Rico's

managed care contracts with Medicaid HMOs.  CMS determined that the contracts complied

with federal requirements and, therefore, has paid Puerto Rico federal payments to support those

contracts.  CMS' decision not to withhold Medicaid payments to Puerto Rico is presumptively

unreviewable, and Plaintiffs' request that this Court order CMS to take on an enforcement action

against Puerto Rico should be denied.[7]

## B.     PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED AND THE COURT SHOULD INSTEAD GRANT THE SECRETARY'S CROSS-MOTION FOR SUMMARY JUDGMENT

_____As discussed above, Plaintiffs' suit should be dismissed pursuant to Federal Rule of Civil

Procedure 12(b)(1) for lack of jurisdiction and 12(b)(6) for failure to state a claim.  However,

even if Plaintiffs survive the Secretary's motion to dismiss on those grounds, they cannot prevail

---

[7]Plaintiffs' attempts to rely on the Appropriations Clause of the United States Constitution, U.S. Const. Art. I § 9, cl. 7, and the Anti-Deficiency Act, 42 U.S.C. § 1341, are also unavailing.  The Appropriations Clause provides, in part, that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. Art. I § 9, cl. 7.  In interpreting this clause, the Supreme Court has stated that "[m]oney may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute."  Office of Personnel Management v. Richmond, 496 U.S. 414, 425 (1990).  The Anti-Deficiency Act, 31 U.S.C. § 1341, states that the federal government may not, through its officers or employees: (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; (B) involve the government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

Plaintiffs try to apply the Appropriations Clause and Anti-Deficiency Act to this case by saying that in 42 U.S.C. § 1396b(m)(1) and (2), Congress "conditioned its authorization to HHS to pay funds to State Medicaid programs" on HHS' pre-approval of contracts and that "without such approval . . . such payments are unauthorized."  Pls.' Br. at 26-27.  Plaintiffs appear to allege that HHS has violated both the Appropriations Clause and the Anti-Deficiency Act by not approving Puerto Rico's managed care contracts with Medicaid HMOs.  As an initial matter, it is not at all clear that there would be an Appropriations Clause and/or Anti-Deficiency Act violation if CMS had not given prior approval for the Medicaid managed care payments to Puerto Rico.  Nonetheless, this is irrelevant because as discussed in Section II.B., infra, CMS has reviewed and approved Puerto Rico's Medicaid managed care contracts as required by 42 U.S.C. § 1396b(m).

on their motion for partial summary judgment.  Summary judgment is to be granted when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  Summary judgment is properly granted against a party that "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Plaintiffs here contend that

they are entitled to summary judgment because the Secretary has violated the Medicaid statute by

failing to approve contracts entered into between Puerto Rico and the HMOs for provision of

Medicaid services.  However, Plaintiffs' assertion is based upon pure conjecture, and they are

unable to establish the most fundamental element of their claim: that CMS failed to provide prior

approval of Puerto Rico's contracts with the Medicaid HMOs.  Therefore, Plaintiffs are not

entitled to summary judgment.  Rather, the Court should grant the Secretary's cross-motion for

summary judgment.

   The primary "violation" alleged by Plaintiffs in this lawsuit is that the Secretary has not

provided approval of the contracts between Puerto Rico and the HMOs with which it contracts to

provide for services to Medicaid beneficiaries.  Complaint ¶ 45.  However, Plaintiffs provide no

support for this assertion.  Under the Medicaid Act, a state's Medicaid managed care program

must be provided in accordance with a contract between the state and the managed care entity

"under which prepaid payments to the entity are made on an actuarially sound basis and under

which the Secretary must provide prior approval . . . ."  42 U.S.C. § 1396b(m)(2)(A)(iii); see also

42 C.F.R. § 438.6.  The fatal flaw in Plaintiffs' allegation is that the Secretary, through CMS, in fact has and does review and provide prior approval for Puerto Rico's contracts with the Medicaid HMOs.  See Ex. A, Kelly Decl. ¶¶ 9-13.

Since Puerto Rico implemented a managed care system to deliver services to Medicaid beneficiaries in 1994, the CMS Region II office in New York ("CMS-RO") has reviewed the Commonwealth's Medicaid managed care contracts using oversight procedures consistent with those followed in the fifty (50) states.  Id. ¶ 10.  The CMS-RO reviews Puerto Rico's contracts, contract amendments and contract extensions within 45 calendar days of receipt of the contract and within 30 calendar days of receipt of the contract amendments and extensions.  Id. ¶ 12.   If there are changes/revisions that need to be  made to the contract or amendment, the CMS-RO notifies the Commonwealth.  Id.  If the contract or amendment can be approved, the CMS-RO prepares and submits an Office of Secretary Notification ("OSN") to the CMS Central Office ("CO") for clearance.  Id.  Upon receipt of clearance from the CO, the CMS-RO sends an approval letter to the Commonwealth approving the contract and rates.  See, e.g., Ex. A, Kelly Decl., Att. 3, CMS-RO Approval Letter to Puerto Rico and OSN for Contract Period Ending June 30, 2006.[8]

In reviewing the contracts, the CMS-RO uses several checklists to assess whether managed care contracts are approvable, including whether the capitation rates submitted by Puerto Rico are actuarially sound per the regulatory guidelines. See Ex. A, Kelly Decl. ¶ 11; Att.1, CMS Checklist for Managed Care Contract Approval; Att. 2, Appendix A - Financial

---

[8]While the letter refers to approval of "contract amendments," those amendments are extensions of the contracts listed for another contract period (July 1, 2005 through June 30, 2006).

Review Documentation for At-Risk Capitated Contracts Ratesetting.  Actuarially sound capitation rates means capitation rates that have been developed in accordance with generally accepted principles and practices and are appropriate for the populations to be covered and services to be furnished under the contract; Puerto Rico (as all states) must provide actuarial certification by an actuary who meets the qualification standards established by the American Academy of Actuaries and follows the practice standards established by the Actuarial Standards Board.  See 42 C.F.R. § 438.6(c); Ex. A, Kelly Decl., Att. 2.

The CMS-RO has reviewed the approved managed care contracts and supporting certifications submitted by Puerto Rico from the inception of Puerto Rico's Medicaid managed care program through the contract period ending June 30, 2006.  See Ex. A, Kelly Decl. ¶ 13. Once it determined that Puerto Rico's rates and certifications for those contract periods met the required standards, the CMS-RO approved the contracts for those periods and, accordingly, afforded full FFP to the Commonwealth's program.  Id.[9]  Plaintiffs' only "evidence" for their allegation that CMS has not approved Puerto Rico's contracts with the Medicaid HMOs is an interrogatory response from the Puerto Rico Department of Health in the earlier Rio Grande case. Pls.' Ex. E.  Interrogatory responses 12 and 13, which seem to state that there is no review and approval process of contracts between Puerto Rico and the HMOs or payment rates to HMOs, are

_____

[9]CMS interprets the "prior approval" provision in 42 U.S.C. § 1396b(m)(2)(A)(iii) to mean that it must approve Puerto Rico's managed care contracts prior to the final award of FFP for a given contract period, not prior to the first day of a contract period.  The agency's interpretation is reasonably entitled to "substantial deference" and "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation omitted).  The CMS-RO is currently in the process of reviewing the contracts and supporting certifications for the contract period July 1, 2006 through June 30, 2008.  See Ex. A, Kelly Decl. ¶ 17.

simply incorrect.  Id. ¶¶ 10, 13.[10]  As described in Ms. Kelly's declaration, there is an extensive

review and approval process conducted by the CMS-RO of Puerto Rico's contracts with HMOs,

including the rates it pays to HMOs.  Id. ¶¶ 10-13.  Any assertion otherwise is simply wrong and

contrary to the overwhelming evidence.

As explained in Ms. Kelly's declaration, the CMS-RO did not approve Puerto Rico's

contracts with Medicaid HMOs until it was satisfied that the approved contracts for each contract

period met the standards required by statute and regulation.  Id. ¶ 13.  The Medicaid Act states

that a state's contracts with Medicaid HMOs must contain certain provisions, 42 U.S.C. §

1396b(m)(2)(A); the Secretary has interpreted this to mean that he (through CMS) must review

the contracts between the states and the Medicaid HMOs to ensure that they contain the

necessary provisions.[11]  See 42 C.F.R. §§ 438.6, 438.806.  The statute does not require, as

Plaintiffs seem to suggest, that the Secretary also review the *subcontracts* between the Medicaid

HMOs and the providers with which they contract to actually render health care services.  There

is no reference in 42 U.S.C. § 1396b(m)(2)(A), or anywhere else in the Medicaid Act, to review

by the Secretary of the subcontracts between the Medicaid HMOs and providers.  Indeed, to

suggest that the Secretary review subcontracts between the HMOs with which a state contracts to

arrange for services and the providers of those services would undermine the cooperative federal-

state nature of the Medicaid program.

---

[10]The response to interrogatory 14 pertains to approval of rates paid by HMOs to providers, not Puerto Rico to the HMOs.  Plaintiffs conveniently mix apples and oranges by using this interrogatory response to suggest that CMS does not review Puerto Rico's contracts with the HMOs.

[11]Under the standards of deference in Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984), the Secretary's interpretation of the Medicaid statute must be upheld so long as it is "within the bounds of reasonable interpretation." Your Home Visiting Nurse Servs., 525 U.S. at 450.

As noted above, each state operates its own Medicaid system. The role of the federal government is to provide oversight to ensure the various state programs operate within the broad mandates of the Social Security Act. It is the state, not the federal government, that is responsible for the day-to-day administration of its state Medicaid program. The Medicaid statute includes no requirement that the federal government review each of the subcontracts between Medicaid providers and their HMOs because the terms of those contracts are precisely the sort of details that are left to the states. Moreover, to read the Medicaid statute as contemplating federal review of each subcontract between each Medicaid HMO and each service provider in every state that uses managed care to provide Medicaid services, would be to contemplate a massive administrative oversight expansion for the federal government - an expansion that would have huge administrative costs. The Secretary's statutory responsibility is restricted to ensuring that a state's managed care contracts with HMOs include the statutorily-required conditions for operating a Medicaid managed care system. Through the CMS Regional Offices, the Secretary thoroughly performs this function and assures prior to approving a state's managed care contracts that each contract contains the necessary provisions.

Plaintiffs' allegations that the Commonwealth's contracts with the HMOs did not meet several of the statutory requirements lack support in fact or law. For example, Plaintiffs state that the Commonwealth's contracts with the Medicaid HMOs do not meet the requirement in 42 U.S.C. § 1396b(m)(2)(A)(ix) to provide that the HMO shall provide payment to FQHCs "that is not less than the level and amount of payment which the [HMO] would make for the services if the services were furnished by a provider which is not" an FQHC. Complaint ¶ 46(D); Pls.' Br. at 22-23. The CMS-RO, however, determined that Puerto Rico's approved contracts with the

Medicaid HMOs did in fact contain the provision required by 42 U.S.C. § 1396b(m)(2)(A)(ix) that they will pay FQHCs "not less than" the amount for services if the services were furnished by a non-FQHC provider.  Ex. A., Kelly Decl. ¶ 14; Att. 4, Article XIX, ¶ 8; see also Three Lower Counties Community Health Services, Inc. v.Maryland, 498 F.3d 294, 304-305 (4th Cir. 2007).  The Secretary, through CMS, met his obligation to ensure that Puerto Rico's Medicaid managed care contracts contained the necessary provision concerning payment to FQHCs.[12]

Plaintiffs also allege that Puerto Rico's contracts with the HMOs violate 42 U.S.C. § 1396b(m)(2)(A)(x), which requires that any physician incentive plan ("PIP") operated by a Medicaid HMO must meet the requirements for PIPs applicable to Medicare managed care organizations, described in 42 U.S.C. § 1395mm(i)(8).  See also 42 C.F.R. 438.6(h) (incorporating Medicare managed care requirements in 42 C.F.R. § 422.208 and 422.210).  These requirements are intended ensure that a physician or physician group will not fail to treat or refer a patient because of the risk imposed.  Contracts between the states and HMOs must provide that PIP requirements will be met, specifically that if contracts between the HMO and physicians or physicians groups place the physicians or physician groups at a level of risk that exceeds the level set forth in the regulations, adequate stop-loss insurance must be provided, among other

---

[12]While Plaintiff FQHCs contend that their subcontracts with some HMOs result in them receiving little or no payment, Pls.' Br. at 15-20, that is the nature of the "risk-based" agreements that they, as well as other providers, have entered into freely with the HMOs and are not prohibited by law.  Moreover, Plaintiffs have not provided any evidence that they are paid less than the amount for services than a non-FQHC provider would receive, which is the only assurance required by 42 U.S.C. § 1396b(m)(2)(A)(ix).  In fact, Plaintiffs themselves admit that the HMOs pay them the same amount that they pay to private doctor groups for similar services.  Compl. ¶ at 44(C) and (D); Pls.' Br. at 17.  The complaint states that "the HMOs payment to the FQHCs is the same as their payment to private doctor groups for the same or similar specific services the FQHCs provide." Compl. ¶ at 44(C).  The report by the managed care consultant included in Plaintiffs' Exhibit A indicates the same ("The HMOs offer the FQHCs the same terms and compensation as other providers of service.")  Thus, Plaintiffs have not shown that the required assurance in Puerto Rico's contracts with the HMOs has been violated.

requirements.  42 U.S.C. § 1395mm(i)(8); 42 C.F.R. §§ 422.208, 422.210.  The CMS-RO has

found that the approved contracts between Puerto Rico and the HMOs contain adequate

assurances concerning PIP requirements, including assurances to provide adequate stop-loss

insurance.  See Ex.A, Kelly Decl. ¶ 15; Att. 5, Article VI, ¶ 22; Article IX, ¶ 2f; Article XV, ¶

27.[13]  Again, the Secretary, through CMS, has met his obligation to ensure that Puerto Rico's

Medicaid managed care contracts contained the necessary assurance concerning PIPs.[14]

Another allegation contends that Puerto Rico's managed care contracts with the HMOs

do not contain the provision required by 42 U.S.C. § 1396b(m)(2)(A)(vii) that in urgent care

situations, where an individual receives services from an out-of-network provider, either the

HMO or the state will provide reimbursement for those services.  However, yet again, Plaintiffs

have erred.  As part of its thorough review of Puerto Rico's managed care contracts, the CMS-

RO determined that the approved contracts contained adequate assurances that the HMOs will

reimburse out-of-network providers for services provided in situations where in-network

providers are unable to provide the necessary services.  See Ex.A, Kelly Decl. ¶ 16; Att. 5,

---

[13]Article XV ¶ 27 had to be amended due to an incorrect regulatory citation.  The amendment, which properly cites the PIP assurance requirement at 42 C.F.R. § 438.6(h), is also attached.

[14]Plaintiffs have not provided any evidence that the PIP assurances in Puerto Rico's managed care contracts are not being fulfilled by the HMOs.  In any event, as discussed in greater detail in the Motion to Dismiss, the PIP requirements are not even applicable to the subcontracts between HMOs and FQHCs because the regulation expressly states that it applies to "physicians" or "physician groups," 42 C.F.R. § 422.208, and does not define physician groups to include FQHCs.  Plaintiffs allege that this is a post hoc justification and question the agency's interpretation.  Pls.' Br. at 24, fn. 13.  However, the inapplicability of the PIP requirements to subcontracts with FQHCs is a reasonable agency interpretation that is entitled to deference.  See Your Home Visiting Nurse Servs., 525 U.S. at 453.  "Physician groups" are defined as "a partnership, association, corporation, individual practice association, or other group of physicians that distributes income from the practice among members."  42 C.F.R. § 422.208(a) (emphasis added).  FQHCs are either publicly run or not-for-profits and, as a result, they are outside the defined scope of "physicians groups" since not-for-profits do not "distribute income from the practice among members."  See 42 C.F.R. § 51c.101 (only public and nonprofit private entities are eligible to apply for section 330 grants).  Because Plaintiff FQHCs are not "physician groups," the PIP assurances in Puerto Rico's managed care contracts do not pertain to them.

Article VI, ¶ 1(iii).  To the extent Plaintiffs allege that CMS has failed to ascertain that Puerto

Rico's managed care contracts contain any other required provisions, including compliance with

the applicable requirements of 42 U.S.C. § 1396u-2, they are similarly in error.[15]  Ex. A, Kelly

Decl. ¶ 13.

Plaintiffs' main allegation in this case is that the Secretary did not provide prior approval

of Puerto Rico's managed care contracts with Medicaid HMOs.  As detailed above, this

allegation runs contrary to the overwhelming evidence that the Secretary, through CMS, provided

thorough review and prior approval of the contracts through which Puerto Rico has operated its

Medicaid managed care system since 1994.  While Plaintiffs are clearly dissatisfied with the

terms of their subcontracts with the HMOs, their attempt to escape from these subcontracts by

claiming that Puerto Rico's contracts with the HMOs are unlawful must fail.

## IV. CONCLUSION

Plaintiffs essentially ask this Court to withhold millions of dollars from the Puerto Rico

Medicaid program and tear down the entire payment structure under which all health care

services are delivered to the needy population in Puerto Rico by declaring unlawful the contracts

between Puerto Rico and the HMOs.  For the foregoing reasons, the Court lacks jurisdiction to

grant this relief and, alternatively, Plaintiffs have failed to state a claim upon which this relief can

be granted.  Therefore, the Secretary respectfully requests that this Court grant the Motion to

Dismiss.  If the Court denies the Motion to Dismiss, the Secretary requests that the Court deny

---

[15]Plaintiffs contend, for example, that Puerto Rico has violated 42 U.S.C. § 1396u-2(a)(3), which generally requires that states must provide Medicaid managed care enrollees with at least two HMOs from which to choose. Pls.' Br. at 24-25.  However, Puerto Rico is statutorily exempt from the "freedom of choice" requirement, among others, by a provision of the Medicaid Act codified at 42 U.S.C. § 1396a(a)(23).  Ex. A., Kelly Decl. ¶ 7.

Plaintiffs' Motion for Partial Summary Judgment and instead grant the Secretary's Cross-Motion

for Summary Judgment.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


_____/s/_____
CHARLOTTE ABEL
D.C. Bar No. 388582
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-307-2332

DEBORAH M. CHASAN-SLOAN
D.C. Bar No. 480560
Attorney
Office of the General Counsel
Department of Health and Human Services
Room 5309, Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201
202-619-2603

OF COUNSEL:

DANIEL MERON
General Counsel

CAROL J. BENNETT
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel for Litigation

United States Department of
Health and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONCILIO DE SALUD INTEGRAL DE | ) | |
| LOIZA, INC., ET AL. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.07-01034 (RMC) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

The Secretary of the U.S. Department of Health and Human Services ("the Secretary,"

"HHS," or "Defendant") hereby submits this Statement of Material Facts in support of his cross-

motion for summary judgment.

1.  Medicaid is a cooperative program between the states (and territories) and the

federal government.  42 C.F.R. Part 430 et seq.; Ex. A, Kelly Decl. ¶ 4.  It is generally

established by Title XIX of the Social Security Act, which authorizes the Secretary to provide

federal matching funds to states and territories that furnish medical assistance to low-income

persons.  42 U.S.C. § 1396 et seq.

2.  Each state is free to design and administer its own Medicaid program, so long as it

abides by broad federal rules.  42 U.S.C. § 1396a; 42 C.F.R. Part 430 et seq.

3.  The Commonwealth of Puerto Rico ("the Commonwealth" or "Puerto Rico") is considered a state for purposes of the Medicaid Act, unless otherwise indicated.  42 U.S.C. § 1301(a)(1).

4.  A participating state administers its Medicaid program pursuant to a "state plan" that must be approved by the Secretary.  42 U.S.C. § 1396a.  The Secretary performs this function through the Centers for Medicare & Medicaid Services ("CMS").  42 C.F.R. Part 430 Subpart B.

5.  Upon approval of its state plan, a state or territory becomes entitled to reimbursement by the federal government for a portion of its payments to hospitals and other providers of medical assistance to Medicaid recipients.  42 U.S.C. § 1396b(a).

6.  This federal contribution to a state's Medicaid expenses is termed federal financial participation ("FFP").  Id. §§ 1396a, 1396b; 42 C.F.R. Part 430.

7.  If the Secretary finds that a state is not in compliance with its state plan, the Secretary may take certain steps such as withholding further payments to the state.  42 U.S.C. § 1396c.

8.  Before taking any compliance action, the Medicaid Act requires the Secretary to provide the State with "reasonable notice and opportunity for hearing."  Id.; 42 C.F.R. § 430.35.

9.  The Medicaid programs are administered by the states and territories, not by the federal government.  42 C.F.R. § 430 et seq.  States have extensive discretion in establishing their programs and may enter into direct agreements with providers of services, by which the states set the level of Medicaid reimbursement paid to providers.  42 U.S.C. §§ 1396a(a)(13)(A), 1396a(a)(27).

10.  As an alternative, states may contract with managed care organizations ("MCOs") including health maintenance organizations ("HMOs") or other "risk-bearing" organizations to

provide some or all of the covered services, in exchange for prepaid capitation payments or some other risk-based arrangement.  Id. § 1396b(m).

11.  In order to meet their responsibility to the state to provide covered services, Medicaid HMOs generally contract with health care providers, in exchange for a contractually agreed upon payment rate.  Ex. A, Kelly Decl. ¶ 5.

12.  The Commonwealth of Puerto Rico uses a managed care system in administering the Medicaid program.  Id. ¶ 6.

13.  The Commonwealth, through the Puerto Rico Health Insurance Administration (known through its Spanish acronym as "ASES"), contracts with HMOs to arrange for the delivery of health care services to Medicaid patients.  Id.  The Commonwealth pays each HMO a fixed monthly sum per Medicaid patient assigned to the HMO, and in return, the HMO agrees to provide all covered services to the individual.  Id.

14.  The HMO provides those services by contracting with providers, including federally-qualified health centers ("FQHCs"), to deliver the health services to the eligible population.  Id.

15.  An FQHC is a not-for-profit entity that provides primary and other health care services to "medically underserved" populations and meets certain other statutory requirements. 42 U.S.C. § 1396d(1)(2).  Entities that receive section 330 Public Health Service ("PHS") grants under 42 U.S.C. § 254b, or are found by the Secretary to meet the requirements for such funding, are considered FQHCs.  Id.

16.  State Medicaid programs are required to offer FQHC services and "any other ambulatory services" offered by an FQHC which are otherwise included in the state's plan to categorically needy Medicaid beneficiaries and may offer those services to medically needy

beneficiaries.  Id. §§ 1396a(a)(10)(A), 1396d(a)(2)(C), 1396d(l)(2)(A).

17.  Each state plan must include, among its numerous details, a provision for payments to FQHCs.  Id. § 1396a(bb).

18.  In 2000, Congress amended the Medicaid Act to replace cost-based reimbursement for FQHCs with a prospective payment system ("PPS") with payment calculated on a per-visit basis.  Medicare, Medicaid and SCHIP Benefits Improvement Act of 2000, Pub. L. N. 106-554 (Dec. 21, 2000), codified at 42 U.S.C. § 1396a(bb).

19.  Under Section 1396a(bb)(5), if FQHC payments from Medicaid managed care entities are less than would be due under the particular FQHC's per-visit rate, the state is required to pay the FQHC the difference; this supplemental payment by the State to the FQHC is known as a "wraparound payment."  42 U.S.C. § 1396a(bb)(5).

20.  CMS reviews and approves the contracts between the states and HMOs to ensure that the contracts meet certain basic requirements.  Id. § 1396b(m)(2)(A); 42 C.F.R. § 438.6.

21.  CMS has no authority over the subcontracts that HMOs enter into with health care providers to provide services.  Ex A, Kelly Decl. ¶ 9.

22.  CMS Region II is responsible for reviewing Puerto Rico's contracts with HMOs and has reviewed these contracts since the adoption of Medicaid managed care in Puerto Rico in 1994.  Id. ¶ 10.

23.  Region II reviews the Commonwealth's Medicaid managed care contracts using federally-approved oversight procedures which are consistent with those followed in the fifty states.  Id.

24. Region II uses several checklists to assess whether Puerto Rico's managed care contracts are approvable and whether the capitation rates submitted by Puerto Rico are actuarially sound, per the regulatory guidelines. Id. ¶ 11.

25. Region II has reviewed the approved managed care contracts and supporting certifications submitted by Puerto Rico from the inception of Puerto Rico's Medicaid managed care program through the contract period ending June 30, 2006. Id. ¶ 13. Once Region II determined that Puerto Rico's rates and certifications for those contract periods met the required standards, it approved the contracts for those periods and, accordingly, afforded full FFP to the Commonwealth's program. Id.

26. As part of the process of reviewing Puerto Rico's approved managed care contracts, Region II determined that such contracts contained the assurance required by 42 U.S.C. § 1396b(m)(2)(A)(ix) that the HMOs pay FQHCs "not less than" the amount for services if the services were furnished by a non-FQHC provider. Id. ¶ 14.

27. As part of the process of reviewing Puerto Rico's approved managed care contracts, Region II found that such contracts contained adequate assurances concerning the physician incentive plan ("PIP") requirements at 42 C.F.R. 438.6(h) (which incorporates the Medicare managed care requirements for PIPs in 42 C.F.R. § 422.208 and 422.210). Id. ¶ 15.

28. As part of the process of reviewing Puerto Rico's approved managed care contracts, Region II determined that such contracts contained the assurance required by 42 U.S.C. § 1396b(m)(2)(A)(vii) that in urgent care situations where an individual receives services from an out-of-network provider, either the HMO or the state will provide reimbursement for those services. Id. ¶ 16.

29.   The process of reviewing Puerto Rico's managed care contracts is an ongoing one, and Region II continuously works with Puerto Rico to rectify any deficiencies identified in the operation of its Medicaid state plan and Medicaid managed care contracts.  Id. ¶ 17.  Region II is in the process of reviewing the contracts and supporting certifications for the contract period July 1, 2006 through June 30, 2008.  Id.

30.   Several FQHCs, including Plaintiffs Concilio de Salud Integral de Loiza, Inc. ("Loiza") and Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval"), filed suit against the Commonwealth in June, 2003 in the United States District Court for the District of Puerto Rico alleging that the Commonwealth had illegally failed to establish a Prospective Payment System office and to make the wraparound payments required by 42 U.S.C. § 1396a(bb)(5).  Rio Grande Community Health Center, Inc. et al. v. Rullan, No. 03-1640, 2004 WL 3202761, at *1 (D.P.R. March 31, 2004).

31.   On March 31, 2004, that Court entered a preliminary injunction against the Commonwealth ordering Puerto Rico's Secretary of Health to make wraparound payments to the FQHCs.  Id. at *2.

32.   The court later found that the Commonwealth complied with that order by both establishing a PPS office and by making wraparound payments to both FQHC Plaintiffs and denied Loiza's request to convert its preliminary injunction into a permanent injunction. Concilio de Salud Integral de Loiza v. Perez Perdomo, 479 F. Supp. 2d 247, 249-251 (D.P.R. 2007).

33.   Plaintiffs attempted to interplead the Secretary into the litigation in the U.S. District Court for the District of Puerto Rico; the motion for interpleader was denied, however, on the

grounds that ". . . plaintiffs' concern of a future claim to the Section 330 funds by the federal

defendants, is purely conjectural." Rio Grande Community Health Center, Inc. v. Puerto Rico,

No. 03-1640, 2006 WL 1514332, at *1 (D.P.R. May 25, 2006).

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


_____/s/_____
CHARLOTTE ABEL
D.C. Bar No. 388582
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-307-2332

DEBORAH M. CHASAN-SLOAN
D.C. Bar No. 480560
Attorney
Office of the General Counsel
Department of Health and Human Services
Room 5309, Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201
202-619-2603


OF COUNSEL:

DANIEL MERON
General Counsel

CAROL J. BENNETT
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONCILIO DE SALUD INTEGRAL DE<br>LOIZA, INC., ET AL.<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL O. LEAVITT,<br>Secretary, United States Department of<br>Health and Human Services,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No.07-01034 (RMC)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF SUE KELLY

I, SUE KELLY, declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I am the Associate Regional Administrator of the Division of Medicaid & Children's

       Health, Centers for Medicare & Medicaid Services ("CMS"), United States Department

       of Health and Human Services ("HHS") in Region II.  Region II covers New York, New

       Jersey, Puerto Rico, and the Virgin Islands.

2.     I have been the Associate Regional Administrator of the Division of Medicaid &

       Children's Health in CMS, Region II, since January, 2003.  Prior to that date, I was the

       Associate Regional Administrator of what was known as the Division of Medicaid &

       State Operations.

3.     As Associate Regional Administrator of the Division of Medicaid & Children's Health

       and, previously, of the Division of Medicaid & State Operations at CMS, Region II, I

have been responsible for federal oversight of state Medicaid programs in Region II, including Puerto Rico, from March, 1998 to the present.

4.    Medicaid is a cooperative program between the states (and territories) and the federal government. It is generally established by Title XIX of the Social Security Act, which authorizes the Secretary of the U.S. Department of Health and Human Services to provide federal matching funds to states and territories that furnish medical assistance to low-income persons. 42 U.S.C. § 1396 et seq. Each state is free to design and administer its own Medicaid program, so long as it abides by broad federal rules. 42 U.S.C. § 1396a; 42 C.F.R. Part 430 et seq. The Commonwealth of Puerto Rico is considered a state for purposes of the Medicaid Act, unless otherwise indicated. 42 U.S.C. § 1301(a)(1).

5.    The Medicaid programs are administered by the states and territories, not by the federal government. States have extensive discretion in establishing their programs and may enter into direct agreements with providers of services, by which the states set the level of Medicaid reimbursement paid to providers. See 42 U.S.C. §§ 1396a(a)(13)(A), 1396a(a)(27). As an alternative, states may contract with managed care organizations ("MCOs") including health maintenance organizations ("HMOs") or other "risk-bearing" organizations to provide some or all of the covered services, in exchange for prepaid capitation payments or some other risk-based arrangement. 42 U.S.C. § 1396b(m). In order to meet their responsibility to the state to provide covered services, HMOs generally contract with health care providers, in exchange for a contractually agreed upon payment rate.

6.    The Commonwealth of Puerto Rico uses a managed care system in administering the
      Medicaid program. The Commonwealth, through the Puerto Rico Health Insurance
      Administration (known through its Spanish acronym as "ASES"), contracts with HMOs
      to arrange for the delivery of health care services to Medicaid patients. The
      Commonwealth pays each HMO a fixed monthly sum per Medicaid patient assigned to
      the HMO, and in return, the HMO agrees to provide all covered services to the
      individual. The HMO provides those services by effectively contracting with hospitals
      and other providers to deliver the health services to the eligible population. The HMO
      earns a profit if its costs are less than the fixed monthly sum paid by the Commonwealth;
      it suffers a loss if its costs are more.

7.    The Medicaid Act contains a provision, codified at 42 U.S.C. § 1396a(a)(23), which
      exempts Puerto Rico from the "freedom of choice" requirement in 42 U.S.C. § 1396u-
      2(a)(3)(A) and 42 C.F.R. § 438.52 to provide Medicaid beneficiaries with a choice of at
      least two MCOs in which to enroll.

8.    During the contract period ending June 30, 2006, Puerto Rico contracted with three HMO
      plans, administered by Humana Health Plans of Puerto Rico, Inc. ("Humana"), MCS
      Health Management Options, and Triple S, Inc, to operate its Medicaid program.[1]

9.    CMS reviews and approves the contracts between the states and HMOs to ensure that the
      contracts meet certain basic requirements. See 42 U.S.C. § 1396b(m)(2)(A); 42 C.F.R. §
      438.6. However, CMS has no authority over the subcontracts that HMOs enter into with
      health care providers to provide services.

---

[1]Puerto Rico also contracted during that time period with two prepaid inpatient health plans, administered by APS
Healthcare of Puerto Rico, Inc. and FHC Health Systems of Puerto Rico, Inc.

10.    CMS Region II is responsible for reviewing Puerto Rico's contracts with its HMOs and
       has reviewed these contracts since the adoption of Medicaid managed care in Puerto Rico
       in 1994. Region II reviews the Commonwealth's Medicaid managed care contracts using
       federally-approved oversight procedures which are consistent with those followed in the
       fifty states.

11.    Region II uses several checklists to assess whether Puerto Rico's managed care contracts
       are approvable and whether the capitation rates submitted by Puerto Rico are actuarially
       sound, per the regulatory guidelines. See, e.g., Att.1, CMS Checklist for Managed Care
       Contract Approval; Att. 2, Appendix A - Financial Review Documentation for At-Risk
       Capitated Contracts Ratesetting.

12.    Region II reviews Puerto Rico's contracts, contract amendments and contract extensions
       within 45 calendar days of receipt of the contract and within 30 calendar days of receipt
       of the contract amendments and extensions. If there are changes/revisions that need to be
       made to the contract or amendment, Region II notifies ASES and the Commonwealth. If
       the contract or amendment can be approved, Region II prepares and submits an Office of
       Secretary Notification ("OSN") to the CMS Central Office for clearance. Upon receipt of
       clearance from the Central Office, Region II sends an approval letter to ASES and the
       Commonwealth approving the contract and rates. See, e.g., Att. 3, CMS-RO Approval
       Letter to Puerto Rico and OSN for Contract Period Ending June 30, 2006.[2]

13.    Region II has reviewed the approved managed care contracts and supporting
       certifications submitted by Puerto Rico from the inception of Puerto Rico's Medicaid
       managed care program through the contract period ending June 30, 2006. Once we

---

[2]While the letter refers to approval of "contract amendments," those amendments are extensions of the contracts
listed for another contract period (July 1, 2005 through June 30, 2006).

determined that Puerto Rico's rates and certifications for those contract periods met the required standards, we approved the contracts for those periods and, accordingly, afforded full federal financial participation ("FFP") to the Commonwealth's program.

14.    As part of the process of reviewing Puerto Rico's approved managed care contracts, Region II determined that such contracts contained the assurance required by 42 U.S.C. § 1396b(m)(2)(A)(ix) that the HMOs pay FQHCs "not less than" the amount for services if the services were furnished by a non-FQHC provider. An example of an assurance that the HMO will pay FQHCs no less than it pays non-FQHCs can be found in the attached contract provisions between Puerto Rico and Humana for the contract period ending June 30, 2006. See Att. 4, Article XIX, ¶ 8. Puerto Rico's contracts with other HMOs during that contract period contain the same language.

15.    As part of the process of reviewing Puerto Rico's approved managed care contracts, Region II found that such contracts contained adequate assurances concerning the physician incentive plan ("PIP") requirements at 42 C.F.R. 438.6(h) (which incorporates the Medicare managed care requirements for PIPs in 42 C.F.R. § 422.208 and 422.210). An example of an assurance that the HMO will meet the PIP requirements, including providing adequate stop-loss insurance to protect physicians from loss and complying with the risk thresholds established under 42 C.F.R. § 422.208, can be found in the attached contract provisions between Puerto Rico and Humana for the contract period ending June 30, 2006. See Att. 5, Article VI, ¶ 22; Article IX, ¶ 2f; Article XV, ¶ 27.[3] Puerto Rico's contracts with other HMOs during that contract period contain the same language.

_____

[3] Article XV, ¶ 27 had to be amended due to an incorrect regulatory citation. The amendment, which properly cites the PIP assurance requirement at 42 C.F.R. § 438.6(h), is also attached.

16.    As part of the process of reviewing Puerto Rico's approved managed care contracts,

Region II determined that such contracts contained the assurance required by 42 U.S.C.

§ 1396b(m)(2)(A)(vii) that in urgent care situations where an individual receives services

from an out-of-network provider, either the HMO or the state will provide reimbursement

for those services.  An example of an assurance that the HMO will reimburse out-of-

network providers for services provided in situations where in-network providers are

unable to provide the necessary services can be found in the attached contract provisions

between Puerto Rico and Humana for the contract period ending June 30, 2006.  See Att.

5, Article VI, ¶ 1(iii).  Puerto Rico's contracts with other HMOs during that contract

period contain the same language.

17.    The process of reviewing Puerto Rico's managed care contracts is an ongoing one, and

Region II continuously works with Puerto Rico to rectify any deficiencies identified in

the operation of its Medicaid state plan and Medicaid managed care contracts.  Region II

is in the process of reviewing the contracts and supporting certifications for the contract

period July 1, 2006 through June 30, 2008.  We are continuing to work with Puerto Rico

to resolve any deficiencies in their pending managed care contracts until we are satisfied

that they meet all statutory and regulatory requirements for approval.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Sue Kelly
Associate Regional Administrator
Division of Medicaid & Children's Health
Centers for Medicare & Medicaid Services – Region II.

Executed on:  October 30, 2007
New York, New York

6

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**    

Region II
Federal Building
26 Federal Plaza
New York, NY 10278

JUN 1 4 2006

Wendy Matos, Ph.D., Executive Director
Office of Economic Assistance to the Medically Indigent
Department of Health
P.O. Box 70184
San Juan, Puerto Rico 00936-8184

Dear Dr. Matos:

I am pleased to inform you that the Centers for Medicare & Medicaid Services (CMS), is approving the contract amendments listed below. The contracts provide health care services to Medicaid recipients on a prepaid capitated basis.

| Managed Care Organization Contract | Contract Number | Health Region | Effective Date | Date of Approval |
|---|---|---|---|---|
| Humana Health Plans of Puerto Rico, Inc. | 03-022H | East | 07/01/05 | 07/01/05 |
| | 03-018H | Southeast | 07/01/05 | 07/01/05 |
| Humana Health Plans of Puerto Rico, Inc. | 03-018G | East | 07/01/05 | 07/01/05 |
| | 03-022G | Southeast | 07/01/05 | 07/01/05 |
| MCS Health Management Options | 03-020G | Northeast | 07/01/05 | 07/01/05 |
| | 03-015G | San Juan | 07/01/05 | 07/01/05 |
| | 03-019G | West | 07/01/05 | 07/01/05 |
| Triple S, Inc. | 03-016G | Metro-North | 07/01/05 | 07/01/05 |
| | 03-017G | North | 07/01/05 | 07/01/05 |
| | 03-021G | Southwest | 07/01/05 | 07/01/05 |
| Alianza De Medicos Del Sureste, Inc. | 04-002H | Southeast | 07/01/05 | 07/01/05 |
| San Judas Medical Services (Family Medicine Group, Inc.) | 04-083C | Northeast | 07/01/05 | 07/01/05 |

Page 2 Wendy Matos, Ph.D

Pursuant to section 1903(m)(2)(a)(iii) of the Social Security Act, any other modification of the current contract, as well as a renewed contract, must be submitted to CMS for prior approval. CMS will also exercise its authority to require that any element approved and subsequently determined to be impermissible under statute or regulation be appropriately modified or deleted.

If you have any questions, please contact Doretha Howard at (212) 616-2425.

Sincerely,

Sue Kelly
Associate Regional Administrator
Division of Medicaid and Children's Health

cc: Nancy Vega, Director, ASES
    Frank Diaz, ASES
    Delia Lasanta, Manager, PRFO
    Luis Donate-Silva, FM

## OS Notification

**Type of Action:**  Puerto Rico Managed Care Organization (MCO) Contract Amendments

**Required Date for State Notification:**  N/A

**Fiscal Impact:** The total fiscal impact of the rate change is **$ 49,752,464.**  It was derived by first computing the rate change for the 8 health regions. Then each rate change was multiplied by the average Federal enrollment data computed for each health region. The individual multiples are then multiply by 11 (since the rate for 7/05 was the same as the previous year's rates) to get yearly amounts. FFP is 50% up to the cap.

**Number of Services Provided by Enhanced Coverage, Benefits or Retained Enrollment:** N/A

**Number of Potential Newly Eligible People:** N/A
**or**
**Eligibility Simplification:**    N/A

**Provider Payment Increase:** no **or Decrease:** no

**Delivery System Innovation:** no

**Number of People Losing Medicaid Eligibility:** N/A

**Reduces Benefits:** no

**Detail:**  We are requesting clearance to approve ten (10) contract amendments to the managed care contracts between the Commonwealth of Puerto Rico and

1) Humana Health Plans of Puerto Rico (East, and Southeast Health Regions)
2) Humana Health Plans of Puerto Rico (East, and Southeast Health Regions) (amends the rates)
3) MCS Health Management Options (Northeast, San Juan, and West Health Regions)
4) Triple S, Inc. (Metro-North, North, and Southwest Health Regions)

The amendments extends the contract for another year, revises the capitation rate beginning August 1, 2005 (prior contract rate in effect for the month of July 2005), and financial requirements. The specific PMPM rate change for each contract is as follows:

| Plan | Prior Rate | New Rate | Rate Change |
|---|---|---|---|
| Humana-East | $86.11 | $92.26 | +$6.15 |
| Humana-Southeast | $73.44 | $81.10 | +$7.66 |
| MCS-Northeast | $72.74 | $77.16 | +$4.42 |
| MCS-San Juan | $91.83 | $104.50 | +$12.67 |

| MCS-West | $64.11 | $67.24 | +$3.13 |
| Triple S-Metro-North | $73.89 | $79.02 | +$5.13 |
| Triple S-North | $64.21 | *$67.36/$67.55 | +$3.15/$3.34 |
| Triple S-Southwest | $63.00 | $65.90 | +2.90 |

**\*$67.36 for August and September 2005 and $67.55 for October thru June 2006**

The effective date is July 1, 2005 to June 30, 2006. The RO reviewed the actuarial certification, rate increases, and financial requirements revisions and have determined that the contract amendments are approvable.

**Recommendation:** This is a routine procedure and there is no need for the Secretary to call the State.

**Other Considerations:** none

**CMS Contact:**     Sue Kelly, Associate Regional Administrator
Division of Medicaid and State Operations
Region II Phone Number 212-616-2428

# Appendix A. PAHP, PIHP and MCO Contracts
## Financial Review Documentation for At-risk Capitated Contracts Ratesetting
### Edit Date: 7/22/03

State: _____
Contract Period: _____
Contractor: _____
(Put "model" if same for all)

Type of Program:
___ 1915(a)(1)(A) voluntary
___ State Plan Amendment
___ 1915(b) waiver
___ 1115 waiver
___ Other ___

Type of Entity:
___ MCO
___ HIO
___ PIHP
___ PAHP

Type of Review:
___ Initial
___ Renewal
___ Amendment
___ Rates Only

Reviewer: _____          Date: _____

Rate Checklist Instructions: This checklist is a tool for Regional Offices for use in approving rates under 42 CFR 438.6(c) for all capitated Medicaid managed care programs [1915(a)(1)(A), 1915(b), 1932(a), and 1115] excluding PACE capitated programs. See Attachment 1 to this Appendix for a listing of requirements for capitated rates. PACE capitated programs are still subject to Upper Payment Limit requirements under 42 CFR 460. 182. The PACE specific checklist should be used to approve PACE program rates. This checklist does not replace cost-effectiveness tests for 1915(b) waivers and budget neutrality for 1115 demonstrations. Some items only apply if the State has included a particular population, adjustment, program or policy for the managed care program. For example, if the State includes dual eligibles in its managed care program, the State must follow the regulations and statues outlined in item AA.2.2.

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | | Subsection AA.1 – General | | | |
| AA.1.0 | 42 CFR 438. 6(c)(2)(i) and (ii)<br><br>42 CFR 438.806<br><br>SMM 2089.2, SMM 2092.8 SMM 2089.1 | Overview of ratesetting methodology - The Contract must specify the payment rates and any risk-sharing mechanisms and the actuarial basis for computation of those rates and mechanisms: Specifically, the contract includes:<br>__ The rates and the time period for the rates,<br>__ The risk-sharing mechanisms,<br>__ The actuarial basis for the computation of those rates and risk-sharing mechanisms (*a lay person's description of the general steps the State followed to set rates is sufficient*).<br><br>*Rate Development or Update*<br>__ *The State is developing a new rate (RO completes steps AA.1 - AA.7).*<br>__ *The State is adjusting rates approved under 42 CFR 438.6(c)-(RO completes all of step AA.1)* | Contract | | |
| AA.1.1 | 42 CFR 438.6(c)(1)(i)(A) and (C)<br><br>42 CFR 438.6(2)(i) and (ii)<br><br>42 CFR 438.6(c)(3) | Actuarial certification -The State must provide the actuarial certification of the capitation rates and payments under the contract. All payments under risk contracts and all risk-sharing mechanisms in contracts must be actuarially sound. Actuarially sound capitation rates means capitation rates that have been developed in accordance with generally accepted actuarial principles and practices, are appropriate for the populations to be covered, and the services to be furnished under the contract; and the Actuary must submit a certification, as meeting the requirements of the regulation, by an actuary who meets the qualification standards established by the American Academy of Actuaries and follows the practice standards established by the Actuarial Standards Board. *Note: An Actuary who is a member of the American Academy of Actuaries will sign his name followed by the designation M.A.A.A., meaning a Member of the American Academy of Actuaries. For further information see* www.actuary.org/faqs.htm | Required Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | 42 CFR 438.6(c)(4)(i)<br><br>SMM 2089.2 | *Note: Actuaries can create either rates or rate ranges so long as the methodology (including all assumptions) to get to the actual rates in the contract are specified and meet CMS requirements. If there are instances where actuaries believe that information their State is required to submit would represent trade secrets or proprietary information, as described in the Freedom of Information Act (FOIA) (5 U.S.C. 552(a)), the information should be identified as such and may be withheld from public disclosure under the provisions of the FOIA.* | | | |
| AA.1.2 | 42 CFR 438.6(c)(4)(iii) | <u>Projection of expenditures</u> -The State must provide a projection of expenditures under its previous year's contract (or under its FFS program if it did not have a contract in the previous year) compared to those projected under the proposed contract. | Contract or Documentation | | |
| AA.1.3 | 45 CFR 74.43 and Appendix A<br><br>42 CFR 438.6(a)<br><br>42 CFR 438.806(a) and (b) | <u>Procurement, Prior Approval and Ratesetting</u> -  All contracts must meet the procurement requirements in 45 CFR Part 74.  Regardless of the procurement method, the final rates must be in the contract and include documentation and a description of how the resulting contract rates are determined in sufficient detail to address this set of regulatory criteria for each contract.  In general, there are two options:<br>___ Option 1: State set rates -- The rates are developed using a set of assumptions meeting federal regulations that results in a set of rates. Open cooperative contracting occurs when the State signs a contract with any entity meeting the technical programmatic requirements of the State and willing to be reimbursed the actuarially-sound, State-determined rate. Sole source contracting occurs where the state contracts with a single entity to provide a set of services must be documented as meeting the requirements of 42 CFR 438.6(c) under this option.<br>___ Option 2: Competitive Procurement -- The rates are developed using a set of assumptions meeting federal regulations that results in a range of acceptable bids to determine a bid range for rates. Competitive procurement occurs when entities submit bids and the State negotiates rates within the range of acceptable bids. *A State could also disclose a maximum or minimum acceptable payment and encourage bids below or above that amount.* | Contract or Documentation | | |
| AA.1.5 | 42 CFR 447.15<br>42 CFR 438.2<br>42 CFR 438.812(a) | <u>Risk contracts</u> – The entity assumes risk for the cost of services covered under the contract and incurs loss if the cost of furnishing the services exceed the payments under the contract. The entity must accept as payment in full, the amount paid by the State plus any cost sharing from the members. Payments for carrying out contract provisions including incentive payments are medical assistance costs. | State Regulation or Contract | | |
| AA.1.6 | 42 CFR 438.60 | <u>Limit on payment to other providers</u> - The State agency must ensure that no payment is made to a provider other than the entity for services available under the contract between the State and the entity, except when these payments are provided for in title XIX of the Act, in 42 CFR, or when the State agency has adjusted the capitation rates paid under the contract to make payments for graduate medical education. *Note: see Step AA.3.8 for GME adjustments.* | Contract or Documentation | | |
| AA.1.7 | 42 CFR 438.6(c)(4)(i) and (ii)<br><br>42 CFR 438.6(c)(2)(i) and (ii)<br><br>42 CFR 438.6(c)(1)(i)(A) and (C) | <u>Rate Modifications</u> - *This section is for use if the State updates or amends rates set under the new regulation at 42 CFR 438.6(c).* The State has made program and rate changes that have affected the cost and utilization under the contract.  The value and effect of these programmatic service changes on the rates should be documented.  Adjustments for changes in the program structure or to reflect Medical trend inflation are made.  Documentation meeting the requirements in step AA.3.0 – AA.3.24 is submitted to the RO for new adjustments. The adjustments include but are not limited to:<br>• Medical cost and utilization trend inflation factors are based on historical medical State-specific costs or a national/regional medical market basket applicable to the state and population. Justification for the predictability of the inflation rates is given regardless of the source. Differentiation of trend rates is documented (i.e., differences in the trend by service categories, eligibility category, etc).  All trend factors and assumptions are explained and documented.  See | Contract | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | 42 CFR 438.6(c)(3)<br><br>42 CFR 438.6(c)(4)(ii)(A)<br><br>42 CFR 438.6(c)(1)(B)<br><br>42 CFR 438.6(c)(3)(ii) and (iv)<br><br>SMM 2089.5 | Step AA.3.9.<br>• Programmatic changes include additions and deletions to the contractor's benefit package, changes in the eligible population, or other programmatic changes in the managed care program (or FFS program that affected the managed care program) made after the last set of rates were set and outlined in the regulation. The State may adjust for those changes if the adjustment is made only once (e.g., if the State projected the effect of a change in the last rate setting, then they must back out that projection before applying an adjustment for the actual policy effect)<br><br>CMS allows rate changes (regardless of whether they are reductions or augmentations) and provides FFP in such changes as long as the changes are implemented through either a formal contract amendment or a multi-period contract and continue to meet all applicable statute provisions and regulations. If rate changes are implemented through a contract amendment, the amendment must receive approval by the RO before FFP in any higher payment amounts may be awarded. If the rate change is an anticipated development in a multi-year process, it must also be reviewed by the RO, consistent with guidelines for multi-year contracts. *If the amended rates use new actuarial techniques or different utilization data bases than was used and approved previously, the regional office should complete the entire checklist. Rates approved prior to the release of 42 CFR 438.6 must comply with the regulation by the period specified in the Federal Register.* | | | |
| Subsection AA.2 – Base Year Utilization and Cost Data | | | | | |
| AA.2.0 | 42 CFR 438.6(c)(3)(i) and (iv)<br><br>42 CFR 438.6(c)(1)(i)(B) | <u>Base Year Utilization and Cost Data</u> - The State must provide documentation and an assurance that all payment rates are:<br>• based only upon services covered under the State Plan (or costs directly related to providing these services, for example, MCO, PIHP, or PAHP administration)<br>• Provided under the contract to Medicaid -eligible individuals.<br><br>*In setting actuarially sound capitation rates, the State must apply the following element or explain why it is not applicable: Base utilization and cost data that are derived from the Medicaid population or if not, are adjusted to make them comparable to the Medicaid population. The base data used were recent and are free from material omission.<br><br>Base data for both utilization and cost are defined and relevant to the Medicaid population (i.e., the database is appropriate for setting rates for the given Medicaid population). States without recent FFS history and no validated encounter data will need to develop other data sources for this purpose. States and their actuaries will have to decide which source of data to use for this purpose, based on which source is determined to have the have the highest degree of reliability, subject to RO approval.<br><br>Examples of acceptable databases on which to base utilization assumptions are: Medicaid FFS databases, Medicaid managed care encounter data, State employees health insurance databases, and low-income health insurance program databases. Note: Some states have implemented financial reporting requirements of the health plans which can be used as a data source in conjunction with encounter data and would improve on some of the shortcomings of these other specific databases used for utilization purposes. For example, some states now require the submission of financial reports to supplement encounter data by providing cost data. It would also be permissible for the State to supplement the encounter data by using FFS cost data. The State could use the cost and utilization data from a Medicaid FFS database and would not need to supplement the data with plan financial information.* | Required Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|--------|-----------|---------|---------------|-----------|---------|
| | | *Note: The CMS RO may approve other sources not listed here based upon the reasonableness of the given data source. The overall intent of these reporting requirements is to collect the same information that is available in the encounter data, but in a more complete and accurate reflection of the true cost of services.* Utilization data is appropriate to the Medicaid population and the base data was reviewed by the State for similarity with the covered Medicaid population. That is, if the utilization assumptions are not derived from recent Medicaid experience, the State should explain and document the source of assumptions and why the assumptions are appropriate to the Medicaid population covered by these proposed rates. | | | |
| | | Service cost assumptions are appropriate for a Medicaid program and the base data was reviewed by the State for similarity with the Medicaid program's current costs. *Note: except in the case of payments to FQHCs that subcontract with entities, which are governed by section 1903(m)(2)(A)(ix), CMS does not regulate the payment rates between entities and subcontracting providers. Payment rates are adequate to the extent that the capitated entity has documented the adequacy of its network.* | | | |
| | | *The term "appropriate" means specific to the population for which the payment rate is intended. This requirement applies to individuals who have health care costs that are much higher than the average. Appropriate for the populations covered means that the rates are based upon specific populations, by eligibility category, age, gender, locality, and other distinctions decided by the State. Appropriate to the services to be covered means that the rates must be based upon the State plan services to be provided under the contract. There is no stated or implied requirement that entities be reimbursed the full cost of care at billed charges.* | | | |
| AA.2.1 | 42 CFR 438.6(c)(1)(i)(B) <br><br> 42 CFR 438.6(c)(4)(ii)(B) | Medicaid Eligibles under the Contract – All payments under risk contracts and all risk-sharing mechanisms in contracts must be actuarially sound.  Actuarially sound capitation rates means capitation rates are appropriate for the populations to be covered and provided under the contract to Medicaid -eligible individuals. *The State may either include only data for eligible individuals and exclude data for individuals in the base period who would not be eligible for managed care contract services or apply an appropriate adjustment factor to the data to remove ineligibles if sufficient documentation exists.  The explanation and documentation should list the eligibility categories specifically included and excluded from the analysis.* <br><br> *Note: for example, if mentally retarded individuals are not in the managed care program, utilization, eligibility and cost data for mentally retarded eligibles should all be excluded from the rates.* <br><br> *Note: all references in this checklist to Medicaid eligibles include 1115 expansion populations approved under 1115 demonstration projects.* | Required Documentation | | |
| AA.2.2 | 1905(p) (1-3) <br><br> SMM 3490 (ff) <br><br> SMD letter 9/30/00 | Dual Eligibles (DE)–Some States include capitation payments for DE.  Because the statute and CMS policy specifies that the State may only pay for Medicaid-eligible individuals, those Medicaid payment limits must be observed if the program includes DE.  See the Attachment to Appendix A for additional information on Dual Eligibles. <br><br> Only the following groups of DE are entitled to Medicaid Services.  If they are included in a capitated managed care contract, they should have a Medicaid rate calculated separately from other DE: <br> ■ QMB Plus <br> ■ Medicaid (Non QMB and Non SLMB) | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|--------|-----------|---------|---------------|-----------|---------|
| | | ■  SLMB Plus<br><br>Eligibles and services for beneficiaries in the four non-Medicaid DE categories<br>■  QMB-only<br>■  QDWI<br>■  SLMB-only<br>■  QI-1<br>should be specifically excluded from the capitated rates calculated for the 3 DE categories above (QMB Plus, Medicaid (Non QMB and Non-SLMB), and SLMB Plus).  If DE beneficiaries in the non-Medicaid four categories are allowed to choose to enroll in capitated managed care, the Medicaid State Agency would continue to be liable for the same Medicare payments (e.g., Medicare fee-for-service premiums) as under FFS. The beneficiary would be liable for any Medicaid services payment because they are not eligible for Medicaid services:<br><br>For QMB-only and QMB-Plus, the State may also need to calculate a separate payment to the capitated organization for Medicare cost-sharing or premium amounts.  If the M+C organization charges monthly premiums,. Medicaid is liable for payment of monthly M+C premium amounts for QMB categories (QMB-only and QMB Plus) for the basic packages of Medicare covered benefits only, if so elected in the Medicaid State plan (State Plan preprint page 29, 3.2(a)(1)(i)).  Medicaid is also liable for Medicare cost-sharing expenses (deductibles, coinsurance and copayments) for Medicare covered services to the payment amount specified in the Medicaid State plan (Supplement 1 to Attachment 4.19-B).   When an M+C organization imposes cost-sharing charges in addition to premiums for Medicare-covered services on their enrollees, the Medicaid agency must pay those costs for QMBs regardless of whether the State elected to include premiums in cost-sharing.  No Medicaid services or payments would be included in the payment calculated for the entity. | | | |
| AA.2.3 | 42 CFR 435.1002(b)<br><br>1903(f)(2)(A)<br><br>SMM 3645 | Spenddown – FFP is not available for expenses that are the recipient's liability for recipients who establish eligibility for Medicaid by deducting incurred medical expenses from income.<br><br>Spenddown is the amount of money that an individual with income over Medicaid eligibility limits must spend on medical expenses prior to gaining Medicaid eligibility. The spenddown amount is equal to the dollar amount the individual's income is over the Medicaid income limit.  42 CFR 435 Subpart D.<br><br>States have two methods for calculating spenddown. Regardless of the option selected by the State, the State should not request federal Medicaid match for expenses that are the recipient's liability.  Typically this means that capitated rates must be calculated without including expenses that are the recipient's liability.<br>1.  Regular method – The individual client collects documentation verifying that a medical expense has occurred and submits to the State. States must ensure that capitation rates for individuals with spenddown (both medically needy beneficiaries and beneficiaries in 209(b) States with spenddown amounts) are calculated without including expenses that are the recipient's liability.<br>2.  Pay-in method – The individual client pays a monthly installment payment or lump sum payment to the State equal to the spenddown amount rather than collecting documentation on medical expenses and submitting that documentation to the case worker.  The same income and resource standards apply as in the regular method.  The State then tracks the client's medical costs to ensure that the costs exceed the spenddown amount. Here the State sets capitation rates to include expenses that are of the recipient's | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | | liability and must ensure that the federal government receives its share of the monthly or lump sum payment from the client. | | | |
| AA.2.4 | 42 CFR 438.6(c)(1)(i)(B)<br><br>42 CFR 438.6(c)(4)(ii)(A) | State Plan Services only -  The State must document that the actuarially sound capitation rates are appropriate for the services to be furnished under the contract and based only upon services covered under the State Plan (or costs directly related to providing these services, for example, MCO, PIHP, or PAHP administration). *The explanation and documentation should list the services specifically included and excluded from the analysis.*  Services provided by the managed care plan that exceed the services covered in the Medicaid State Plan may not be used to set capitated Medicaid managed care rates (e.g., 1915(b)(3) waiver services or services outlined in 42 CFR 438.6(e) as referenced in AA 2.5. <br> • *States using entity* **encounter data** *may base utilization and service costs on non-FFS data adjusting the data to reflect State plan services only.* <br> • **Services not part of the State plan** *that are unilaterally contractually required or "suggested" (typically authorized as "1915(b)(3) services") may not be used to calculate actuarially sound rates and must be paid out of separate payment rates approved prospectively under the 1915(b) waiver process.* <br> • **EPSDT extended/supplemental services** *for children are State Plan Approved services and may be built into the capitated rates* <br> • **1115(a)(2)** *services are considered State Plan services for 1115 populations for the duration of the demonstration and may be built into capitated payments approved through the 1115 demonstration budget neutrality agreement for approved populations only.* <br> • **HCBS waiver services** *may only be included for capitated contracts under 1915(b)/(c) concurrent waiver or in CMS RO approved 1915(a)(1)(A)/(c) capitated contracts for approved 1915(c) waiver participants.  Note: for the purposes of pre-PACE under 1915(a)(1)(A) HCBS services should be included.  If the population is a nursing home-certifiable population and eligible for HCBS, the State may consider HCBS as an acceptable service for long-term care managed care.* <br> • **1915(a)(1)(A) capitated rates** *must be based on State Plan Approved services only and 1915(c) approved services for 1915(c) participants.* <br><br> *Note: The inclusion of any additional Medicaid services during the term of a contract could either be handled through a contract amendment or a contract term that provides for the contingency, subject to CMS  approval. Amendments must be prior approved by the CMS RO.* | Contract or Documentation | | |
| AA.2.5 | 438.6(e) | Services that may be covered by a capitated entity out of contract savings - An entity may provide services to enrollees that are in addition to those covered under the State plan, although the cost of these services cannot be included when determining the payment rates. *Note: this is different than 1915(b)(3) waiver services which are contractually required by the State.  When a State agency decides to contract with an entity, it is arranging to have some or all of its State plan services provided to its Medicaid population through that entity.  The State has not modified the services that are covered under its State plan, nor is it continuing to pay, on a FFS basis, for each and every service to be provided by the entity.  Further, entities have the ability to provide services that are in the place of, or in addition to, the services covered under the State plan, in the most efficient manner that meets the needs of the individual enrollee. These additional or alternative services do not affect the capitation rate paid to the entity by the State.  The capitation rates should not be developed on the basis of these services.  The State determines the scope of State plan benefits to be covered under the managed care contract, and sets payment rates based on those services.  This does not affect the entities right, however, to use these payments to provide alternative services to enrollees that* | Contract | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|--------|-----------|---------|---------------|-----------|---------|
| | | *would not be available under the State plan to beneficiaries not enrolled in the entity. Section 1915(b)(3) waiver authority that allows a State to share savings resulting from the use of more cost-effective medical care with beneficiaries by providing them with additional services.* | | | |
|  | Subsection AA.3 – Adjustments to the Base Year Data | | | | |
| AA.3.0 | 42 CFR 438.6(c)(3)(ii) and (iv) | <u>Adjustments to the Base Year Data -</u> The State made adjustments to the base period to construct rates to reflect populations and services covered during the contract period. These adjustments ensure that the rates are predictable for the covered Medicaid population.<br><br>All regulatorily referenced adjustments are listed in 3.1 through 3.14.<br><br>**Adjustments must be mutually exclusive and may not be taken twice. States must document the policy assumptions, size, and effect of these adjustments and demonstrate that they are not double counting the effects of each adjustment. The RO should check to ensure that the State has contract clauses (or State Plan Amendments), where appropriate, for each adjustment.**<br><br>Sample Adjustments to the Base Year that may increase the Base Year:<br>• Administration (Step AA.3.2)<br>• Benefit, Programmatic and Policy change in FFS made after the claims data tape was cut (Step AA.3.1)<br>• Claims completion factors (Step AA.3.2)<br>• Medical service cost trend inflation (Step AA.3.3)<br>• Utilization due to changes in FFS utilization between the Base Year and the contract period. Changes in utilization of medical procedures over time is taken into account (Step AA.3.11)<br>• Certified Match provided by public providers in FFS<br>• Cost-sharing in FFS is not in the managed care program<br>• FFS benefit additions occurring after the extraction of the data from the MMIS are taken into account<br>• One-time only adjustment for historically low utilization in FFS program of a State Plan Approved benefit (i.e., dental)<br>• Patient liability for institutional care will be charged under this program<br>• Payments not processed through the MMIS<br>• Price increase in FFS made after the claims data tape was cut<br><br>Sample Adjustments to the Base Year that may adjust the Base Year downward:<br>• Benefit deletions in the FFS Program occurring after the extraction of the data from the MMIS are taken into account (Step AA.3.1)<br>• Cost-sharing in managed care in excess of FFS cost-sharing<br>• Disproportionate Share Hospital Payments (Step AA.3.5)<br>• Financial Experience Adjustment<br>• FQHC/RHC payments<br>• Graduate Medical Education (Step AA.3.8)<br>• Income Investment Factor<br>• Indirect Medical Education Payments (Step AA.3.8)<br>• Managed Care Adjustment<br>• PCCM Case Management Fee | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|--------|-----------|---------|---------------|-----------|---------|
| | | • Pharmacy Rebates<br>• Post-pay recoveries (TPL) if the State will not collect and allow the MCE to keep TPL payments (Step AA.3.6)<br>• Recoupments not processed through the MMIS<br>• Retrospective Eligibility costs (Step AA.3.4)<br><br>Cost-neutral Adjustments:<br>• Data smoothing for data distortions and individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims including risk-sharing and reinsurance (Step AA.5.0)<br><br>*Note: The CMS RO must review all changes for appropriateness to the data selected by the State (e.g., if the State is using encounter data, then adjustments for FFS changes may not be appropriate). Some adjustments are mandatory. They are noted as such.*<br><br>***All adjustments must be documented. Adjustments must be mutually exclusive and may not be taken twice. States must document the policy assumptions, size, and effect of these adjustments and demonstrate that they are not double counting the effects of each adjustment. The RO should check to ensure that the State has contract clauses (or State Plan Amendments), where appropriate, for each adjustment.*** | | | |
| AA.3.1 | 42 CFR 438.6(c)(1)(B)<br><br>42 CFR 438.6(c)(4)(ii)(A) | <u>Benefit Differences -</u> Actuarially sound capitation rates are appropriate for the services to be furnished under the contract.  The State must document that actuarially sound capitation rates payments are based only upon services covered under the State Plan. *Differences in the service package for the Base Period data and the Medicaid managed care covered service package are adjusted in the rates. Documentation of assumptions and estimates is required for this adjustment.* | Required Documentation | | |
| AA.3.2 | 42 CFR 438.6(c)(4)(ii) (A)<br><br>42 CFR 438.6(c)(3)(ii)<br><br>42 CFR 438. 812<br><br>Family Planning FMAP 1903(a)(5) and 42 CFR 433.10(c)(1)<br><br>Title XIX Financial Management Review Guide #20 Family Planning Services (See page | <u>Administrative cost allowance calculations -</u> The State must document that an adjustment was made to the rate to account for MCO, PIHP or PAHP administration. Only administrative costs directly related to the provision of Medicaid State Plan approved services to Medicaid-eligible members are built into the rates. *Documentation of assumptions and estimates is required.*<br><br>In order to receive Federal reimbursement, administrative costs at the entity level are subject to all applicable Medicaid administrative claiming regulations and policies. Medicaid pays for the administration of Medicaid services to Medicaid beneficiaries covered under the contract. The following examples are not all inclusive.<br>• Public entities cannot build in administrative costs to pay for non-Medicaid administration or services such as education, prisons, or roads, bridges and stadiums using the administrative cost in capitated rates.<br>• Administrative costs for State Plan approved services can only be claimed for services to be delivered to Medicaid beneficiaries under the contract (not for 1915(b)(3) services.  Administration costs in contracts must be allocated to the appropriate programs (e.g. public health must pay for the administration of public health services to non-Medicaid eligibles). CMS provides FFP only for the administration of Medicaid services to Medicaid beneficiaries covered under the contract.<br>• Regular Medicaid matching rules apply. See 42 CFR 438.812 which states that all payments under a risk contract are medical assistance costs (FMAP rate) and which requires an allocation for non-risk contracts between service costs and administrative costs. Separate administrative costs under the State | Required Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | 1 of this guide for a complete list of statutory and regulatory references) 7/3/01 SMD Letter<br><br>Indian Health Service facility FMAP 1905(b) and 42 CFR 433.10(c)(2) | Plan should not be placed under a capitated contract in order for the State to draw down the FMAP (50-80%) rate rather than the administrative rate (50%). Examples of this include: survey and certification costs or other administrative costs not associated with the plan's provision of contractually-required covered State Plan services to Medicaid enrollees. Separate administrative contracts including this administration can be written for capitated entities that will be matched at 50% by the federal government. *Note: Family planning and Indian health services enhanced matching FMAP rates and rules do apply to family planning and Indian Health services in capitated contracts. For family planning, the State must document the portion of its rates that are family planning consistent with the CMS Title XIX Financial Management Review Guide #20 Family Planning Services, especially Exhibit A. Please refer to the 7/3/01 SMD letter regarding the need for timely filing of claims.*<br>• Paperwork costs, such as time spent writing up case notes, associated with face-to-face contact with an eligible member is already included in the direct service cost and should not be built into the capitated rates again. Medicaid State agencies should also not pay separately for this administration. This occurs when an entity contracts with a public entity to provide services. The public entity provides the direct services and then bills the State Medicaid agency or the entity for administration associated with the direct services. Schools are providing the primary examples of this practice. This could also occur if an entity builds in additional administrative costs associated with direct service that have already been built into the direct service rates to providers.<br><br>*Note: CMS does not have established standards for risk and profit levels but does allow reasonable amounts for risk and profit to be included in capitated rates.* | | | |
| AA.3.3 | 42 CFR 438.6(c)(3)(ii) | Special populations' adjustments - Specific health needs adjustments are made to make the populations more comparable. The State may make this adjustment only if the population has changed since the utilization data tape was produced (e.g., the FFS population has significantly more high-cost refugees) or the base population is different than the current Medicaid population (e.g., the State is using the State employees health insurance data). The State should use adjustments such as these to develop rates for new populations (e.g., SCHIP eligibles or 1115 expansion eligibles). The State should document why they believe the rates are adequate for these particular new populations. | Contract or Ratesetting Documentation | | |
| AA.3.4 | 42 CFR 438.6(c)(3)(ii) and (iv) | Eligibility Adjustments - The actuary analyzed the covered months in the base period to ensure that member months are parallel to the covered months for which the entities must assume risk. Adjustments are often needed to remove from the base period covered months -- and their associated claims – that are not representative of months that would be covered by an entity. For example, many newborns are retrospectively covered by FFS Medicaid at birth, and will not enroll in an entity (even in mandatory enrollment programs) until a few months after birth. Because the costs in the first months of life are very high, if retrospective eligibility periods are not removed from the base period the state could be substantially over-estimating entities' average PMPM costs in the under-1 age cohort. Similar issues exist with the mother's costs when the delivery is retrospectively covered by FFS Medicaid, and with retrospective eligibility periods in general. | Contract or Ratesetting Documentation | | |
| AA.3.5 | 1923(i) BBA 4721(d) | DSH Payments *[contracts signed after 7/1/97]* – DSH payments may not be included in capitation rates. The State must pay DSH directly to the DSH facility. | Contract or Documentation | | |
| AA.3.6 | 42 CFR 433 Sub D 42 CFR 447.20 SMM 2089.7 | Third Party Liability (TPL) – The contract must specify any activities the entity must perform related to third party liability. The Documentation must address third party liability payments and whether the State or the entity will retain TPL collections. Rates must reflect the appropriate adjustment (i.e., if the entity | Required in Contract | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|--------|-----------|---------|---------------|-----------|---------|
| | | retains TPL collections the rates should be adjusted downward or if the State collects and retains the TPL the rates should include TPL). | | | |
| AA.3.7 | 42 CFR 447.58<br><br>SMM 2089.8 | Copayments, Coinsurance and Deductibles in capitated rates –If the State uses FFS as the base data to set rates and the State Medicaid agency chooses not to impose the FFS cost-sharing in its pre-paid capitation contracts with entities, the State must calculate the capitated payments to the organization as if those cost sharing charges were collected. For example, if the State has a $2 copayment on FFS beneficiaries for each pharmacy prescription, but does not impose this copayment on any managed care member, the State must add back an amount to the capitated rates that would account for the lack of copayment. *Note: this would result in an addition to the capitated rates.*<br><br>For 1115 expansion beneficiaries only, if the state usees FFS as the base data to set rates and imposes more deductibles, coinsurance, co-payments or similar charges on capitated members than the State imposes on its fee-for-service beneficiaries, the State must calculate the rates by reducing the capitation payments by the amount of the additional charges. *Note: this would result in a reduction to the capitated rates.* | Contract or Documentation | | |
| AA.3.8 | 42 CFR 438.60<br><br>42 CFR 438.6(c)(5)(v) | Graduate Medical Education (GME) - If a State makes GME payments directly to providers, the capitation payments should be adjusted to account for the aggregate amount of GME payments to be made on behalf of enrollees under the contract (i.e., the State should not pay the entity for any GME payments made directly to providers). States must first establish actuarially sound capitation rates prior to making adjustments for GME.<br><br>CMS permits such payments only to the extent the capitation rate has been adjusted to reflect the amount of the GME payment made directly to the hospital. States making payments to providers for GME costs under an approved State plan must adjust the actuarially sound capitation rates to account for the aggregate amount of GME payments to be made directly to hospitals on behalf of enrollees covered under the contract. These amounts cannot exceed the aggregate amount that would have been paid under the approved State plan for FFS. This prevents harm to teaching hospitals and ensures the fiscal accountability of these payments. | Contract or Documentation | | |
| AA.3.9 | 1903(m)(2)(A)(ix) 1902(bb) | FQHC and RHC reimbursement – The State may build in only the FFS rate schedule or an actuarially equivalent rate for services rendered by FQHCs and RHCs. The State may NOT include the FQHC/RHC encounter rate, cost-settlement, or prospective payment amounts. The entity must pay FQHCs and RHCs no less than it pays non-FQHC and RHCs for similar services. In the absence of a specific 1115 waiver, the entity cannot pay the annual cost-settlement or prospective payment. | Contract | | |
| AA.3.10 | 42 CFR 438.6(c)(3)(ii) | Medical Cost/Trend Inflation – Medical cost and utilization trend inflation factors are based on historical medical State-specific costs or a national/regional medical market basket applicable to the state and population.    All trend factors and assumptions are explained and documented.<br><br>*Note: This also includes price increases not accounted for in inflation (i.e., price increases in the fee-for-service or managed care programs made after the claims data tape was cut). This adjustment is made if price increases are legislated by the Legislature. The RO must ensure that the State "inflates" the rate only once and does not double count inflation and legislative price increases. The State must document that program price increases since the rates were originally set are appropriately made.* | Contract or Documentation | | |
| AA.3.11 | 42 CFR 438.6(c)(3)(ii) and (iv) | Utilization Adjustments - Generally, there are two types of Utilization adjustments are possible: utilization differences between base data and the Medicaid managed care population and changes in Medical utilization over time. | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | | • Base period differences between the underlying utilization of Medicaid FFS data and Medicaid managed care data assumptions are determined.  These adjustments increase or decrease utilization to levels that have not been achieved in the base data, but are realistically attainable CMS program goals.  States may pay for the amount, duration and scope of State plan services that States expect to be delivered under a managed care contract.  Thus, States may adjust the capitation rate to cover services such as EPSDT or prenatal care at the rate the State wants the service to be delivered to the enrolled population.  The RO should check to ensure that the State has a contract clause for using mechanisms such as financial penalties if service delivery targets are not met or incentives for when targets are met. *Note: an example of this adjustment is an adjustment to Medicaid FFS data for EPSDT where FFS beneficiaries have historically low EPSDT utilization rates and the managed care contract requires the entity to have a higher utilization rate.  The State should have a mechanism to measure that the higher utilization occurs and the RO should verify that this measurement occurs.* <br><br> • A change in utilization of medical procedures over time is taken into account.  Documentation is required if this adjustment is made. The State should document 1) The assumptions made for the change in utilization.  2) How it came to the precise adjustment size.   3) That the adjustment is a unique change that could not be reflected in the utilization database because it occurred after the base year utilization data tape was cut.  Examples may include: major technological advances (e.g., new high cost services) that cannot be predicted in base year data (protease inhibitors would be acceptable, a new type of aspirin would not be acceptable). <br><br> *Note: These adjustments can be distinguished from each other. The first is utilization change stemming from historic under- or over-utilization that is being corrected solely by the implementation of this program.  Historic access problems in FFS Medicaid programs may be addressed through this adjustment.  The second is a one time only non-recurring adjustment because of a unique utilization change projected to occur (or which did occur) after the base year data tape was produced.* | | | |
| AA.3.12 | 42 CFR 438.6(c)(4)(ii) <br><br> 42 CFR 438.6(c)(3)(iv) <br><br> 42 CFR 438.6(c)(1)(i)(B) | Utilization and Cost Assumptions  – The State must document that the utilization and cost data assumptions for a voluntary program were analyzed and adjusted to ensure that they are appropriate for the populations to be covered if a healthier or sicker population voluntarily chooses to enroll (compared to the population data on which the rates are set). The State must document that utilization and cost assumptions that are appropriate for individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims, using risk adjustment, risk-sharing or other appropriate cost-neutral methods  *Note: this analysis is needed whenever the population enrolled in the managed care program is different than the data for which the rates were set (e.g.,  beneficiaries have a choice between a fee-for-service program (PCCM) and a capitated program (MCO) and the rates are set using FFS data) .* | | | |
| AA.3.13 | 42 CFR 435.725 (Categorically Needy) <br><br> 42 CFR 435.832 (Medically Needy) | Post-Eligibility Treatment of Income (PETI) *(This applies for NF, HCBS, ICF-MR, and PACE beneficiaries in capitated programs where PETI applies only.)*  If the State Plan or waiver requires that the State consider post-eligibility treatment of income for institutionalized beneficiaries, the actual rate paid to the capitated entity would be the rate for the member minus any patient liability for that specific enrolled member. The State should calculate the client participation amount specifically for each member using the FFS methodology. <br><br> *Patient liability is a post-eligibility determination of the amount an institutionalized Medicaid beneficiary is liable for the cost of their care. It is also called client participation, cost of care, PE, and post-eligibility* | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | | *treatment of income. 42 CFR 435 Subpart H. Client participation should not be used to reduce total costs for all participants. Client participation should be assessed individually, reducing the individual rate paid to the capitated entity, not computed in aggregate and reducing all capitation payments. If the MMIS data tape is cut to reflect only the amount the Medicaid agency paid providers, then patient liability for cost of care must be added back to the rate to determine the total cost of care for an individual. The actual rate paid to the capitated entity would be the rate for the member minus any patient liability for that specific enrolled member. The capitated entity would then need to collect the patient liability from the enrolled member.*<br><br>An Option under 42 CFR 435.725(f) - The State can use a projection of expenses for a prospective period not to exceed 6 months to calculate client participation. This option requires the State to reconcile estimates with incurred expenses. Even with this option, the State must reduce the capitation rate to exclude expenses that are of the recipient's liability. This procedure ensures that the federal government does not pay more that its share of costs. | | | |
| AA.3.14 | 42 CFR 438.6(c)(3)(ii) | Incomplete Data Adjustment– The State must adjust base period data to account for incomplete data. When fee-for-service data is summarized by date of service (DOS), data for a particular period of time is usually incomplete until a year or more after the end of the period. In order to use recent DOS data, the Actuary must calculate an estimate of the services ultimate value after all claims have been reported . Such incomplete data adjustments are referred to in different ways, including "lag factors," "incurred but not reported (IBNR) factors," or incurring factors. If date of payment (DOP) data is used, completion factors are not needed, but projections are complicated by the fact that payments are related to services performed in various former periods. *Documentation of assumptions and estimates is required for this adjustment.* | Contract or Documentation | | |
| Subsection AA.4 – Establish Rate Category Groupings | | | | | |
| AA.4.0 | 42 CFR 438.6(c)(3)(iii)<br><br>FR 6/14/02 p41001 | Establish Rate Category Groupings (All portions of subsection AA.4 are mandatory) -- The State has created rate cells specific to the enrolled population. *The rate category groupings were made to construct rates more predictable for future Medicaid populations' rate setting. The number of categories should relate to the contracting method. Rate cells need to be grouped together based upon predictability so entities do not have incentives to market and to enroll one group over another. Multiple rate cells should be used whenever the average costs of a group of beneficiaries greatly differ from another group and that group can be easily identified. Note: The State must document that similar cost categories are grouped together to improve predictability. For example, rate cells may be combined if there is an insufficient number of enrollees in any one category to have statistical validity.* | Contract or Documentation | | |
| AA.4.1 | 42 CFR 438.6(c)(3)(iii)(B) | Age - Age Categories are defined. If not, justification for the predictability of the methodology used is given. | Contract or Documentation | | |
| AA.4.2 | 42 CFR 438.6(c)(3)(iii)(C) | Gender -Gender Categories are defined. If not, justification for the predictability of the methodology used is given | Contract or Documentation | | |
| AA.4.3 | 42 CFR 438.6(c)(3)(iii)(D) | Locality/Region - Locality/region Categories are defined. If not, justification for the predictability of the methodology used is given | Contract or Documentation | | |
| AA.4.4 | 42 CFR 438.6(c)(3)(iii)(E) | Eligibility Categories - Eligibility Categories are defined. If not, justification for the predictability of the methodology used is given. | Contract or Documentation | | |
| Subsection AA.5 – Data Smoothing, Special Populations and Catastrophic Claims | | | | | |
| AA.5.0 | 42 CFR 438.6(c)(3)(ii), (iii) and (iv) | Data Smoothing (All portions of subsection AA.5 are mandatory) - The State has examined the data for any distortions and adjusted in a cost-neutral manner for distortions and special populations. Distortions are primarily the result of small populations, special needs individuals, access problems in certain areas of the | Contract or Ratesetting Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | 42 CFR 438.6(c)(1)(ii) | State, or extremely high-cost catastrophic claims. Costs in rate cells are adjusted through a cost-neutral process to reduce distortions across cells to compensate for distortions in costs, utilization, or the number of eligibles. This process adjusts rates toward the statewide average rate. The State must supply an explanation of the smoothing adjustment, an understanding of what was being accomplished by the adjustment, and demonstrate that, in total, the aggregate dollars accounted for among all the geographic areas after smoothing is basically the same as before the smoothing.<br><br>The State has taken into account individuals with special health care needs and catastrophic claims. These populations should only be included if they are an eligible, covered population under the contract. Claim costs and utilization for high cost individuals (e. g., special needs children) in the managed care program are included in the rates. | | | |
| AA.5.1 | 42 CFR 438.6(c)(3)(iv) | Special Populations and Assessment of the Data for Distortions – Because the rates are based on actual utilization in a population, the State must assess the degree to which a small number of catastrophic claims might be distorting the per capita costs. Other payment mechanisms and utilization and cost assumptions that are appropriate for individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims, using risk adjustment, risk-sharing, or other appropriate cost-neutral methods may be necessary.<br><br>If no distortions or outliers are detected by the actuary, a rate setting method that uses utilization and cost data for populations that include individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims will meet requirements for special populations without additional adjustments, since the higher costs would be reflected in the enrollees' utilization. States must document their examination of the data for outliers and smooth appropriately.<br><br>The fact that the costs of these individuals are included in the aggregate data used for setting rates will not account for the costs to be incurred by a contractor that, due to adverse selection or other reasons, enrolls a disproportionately high number of these persons. CMS requires some mechanism to address this issue. Most entity contracts currently use either stop-loss, risk corridors, reinsurance, health status-based risk adjusters, or some combination of these cost-neutral approaches.<br><br>*Note: The RO should verify that this assessment occurred and that distortions found were addressed in 5.2.* | Contract or Ratesetting Documentation | | |
| AA.5.2 | 42 CFR 438.6(c)(1)(iii)<br><br>42 CFR 438.6(c)(3)(ii) and (iv)<br><br>SMM 2089.6 | Cost-neutral data smoothing adjustment -- If the State determines that a small number of catastrophic claims are distorting the per capita costs then at least one of the following cost-neutral data smoothing techniques **must** be made.<br><br>Cost neutral means that the mechanism used to smooth data, share risk, or adjust for risk will recognize both higher and lower expected costs and is not intended to create a net aggregate gain or loss across all payments.<br><br>Actuarially sound risk sharing methodologies will be cost neutral in that they will not merely add additional payments to the contractors' rates, but will have a negative impact on other rates, through offsets or reductions in capitation rates, so that there is no net aggregate assumed impact across all payments. A risk corridor model where the State and contractor share equal percentages of profits and losses beyond a threshold amount would be cost neutral. | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|--------|-----------|---------|---------------|-----------|---------|
| | | The mechanism should be cost neutral in the aggregate. How that is determined, however, will differ based on the type of mechanism that is used. A stop-loss mechanism will require an offset to capitation rates under the contract, based on the amount and type of the stop-loss. Health status-based risk adjustment may require an adjustment to the capitation rate for all individuals categorized through the risk adjustment system, but the aggregate program impact will still be neutral. CMS will recognize that any of these mechanisms may result in actual payments that are not cost neutral, in that there could be changes in the case mix or relative health status of the enrolled population. As long as the risk sharing or risk adjustment system is designed to be cost neutral, it would meet this requirement regardless of unforeseen outcomes such as these resulting in higher actual payments.<br><br>Data Smoothing Techniques:<br>___ Provision of stop loss, reinsurance, or risk-sharing (See 6.0)<br>___ Catastrophic Claims Adjustment – The State must identify that there are outlier cases and explain how the costs associated with those outlier cases were separated from the rate cells and then redistributed across capitation payment cells in a cost-neutral, yet predictive manner.<br>___ Small population or small rate cell adjustment – The State has used one of three methods: 1) The actuary has collapsed rate cells together because they are so small, 2) the actuary has calculated a statewide per member per month for each individual cell and multiplied regional cost factors to that statewide PMPM in a cost-neutral manner, or 3) the actuary bases rates on multiple years data for the affected population weighted so that the total costs do not exceed 100% of costs (e.g., 3 years data with most recent year's data weighted at 50%, 2nd most recent year's data weighted at 30% and least recent year weighted at 20%).<br>___ Mathematical smoothing – The actuary develops a mathematical formula looking at claims over a historical period (e.g., 3 to 5 years) that identifies outlier cost averages and corrects for skewed distributions in claims history. The smoothing should account for cost averages that are higher and lower than normal in order to maintain cost-neutrality.<br>___ Maternity Kick-Payment (Per delivery rate) – Non-delivery related claims were separated from delivery related claims. The non-delivery related claims were sorted into categories of service and used to base the managed care capitation payments. Delivery-related costs were removed from the total final paid claims calculations. The State developed a tabulation of per-delivery costs only. The State reviewed the data for accuracy and variance. The State develops a single, average, per-delivery maternity rate across all cohorts and across all regions unless variance warrants region-specific per-delivery maternity rates. Some states also have birth kick payments to cover costs for a newborn's birth (Per newborn rate).<br>___ Applying other cost-neutral actuarial techniques to reduce variability of rates and improve average predictability. If the State chooses to use a method other than the catastrophic claims adjustment or a small population or small rate cell adjustment, the State explains the methodology. The actuary assisted with the development of the methodology, the approach is reasonable, the methodology was discussed with the State, and an explanation and documentation is provided to CMS. | | | |
| AA.5.3 | 42 CFR 438.6(c)(1)(iii) | Risk-Adjustment – The State may employ a risk adjustment methodology based upon enrollees' health status or diagnosis to set its capitated rates. If the State uses a statistical methodology to calculate diagnosis-based risk adjusters they should use generally accepted diagnosis groupers. The RO should verify that: | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | 42 CFR 438.6(c)(3)(iii) and (iv) | <ul><li>The State explains the risk assessment methodology chosen</li><li>Documents how payments will be adjusted to reflect the expected costs of the disabled population</li><li>Demonstrates how the particular methodology used is cost-neutral</li><li>Outlines periodic monitoring and/or rebasing to ensure that the overall payment rates do not artificially increase, due to providers finding more creative ways to classify individuals with more severe diagnoses (also called upcoding or diagnosis creep)</li></ul>Risk-adjustment must be cost-neutral. *Note: for example, risk-adjustment cannot add costs to the managed care program. Risk adjustment can only distribute costs differently amongst contracting entities.* | | | |
| Subsection 6.0 – Stop Loss, Reinsurance, or Risk-sharing arrangements | | | | | |
| AA.6.0 | 42 CFR 438.6(c)(4)(iv)<br><br>42 CFR 438.6(c)(5)(i)<br><br>42 CFR 438.6(c)(2)(ii) | Stop Loss, Reinsurance, or Risk-sharing arrangements (8.0 is mandatory if the State chooses to offer one of these options) *(State Optional Policy)* – The State must submit an explanation of state's reinsurance, stop loss, or other risk-sharing methodologies. These methodologies must be computed on an actuarially sound basis. *Note: If the State utilizes any of the three risk-sharing arrangements, please mark the applicable method in 8.1, 8.2, or 8.3. For most contracts, the three options are mutually exclusive and a State will use only one technique per contract. If a State or contract uses a combination of methodologies in a single contract, the State must document that the stop loss and risk-sharing do not cover the same services simultaneously. Plans are welcome to purchase reinsurance in addition to State-provided stop loss or risk-sharing, but CMS will not reimburse for any duplicative cost from such additional coverage.*<br><br>The contract must specify any risk-sharing mechanisms, and the actuarial basis for computation of those mechanisms. *Note: In order for the mechanism to be approved in the contract, the State or its actuary will need to provide enough information for the reviewer to understand both the operation and the financing of the risk sharing mechanism.*<br><br>Capitation rates are based upon the probability of a population costing a certain rate. Even if the entity's premium rates are sufficient to cover the probable average costs for the population to be served, the entity is always at risk for the improbable – two neonatal intensive care patients and one trauma victim in its first 100 members, or an extraordinarily high rate of deliveries. A new entity, with a small enrollment to spread the risk across, could be destroyed by one or two adverse occurrences if it were obliged to accept the full liability.<br><br>FFP is not available to fund stop loss and risk-sharing arrangements on the provision of non-State Plan services. | | | |
| AA.6.1 | 42 CFR 438.6(c)(4)(iv)<br><br>42 CFR 438.6(c)(5)(i) | Commercial Reinsurance – The State requires entities to purchase commercial reinsurance. The State should demonstrate that the contractor has ensured that the coverage is adequate for the size and age of the entity. | Contract | | |
| AA.6.2 | 42 CFR 438.6(c)(4)(iv) | Simple stop loss program -- The State will provide stop-loss protection by writing into the contract limits on the entity's liability for costs incurred by an individual enrollee over the course of a year (either total costs or for a specific service such as inpatient care). Costs beyond the limits are either entirely or partially | Contract | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | 42 CFR 438.6(c)(5)(i)<br><br>SMM 2089.6 | assumed by the State. The entity's capitation rates are reduced to reflect the fact that the State is assuming a portion of the risk for enrollees.<br><br>■ The State has included in its documentation to CMS the expected cost to the State of assuming the risk for the high cost individuals at the chosen stop-loss limit (also called stop-loss attachment point).<br>■ An explanation of the State's stop loss program includes the amount/percent of risk for which the State versus entity will be liable.<br>■ The State has explained liability for payment. In some contracts, the entity is liable up to a specified limit and partially liable for costs between that limit and some higher number. The State is wholly liable for charges above the higher limit. If there is shared risk rather than either the State or the entity entirely assuming the risk at a certain point, the entity and State determine whether the services will be reimbursed at Medicaid rates, at the entities' rates, or on some other basis. The State must specify which provider rates will be used to establish the total costs incurred so that the entity clearly knows whether the reinsurance will pay (i.e., the attachment point is reached).<br>■ The State has deducted a withhold equal to the actuarially expected cost to the State of assuming the risk for high cost individuals. The State pays out money based on actual claims that exceed the stop loss limit (i.e., above the attachment point).<br>■ The State has documented whether premiums will be developed by rate cell or on a more aggregated basis. | | | |
| AA.6.3 | 42 CFR 438.6(c)(4)(iv)<br><br>42 CFR 438.6(c)(5)(i) and (ii)<br><br>42 CFR 438.6(c)(1)(v) | Risk corridor program – Risk corridor means a risk sharing mechanism in which States and entities share in both profits and losses under the contract, outside of a predetermined threshold amount, so that after an initial corridor in which the entity is responsible for all losses or retains all profits, the State contributes a portion toward any additional losses, and receives a portion of any additional profits.<br><br>If risk corridor arrangements result in payments that exceed the approved capitation rates, these excess payments will not be considered actuarially sound to the extent that they result in total payments that exceed the amount Medicaid would have paid, on a fee-for-service basis, for the State plan services actually furnished to enrolled individuals, plus an amount for entity administrative costs directly related to the provision of these services.<br><br>The State agrees to share in both the aggregate profits and losses of an entity and protect the entity from aggregate medical costs in excess of some predetermined amount. To the extent that FFP is involved, CMS will also share in the profits and losses of the entity.<br><br>In this instance, the State and CMS must first agree upon the benchmark point up to which federal match will be provided. Federal matching is available up to the cost of providing the same services under a non-risk contract (i.e., the services reimbursed on a Medicaid fee-for-service basis plus an amount for entity administrative costs related to the provision of those services). See 447.362. States typically require entities to adopt the Medicare cost-based entity principles for the purposes of calculating administrative costs under this model.<br><br>*Note: For this example, let's say the payment is $100 and there are 10 members expected to enroll. The total capitated payment CMS will match is $1,000.*<br>- *The State and the entity must then agree on the amount of risk to be shared between them (e.g., 5% or* | Contract | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | | *the risk corridor is between $950 and $1,050).* | | | |
| | | - *The entity must calculate its overall costs at the end of the year and submit them to the State.* | | | |
| | | - *Scenario 1, the entity costs are $950: In this example, the entity's profits are within the risk corridor of $950 to $1,050, so the entity keeps the entire amount of capitated payments and no adjustment is made.* | | | |
| | | - *Scenario 2, the entity costs are $1,050: In this example, the entity's loss is within the risk corridor, so the entity keeps the entire amount of the capitated payment and no adjustment is made.* | | | |
| | | - *Scenario 3, the entity costs are $850: In this example, the entity profit is outside of the risk corridor, so the entity must pay the State the amount of the excess profit or $100.* | | | |
| | | - *Scenario 4, the entity costs are $1,150: In this example, the entity loss is outside of the risk corridor, so the State must pay the entity the amount of the excess loss or $100.* | | | |
| | | *Please note: FFP is not available for amounts in this contract over the fee-for-service cost of providing these services. In order to compute the fee-for-service cost of providing services, the State must "price" the capitated entity's encounter data through the State's fee-for-service MMIS system. Amounts exceeding the cost of providing these services through a non-risk contract are not considered actuarially sound. The State must "price" the encounter data for entities with open ended risk-corridors (meaning there is no limit to the State's liability) when the entity exceeds the aggregate of actuarially sound rates x member months by more than 25%. In practice the RO may require the "pricing" of encounter data whenever evidence suggests that the non-risk threshold has been exceeded. Similarly, the State can require documentation if evidence suggests that the entity should be profit sharing below the threshold. In this example, if the fee-for-service and entity administrative cost of providing these services were $1,100, then FFP would only be available up to $1,100. See 42 CFR 447.362 or Step AA.1.8 of this checklist.* | | | |
| | Subsection AA.7.0 – Incentive Arrangements | | | | |
| AA.7.0 | 42 CFR 438.6(c)(4)(iv)<br><br>42 CFR 438.6(c)(5)(iii) and (iv)<br><br>SMM 2089.3<br><br>42 CFR 438.6(c)(2)(i)<br><br>42 CFR 438.6(c)(1)(iv)<br><br>42 CFR 438.6(c)(4)(ii) | <u>Incentive Arrangements (9.0 is mandatory if the State chooses to implement an incentive)</u> *(State Optional Policy)* – Incentive arrangement means any payment mechanism under which an entity may receive additional funds over and above the capitation rates it was paid for meeting targets specified in the contract. The State must include an explanation of the State's incentive program. Payments in contracts with incentives may not exceed 105% of the approved capitation payments attributable to the enrollees or services covered by the incentive arrangement, since such payments will not be considered actuarially sound.<br><br>The State must document that any payments under the contract are actuarially sound, are appropriate for the populations covered and services to be furnished under the contract, and based only upon services covered under the State Plan to Medicaid-eligible individuals (or costs directly related to providing these services, for example, MCO, PIHP, or PAHP administration).<br>• All incentives must utilize an actuarially sound methodology and based upon the provision of approved services to Medicaid eligible beneficiaries.<br>• Incentives cannot be renewed automatically and must be for a fixed time period.<br>• The incentive cannot be conditioned upon intergovernmental transfer agreements.<br>• Incentives must be available to both public and private contractors.<br>*Note: Reinsurance collections from reinsurance purchased from a private vendor (See 8.1) and State provided stoploss (8.2) are actuarially calculated to be cost-neutral and should not considered to be* | Contract | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|--------|-----------|---------|---------------|-----------|---------|
|  |  | *"incentives" or included in these payments.* |  |  |  |

**Attachment to Appendix A. PAHP, PIHP, and MCO Contracts**
**MEDICARE/MEDICAID**
**DUAL ELIGIBLE CATEGORIES**
**(EACH MEDICAID CATEGORY IS ENTITLED TO MEDICARE)**

| Eligibility Category | Medicaid Benefits | Cost Limit to Medicaid (if any) | Provider | Medicaid Liability for Services |
|---|---|---|---|---|
| QMB only | Medicare premiums, deductibles, and coinsurance (crossover) No Medicaid services | Full Medicare | Medicare | QMB rates for Medicare deductibles and coinsurance<br><br>Includes any M+C premiums if the State has chosen to cover in the State Plan on page 29. |
| QMB PLUS (QMB + Medicaid) | Medicare premiums, deductibles, and coinsurance (crossover) Medicaid services | Full Medicare + Medicaid | Medicare<br><br>Medicaid | QMB rates for Medicare deductibles and coinsurance Medicaid rates for Medicaid only services<br><br>Includes any M+C premiums if the State has chosen to cover in the State Plan on page 29. |
| MEDICAID (Non QMB and Non SLMB) | Medicare Part B premiums (optional for medically needy) Medicaid services | $58.70 + Medicaid | Medicare<br><br>Medicaid | No liability for Medicare deductibles and coinsurance Difference between Medicare payment and Medicaid rates for Medicaid services |
| SLMB only | Medicare Part B premiums No Medicaid services | $58.70 | Medicare | No liability for Medicare deductibles and coinsurance |
| SLMB PLUS (SLMB + Medicaid) | Medicare Part B premiums Medicaid services | $58.70 + Medicaid | Medicare<br><br>Medicaid | No liability for Medicare deductibles and coinsurance Difference between Medicare payment and Medicaid rates for Medicaid services |
| QDWI (Not otherwise eligible for Medicaid) | Medicare Part A premiums | $316 http://www.medicare .gov/Basics/Amounts 2002.asp | Medicare | No liability for Medicare deductibles and coinsurance |
| QI (Not otherwise eligible for Medicaid) | All or part of Medicare Part B premiums | Q1 – $ 58.70 | Medicare | No liability for Medicare deductibles and coinsurance Effective January 1, 2003, the QI-2 benefit is no longer authorized and states should provide notice to the QI-2 beneficiaries of the termination action to be taken, consistent with the rules on advance notice at 42 CFR 431.211.  States were required to pay beneficiaries $3.91 per month toward the Medicare Part B premiums for QI-2s through December 31, 2002. |

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**



Region II
Federal Building
26 Federal Plaza
New York, NY 10278

JUN 1 4 2006

Wendy Matos, Ph.D., Executive Director
Office of Economic Assistance to the Medically Indigent
Department of Health
P.O. Box 70184
San Juan, Puerto Rico 00936-8184

Dear Dr. Matos:

I am pleased to inform you that the Centers for Medicare & Medicaid Services (CMS), is
approving the contract amendments listed below. The contracts provide health care services to
Medicaid recipients on a prepaid capitated basis.

| Managed Care Organization Contract | Contract Number | Health Region | Effective Date | Date of Approval |
|---|---|---|---|---|
| Humana Health Plans of Puerto Rico, Inc. | 03-022H | East | 07/01/05 | 07/01/05 |
|  | 03-018H | Southeast | 07/01/05 | 07/01/05 |
| Humana Health Plans of Puerto Rico, Inc. | 03-018G | East | 07/01/05 | 07/01/05 |
|  | 03-022G | Southeast | 07/01/05 | 07/01/05 |
| MCS Health Management Options | 03-020G | Northeast | 07/01/05 | 07/01/05 |
|  | 03-015G | San Juan | 07/01/05 | 07/01/05 |
|  | 03-019G | West | 07/01/05 | 07/01/05 |
| Triple S, Inc. | 03-016G | Metro-North | 07/01/05 | 07/01/05 |
|  | 03-017G | North | 07/01/05 | 07/01/05 |
|  | 03-021G | Southwest | 07/01/05 | 07/01/05 |
| Alianza De Medicos Del Sureste, Inc. | 04-002H | Southeast | 07/01/05 | 07/01/05 |
| San Judas Medical Services (Family Medicine Group, Inc.) | 04-083C | Northeast | 07/01/05 | 07/01/05 |

Page 2 Wendy Matos, Ph.D

Pursuant to section 1903(m)(2)(a)(iii) of the Social Security Act, any other modification of the current contract, as well as a renewed contract, must be submitted to CMS for prior approval. CMS will also exercise its authority to require that any element approved and subsequently determined to be impermissible under statute or regulation be appropriately modified or deleted.

If you have any questions, please contact Doretha Howard at (212) 616-2425.

Sincerely,

Sue Kelly
Associate Regional Administrator
Division of Medicaid and Children's Health

cc: Nancy Vega, Director, ASES
    Frank Diaz, ASES
    Delia Lasanta, Manager, PRFO
    Luis Donate-Silva, FM

## OS Notification

**Type of Action:** Puerto Rico Managed Care Organization (MCO) Contract Amendments

**Required Date for State Notification:** N/A

**Fiscal Impact:** The total fiscal impact of the rate change is **$ 49,752,464.** It was derived by first computing the rate change for the 8 health regions. Then each rate change was multiplied by the average Federal enrollment data computed for each health region. The individual multiples are then multiply by 11 (since the rate for 7/05 was the same as the previous year's rates) to get yearly amounts. FFP is 50% up to the cap.

**Number of Services Provided by Enhanced Coverage, Benefits or Retained Enrollment:** N/A

**Number of Potential Newly Eligible People:** N/A
**or**
**Eligibility Simplification:**    N/A

**Provider Payment Increase:** no **or Decrease:** no

**Delivery System Innovation:** no

**Number of People Losing Medicaid Eligibility:** N/A

**Reduces Benefits:** no

**Detail:**  We are requesting clearance to approve ten (10) contract amendments to the managed care contracts between the Commonwealth of Puerto Rico and

1) Humana Health Plans of Puerto Rico (East, and Southeast Health Regions)
2) Humana Health Plans of Puerto Rico (East, and Southeast Health Regions) (amends the rates)
3) MCS Health Management Options (Northeast, San Juan, and West Health Regions)
4) Triple S, Inc. (Metro-North, North, and Southwest Health Regions)

The amendments extends the contract for another year, revises the capitation rate beginning August 1, 2005 (prior contract rate in effect for the month of July 2005), and financial requirements. The specific PMPM rate change for each contract is as follows:

| Plan | Prior Rate | New Rate | Rate Change |
|---|---|---|---|
| Humana-East | $86.11 | $92.26 | +$6.15 |
| Humana-Southeast | $73.44 | $81.10 | +$7.66 |
| MCS-Northeast | $72.74 | $77.16 | +$4.42 |
| MCS-San Juan | $91.83 | $104.50 | +$12.67 |

| | | | |
|---|---|---|---|
| MCS-West | $64.11 | $67.24 | +$3.13 |
| Triple S-Metro-North | $73.89 | $79.02 | +$5.13 |
| Triple S-North | $64.21 | *$67.36/$67.55 | +$3.15/$3.34 |
| Triple S-Southwest | $63.00 | $65.90 | +2.90 |

**\*$67.36 for August and September 2005 and $67.55 for October thru June 2006**

The effective date is July 1, 2005 to June 30, 2006. The RO reviewed the actuarial certification, rate increases, and financial requirements revisions and have determined that the contract amendments are approvable.

**Recommendation:**  This is a routine procedure and there is no need for the Secretary to call the State.

**Other Considerations:** none

**CMS Contact:**          Sue Kelly, Associate Regional Administrator
                          Division of Medicaid and State Operations
                          Region II Phone Number 212-616-2428

14. If any differences arise in the ADMINISTRATION's payment of premiums to the INSURER, the latter will proceed to analyze the differences between the original billing submitted by the INSURER and the amount paid by the ADMINISTRATION. The INSURER will proceed, after proper analysis, to submit to the ADMINISTRATION a diskette as well as all relevant documentation that supports and details the INSURER's claim not later than thirty (30) working days after payment is made to the INSURER by the ADMINISTRATION.  Once this term has ended, the INSURER waives its right to claim any amounts from differences arising from the monthly payment made by the ADMINISTRATION and releases the ADMINISTRATION from any and all obligation to pay any additional premiums, including differences to billing by more than one insurer. During the following one hundred and twenty (120) days the ADMINISTRATION will confirm the validity of the claim and make payment thereof.

The parties acknowledge that the amount submitted for reconciliation pursuant to item fourteen herein, must be within the reasonable operational capacity of the ADMINISTRATION due to the manual reconciliation process that item fourteen entails for the ADMINISTRATION.    In the event that reconciliation of claims on the original billing are due to errors solely attributable to INSURER and such reconciliations constitute extraordinary amounts, such as cases above one thousand (1,000) or more claims, which are to be considered beyond the ADMINISTRATION's normal operational capacity, INSURER shall pay the ADMINISTRATION the costs which are borne by the ADMINISTRATION for the reconciliations, (such costs shall include, and not be limited, to expenses for  the additional human resources to be engaged or hired, overtime hours, etc.) to be recoverable to a maximum  rate of five percent (5%) of the total amount to be reconciled.  Said amount to be paid by INSURER to the ADMINISTRATION shall be retained from the resulting amount of the reconciliation.   For purposes of this section, errors due solely to the INSURER, include, but are not limited to, errors in the code assigned to municipalities; errors in social security numbers or family identification numbers.

## ARTICLE XIX
## ACTUARIAL REQUIREMENTS

1. For the purpose of determining future premiums, the loss experience of this contract shall be based exclusively on the results of the cost of health care services provided to the beneficiaries covered under this contract. The INSURER shall maintain all the utilization and financial data related to this contract duly segregated from its regular accounting system including, but not limited to the General Ledger and the necessary Accounting Registers classified by the Area/Region subject to this contract.

2. Administrative expenses to be included in determining the experience of the program are those directly related to this contract. Separate allocations of expenses from the INSURER's regular business, INSURER's related companies, INSURER's parent company or other entities will be reflected or made a part of the financial and accounting records described in the preceding section.

3. Any pooling of operating expenses with other of the INSURER's groups, cost shifting, financial consolidation or the implementation of other combined financial measures is expressly forbidden.

4. Amounts paid for claims or encounters resulting from services determined to be medically unnecessary by the INSURER will not be considered in the contract's experience.

5. The INSURER shall provide the ADMINISTRATION every month with a Premium Disbursement Illustration. Said illustration shall present the distribution of the capitation, claim expenses by coverage, reserves, administrative expenses and premium distributions as referred and contained in the RFP's Actuarial Reports formats. Failure to comply with the requirements contained herein will be sufficient cause for the imposition against the INSURER of the penalty provided for in Article XXXVI of this contract.

6. The determination by the INSURER as to the payment of the capitation fee and as to any other payments by virtue of this contract will be computed on an actuarially sound basis.

7. The INSURER will provide to the ADMINISTRATION, on a monthly basis, the actuarial data, premium distribution, and reports as contained in the RFP's Actuarial Report formats. Failure to comply with the requirements contained herein will be sufficient cause for the imposition against the INSURER of the penalty provided for in Article XXXVI of this contract.

8. The ADMINISTRATION and INSURER acknowledge that:

- The Administration represents that, to the best of its knowledge, the services provided to enrollees under this Contract are those services established in the State Plan. The parties herein agree that in the event that INSURER provides any service that is not in the State Plan, the cost of such service shall not be included when determining capitation rates.

- The ADMINISTRATION may build only the FFS rate schedule or an actuarially equivalent rate for services rendered by FQHC and RHCs when applicable. The ADMINISTRATION may not include the FQHC/RHC encounter rate, cost

settlement, or prospective payment amounts.  INSURER must pay FQHCs and RHCs no less than it pays non-FQHCs and non-RHCs.

## ARTICLE XX
## PREVENTIVE MEDICINE PROGRAM

1.  The INSURER will provide for and effectively implement a preventive medicine program with primary emphasis in disease prevention and health education.  This program will also contain specific orientation and guidance on lifestyle, AIDS, drug abuse and mother and child care.  The INSURER through its Preventive Program, will address, analyze and implement measures to provide effective community orientation seeking to reduce the principal  causes of death in the contracted region

    In cooperation with the INSURER, the Department of Health will develop a surveillance methodology to identify compliance with this program.

2.  The INSURER, through its secondary and tertiary Preventive Program, will address, analyze and implement measures to provide effective clinical and educational activities seeking to combat the specific causes of morbidity and mortality in the Area/Region.

3.  The INSURER will develop and effectively implement a case management system in order to monitor high risk cases and attend to the covered health care needs of the beneficiaries and dependents within said category.

4.  The INSURER represents that under its Preventive Program it will contract, sufficient medical specialists and specialized teams in order to combine the resources of the HCO's and the professional staff of the HCO's, including but not limited to, health educators, nutritionists, dieticians, nurses, other trained personnel and physicians who will act as the team's educator, manager and coordinator.

5.  The INSURER will be responsible to direct to a network of other agencies and community resources serving each municipality within the Area/Region so as to guarantee that participating providers and beneficiaries are aware of and understand the available services in their community and the process by which to access them.

6.  The INSURER will assure that discharge of the mother and her baby from the hospital is based upon sound clinical judgment determined by the clinician.  The coverage for hospital stay following a normal vaginal delivery may not be limited to less than 48 hours for both the mother and newborn child and in the case of childbirth following cesarean section; the hospital stay may not be limited to less than 96 hours for both mother and newborns.

10.    INSURER may establish a reasonable triage fee in its contracts with providers in accordance with the Medicaid Managed Care Regulations.

11.    INSURER shall not hold an enrollee liable for payment of subsequent screening and treatment needed to diagnose the specific condition or stabilize the condition as long as access to services were provided in accordance with this agreement.

## ARTICLE VI
## ACCESS TO BENEFITS

1.    INSURER shall contract with all available providers meeting INSURER's credentialing process and which agrees to INSURER's its contractual terms in order to (i) assure timely access to benefits provided herein; and (ii) provide sufficient participating providers to satisfy the demand of covered services with adequate capacity and services. The foregoing sentence may not be construed to (i) require that INSURER contracts with providers beyond the numbers necessary to meet the needs of its enrollees; (ii) preclude INSURER from using different reimbursement amounts for different specialties; (iii) or preclude INSURER from establishing measures that are designed to maintain quality of services and control costs, as long as they are consistent with its responsibilities to enrollees and any applicable guidelines established by the ADMINISTRATION. In establishing and maintaining an adequate network of providers, INSURER shall consider the following criteria:

(i) Network Criteria

- The anticipated Medicaid enrollment
- The expected utilization of services, considering the specific, population characteristics and special health care needs in the INSURER's Health Area/Region
- The numbers and types of providers required to furnish the contracted services, taking in account experience, training and specialization
- The number of providers not accepting new patients
- The geographic location of providers and enrollees, considering distance, travel time, the means of transportation ordinarily used by enrollees and whether the location provides physical access for enrollees with disabilities or special needs.

(ii) Network ratios

The expected ratio of the number of providers for a particular number of enrollees in the Health Area/Region shall be as follows:

- One PCP for every 1,700 lives (1:1,700);

31

- One type of a particular specialist for every 2,200 lives (1:2,200);
- One dentist for every 1,350 lives (1:1,350); and taking all physicians in consideration, one physician for every 1,600 lives (1:1,600);

The network ratios established herein shall be maintained regardless of whether the HCO treats patients other than the ones sponsored by the health insurance of the Commonwealth of Puerto Rico. The INSURER shall assure compliance with said physician/beneficiary ratio.

### (iii) Out-of-Network Providers

If the INSURER's provider network or HCO's network in the Health Area/Region are unable to provide necessary medical services under the Contract to a particular enrollee, INSURER shall adequately and timely cover these services utilizing out-of-network providers for the enrollee, for as long as the INSURER is unable to provide them. INSURER shall assure that out of network providers contracted in those circumstances, are adequately paid and credentialed at the level required by INSURER. INSURER shall ensure that any cost to the enrollee is not greater than it would be if the services were furnished within the network.

2.    The INSURER shall be responsible to contract all the necessary health care services and participating providers to insure that all the benefits covered under the Basic, Dental and Special Coverage of the plan are rendered, through the INSURER's participating providers with the timeliness, amount, duration and scope as those services are rendered to non-Medicaid recipients within the area/region served.

INSURER shall be responsible to provide female enrollees with direct access to a women's health specialist within the network for covered  care necessary to provide women's routine and preventive health care  services. This is in addition to the enrollee's designated source of primary  care  if that source is not the women's health specialist.

3.    Every subscriber shall be able to select from at least two (2) HCO's with sufficient enrollment capacity in his or her municipality, one of which will be a privatized government facility, if available and subject to compliance with INSURER's requirements for HCO's. Each subscriber shall also be able to choose the HCO outside his or her municipality of domicile as provided for in Article III, paragraph 1 of this contract.

4.    A primary care physician may only act as such in one (1) municipality within the Health Area/Region subject of this contract. INSURER  shall guarantee that providers or their designated substitute, including, but not limited to, primary care

32

physicians, are available for rendering covered benefits to enrollees on a twenty-four hour basis, each day of the week. All providers contracted shall be required to meet the ADMINISTRATION'S standards for timely access to care and services, taking in account the urgency needs for the services. INSURER shall ensure that the network of providers offer hours of operation that are no less than the hours of operation offered to commercial enrollees, or comparable to Medicaid fee-for-service if the provider serves only Medicaid enrollees.

INSURER shall establish mechanisms to ensure that network providers timely comply with access requirements, monitor these requirements regularly to determine compliance and take corrective action if there is failure to comply.

5.  Contracts between the INSURER and HCO's and between the INSURER and its participating providers shall be independent contracts specifically designed to cover all terms and conditions contained in this contract. Coverage afforded to beneficiaries under this contract constitutes a direct obligation on the part of the INSURER's participating providers to comply with all terms and conditions contained herein.

6.  HCO enrollment shall be conditioned on the availability of adequate health care services. It shall be the INSURER's responsibility to constantly assess the enrollment capacity of each HCO compared to the adequacy and level of services required by the ADMINISTRATION. INSURER shall do the following In order to put the ADMINISTRATION in a position to certify to CMS that INSURER complies with the ADMINISTRATION's standards for availability of services:

   a)  Establish mechanisms to ensure that its network of providers comply with adequate capacity and services standards;
   b)  Document such mechanisms and submit said documentation upon execution of this Contract, as well as any time there is a significant change, as defined by the ADMINISTRATION, in the INSURER's operations that would affect the adequacy and capacity of the services, including: changes in services, benefits, geographic service area payments or enrollment of a new population in the INSURER's area region.

Adequate health care services will be those determined acceptable under the ADMINISTRATION's Compliance Evaluation Program as outlined in Article XVII of this contract.

7.  That INSURER shall be responsible for communicating to its participating providers the public policy that prohibits provider inquiries with the purpose of determining if the beneficiary is subject to the benefits provided under Law 72 of September 7, 1993.

33

8.  INSURER shall be responsible for the implementation, development, and maintenance and monitoring of written policies and procedures to ensure an adequate system for referrals of health services and the processing of authorizations of services requests under this contract. The referral system shall be approved by the ADMINISTRATION and shall be audited periodically by the INSURER and the ADMINISTRATION. INSURER, the HCO, any participating provider, or any health organization shall not submit for the approval of any internal or external committee any referral to specialists.

INSURER, the HCO, any participating provider, or any health organization shall not in any way interfere, prohibit, or restrict any health care professional's advice within their scope of practice. INSURER shall develop and conduct semi-annual orientations to all participating providers on the drug formularies available for the services provided herein, their proper use, and their interaction with the PBM.

9.  All referral systems must comply with timeframes established in paragraph (23). If the system developed by the INSURER is by electronic means, it must be installed at all primary care offices. It is unacceptable to force the beneficiary to move to another facility to obtain referrals.

10. The INSURER assures the ADMINISTRATION that no HCO'S or participating providers will impose limit quotas or restrain services to subcontracted providers for the services medically needed (e.g. laboratory, pharmacies, or other services).

11. The INSURER shall expedite access to benefits of beneficiaries diagnosed with conditions under the Special Coverage. The identification of these beneficiaries will allow rapid access of the medical services covered under our Special Coverage.

12. Any denial, unreasonable delay or rationing of services to the beneficiaries is expressly prohibited. The INSURER shall require strict compliance with this prohibition by its participating providers or any other entity related to the rendering of medical care services to the beneficiaries. Any action in violation of this prohibition shall be subject to the provisions of Article VI, Section 6 of Law 72 of September 7, 1993. Furthermore, the INSURER shall be responsible for posting information at every HCO, addressed to the beneficiaries, stating the policy that prohibits denying, unreasonably delaying or rationing services by participating providers or any other entity related to the rendering of medical care services to the beneficiaries, and providing information on procedures for filing a grievance on the subject. The INSURER shall notify the HCO's and participating providers that they must comply with the policy that prohibits the denial, the unreasonable delay or the rationing of services by participating providers or any other entity rendering medical services to beneficiaries, and further that they must provide information on procedures for filing a grievance. The INSURER

34

shall comply with the performance measures established and scheduled by the ADMINISTRATION.

13. The INSURER will ensure that HCO's and participating providers have a mix of patients distributed between private and eligible beneficiaries so as to avoid any possibility of discrimination by reason of medical indigence, whenever feasible.

14.. No participating provider, or its agents, may deny a beneficiary access to medically necessary health care services, except for the reasons specified in Article VI, section 6 of Law 72 of September 7, 1993.

15. The INSURER is responsible for having an adequate number of participating physicians and providers to supply all the benefits offered in the Basic, Dental and the Special Coverage of the contracted health insurance. The benefits under the Basic, Special and Dental coverage will be provided to the beneficiaries at the location of the participating providers.

16. The INSURER is responsible to have available all participating providers needed in order to render all the medically necessary services required to provide the beneficiaries with the benefits included in the Basic, Dental and Special Coverage of the contracted health insurance as specified in Addendum I of this contract.

The INSURER shall provide for enrollee to have a second opinion from a qualified health care professional within the HCO network unless none is available, in which case, the INSURER will arrange for the enrollee to obtain one outside of the network, at no cost for enrollee.

17. The INSURER agrees to require compliance by all participating physicians and providers with all provisions contained in this contract.

18. The INSURER has a continuous legal responsibility toward the ADMINISTRATION to assure that all activities under this contract are carried out. INSURER will use its best efforts to prevent unauthorized actions by HCO's or participating providers. INSURER will take appropriate measures to ensure that all activities under this Contract are carried out. Failure to properly discharge the obligation to assure, by all means necessary and appropriate, full compliance with said activities, shall result in the termination of this contract as provided in Article XXXIII hereof.

19. Pursuant to the Health Reform Concept of 1993, the INSURER shall contract as participating providers those Commonwealth owned facilities that have been privatized in the Health Area/Region by virtue of Laws 190 of July 12, 1995, and 190 of September 5, 1996, the 330 and 339 Projects of the Rural Health Initiatives, those State owned facilities not privatized, as well as the privatized or

35

non privatized municipally owned facilities in the different areas/regions and regions which will complement access to covered medical services, subject to its credentialing requirements and contractual terms.

20.  The INSURER assures the ADMINISTRATION that physician and providers of services under this contract will provide the full range of medical counseling that is appropriate for beneficiary's condition. In no way the INSURER or any of its contractors may interfere, prohibit, or restrict any health care professional's advice within their scope of practice, from advising or advocating on behalf of an enrollee who is his or her patient:

- For the enrollee's health status, medical care or treatment options, including any alternative treatment that may be self-administered.

- For any information the enrollee needs in order to decide among all relevant treatment options.

- For the risks, benefits and consequences of treatment or non-treatment.

- For the enrollee's right to participate in decisions regarding his or her health care, including to refuse treatment and to express preferences about future treatment decisions.

21.  The INSURER assures the ADMINISTRATION that its Physician Incentive Plan does not in any way compensate directly or indirectly physicians, individual physicians, group of physicians or subcontractors as an inducement to reduce or limit medically necessary services furnished to individual enrollees and that it meets or exceeds the stop-loss protection and enrollee survey and disclosure requirements under the Social Security Act. The INSURER shall ensure that at the intermediate level all physician providers groups are afforded with adequate stop-loss protection within the required thresholds under the Medicaid Program regulations.

22.  The INSURER assures that it will provide an adequate stop-loss insurance set at no more than ten thousand ($10,000) dollars to protect physicians from loss and comply with to the risk thresholds established under sections 42CFR 422.208. In the event, INSURER places physicians at substantial risk it shall conduct enrollee/disenrollee surveys not later than one year after the effective date of the contract and at least annually thereafter.

23.  Timeframes for Access Requirements. INSURER must have sufficient network of providers and must establish procedures to ensure beneficiaries have access to routine, urgent, and emergency services; telephone appointments; advice and Beneficiaries service lines.

**23.1 Timeframes**

The INSURER shall ensure that its providers comply with timely access requirements and the standards for timely access to care and services, taking into account the urgency of services. INSURER shall have sufficient network of providers and shall establish procedures to ensure enrollees have access to routine, urgent, and emergency services; telephone appointments; advice and enrollee service lines. These services shall be accessible to enrollees within the following timeframes:

- Urgent Care within 24 hours of request;

- Routine care within 2 weeks of request;

- Physical/Wellness Exams for adults shall be provided within 8 to 10 weeks of the request;

- Referrals: Whenever medically necessary, appointments of referrals must be delivered and notified to an enrollee shall be referred to a specialist; the latter shall notify to the enrollee the appointment date within five (5) days from the date prescribed by the provider of the issuance of the referral. The services required from said specialist shall be delivered within a reasonable period, as medically needed by the enrollee, but never later than thirty (30) days from the date the appointment was made, except in cases were the particular nature of the services rendered by the specialist require additional waiting time because of unavailability of a specialty service. A reasonable period of time may be, for example, the average waiting time for such services in the commercial sector.

**23.2 Primary Care and Coordination of Services**

INSURER shall implement procedures to ensure enrollees have access to an adequate, ongoing source of primary care and that the PCP responsible for ongoing primary care coordinates the referral to other health care services that the enrollee is entitled to receive, such as (i) mental health services, through the use of a Mental Health Referral Form, included herein as Addendum I-A; which must also be implemented in any participating hospital facility (ii) the Department of Health, such as those established in Addendum I(A)(I)(a)(5)-(7); or (iii) any other that may be established from time to time by the ADMINISTRATION.

INSURER shall implement procedures to share the identity of the enrollee the results of its identification and assessment of that enrollees special health care needs and any special health care needs the enrollee may have with other Insurers, MBHO's and PHO's serving the enrollee as defined by the ADMINISTRATION, or the Department of Health's Medical Office so that those activities may not be duplicated.

INSURER shall implement procedures to ensure that in the process of coordinating care, each enrollee's privacy is protected consistent with the confidentiality requirements in 45 CFR parts 160 and 164.

### 23.3  Assessment of enrollees with special health care needs.

INSURER shall require that mechanisms be in place to assess any ongoing, special conditions of an enrollee with special health care needs and requiring a particular course of treatment or regular care monitoring. The assessment shall include the use of health care professionals.

For enrollees determined to need a course of treatment or regular care monitoring, the entity shall have a mechanism in place to allow enrollees to directly access a specialist as appropriate for the enrollee's condition and identified needs.

24.    INSURER must establish policies and procedures to ensure access to EPSDT Checkups be provided within ninety (90) days of new enrollment, except that newborn beneficiaries should be seen within two (2) weeks of enrollment, and that in all cases, and for all beneficiaries such policies and procedures be consistent with the American Academy of Pediatrics and EPSDT periodicity schedule which is based on the American Academy of Pediatrics schedule and the guidelines established by the ADMINISTRATION. The INSURER must advice the beneficiary of his right to have a checkup.

## ARTICLE VII
## CONTRACTS WITH HCO's AND ALL PARTICIPATING PROVIDERS

1.    All services necessary to provide beneficiaries the benefits of the Basic, Special and Dental Coverage shall be contracted in writing with all participating providers. The INSURER will ensure that all provisions and requirements contained in this contract are properly included in the contracts with the HCO's and with all participating providers and that they are carried out by said HCO's and participating providers. Such provisions and requirements made part of these contracts will be properly notified to the ADMINISTRATION. Coverage afforded to beneficiaries under this contract constitutes a direct obligation on the part of the INSURER's participating providers to comply with all terms and conditions contained herein.

INSURER shall oversee the functions and responsibilities delegated to any subcontractor and acknowledges that will be held accountable under this Contract for responsibilities delegated if INSURER fails to monitor and intervene, when necessary. It shall be responsible for evaluating the prospective

7.  The INSURER will replace lost, stolen, mutilated cards and will have the right to charge in beneficiaries one dollar ($1.00) for each card replaced. This charge will not be applicable to Medicaid Beneficiaries, which are categorized within the established indigence level 0 (0%-50%).

8.  The INSURER will replace free of charge the identification card whenever a change of HCO is made.

9.  Identification cards are the property of the INSURER and they shall be returned by the beneficiary upon losing eligibility to the plan or when a change of HCO is made.

10. The INSURER shall be responsible for notifying each beneficiary that the identification card is for the personal identification of the beneficiary to whom it has been issued, and that lending, transferring or in any other way consenting to the use of the card by any other person constitutes a fraudulent act.

11. Identification Card contents and layout are subject to the prior approval of the ADMINISTRATION to be in accordance with Law 72 of September 7, 1993.

12. Notwithstanding the above, during the implementation and roll-out of the Smartcard Project on any Health region, the subscription process shall be affected to the extent necessary and pursuant to the provisions set forth in Article XXI.

13. INSURER will comply with all the necessary changes requested by the ADMINISTRATION resulting from the implementation of the "Smart Card".

### ARTICLE IX
### SUMMARY PLAN DESCRIPTION BOOKLET AND ORIENTATION PROGRAMS
### MARKETING PROVISIONS

1.  INSURER shall be responsible, at its sole cost, for the preparation, printing, and distribution of booklets in Spanish, which shall describe the plan, the benefits covered and the rights of enrollees. A translated copy of the enrollee's booklet shall be made available in the English language for access to English-speaking enrollees, and for the proper revision of federal authorities. These booklets shall be delivered to each subscriber upon enrollment, along with the required identification card(s).

2.  The information booklets shall serve as guarantee of the benefits to be provided to enrollees and potential enrollees and must be provided in easily understandable format and in other appropriate alternative formats considering the special needs of

49

enrollees that may be visually limited, or have a limited reading proficiency. In the event that oral interpretation services may be necessary in a language other than Spanish, INSURER shall make those services available free of charge, and inform the enrollee and potential enrollee how to access such formats. The booklet shall contain the following information:

a) Schedule of benefits covered, amount , duration and scope of all services and items that are available and that are covered either directly or through methods of referral and/or prior authorization, a written description of how and where the services that have been available through the plan services may be obtained. Information of the extent to which and how after hours and emergency services coverage are provided: what constitutes emergency medical condition, services and postabilization care services with reference to definitions on 42 CFR 438.114( a), the fact that prior authorization is not required for emergency service, the process for obtaining services, including use of 911- telephone system, locations of emergency settings at which providers and hospitals furnish emergency care and postabilization services, the fact that subject to contract provisions the enrollee has a right to use any hospital or setting for emergency care and postabilization services rules as set forth at 42 CFR 422.113(c ).

b) Benefit's exclusions and limitations. For benefits that enrollees are entitled to but are not available through the MCO; a written description on how and where to obtain benefits; description of procedures for requesting disenrollments/changes.

c) Beneficiary's rights and responsibilities, in accordance with specific rights and requirements set forth under 42 CFR 438.100 of the Medicaid Regulations and the Puerto Rico Patient Bill of Rights Law 194 of August 25, 2000, the Puerto Rico Mental Health Code, of October 2, 2000, as amended and implemented by their regulations, and Law 11 creating the Office of Patients Solicitor General of April 11, 2001.

d) Instructions on how to access benefits, including a list of (1) available HCO's and its participating providers, PCP or Specialists (its telephone numbers, address and qualifications) and identification of the providers that are not accepting new patients, (2) providers from which to obtain benefits under the Special Coverage. Said list can be provided in a separate booklet that shall be updated as appropriate.

e) Explanations and information of the grievance, appeal and fair hearing procedures and timeframes as provided in 42 CFR 438.400 through 438.424.

f) In the event a Physician Incentive Plan affects the use of referral services and/or places physicians at substantial risk, the INSURER shall provide the following information upon beneficiaries' requests: the type of incentive arrangements, whether stop-loss insurance is provided and the survey results of any enrollee/disenrollee surveys that will have to be conducted by INSURER.

g) Unless otherwise specified, subscription materials must be written at the 4th 6th grade reading comprehension level.

h)    Explanations of instances under which a beneficiary's disenrollment may be requested without his/her consent by a provider or INSURER; and information on the enrollee's right to request disenrollment when the ADMINISTRATION interposes intermediate sanctions specified in 42 CFR 438.702(a)(3).

i)    Explanations of right of beneficiary to transfer from HCO at any time for cause and to transfer or change within first ninety (90) days of the date of enrollment or the later date of receipt of notice of enrollment, and at least every (12) months thereafter without cause.

j)    Advance Directives in accordance to state law and 42 CFR 438.6(i).

k)    Other information that is available upon request, such as: information on the structure and operation of the INSURER.

l)    Notification on the right to request the information described herein items a-k at least once a year.

3.    The booklets shall be approved by the ADMINISTRATION prior to its printing, distribution, and dissemination in compliance with provisions of Article IX. INSURER shall notify enrollees in writing 30 days prior to adopting any intended significant changes related to benefits limitations, other rights and benefits they may be entitled to.

4.    The INSURER shall also be responsible for the preparation, printing and distribution, at its own cost, of an Informative Bulletin, in the Spanish language, that describes the plan, services and benefits covered therein as well as the managed care concept. This Informative Bulletin will be distributed among the HCO's, HCO's network of participating providers and the INSURER's participating providers.

5.    The INSURER shall be responsible to conduct and assure the participation of all providers under this contract to diverse seminars to be held throughout the Health Area/Region in order to properly orient and familiarize said providers with all aspects and requirements related to the Preventive Medicine Program, Benefits and Coverage under this contract, and the Managed Care concept. Said seminars will be organized, scheduled, conducted and offered at the expense of the INSURER. The curriculum for said seminars will be coordinated with and approved by the ADMINISTRATION Healthcare Coordinators.

6.    All participating providers are mandated required to receive yearly during the contract term at least fifteen (15) hours of orientation, education and familiarization with different aspects related to this contract on/or before the expiration of the first four and a half (4 ½) months of the contract term. Failure to comply with this requirement will be sufficient grounds to exclude from the Health Insurance Program the participating provider. If, at the expiration of the first four and half (4 ½ months) of the contract term, the participating provider has not fully complied with this requirement, it will be excluded as participating provider for subsequent periods of the contract or the contract term. At the discretion of the

51

ADMINISTRATION, and for good cause the excluded provider may be authorized to be contracted as a participating provider if it subsequently complies with the requirement.

7. The ADMINISTRATION will monitor and evaluate all marketing activities by the INSURER, its contractor, sub-contractors or any provider of services under this contract.

8. Any marketing material addressed to enrollees must be accurate and sufficient to assist enrollee in reaching an informed decision on enrollment. The INSURER must comply and ensure that marketing materials does not contain any assessment or statement(whether oral, written or in any medium) that: the recipient must enroll in the INSURER or a particular provider in order to obtain benefits, or in order not to lose benefits and that the INSURER or any provider are endorsed by CMS, the Federal or State Government Agencies. Marketing materials shall have to be pre-approved by the ADMINISTRATION..

9. The INSURER, contractor or subcontractor or any providers of services must distribute the material to its entire service area/region. In the event the INSURER or any of its contractors develop new and revised materials they shall submit them to the ADMINISTRATION for prior approval.

10. INSURER agrees to fully cooperate with and upon request of the Advisory Committee to the Commonwealth's Medicaid Office established by said office under 42 Code of Federal Regulations Part 431, which advises the Medicaid agency about health and medical care services, and at a minimum shall be composed of the following members, who must be appointed on a rotating and continuous basis:

- Board-certified physicians and other representatives of the health professions who are familiar with the medical needs of low-income population groups and with the resources available and required for their care;
- Members of consumer's groups, including Medicaid recipients, and consumer organizations, such as labor unions, cooperatives, consumer-sponsored prepaid group practice plans, and others; and
- The Commonwealth's director of the public welfare department or the public health department, whichever does not head the Medicaid agency;

11. The Advisory Committee will assist the ADMINISTRATION in the evaluation and the review of any marketing or informational material addressed to assist Medicaid recipients in the provision of health services under this contract.

All the marketing activities and the information which shall be allowed will be limited to the following:

a) Clear description of health care benefits coverage and exclusions to enrollees;

52

b)  Explain how, when, where benefits are available to enrollees;

c)  Explain how to access emergency, family-planning services, and services that do or do not require referrals and authorizations;

d)  Explain any benefits enrollees are entitled to, that are not available through the INSURER and how to obtain them;

e)  Enrollees rights and responsibilities;

f)  Grievance and appeal procedures.

12.  The INSURER, its agents, any contractor or sub-contractor party under this contract shall not engage in cold call marketing that is, unsolicited personal contact with potential enrollees for the purpose of influencing them to enroll with any of its contractors. Also telephone, door-to-door or telemarketing for the same purposes is hereby prohibited.

13.  Neither the INSURER, its contractor, subcontractor or any provider may put into effect a plan under which compensation, reward, gift or opportunity are offered to enrollees as an inducement to enroll other than to offer health care benefits. The INSURER its contractor, subcontractor or provider is prohibited from influencing an individual enrollment with the sale of any other insurance.

14.  In the event of a final determination is reached by the ADMINISTRATION that the INSURER, its agents, any of its contractor or subcontractors, has failed to comply with any of the provisions set forth on this article, the ADMINISTRATION in compliance with due process guarantees and remedies available under its regulations; Law No. 72; the Social Security and Balance Budget Act, will proceed to enforce the compliance of these provisions by pursuing within its empowered authority, the sanctions established in Article XXXVII.

## ARTICLE X
## GRIEVANCE PROCEDURE

1.  **Grievance System.** INSURER shall have in place a grievance system for enrollees that meets all the Medicaid regulation requirements, including a grievance process; an appeal process; and access to the ADMINISTRATION's hearing system, which are hereby addressed.

1.1  INSURER's grievance system shall ensure at the time the INSURER enters into a contract with providers and subcontractors, that the latter parties are duly informed of the following grievance, appeal, and fair hearing procedures, as well as the applicable timeframes:

a)  the enrollee's right to file grievances and appeals and their requirements and timeframes for filing;

53

a)  The ADMINISTRATION determines there is a special need to retain a particular record or group of records for a longer period and notifies the INSURER at least thirty (30) days before the normal disposition date;

b)  There has been a termination, dispute, fraud, or similar fault by the INSURER, in which case the retention may be extended to three (3) years from the date of any resulting final settlement; or

c)  The ADMINISTRATION determines that there is a reasonable possibility of fraud, in which case it may reopen a final settlement at any time;

d)  There has been an audit intervention by CMS, the office of the Comptroller of Puerto Rico, the Comptroller General of the United States or the ADMINISTRATION, in which case the retention may be extended until the conclusion of the audit and publication of the final report.

11.  The INSURER agrees to require all HCO's and participating providers to permit the ADMINISTRATION to review and audit all aspects related to quality, appropriateness, timeliness and cost of services rendered, and to demonstrate that the services for which payment was made were actually provided.

## ARTICLE XV
## INFORMATION SYSTEMS AND
## REPORTING REQUIREMENTS

1.  The INSURER agrees to comply with the reporting and information systems requirements as provided for in the Request for Proposals and the Proposal submitted by the INSURER. INSURER shall maintain a health information system that collects, analyses, integrates and reports data, and above all, ensures that the data received from providers is accurate and complete by; verifying the accuracy and timeliness of reported data; screening the data for completeness, logic and consistency and collecting service information in standardized formats to the extent feasible and appropriate. Accordingly, INSURER shall submit to the ADMINISTRATION a detailed Systems Requirements Inventory Report which details the following:

a)  Plan's compliance with each information system requirement;

b)  Action plan of INSURER's response to the requirements;

c)  Actual date that each system requirement will be completely operational, not to exceed the effective date of coverage under this contract.

2.  The INSURER agrees to submit to the ADMINISTRATION the System Inventory Report for final approval not later than the date of the signing of this contract.

3. All Management Information Systems Requirements included in the Request for Proposal and those included in the INSURER's Proposal shall be fully operational as of the first day of coverage under this Contract and shall remain as such for the duration of the Contract. Material non-compliance with this requirement is subject to Articles XXXIV and XXXV herein.

4. The INSURER shall be responsible for the data collection and other statistics of all services provided including, but not limited, to encounter and real cost of each one, claims services and any other pertinent data from all HCO's, participating providers or any other entity which provide services to beneficiaries under the program, said data to be classified by provider, by beneficiary, by diagnosis, by procedure and by the date the service is rendered. The data collected must then be forwarded to the ADMINISTRATION on a monthly basis in an electronic or on machine readable media format. The data fields and specific data elements required to be transmitted are contained in the RFP's Claim File Layout format. The ADMINISTRATION reserves the right to modify, expand or delete the requirements contained therein or issue new requirements, subject to consultation with the INSURER and cost negotiation, if necessary.

5. The INSURER agrees that all required data and information needs to be collected and reported through electronic or machine readable media commencing with the effective date of coverage of this contract to the ADMINISTRATION, and upon request to CMS.

5.1 Data that must be certified by INSURER. The data that must be certified include and is not limited to, documents specified by the ADMINISTRATION, enrollment information, encounter data and other information required in this contract and RFP. Any payment by the ADMINISTRATION that is based on data submitted by the INSURER, must comply with the certification as provided on 42 CFR 438.606. The certification must attest, based on the best knowledge, information and belief as to the accuracy, completeness and truthfulness of the document and data. The certification must be submitted concurrently with the certified data and documents.

5.2 The data and documents submitted by INSURER to the ADMNISTRATION must be certified by one of the following:
   - INSURER'S Chief Executive Officer
   - INSURER'S Chief Financial Officer
   - An individual who has delegated authority to sign for, and who reports directly to INSURER'S Chief executive Officer or Chief Financial Officer.

6. The information system of all HCO's shall be compatible with the systems in use by the INSURER.

76

7. The INSURER shall supply the HCO's and, upon request, all participating providers with eligibility information on a daily basis. Said information shall be secured through on-line access with the INSURER.

8. INSURER agrees to submit to the ADMINISTRATION in such form and detail as indicated in the Claim File Layout format and any other formats the ADMINISTRATION requires in the RFP, the following information in the timeframes specified herein:

a) **Within fifteen (15) days of the end of each month**

- Data pertaining to health insurance claims and encounters for all services provided to beneficiaries.
- Enrollment data

b) **On or before the twenty-fifth (25) day of each month:**

- Statistical data on providers, medical services and any other services;
- Any and all data and information as required in the Request for Proposals and in the Proposal submitted;
- Any other reports or data that the ADMINISTRATION may require after consultation and negotiation with INSURER.

9. The INSURER agrees to provide to the ADMINISTRATION, on a regular basis as needed, any and all data, information, reports, and documentation that will permit Governmental Agencies, to compile statistical data to substantiate the need for, and the appropriate use of federal funds for federally financed health programs.

10. The INSURER agrees to report to the ADMINISTRATION on a daily basis all information pertaining to enrollment, disenrollment, and other subscriber or beneficiary transactions as required by the ADMINISTRATION. All records shall be transmitted: 1) through approved ADMINISTRATION systems contractor; or 2) over data transmission lines directly to the ADMINISTRATION; or 3) on machine readable media. All machine readable media or electronic transmissions shall be consistent with the relevant ADMINISTRATION's record layouts and specifications.

11. The INSURER will submit to the ADMINISTRATION on a monthly basis reports and data generated electronically that allows the ADMINISTRATION:

    a. Evaluation of the effectiveness of the delivery of services by providers and the adequacy of these services.
    b. Monitoring and evaluation of the efficiency and propriety of the services that are being received by the beneficiaries and their dependents.
    c. Comparison of experience with that of other providers.

d.   Comparison of the utilization of health care and the cost tendencies within the community and the group that renders service.

e.   Demonstration of how the quality of care is being improved for the insured and their dependents.

f.   Comparison of the administrative measures taken by the INSURER with reference points to be able to evaluate the progress towards constant improvement.

g.   Compliance with the information requirements and reports of the Federal Programs such as: Title II of the Health Insurance Portability and Accountability Act; Title IV-B Part 1 and 2, Title IV-E, Title V, Title XIX, and Title XXI of the Social Security Act; the applicable state laws as( the Child Abuse Act, "Ley de Maltrato de Menores" Public Law 75 of May 28,1980 ; the Protection and Assistance to Victims and Witness Act, "Ley de Protección y Asistencia a Víctimas de Delitos y Testigos",Public Law 77 of July 9,1986), and any other information requirements which in the future are mandated by federal and state programs.

h.   Evaluation of each service provided with separate identification by beneficiary, by provider, by diagnosis, by diagnostic code, by procedure code and by date and place of service.  The provider must be identified by his/her provider's identification number or his/her social security account number.

12.   The INSURER will provide the ADMINISTRATION with a uniform system for data collection.

13.   The INSURER'S Information Systems must provide a continuous flow of information to measure the quality of services rendered to the beneficiaries and their dependents.   The purpose of these systems must be to help the ADMINISTRATION and the INSURER in the process of achieving continuous improvement in the quality of services rendered to beneficiaries and their dependents within a cost effective system.

14.   The INSURER will prepare the necessary reports requested herein for the administration of the health insurance contract. Daily reports are due by the end of the following business day. Weekly reports are due on the first business day of the following week.  Monthly reports are due twenty-five (25) days after the end of each month.  Quarterly reports are due thirty (30) days after the end of each quarter.

15.   The INSURER must inform the Administration on a monthly basis all cancellation and disenrollment of providers.

16.   INSURER shall provide the ADMINISTRATION, on or before the twenty-fifth (25th) day of the month, in electronic and hard-copy format, an updated version of the Providers Directory referred to in Article III paragraph (11) of this Contract.

78

Said electronic delivery shall be in the Excel format compatible with the ADMINISTRATION systems, or in any other agreed upon electronic form.

17. The INSURER will coordinate the enrollment of beneficiaries.

18. The INSURER will assure adequate and efficient functioning for the term of the contract that includes an insurance against economic loss due to system failure or data loss.

19. As an additional measure to guarantee quality and adequacy of the medical health services, the INSURER will conduct periodical statistics analysis of the medical services rendered to the beneficiaries and will compare them with the primary physician practice profile of their regular health insurance plan. Quarterly reports as to the analysis and comparison statistics will be submitted to the ADMINISTRATION.

20. In order to insure that all subscriber encounters are registered and recorded, the INSURER will conduct audits of statistical samples and unannounced personal audits of the HCO's and participating provider's facilities to assure that the medical records reconcile with the encounter reported, and corrective measures will be taken in case of any violation of the INSURER's regulations regarding the registration and reporting of encounters. The INSURER will provide quarterly reports to the ADMINISTRATION covering all the findings and corrective measures, if any, taken regarding any violation of said regulations.

21. The INSURER, as a minimum must guarantee the following:

   a. The security and integrity of the information and communication systems through:
      1. Regular Backups on a daily basis
      2. Controlled Access to the physical plant
      3. Control logical access to information systems
      4. Verification of the accuracy of the data and information

   b. The continuity of services through:
      1. Regular maintenance of the systems, programs and equipment
      2. A staff of duly trained personnel
      3. An established and proven system of Disaster Recovery
      4. Cost Effective systems.

   c. Identification of the beneficiary via the use of plastic cards
   d. Automated system of communication with statistics of the management of calls (Occurrence of busy lines, etc.)
   e. A comprehensive health insurance claim processing system to handle receiving, processing and payment of claims and encounters.

f.    Analysis/Control of utilization (The INSURER must provide said analysis to the ADMINISTRATION on a monthly basis in the format outlined by the ADMINISTRATION):
1.    by patient/family
2.    by region, area/region town, (zip code)
3.    by provider (provider's identification number or social security account numbers)
4.    by diagnosis
5.    by procedure or service
6.    by date of service



g.    Financial and Actuarial reports
h.    System of Control for claims payment that includes payment history.
i.    Computerized pharmacy system that permits its integration to the payment procedures to the providers.
j.    Outcome Analysis
k.    Electronic creation of data files related to mortality, morbidity, and vital statistics.
l.    Integration to central systems
1.    Procedures and communications protocol compatibility;
2.    Ability to transmit reports, and or files via electronic means.
m.    Electronic Handling of:

1.    The process of Admission to hospitals and ambulatory services
2.    Verification of eligibility and subscription to the plan.
3.    Verification of benefits
4.    Verification of Financial information (Deductibles, Co-payments, etc.)
5.    Verification of individual demographic data
6.    Coordination of Benefits.

n.    Computerized applications for general accounting.
o.    As to HCO's and all Participating Providers the information system shall provide for:

1.    On line access to service history for each beneficiary.
2.    Register of diagnosis and procedures for each service rendered.
3.    Complete demography on line, including the aspect of coverage and financial responsibility of the patient.
4.    Individual and family transactions
5.    Annotations on line (General notes such as allergies, reminders or other clinical aspects (free form)
6.    Analysis of activity by:

a.    department



        b.      provider
        c.      diagnosis
        d.      procedures
        e.      age
        f.       sex
        g.      origin
        h.      others, as mutually agreed upon.

7. Diagnosis history by patient with multiple codes per service.
8. AD Hoc Reports
9. Referrals Control
10. Electronic Billing
11. Pharmacy system
12. Dental system
13. Ability to handle requirements of the Medicare programs such as RBRVS (Relative Base Relative Value System).
14. Ability to collect data as to the quarter in which the pregnant female beneficiary commences her ob-gyn treatment. The format for the collection of this data shall be approved by the ADMINISTRATION prior to its implementation.

Failure to comply with the requirements contained herein will be sufficient cause for the imposition against the INSURER of the penalty provided for in Article XXXVI of this contract.

22. The INSURER agrees to report all procedure and diagnostic information using the current versions of Current Procedural Terminology, International Classification of Diseases, Clinical Modification, Diagnostic Statistic Manual and American Dental Association's Current Dental Terminology, respectively. This does not prevent the adoption by INSURER of the ANSI X-12 electronic transactions for standards set forth in the HIPAA regulations; which shall be implemented on or before October 2002, unless modified by DHHS.

23. Non compliance with any of the Information Systems and Reporting Requirements; with any requirements related to the electronic standards transactions to be implemented within the schedule set forth by the HIPAA regulations, or with other requirements contained herein, shall be subject to the provisions of Articles XXXIII and XXXVI of this contract, as well as to Article IV, Section 2(n) of Law 72 of September 7, 1993, which provides the right of the ADMINISTRATION to enforce compliance through the Circuit Court of Appeals of Puerto Rico, Part of San Juan .

24. The INSURER shall provide the ADMINISTRATION with one or more telephone numbers of dial-in data lines, and a minimum of three user's ID's and passwords that will allow the ADMINISTRATION's authorized personnel access to the INSURER's on-line computer applications, Such access will allow the ADMINISTRATION use of the

same systems and access to the same information as used by the INSURER and enable the inquiry on beneficiaries, providers, and statistics files related to this contract.

25.  As per the INSURER's proposal, INSURER shall provide to each HCO's, HCO s network of participating providers and INSURER's participating providers in the Health Area/Region, as well as to those outside of the area/region who provide services to beneficiaries from within the area/region, the necessary hardware and software to maintain on-line communication with the INSURER's Information System to document all encounters and services rendered to beneficiaries.  Said hardware and software will be provided at a reasonable cost for the implementation and servicing.

26.  The INSURER agrees to submit to the ADMINISTRATION reports as to the data and information gathered through the use of the Health Plan Employer Data and Information Set (HEDIS) and the work plan required in the RFP formats, as per Article XVII, Section VII.

27.  The INSURER must disclose to the ADMINISTRATION the following information on provider incentive plans in sufficient detail to determine whether their incentive plan complies with the regulatory requirements set forth on 42 CFR 434.70(a) and 422.10:

   a)  Whether services not furnished by the physician or physician group are covered by the incentive plan.  If physician incentive plan does not cover the services furnished by the physician or physician group, disclosure of other aspects of the plan need not be made.
   b)  The type of incentive arrangement (i.e., withhold, bonus, capitation).
   c)  A determination on the percent of payment under the contract that is based on the use of referral services.  If the incentive plan involves a withholding or bonus, the percent of the withholding of bonus. If the calculated amount is 25% or less, disclosure of the remaining elements in this list is not required and there is no substantial risk.
   d)  Proof that the physician or physician group has adequate stop-loss protection, including the amount and type of stop-loss protection.
   e)  The panel size and, if patients are pooled, the method used.
   f)  In the case of those prepaid plans that are required to conduct beneficiary surveys, the survey's results.

The information items (a) through (e) above, must be disclosed to the ADMINISTRATION: (1) prior to approval of its initial contracts or agreements, upon the contract or agreements anniversary or renewal effective date or upon request by the Administration or CMS. The disclosure item (f) is due 3 months after the end of the contract year or upon request by CMS.

If the contract with the INSURER is an initial Medicaid contract, but the INSURER has operated previously in the commercial or Medicare markets, information on physician incentive plans for the year preceding the initial contract

82

- with its application for a Medicaid contract;
- whenever it adopts the policy during the term of the contract; and
- it must be consistent with the provisions of 42 CFR 438.10
- it must be provided to potential enrollees before and during enrollment
- it must be provided to enrollees within 90 days after adopting the policy with respect to any particular service.

## ARTICLE XIII
## UTILIZATION REVIEW AND QUALITY ASSURANCE

In Article XIII paragraph 1 is amended to include the phrase appearing in bold and to include under item (i) as Exhibit 1 the performance measures required for current contract period to read as follows:

### 1. QUALITY PROGRAM.

INSURER shall maintain a Quality of Care Program that ensures an ongoing quality a ssessment a nd p erformance i mprovement p rojects for the s ervices furnished to enrollees. INSURER shall conduct performance measures and topics for performance improvement projects as required in consultation with the ADMINISTRATION, Department of Health and CMS. The Quality Care Program shall ensure the mechanisms to assess quality and a ppropriateness o f care furnished to e nrollees w ith special h ealth care needs.

[...]

i) <u>PERFORMANCE MEASUREMENT</u>:  INSURER shall submit annual reports to the ADMINISTRATION on the activities and projects required to measure and report performance according to HEDIS Work Plan for current contract period ( Exhibit 1). The INSURER on an annual basis, and  following the recommendations of the NCQA if the parties do not agree in writing on any other format, shall conduct a CAPHS satisfaction survey.

## ARTICLE XV
## INFORMATION SYSTEMS AND REPORTING REQUIREMENTS

In Article XI paragraph 4 is amended to include additional information and paragraph 27 is amended to correct reference to read as follows:

4. The INSURER shall be responsible for the data collection and other statistics of all services provided including, but not limited, to encounter and real cost of each one, claims services a nd a ny o ther pertinent data from all HCO's,

3

participating providers or any other entity which provide services to beneficiaries under the program, said data to be classified by provider, by beneficiary, by diagnosis, by procedure and by the date the service is rendered. **INSURER shall also provide information on utilization, grievances and appeals and disenrollment for other than loss of Medicaid eligibility.** The data collected must then be forwarded to the ADMINISTRATION on a monthly basis in an electronic or on machine readable media format. The data fields and specific data elements required to be transmitted are contained in the RFP's Claim File Layout format. The ADMINISTRATION reserves the right to modify, expand or delete the requirements contained therein or issue new requirements, subject to consultation with the INSURER and cost negotiation, if necessary.

[...]

27. The INSURER must disclose to the ADMINISTRATION the following information on provider incentive plans in sufficient detail to determine whether their incentive plan complies with the regulatory requirements set forth on 42 CFR 438.6(h).



## ARTICLE XXXIX
### CENTERS FOR MEDICARE AND MEDICAID SERVICES CONTRACT REQUIREMENTS

**In Article XXXIX the second paragraph is amended to correct citations of Civil Rights Act and the third paragraph to include language that appears in bold, to read as follows:**

[...]

INSURER agrees to comply with all applicable Federal and State Laws and regulations, including Title **VI** of the Civil Rights Act of 1964; Title IX of the Educations Amendments Act of 1972; the Age Discrimination Act of 1975; the Rehabilitation Act of 1973; the American Disabilities Act; applicable standards, orders or requirements issued under section 306 of the Clean Air Act (42 USC 1857 (h)); § 508 of the Clean Water Act (33 USC 1368); Executive Order 11738; Environmental Protection Agency regulations (40 CFR part 15); Equal Employment Opportunity Act provisions; the Byrd Anti-lobbying Amendments, and mandatory standards and policies relating to energy efficiency which are contained in the State energy conservation plan issued in compliance with the Energy Policy and Conservation Act (Pub. L. 94-165).

INSURER shall comply with reporting patent rights under any contract involving research, developmental, experimental or demonstration work with respect to any discovery or **invention rights of the federal government and the recipient**

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONCILIO DE SALUD INTEGRAL DE LOIZA, INC., ET AL. | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No.07-01034 (RMC) |
| MICHAEL O. LEAVITT, Secretary, United States Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## <u>ORDER</u>

Upon consideration of the parties' motions for summary judgment and the entire record herein, it is this ___ day of _____, 2007,

ORDERED that Plaintiffs' Motion for Partial Summary Judgment be, and it hereby is, DENIED; and it is

FURTHER ORDERED that Defendant's Motion for Summary Judgment be, and it hereby is, GRANTED.


_____
ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record via Electronic Case Filing System