UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al*. | ) | |
| | ) | |
| *Individual Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-1034 (RMC) |
| | ) | |
| U.S. Department of Health and Human Services, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael Leavitt, Secretary | ) | |
| U.S. Department of Health and Human Services | ) | |
| | ) | |
| *Defendants.* | ) | |

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT
OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

The Medicaid FQHC program was, according to Congress when it legislatively initiated

that program in 1989, designed to ensure that federally funded (under Section 330 of the Public

Health Service Act) health centers (labeled FQHCs for Medicaid purposes)) were fully paid by

the State Medicaid programs for their costs of treating Medicaid beneficiaries rather than the

limited per visit fees the centers were then being paid.  The result sought by Congress was an end

to those limited fees, which forced the centers to subsidize their Medicaid efforts with their

Section 330 grant funds.  Under HHS' derelict oversight of the FQHC requirements, Puerto Rico

not only has not paid those costs, but also allowed the HMOs that manage its Medicaid program

to tax the Puerto Rico health centers each year $38 million, which is $6 million more than the entire amount of the centers' Section 330 grants. *See* Ex. A to Plaintiffs S.J. Motion, at 10, Kelleher report.

Puerto Rico, except for payments ordered by the federal courts to the two plaintiffs herein, itself makes no payments to the FQHCs/health centers for Medicaid services. Its Medicaid program is structured so that all payments for services (if any) to providers of medical care must come from the HMOs. For the purposes of this case, Puerto Rico's delegation of all payment responsibility to the HMOs is not the problem (even though it violates the Medicaid statute). HHS is responsible for reviewing and approving, in advance, State Medicaid contracts with HMOs. One of the requirements on HMOs HHS must decide is met in approving these contracts is to ensure the FQHCs are paid for the particular services they provide to Medicaid beneficiaries. Despite this requirement and despite the undisputed fact that the HHS officials who are responsible for reviewing and approving Puerto Rico's HMO contracts know and knew that the HMOs were taxing instead of paying the FQHCs, they have nonetheless continued to approve the HMO contracts.

HHS' statutory responsibilities to review and approve the HMO contracts is not limited to FQHCs or the patients and communities for which the FQHCs have responsibility under their Section 330 grants. Under federal law, a Medicaid managed care system can exist only if several specific requirements (including the FQHC payment requirement) have been met. Defendant's October 31, 2007 Reply in Support of Motion to Dismiss and Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment (collectively, the "Cross-Motion") makes clear that HHS has not even met the most fundamental of these requirements -- approving Puerto Rico's HMO contracts

*before* it makes any payment to Puerto Rico that will be used (in turn) to pay HMOs.[1]  According to that Cross-Motion, none of the Puerto Rico HMO contracts, beginning July 1, 2006, has yet been approved, much less in accordance with what the law requires.  The same Cross-Motion contains no denial that HHS has been making payments that will, have been or are being used by the Puerto Rico Medicaid program to fund unapproved managed care contracts during this period.  Indeed, HHS argues that it may do so despite the applicable statutory language demanding "prior approval" before any such payment can be made.

Our counter-argument on this point is presented below.  Suffice it to say here that:  (1) the core of HHS' argument is that if it is eventually able to approve those contracts before they expire, the payments already made will have become permissible; and (2) that argument (among its many other failures (discussed later)) ignores the question of what happens if HHS is never able to issue its approval or issues its approval on day 350 of the contract when the HMO finally begins to meet the requirements on which HHS must base its "prior approval".  Whether HHS can get back the money it has already paid questionable.  More importantly, whatever burdens, problems, failings, *etc.* the HMO's violations may have caused beneficiaries or others for whose protections these requirements were enacted are inherently uncorrectable.

Whatever HHS answers may be to these and other questions/issues discussed below, it cannot be that its officials were unaware of what is occurring.  HHS officials have known for as long as any period even remotely relevant to the instant case that the Puerto Rico *Reforma* program does not meet a number of these requirements, including the FQHC payment provision.

---

[1] We take this opportunity to emphasize that our argument concerning HHS' failure to approve those contracts is not confined to the fact that someone in HHS has or has not given some kind of "approval".  The question of whether those approvals, if made, conformed to applicable legal requirements.  Our previous arguments as to the known failures of the Puerto Rico Medicaid program to comply with the basic legal requirements associated with HMO contract approvals were advanced to show that any HHS approvals, if given, were made improperly.

This is why the brunt of HHS' defense is that the contract approval process is merely a checklist exercise permitting those officials to issue approvals solely on what the HMO contracts say, or appear to say, not on what HHS knows to be the case. Thus, if the contracts or other representations of State Medicaid officials say X will be done, even though HHS knows that Y, which is clearly unlawful, is what is now being done under the same contract language, HHS' position here is that it must approve the contract and make payments that will support the unlawful conduct of which HHS is specifically aware. This argument, with its possibility/probability of exposing Medicaid beneficiaries to actions detrimental to their health, is as legally illegitimate as it is shameful.

## II. **POSTURE OF THIS CASE**

### A.     **Plaintiffs' Summary Judgment Motion**

Except for HHS' insistence that in the past it actually and properly approved Puerto Rico's HMO contracts and an unfortunate remark in footnote 12 on page 27 of the Cross-Motion[2], HHS has not disputed any of the material facts on which Loiza and Belaval relied and now relies in their summary judgment argument. Accordingly, the Court in deciding this case should do so in light of the following "facts" Loiza and Belaval previously advanced:

(1)     That the head of HHS' Section 330 grant program sent a letter to all of the Puerto Rico Public Health Service ("PHS") Act Section 330-funded health centers stating, among other things, that he was "concerned that the [PHS Act Section] 330 grant dollars may be paying for

---

[2] The remark is in footnote 12, page 27 of the Cross-Motion indicates that plaintiffs have entered into their HMO contracts "freely". A statutory condition of awarding a Section 330 grant is that the applicant health center has or will have a contract for Medicaid services. 42 U.S.C. § 254b(k)(3)(E)(i)(I). In Puerto Rico that contract is available only from the Medicaid HMOs. HHS is all too aware that plaintiffs in this case have no bargaining power with the HMOs because of this requirement and that the take-it-or-leave-it HMO contract Mr. Colon reports as having been offered to the FQHCs had to be taken, not left, by the plaintiffs.

services…that are beyond the scope of services for which the funds are intended." *See, e.g.,* discussion on pages 16 and 17 of plaintiffs' S.J. memo, SF ¶ 10.[3]

(2)    That the Kelleher report relied on by the head of HHS' Section 330 grant program for this letter referenced in paragraph 1 is accurate.  SF ¶ 10.

(3)    That the declaration of the Director of one of the Puerto Rico *Reforma* program's HMOs (discussed on pages 14 and 15 of our S.J. memo) accurately portrays the contractual obligation imposed on Loiza and Belaval.  SF ¶ 5.

(4)    That as of this time, HHS has yet to approve the contract of *any* of the Medicaid HMOs in Puerto Rico, much less any that contract with Loiza and Belaval.[4]

(5)    That HHS is, and has been, making Medicaid payments to enable Puerto Rico to pay these HMOs.

(6)    That only one HMO in each of Puerto Rico's 10 Medicaid regions (with the possible exception of one of these regions (not Loiza's or Belaval's)) has been and currently is available to provide services to Medicaid beneficiaries, who must enroll with that such a single regional HMO in the region in which they reside in order to receive Medicaid services.  SF ¶ 19.

(7)    That the allegations presented on page 23 of plaintiffs' S.J. memo (¶ 8) are true.

## B.    Defendants' Summary Judgment Motion

The "facts" on which HHS' summary judgment motion rest are all dependent on the Declaration of Sue Kelly (which accompanied HHS' motion).  Much of what the Kelly Declaration presents is legal statement, which we deal with, as necessary, below.  There are nonetheless some facts presented, most notably those describing her office's reviews of Puerto

---

[3] SF refers to the Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment dated September 24, 2007.

[4] For the reasons advanced in our initial memorandum and here, even if those contracts were approved, the approval would be unlawful.

Rico HMO contracts.  Her attestation of previous approvals of contracts with the HMO that deals with Loiza and Belaval is supported by a partial copy of a contract during the most recent period of her office's review and approval.  The contract is not current, nor is it with the HMO covering Loiza's and Belaval's areas.  Her statement in ¶ 15 (p. 5) of her declaration that all the HMO contracts "contain[ed] the same language" is unsupported.  Likewise, the back-up documentation for her office's approval of all prior contracts is limited and is not anything close to what her office (at least purportedly) reviews in deciding on an approval.  No contracts or other documents in years previous to an end date in 2006 are produced.

Ms. Kelly has presided in Region II (covering Puerto Rico) for all or nearly all of the time the FQHC provisions of the Medicaid statute have been effective.  It is on her watch that, according to the attached Second Declaration of Jose Orlando Colon, Exh. A, these provisions have *never* been implemented by Puerto Rico.  Furthermore, as Mr. Colon's Second Declaration also attests (at ¶ 4), Ms. Kelly, in a 2000 letter to one of Puerto Rico's senior Medicaid officials, completely whitewashed this FQHC failure (up to that time) by stating (according to Mr. Colon's declaration) incorrectly and without any supporting documentation, that Puerto Rico had met its FQHC payment commitment through in-kind "contributions".  Mr. Colon's declaration makes clear that those in-kind contributions fell millions of dollars short of the payments that were required.  Ms. Kelly's pronouncement of legal compliance is, when one thinks about it, is utterly and completely wrong, so lacking in any credible support as to be reckless and/or irresponsible.

Between such recklessness and irresponsibility in ignoring Puerto Rico's failure to pay FQHCs as federal law and the absence of supporting documentation for her descriptions of the approval process, we do not and cannot accept as fact *any* statement by Ms. Kelly in her declaration as to what she or her office did, or were required to do.  Put simply, HHS' summary

judgment motion is not ripe for decision.  Fed. R. Civ. P. 56(c):  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

**C.**     <u>**Next Steps**</u>

There are, for the moment, two categories of issues now to be addressed for the purposes of our summary judgment motion.  The first and most obvious one is HHS' acknowledgement that it has not yet approved the contract for the HMO that (in turn) contracts with Loiza and Belaval, and is currently making payments that support that HMO's contract with Puerto Rico. These payments are unauthorized as explained below.

The second category is the various arguments HHS has advanced for its prior approvals of HMO contracts.  We presume that HHS believes, as do we, that the current unapproved HMO contracts will likely mirror the most recent such contracts HHS claims it has approved and that the facts we have advanced as to why such approvals should not have been given will remain the facts for the current unapproved version.  Accordingly, we stand by our earlier arguments on these facts and address HHS' counter-arguments as to what those facts mean below.

## III.  <u>ARGUMENT</u>

**A.**     <u>**The Prior Approval Requirement Is Being Violated**</u>

Title 42 U.S.C. § 1396b(m)(2)(A)(ii) requires HHS "prior approval" of any Medicaid managed care contract of the kind at issue in this case.  This unambiguous requirement -- the words "prior approval" have a very clear meaning -- was enacted in 1986.  Not surprisingly, the legislative history of the prior approval requirement completely supports the obvious meaning of the two words.  As H.R. Rep. No. 99-727, at 123 (1986), indicates, Congress' focus at the time was on a significant problem that had erupted in Arizona where it was later discovered, after

some Medicaid HMOs had been given contracts, that the HMOS were financially incapable of doing what the contracts required.

As Congress explained in that "prior approval" history, it wanted to be certain that such "after the fact" discoveries/problems would be headed off *via* a prior approval requirement. According to Congress, disclosure was necessary to ensure that federal funds were used for their intended purpose. *Id.* at 122. Without disclosure of information pertaining to ownership and control and related party transactions, capitated funds could be "used to pay unnecessary administrative costs or excessive profits to related parties rather than to provide medical care services." *Id*. at 123 (quoting "Arizona Medicaid: Nondisclosure of Ownership Information by Health Plans", GAO/HRD-86-10 (November 1985) at page 10). Disclosure requirements alone, according to Congress, were not sufficient without prior approval. *Id.* The history also described the GAO's discovery of noncompliance (with the disclosure requirements) on a widespread scale, and that the GAO suggested instituting prior approval to "avert nondisclosure problems like those that occurred in Arizona." *Id.* The report went on to state that prior approval was necessary to "tighten[] the [] statutory disclosure requirements." *Id.*

The history of the regulatory prior approval requirement at 42 C.F.R. § 438.806 is consistent with the foregoing statutory history and plain meaning of prior approval. Prior approval is needed for all comprehensive risk contracts, including those with new and currently contracting managed care organizations. 67 *Fed. Reg.* 40989-01 [June 14, 2002]. "FFP is not available for contracts that CMS has not approved." *Id*. Only when a contract is approved may FFP be available for periods in which approval was pending. *Id at 40999.* A contract will not be approved "if it did not meet all the requirements of the law and regulations." *Id.* Furthermore, rates actually used by MCOs "must be part of the contract that is approved by [CMS] as part of

the contract approval process that is a pre-condition for FFP." *Id.* Overall, 42 C.F.R. § 438.806, along with its preamble, makes it very clear that Medicaid managed care contracts must be approved prior to the availability of FFP for participating MCOs. *Id.*

The clearest statement on the flexibility HHS had read into the statutory prior approval requirement is The following comment received in connection with its 2000 rulemaking as to the managed care requirements in 42 C.F.R. Part 438:

> The requirement for prior approval of a new contract or new contract amendment applies to all comprehensive risk contracts, whether with a new or currently contracting MCO.  FFP is not available for contracts that CMS has not approved.   However, once we approve a contract, FFP is available for any period during which an approvable contract was under review.

67 *Fed. Reg.* 40999.  The latitude afforded by the rulemaking as to the meaning of prior approval is only to make payment for periods before the approval once and only if such approval is granted, not the bizarre payment-in-advance-even-though-the-law-may-be-currently-violated-interpretation HHS proposes is legally okay.

That HMO payments are now being made and that HHS has not approved any HMO contract currently in effect is shown in HHS' Cross-Motion at Ex. A., Kelly Decl. ¶ ¶13, 17.[5] Beyond our assumption stated previously that Puerto Rico will continue to do as it has *vis-a-vis* the HMOs, HHS has offered nothing to support any notion that Puerto Rico is now operating its managed care program in accordance with the Medicaid statute.  Indeed, it is not even apparent that defendant is in possession of all of the current HMO contracts because the only contract appended to defendant's Cross-Motion was an exception of a contract between Humana Health Plans of Puerto Rico, Inc. ("Humana") and the Commonwealth for the contract period ending

---

[5] Ms. Kelly's Declaration further states, "Region II [of CMS] is in the process of reviewing the contracts and supporting certifications for the contract period July 1, 2006 through June 20, 2008."  Kelly Decl. at ¶ 17.

June 30, 2006.[6]  As previously mentioned, Humana is not the HMO that contracts with the plaintiff health centers in this case.  It is certainly more than curious that HHS has failed to supply a currently contract with the HMO that has entered into a contract with the plaintiffs in support of its Cross-Motion.

HHS excuses its failure to approve the current HMO contracts by arguing (at 24, n. 9) that "prior" approval does not actually mean "prior."  For several reasons, including how HHS has in the past interpreted "prior approval", this is an interpretation that is plainly incorrect.  According to the Cross-Motion, the "prior approval" provision in 42 U.S.C. § 1396b(m)(2)(A)(iii) means that it must approve Puerto Rico's managed care contracts "prior" to the final award of federal financial participation ("FFP") for a given contract period, not prior to the first day of a contract period or at least prior to making a payment to a State to fund its HMO contracts (which, as previously discussed, is HHS' stated position in regulatory history).  Defendant's Cross-Motion at 24, n. 9.  There is nothing in the plain language of the statute, however, that would lead anyone to believe that by using the word "prior" Congress did not mean anything other than the ordinary meaning of the word.   Indeed, the structure of the statute reinforces the notion that in order to curtail Medicaid beneficiaries' rights by placing them in a managed care system, the contract between a State and an MCO must be approved in advance.

It is well-established that an agency is bound to follow its own rules, regulations, policies, and procedures, even where they operate to inconvenience the government.  *See e.g. National Family Planning and Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992); *see also Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (agency must "supply a reasoned analysis" for changing policies).  The

---

[6] *See* Kelly Decl. at ¶ 14 (identifying Humana contract) and Att. 4 thereto (the Humana contract itself).

statutory language is clear, and the legislative and regulatory history behind the language clearly indicates that "prior" meant "prior". Payments before prior approval is given is prohibited by federal law and HHS' payments to Puerto Rico violate that law.

## B.    FQHC Payment Requirement

**T**here is undisputed evidence in this case that Section 330 funds are being used to pay for the obligations that should rightfully be paid for by the State Medicaid program -- according to Congress when, in 1989, it amended the Medicaid statute for the specific purpose of ensuring against such augmentation of Medicaid funding.

> To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is comprising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.

H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.[7]

---

[7] Defendant's Cross-Motion failed to address in any form Congress's specific concern that the PHS grant program should not wind up subsidizing Medicaid. In federal appropriations law it is recognized that when Congress enacts grant legislation and provides appropriations to fund the grants, it is exercising the spending power conferred upon it by the Constitution. Executive agencies are prohibited from augmenting those appropriations from other sources without specific statutory authority. *See* 31 U.S.C. § 1301(a) (restricting use of appropriated funds to their intended purposes); *see also* HHS' duties under the U.S. Constitution and the Antideficiency Act, 42 U.S.C. § 1341. "When Congress makes an appropriation, it is telling the agency that it cannot operate beyond the level it can finance under its appropriation[, and to] permit an agency to operate beyond this level with funds derived from some other source without specific congressional sanction would amount to a usurpation of the congressional prerogative." Government Accountability Office, *Principles of Federal Appropriations Law*, Vol. II at 6-103. "Another way of stating the augmentation rule is that when Congress appropriates funds for an activity, the appropriation represents a limitation Congress has fixed for that activity, and all expenditures for that activity must come from that appropriation absent express authority to the contrary." *Id.* at 6-155. Defendant's Cross-Motion acknowledged (at 21, n. 7) the general principles underlying the Anti-Deficiency Act, but failed to see its relevance to Congress' legislative history when it first enacted FQHC payment protections. The relevance is obvious. According to the Kelleher report (at 10) HHS and Puerto Rico together are taking (or allowing to be taken) $32 million of PHS Act funds to pump up Puerto Rico's Medicaid program, which has a specific appropriations limit. 42 U.S.C. § 1307(f)(1) and (g)(1) of the Social Security Act. Obviously, this $32 million subsidy to another federal program is an Anti-Deficiency Act

Furthermore, the HMO contract with plaintiffs cannot conceivably be thought to pay centers the "level[s] and amount[s]. . .the entity would make for the [FQHC] *services*, if the *services* were furnished by" another party than an FQHC. (Emphasis added.) The payment clearly contemplated by that language is clearly a direct payment for services provided and certainly not a risk-based deal which results in the FQHCs going into debt by providing Medicaid services. The contract does not fulfill this requirement.

With respect to this subsidy, Ms. Kelly attests that, "As part of the process of reviewing Puerto Rico's managed approved managed care contracts, Region II determined that [the HMO] contracts contained the assurance required by 42 U.S.C. § 1396b(m)(2)(A)(ix) that the HMOs pay FQHCs "not less than" the amount for services if the services were furnished by a non-FQHC provider. The assurance that the HMO will pay FQHCs no less than it pays non-FQHCs on which Ms. Kelly relies can be found in the attached contract provisions between Puerto Rico and Humana for the contract period ending June 30, 2006, which, according to Ms. Kelly, is identical among all Puerto Rico HMO contracts. Kelly declaration at ¶ 14.

Ms. Kelly's statement is close to what the statute says. It is also close to the language of the checklist (Atts. 1 and 2 to Ms. Kelly's Decl.) on which she relies, the checklist, on page 10, A A.3.9, states that "[t]he [managed care] entity must pay FQHCs. . .no less than it pays non-FQHC [sic]. . .for similar services." Although we would argue that (at least) the checklist should copy the statute, the important point of both Ms. Kelly's and the checklist's language is that the payment to the FQHC must be no less than what the HMO would pay for the same or similar (the checklist only refers to "similar") *services* (emphasis added) from a non-FQHC. Ms. Kelly's

---

violation.

conclusion that the Humana contract meets her or the checklist's description of the necessary

magic language, is incorrect.

That Humana contract provision referred to by Ms. Kelly provides that:

> The ADMINISTRATION [ASES] may build [*sic*] only the FFS
> rate schedule or an actuarially equivalent rate for services rendered
> by FQHC and RHCs when applicable.  The ADMINISTRATION
> may not include the FQHC/RHC encounter rate, cost settlement, or
> prospective payment amounts.  INSURER must pay FQHCs and
> RHCs no less than it pays non-FQHCs and non-RHCs.

Att. 4 to Def.'s Cross Motion at Article XIX, ¶ 8 (pp. 97-98).  The contract language does not

refer to services or payment for services, and no wonder.  As the Cruz declaration acknowledges

and the Kelleher report discloses, the HMO contracts do not pay for the services the FQHCs

render.  Puerto Rico and its HMOs have carefully crafted the contract language that is addressed

to the FQHC requirement to mask their violation of that requirement, and succeeded in fooling

Ms. Kelly, whose desire to be fooled is apparent from the fact that she was willing to ignore the

true nature of the FQHC payment provision of which she was independently aware.

## C.     <u>Lack of Compliance with PIP Requirements</u>

The above argument regarding the HMOs' non-payments to FQHCs is directly relevant

to our argument in this case that HHS approval of the Puerto Rico HMO contracts would be

improper under 42 U.S.C. 1396b(m) because they violate the PIP requirements at 42 U.S.C.

§ 1396b(m)(2)(A)(x).  HHS argues that past approvals of the HMO contracts' PIP-related

provisions are authorized, referencing (in part) paragraph 15 of the Kelly declaration.  In an

earlier paragraph in her declaration (¶ 11), Ms. Kelly avers that she uses a checklist "to assess

whether" the HMO contracts at issue "are approvable. . ."  Presumably, her review of the

contract's PIP provisions as described in ¶ 15 relied on that checklist.

In any event, Ms. Kelly refers to the PIP clause in the Humana contracts as "an assurance that the HMO will meet the PIP requirements. . . That clause provides as follows:

> The ADMINISTRATION may build [sic] only the FFS rate schedule or an actuarially equivalent rate for services rendered by FQHC and RHCs when applicable. The ADMINISTRATION may not include the FQHC/RHC encounter rate, cost settlement or prospective payment amounts. INSURER must pay FQHCs and RHCs no less than it pays non-FQHCs and non-RHCs.

The relevant connection between FQHC payments and PIP arises in a footnote, which insists that that we have not shown the HMO payments are different than what the HMO is paying the IPA. Footnote 12, pages 27, of the Cross-Motion. The relevance of the PIP requirements to this case lies is this argument that the FQHC payments being made by the HMO are lawful because they are the same as the HMO is making to IPA doctor groups, which are unarguably covered by PIP.

In Section 1396b(m)(2)(A)(x), the PIP requirement provides that risk contracts must limit the risk to ensure (among other things) that the physician/group will not fail to treat or refer a patient because of the risk imposed. Under that section and 42 C.F.R. § 438.6(h), a Medicaid HMO may not enter into a risk arrangement with a health provider such as an FQHC unless the arrangement meets the requirements described in 42 U.S.C. § 1395mm(i)(8) and regulations issued thereunder for physician incentive plans, or PIPs.[8] Considering that the providers only way to limit the risk Puerto Rico's HMOs impose, the PIP's main purpose is clearly being violated The same violation is immediately apparent from what the PIP regulations require.

---

[8] 42 U.S.C. § 1395mm(i)(8) is incorporated by referenced into § 1396b(m)(2)(A)(x)) and the regulations promulgated thereunder, at 42 C.F.R. § 417.478.

The Cruz declaration admits that the cost of the risk assigned to Loiza by the HMO contract exceeded the entire amount of capitation payments made to Loiza.  As also described in the Kelleher Report:

> Probably the most significant defect of the HMO contracts is that there is no guarantee of any payment to the HCO[9].  Risk is unlimited and the FQHC can be asked to pay the HMO even as it provides services to the HMO's members.  As noted above in the "government" section, all other providers are paid their negotiated fees.  Primary care groups are, by design, last in line and many receive nothing in return for the services they provide.

Ex. A to Plaintiffs' Summary Judgment Motion, Kelleher Report at 8-9; see also Complaint ¶ 46; Cruz Declaration (Ex. B to Plaintiffs' Summary Judgment Motion), HRSA letter (Ex. A to Plaintiffs' Summary Judgment Motion) and SF ¶¶ 5, 7-8 (Colon Decl.).

The risk described by the Cruz declaration and Kelleher report clearly violates 42 C.F.R. § 422.208, the central regulatory provision describing PIP (in the Medicare program).  Under § 422.208(c)(2):

> If the physician incentive plan places a physician or physician group at substantial financial risk (as determined under paragraph (d) of this section) for services that the physician or physician group does not furnish itself, the MA organization must assure that all physicians and physician groups at substantial risk have either aggregate or per-patient stop-loss protection in accordance with paragraph (f) of this section.

Under subsection (f)(2)(i) (referenced in the foregoing quotation), there must be, for any physician group with a PIP contract, "aggregate stop-loss protection [which] must cover 90 percent of the costs of referral services that exceed 25 percent of potential payments."  The meaning of this dense language can be easily illustrated.

---

[9] As explained in the Kelleher Report (at 5, second bullet point), HCO is a term used in the Commonwealth of Puerto Rico to denote "at-risk providers."

Assume the Puerto Rico IPA or FQHCs they are paid $50 per member, per month by the HMO in "capitation", which must cover the payments to all other providers. As the Cruz declaration and Kelleher report states, the entire $50 is at risk for the cost of such other services. Likewise, that $50 is the full amount of "potential payments" as the regulations describe that term. Accordingly, under § 422.208(f)(2)(i) the payment to which the regulatory limits would be applied would be that $50. The stop loss protection required would be $50 minus 25 percent of $50, or $12.50, which when deducted from $50 equals $38.50. Ninety percent of $38.50 would be $34.65. The least the IPAs and FQHCs could net from their $50 capitations would be this amount.

Stated otherwise, were PIP-required protections in place in Puerto Rico's Medicaid program, it would be impossible for an IPA or FQHC to owe the HMO more than all of its HMO payments. Yet, both the Cruz declaration and Kelleher report state that this is exactly what takes place. The overall protection required to be afforded under the PIP regulations is accordingly nonexistent.

Clearly, FQHCs cannot be receiving the payment for services from an HMO contemplated by Section 1903(m) if the payment is unlawfully low for the non-FQHC IPAs to which the FQHC payments are compared (by HHS). Ms. Kelly knew or should have known that the HMO contracts with Loiza and Belaval would violate this PIP protection. She apparently (from HHS argument in this case) was willing to assume that whatever the FQHCs were (not) being paid was the same as the IPAs. She, therefore, had to realize that the PIP requirements were being violated.

The importance of HMOs adhering to the PIP protections is obvious. Unless they do, the doctors and others who accept the unlawful risk will have an enormous financial incentive not to

refer (in this case) Medicaid patients for other care.  Unlike FQHCs, which have Section 330 grant funds to fall back on when they are not paid by the HMO, the private doctor groups functioning as IPAs do not.  This Court may, and should, take judicial notice that these groups will not provide services for nothing or less than nothing as the FQHCs have been doing.

This, of course, means that the IPAs may be presumed to be not referring patients in need of the additional services from other doctors, *etc*.  It further means that what Puerto Rico Medicaid beneficiaries derive by being assigned to an FQHC, not a doctor group IPA, for their basic services is not just the extra benefits and care FQHCs provide, but also an avoidance of exposure to a situation where their health is jeopardized because of an IPA's unwillingness or financial inability to refer when medically indicated.  As attested to in the two Colon declarations (September 24, 2007 Declaration of José Orlando Colon at ¶¶ 7-9; Exhibit A hereto at ¶ 5), potential patients of Loiza and Belaval are being forced or manipulated into receiving Medicaid care through doctor group IPAs.  The potential harm being done to them, to say the least, is of extreme importance and value.

One last point:  HHS insists that FQHCs are not covered by the PIP protections (*e.g.*, Cross-Motion, fn.14, p.28).  In so doing, HHS is proffering an unjustified *post hoc* rationalization.  HHS' prior interpretation is that the PIP provisions are applicable to FQHCs. This is evident from an April 2002 HHS Office of Inspector General issuance entitled "Physician Incentive Plan Reporting for Medicare + Choice Organizations" (attached hereto as Exhibit B). According to the PIP reporting instructions to the MCOs, one item of information that must be disclosed is the identity of Federally-qualified health centers.  Ex. B at 19, instruction for Line 1.C.  If FQHCs were not covered by the PIP provisions, there would be no reason to identify them in the form.

**D.**    **Lack of Actuarially Sound Payment Rates**

Section 1396b(m)(2)(A)(iii) requires that rates paid to HMOs must be "actuarially

sound". The rates being paid the HMOs are not actuarially sound. We say this because of the

non-payment of FQHCs that is now occurring. If some of the payment being made to the HMOs

is intended to be given to the FQHCs, the rates are obviously too high and actuarially unsound

because the HMOs are pocketing that portion of the payment. If the payment rates fail to include

an amount for FQHC payment they are likewise actuarially unsound because they fail to account

for payments the HMOs are required by law to make -- and exacerbate the non-FQHC payment

problem. Additionally, the requisite actuarial findings and certifications required by regulation,

at 42 C.F.R. § 438.6, are lacking. Ms. Kelly testified that ". . . we determined that Puerto Rico's

rates and certifications for those [prior] contract periods met the required standards, we approved

the contracts for those periods . . . " Kelly Decl. at ¶ 14. The actuarial information that 42

C.F.R. §438.6(c)(4)[10] requires the Commonwealth to submit to CMS is not included in the

contract materials submitted by Ms. Kelly for any contract period and we have reason to believe

such information was submitted.

**E.**    **Freedom of Choice**

Section 1903(m)(2)(A)(vi) requires that Medicaid managed care contracts permit

beneficiaries to terminate enrollment. 42 U.S.C. § 1396(m)(2)(A)(vi). Furthermore, 42 U.S.C.

§ 1396u-2 added a complementary requirement -- that a State must provide beneficiaries with a

choice of at least two managed care entities in which to enroll. 42 U.S.C. § 1396u-2(a)(3). The

---

[10] 42 C.F.R. §438.6(c)(4) requires the Commonwealth to provide CMS with such information as:
the actuarial certification of the capitation rates, an assurance that all payments rates are based
only upon services covered under the State Medicaid plan, and an explanation of any incentive
arrangements or stop-loss, reinsurance "or any other risk-sharing methodologies under the
contract." None of this information was submitted in support of defendant's Cross-Motion.

Commonwealth's managed care contracts violate this provision in that there is only one HMO available within each of Puerto Rico's 10 regions. Defendant contends (at 29) "[t]o the extent Plaintiffs allege that CMS has failed to ascertain that Puerto Rico's managed care contracts contain any other required provisions, including compliance with the applicable requirements of 42 U.S.C. § 1396u-2, they are [] in error." In making this argument, Defendant states *via* footnote 15 that "Puerto Rico is statutorily exempt from the 'freedom of choice' requirement, among others, by a provision of the Medicaid Act codified at 42 U.S.C. § 1396a(a)(23)." Defendant cites the declaration of Sue Kelly in making this contention, which states:

> The Medicaid Act contains a provision, codified at 42 U.S.C. § 1396a(a)(23), which exempts Puerto Rico from the "freedom of choice" requirement in 42 U.S.C. § 1396-2(a)(3)(A) and 42 C.F.R. § 438.52 to provide Medicaid beneficiaries with a choice of at least two MCOs in which to enroll. Kelly Decl. ¶ 7.

While Ms Kelly references § 1396a(a)(23), she does not show how or why the provision takes effect to exempt the Commonwealth from having to meet the two HMO minimum requirement in § 1396u-2(a)(3). In fact, the plain language of 42 U.S.C. § 1396a(a)(23) and 42 U.S.C. § 1396u-2(a) shows just the opposite. Section 1396u-2(a)(1) requires compliance with all the paragraphs of that section, "notwithstanding" 42 U.S.C. § 1396a(a)(23)(A). Only if such compliance exists may Medicaid beneficiaries be transferred into managed care. 42 U.S.C. § 1396u-2(a)(1).

The remainder of 42 U.S.C. § 1396a(a)(23) not covered by the "notwithstanding" provides no additional authority to exempt Puerto Rico from § 1396u-2's two HMO minimum requirement. Section 1396a(a)(23)(B) states that the enrollment of a person in a Medicaid MCO "shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title [referring to family planning services and

supplies], except as provided in subsection (g) of this section and 1396n of this title [concerning compliance with State plan provisions], except that this paragraph shall not apply in the case of Puerto Rico. . . " 42 U.S.C. § 1396a(a)(23)(B). This remaining language clearly focuses on freedom of choice of providers for family planning services/supplies, rather than choice of managed care entities. *Id.*

There is more than a bit of irony to Sue Kelly's use of Puerto Rico's exemption from § 1396a(a)(23)'s requirements. Puerto Rico was initially afforded the exception because it had a public health care system in place prior to Medicaid "which it was felt was important to preserve." H.R. Rep. No. 94-327, at 428 (1975). In order to maintain this system, which covered many individuals not eligible for Federal matching, "Puerto Rico [] stretched [its] coverage by limiting application of the freedom-of-choice provision so that certain kinds and types of services are paid for only if the public providers are used." *Id.* Furthermore, freedom of choice was "limited to services of generalists, a very few specialists, and some routine laboratory and x-ray services." *Id.* Puerto Rico preservation of this system made full scale freedom of choice "inappropriate." *Id.*

The reason behind this exemption has vanished. "Health Reform greatly changed the health care landscape in Puerto Rico." (Ex. A to Plaintiffs' Summary Judgment Memorandum at 1.) As such, "the Commonwealth transferred the responsibility of providing health services for Medicaid eligible beneficiaries from the public to the private sector." *Id.* Sue Kelly further described this shift from public services in July 2000 by stating:

> Prior to health care reform, under the fee for service Medicaid Program, [FQHCs/RHCs] received in-kind payments in the form of staff and space from the Department of Health and thus, their costs for serving Medicaid beneficiaries were being met. Since the implementation of health care reform, the centers have had to compete for managed care subcontracts on the same basis as all other

clinics and no longer receive in-kind payments from the Department of Health. (Ms. Kelly's July 2000 letter to Roberto Hernandez) (attached to Ex. A hereto).

**F.**    **Plaintiffs Have the Requisite Authority to Bring This Case and Obtain the Relief They Seek**

Defendants' contention that Plaintiffs lack standing to sue under the standards set forth in *Lujan v. Defenders of Wildlife, et al.*, 504 U.S. 555 (1992), is without merit.  Defendants assert that, because "CMS has no authority over the contracts that HMOs enter into with health care providers, including Plaintiffs," none of Plaintiffs' harms arising out of those contracts are "traceable to the actions of the CMS."  *See* Defendant's Cross-Motion at 17 (citing Kelly Decl. at ¶ 9).

As an initial matter, HHS' position is contrary to long-standing CMS policy.  What HHS overlooks is the fact that its Medicaid program -- by that program's own account - - *does* regulate agreements between HMOs and FQHCs.  Although CMS has generally disclaimed the authority to "regulate the payment rates between MCOs and subcontracting providers," it specifically acknowledged managed care subcontracts with FQHCs as an area in which Congress has vested HHS with oversight responsibility.  *See* Centers for Medicare and Medicaid Services, "Medicaid Program; Medicaid Managed Care: New Provisions - - Final Rule," 67 *Fed. Reg*. 40998 (2002) ("[O]ther than in the case of FQHCs, the Congress has not established any standards for payments to subcontractors."); *see also* Health Care Financing Administration, "Medicaid Program; Medicaid Managed Care; Final Rule," 66 *Fed. Reg*. 6236 (2001) ("The only instances in which the statute provides authority to regulate payments by MCOs to subcontractors are the physician incentive plan . . . , and the requirement . . . that payments by MCOs to FQHCs. . . be no less than rates paid to similar subcontractors providing a similar range of services.").

Moreover, it is only by virtue of HHS' exercise of § 1396b(m) its contract approval authority that a State may delegate the operation of its Medicaid program to an MCO.  Indeed, the *sine qua non* for any State availing itself of the "managed care option" under 42 U.S.C. § 1396u-2 is review and approval of the State's managed care contract(s) by HHS.  *See* 42 U.S.C. § 1396b(m)(2)(A); 42 C.F.R. § 438.806.  If HHS does not approve a State contract with an HMO, the State is only precluded from later claiming FFP for costs under that contract.  The State must still fulfill its State Plan obligations through a non-managed care scheme, and may claim FFP for its costs in that connection.

The foregoing makes clear that there is, in fact, the causal connection between HHS' conduct and Loiza's and Belaval's injuries necessary for standing in this case.  Loiza and Belaval would not be forced to operate under a system that fails to compensate them properly -- much less at all -- for their costs in caring for Medicaid patients *but for* HHS' endorsement and/or continued financial support for that system.  Similarly, were HHS to withhold its approval for the Puerto Rico FQHCs contracts with their HMOs, Loiza and Belaval would be able to seek reimbursement directly from the Commonwealth of Puerto Rico through the prospective payment mechanism required under 42 U.S.C. §§ 1396a(bb)(1)-(4).  In other words, not only are the harms that plaintiffs suffer "fairly traceable" to HHS' actions, but the elimination or reversal of those actions would effectively remedy plaintiffs' harms by permitting them to pursue payment through alternative means.  Plaintiffs thus satisfy both the "fairly traceable" and "redressability" prongs of *Lujan v. Defenders of Wildlife*.

Defendants are simply wrong in their further argument that there is no jurisdiction or application of the APA because the Medicaid statute sets forth a comprehensive (and, presumably, exclusive) remedial scheme.  The various sources of authority on which HHS relies

for this proposition refer only to a State's right to seek reconsideration and appeal of a secretarial determination of non-compliance with a State Plan requirement or a "disallowance" of a claim for FFP under 42 C.F.R. Part 430, neither of which is relevant to this lawsuit. There is no notice and administrative appeal provision - - much less one that allows for review of approvals/disapprovals of HMO contracts - - in the CMS Medicaid managed care regulations similar to those in 42 U.S.C. § 1396c and 42 C.F.R. §§ 430.35, 430.38.  In fact, the HHS Departmental Appeals Board has expressed doubt as to whether its jurisdiction would extend to Medicaid-related disputes beyond those set forth in Part 430. *See Appeal of Connecticut Department of Social Services*, DAB Decision No. 1983 at 18 (June 29, 2005) (DAB authority over Medicaid matters "is confined, by regulation, to a review of CMS's 'disallowance' determination").

As we have stated previously, the 42 U.S.C. § 1396b(m) prior approval of managed care contracts authority is one, and possibly the only, instance where HHS is thrust into the midst of directly overseeing and approving a State's administration of a facet of the State's Medicaid program.  HHS actions in regard to this authority are simple.  If HHS finds in advance that the § 1396b(m) requirements are met may payments may go forth.  No rights of hearing or appeal, *etc.* attend to an HHS refusal to approve an HMO contract.

Finally, as to the basic issue of jurisdiction, Plaintiffs complaint properly references federal question and other statutory jurisdiction provisions.  Manifestly, whether HHS has made approvals and/or payments as federal law requires is a "federal question".

**G.** **HHS Payments of Medicaid Funds to Puerto Rico to be Used for HMO Contracts Violates the APA**

In *Motor Vehicle Mfrs. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 41 (1983), the U.S. Supreme Court provided clear criteria to be applied in determining whether an agency has acted

in a manner that is "arbitrary, capricious, and an abuse of discretion or otherwise contrary to law."  That case contains the seminal analysis of Administrative Procedure Act (5 U.S.C. § 706(2)(A)), that is directly relevant to assessing HHS' actions (and inaction) in this case:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, *entirely failed to consider an important aspect of the problem*, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  (citations omitted) (emphasis added).

The Supreme Court further admonished that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id. (quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).  An agency must be accountable for its decision-making, which means that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 645 (1986).[9]  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 91 L.Ed. 1995, 67 S. Ct. 157 (1947).  Further, this Circuit has opined that "[f]undamental principles of administrative law require that agency action be 'based on a consideration of the relevant factors.'"  *U.S. Telecom Association v. FCC*, 227 F. 3d 450, 461 (D.C. Cir. 2000), quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

　　　　Here, HHS has failed to consider all of the information before it and readily available to

---

[9] Moreover, the "mere fact that there is 'some rational basis within the knowledge and experience of the [regulators] under which they 'might have concluded' that the regulation was necessary to discharge their statutorily authorized mission will not suffice to validate agency decisionmaking."  *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 627 (citations omitted).

it concerning the FQHC payment and other violations in the Commonwealth's Medicaid managed care program. The record before HHS simply cannot support any finding that the past or current HMO contracts are approvable given what HHS knows about the way the program actually works and, among other things, fails to make FQHC payments.

No amount of magic language in the contracts can make HHS rationally disregard everything else that it knows about the Commonwealth's *Reforma* program. The case law addressing a State's reliance on HHS Medicaid plan approval is also relevant in this regard. It has been well-established that a State cannot assert HHS approval of its State plan as a defense to charges that its Medicaid plan fails to meet federal requirements. In *New Jersey Ass'n of Health Care Facilities v. Gibbs*, 838 F. Supp. 881, 896 (D.N.J. 1993), for example, the Court noted that "there is a presumption that a state will engage in a *bona fide* finding process before it makes assurances to HCFA that required findings have been made,"*quoting AMISUB v. Colorado*, 879 F. 2d, 789, 797 (10th Cir. 1989).[11] In *Gibbs*, the Court found that a presumption of validity based solely on HCFA's "cursory approval" was unwarranted because no analysis of the bases underlying the assurances had been made. *Gibbs*, 838 F. Supp. at 899. Similarly, in *Erie County Geriatric Center v. Sullivan*, 952 F. 2d 71, 81 (3rd Cir. 1991), the Third Circuit found that the State of Pennsylvania's assurance to HCFA concerning the reasonableness and adequacy of reimbursement to eligible facilities "was merely a hollow recitation of the wording of the Medicaid statute." HHS, in other words, has an affirmative obligation to look behind the contracts it is required by statute to review and prior approve, especially where it has reason to know that those contracts do not accurately reflect what is occurring, or in the case of the

---

[11] At issue in *Gibbs* was the reasonableness of Medicaid payment rates for nursing home facilities under the "Boren Amendment" which requires states to submit certain assurances to HCFA (now CMS) which must be supported by findings that the rates comply with Boren standards. *Gibbs*, 838 F. Supp. at 895.

Humana FQHC payment clause, where the contract language is facially incomplete and HHS knows exactly how the clause is being interpreted and implemented.

At the very least, HHS knows that the Puerto Rico HMOs do not pay FQHCs as the Medicaid statute requires and violate the PIP protections in that statute.  And, even (perhaps) worse, HHS is making payments when there has been no "prior approval" as the statute demands.  HHS payments to Puerto Rico to support the Commonwealth's Medicaid HMO contracts are clearly arbitrary and capricious and a violation of the law.

Respectfully submitted,

Date: December 20, 2007            /s/ James L. Feldesman
                                   James L. Feldesman ( D.C. Bar No. 23796)
                                   jfeldesman@ftlf.com
                                   Kathy S. Ghiladi (D.C. Bar No. 435484)
                                   kghiladi@ftlf.com
                                   Robert A. Graham (D.C. Bar No. 450345)
                                   rgraham@ftlf.com

                                   Feldesman Tucker Leifer Fidell LLP
                                   2001 L Street, N.W., Second Floor
                                   Washington, D.C.  20036
                                   (202) 466-8960 (telephone)
                                   (202) 293-8103 (facsimile)

                                   *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al.* ) | |
| ) | |
| *Individual Plaintiffs,* ) | |
| ) | |
| v. ) | Case No. 1:07-cv-1034 (RMC) |
| ) | |
| U.S. Department of Health and Human ) | |
| Services, | |
| ) | |
| and ) | |
| ) | |
| Michael Leavitt, Secretary ) | |
| U.S. Department of Health and Human ) | |
| Services ) | |
| ) | |
| ) | |
| *Defendants.* ) | |

<u>SECOND DECLARATION OF JOSÉ ORLANDO COLON, CPA</u>

I, Jose Orlando Colon, declare under penalty of perjury as follows:

1.      My name is José Orlando Colon.  I am a Certified Public Accountant performing

accounting and auditing services in the Commonwealth of Puerto Rico.

2.      This constitutes my second declaration in support of the plaintiffs in this action.

My background was presented in the earlier declaration.  I have been asked by counsel for

plaintiffs (Mr. Feldesman) to respond to four further questions he has put to me.  They are:

(1) In a letter dated July 20, 2000 from Sue Kelly of CMS Region

II (New York) to a senior official in Puerto Rico's Medicaid

department (copy attached), among other things, Ms. Kelly states

that "[p]rior to health care reform under the fee for service

Medicaid program [of Puerto Rico], [the FQHCs] received in-kind

payments in the form of staff and space from the Department of

Health and thus, their costs for serving Medicaid beneficiaries were being met." Do you know whether the foregoing statement by Ms. Kelly is true and/or whether there is any credible support for it?

(2) Are services provided by the Loiza health center in the Rio Grande area adequate to fulfill the needs of the Medicaid beneficiaries in that area for FQHC services?

(3) To the best of your knowledge, has Puerto Rico ever paid FQHCs the sums to which the Medicaid statute entitles them to receive for the services they provide to Medicaid beneficiaries?

(4) Is the Kelleher report relevant to Loiza's and Belaval's payment circumstances and, if so, how?

My answers to the foregoing questions are presented in succeeding paragraphs of this declaration.

3.      Regarding Mr. Feldesman's first question, during the period of time covered by Ms. Kelly's statement in her July 20, 2000 letter, I served as independent auditor for various FQHC centers (for at least three years). In addition, during that same period, I provided financial management assistance to a number of other centers. I believe that I am in a position to respond accurately to Ms. Kelly's statement as a result of this experience.

4.      Ms. Kelly's statement is erroneous. The value of the staff and space that were provided to various Section 330 funded health centers during the period covered by her statement never approached the sums to which the centers would have been entitled had they been properly paid for 100 percent of their reasonable costs as the Medicaid statute then required.

Furthermore, I know of no audit or other financial report that would have analyzed or addressed the value of these in-kind "contributions" and compared that value to what the Medicaid program should have then been paying the FQHCs. Stating it otherwise, I know of no evidence of any sort on which a federal official could rely for the statement of Ms. Kelly. One final observation: one of the plaintiffs in this case, Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval"), for the entire period covered by Ms. Kelly's statement was located in San Juan (it still is) and did not even occupy a Commonwealth facility or otherwise deal with the Commonwealth in regard to the Medicaid program because the responsibility for the program in San Juan was then delegated to the San Juan Municipality. Belaval did then occupy a San Juan-owned facility. For another purpose than this legal action, I looked into the in-kind value of that facility (and any free services Belaval was provided by San Juan). Even the most generous valuation of those "contributions" fell millions of dollars short of what Belaval should have been paid as an FQHC for its services to Medicaid beneficiaries.

5.    As to Mr. Feldesman's second question, there is a problem in the Rio Grande area for Medicaid beneficiaries who wish or might wish to receive FQHC services. The way in which the Puerto Rico Medicaid program now works is for the single HMO that covers a particular region to assign IPA numbers to the particular doctor groups (known as "IPAs") (or FQHCs, which are also labeled "IPAs") that the HMO contracts with to treat Medicaid beneficiaries in a particular community. I have been advised that for the Rio Grande area, even though Loiza has a responsibility under its Section 330 grant to cover that area, Loiza has been unable to obtain an IPA number and that Medicaid beneficiaries/enrollees of the HMO serving that area are all assigned to two or three IPAs that have numbers authorizing them to provide services in the Rio Grande community.

6.      Notwithstanding Loiza's inability to secure an IPA number for Rio Grande, it has a small presence in Rio Grande and has somewhere (as has been reported to me) around two to three thousand Medicaid patients who have been assigned by the HMO to that small presence. However, in dealing with the HMO, Loiza continues to use the IPA number it has been assigned for the Loiza community, which technically (as the *Reforma* program is administered) does not make it eligible to supply services in another community, in this case, Rio Grande. Notwithstanding this, as a practical matter, if a beneficiary goes to the HMO and specifically asks to be treated by Loiza, the HMO apparently will assign the enrollee to Loiza's operation in Rio Grande.

7.      Of the approximately 12,000 patients who had been seen by the Rio Grande health center, which formerly received a Section 330 award and served the Rio Grande area, as noted above, only somewhere between two and three thousand are now receiving FQHC services from Loiza, the only FQHC serving Rio Grande.  The reality is that most of the people who might want to receive FQHC services are not sophisticated and do not have a sufficient awareness of how to cope with a managed care system to know enough or have the ability to make a specific request to the Medicaid HMO to be assigned to Loiza.  Moreover, many do not realize that Loiza has supplanted the Rio Grande health center as an FQHC or what the advantages of FQHC services, such as inexpensive drugs, even are.  What happens with most of them is that they receive notification from the HMO indicating that if they do not select one of the two or three IPAs to be their primary care provider, they will be "defaulted" by the HMO to one of the them.  Most do not respond at all and are thereafter assigned to one of the two or three IPAs by the HMO.  Even for those that respond, because they are given a choice of only two or three such IPAs and are unaware of Loiza's presence (and the informal process now being

4

employed that allows them to be assigned to Loiza on specific request), they will select one of the two or three IPAs.

8.      As to Mr. Feldesman's third question, I can state categorically that the Medicaid FQHC payment requirements have never been complied with in Puerto Rico. Until federal lawsuits were brought by the two plaintiffs in this case, the Puerto Rico Medicaid office had never made an FQHC payment. No such payments, right now, are being made. And because the HMO contracts with the FQHCs impose undue risk, the FQHCs never receive any sums close to what a fee for service payment system, even at a ridiculously low $10 to $10 per visit rate, would be.

9.      Finally, the Kelleher report (issued by David Kelleher, a consultant to the head of the HHS Bureau of Primary Health Care (within HRSA) that administers the Section 330 grant program) is relevant because it corroborates the fact that the Section 330-funded health centers in Puerto Rico are receiving zero or less than zero for their services to the enrollees of the *Reforma* program. Using the Kelleher report, I can give this Court an idea of what this loss currently means to Loiza and Belaval. At present, these centers together have approximately 17,000 *Reforma* HMO patients. Assume the two centers' Medicaid patients are but one-half of this total (in Loiza's and Belaval's litigation against Puerto Rico, Puerto Rico has argued that the figure is 56.5 percent).[1] Then assume that the two centers losses are at the lowest end of Mr. Kelleher's reported individual centers' losses (on page 4), or $11.47 per enrollee, per month. This means annual losses of $11.47 X 12 months, or $137.64 per enrollee, per year. Then, multiply that figure by 8,500 (1/2 of the 17,000 *Reforma* population the centers are seeing). The result is a

---

[1] Puerto Rico's figure significantly understates the true Medicaid populations in these centers, and that issue, among others, is now on appeal to the First Circuit Court of Appeals.

combined loss for both centers of $1,116,940. This extremely modest calculation based on the

Kelleher report is the result of the risk contracts the HMO has imposed on Loiza and Belaval.


December 20, 2007_____        /s/ José Orlando Colon_____
Date                                     José Orlando Colon, CPA

6

figure by 8,500 (1/2 of the 17,000 *Reforma* population the centers are seeing).  The result is a combined loss for both centers of $1,116,940.  This extremely modest calculation based on the Kelleher report is the result of the risk contracts the HMO has imposed on Loiza and Belaval.


12-20-07
Date

José Orlando Colon, CPA



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Refer to        **DMSO:JA**

JUL 2 0 2000

Health Care
Financing Administration

Region II
Federal Building
26 Federal Plaza
New York, NY 10278

Roberto Hernandez, Director
Office of Economic Assistance to the Medically Indigent
Department of Health
Commonwealth of Puerto Rico
Box 70184
San Juan, Puerto Rico 00936

Dear Mr. Hernandez:

As we discussed on June 6, 2000 and on other occasions, the Primary Care Association of Puerto
Rico and the Health Resources and Services Administration (HRSA) have raised questions about
why the Commonwealth of Puerto Rico does not make "wrap around" payments to Federally
Qualified Health Centers/Rural Health Clinics (FQHCs/RHCs) that subcontract with managed
care organizations (MCOs) to provide services to Medicaid beneficiaries. Prior to health care
reform, under the fee for service Medicaid program, these centers received in-kind payments in
the form of staff and space from the Department of Health and thus, their costs for serving
Medicaid beneficiaries were being met. Since the implementation of health care reform, the
centers have had to compete for managed care subcontracts on the same basis as all other clinics
and no longer receive in-kind payments from the Department of Health. They do, however, have
the protection of the Social Security Act, as amended by the Balanced Budget Act of 1997 and
the Balanced Budget Refinement Act of 1999, with respect to the recovery of the reasonable
costs they incur in serving Medicaid beneficiaries.

Section 1902(a)(13)(C)(ii) of the Social Security Act (the Act), as amended by the Balanced
Budget Act of 1997 and the Balanced Budget Refinement Act of 1999, requires States to make
supplemental payments (at least quarterly) to FQHCs/RHCs that subcontract with MCOs to
ensure that FQHCs/RHCs receive payments that they are entitled to under the Act (100 percent
of reasonable cost or the following phase down percentage as specified in the State Plan).

| FY 2000 | FY 2001 | FY 2002 | FY 2003 | FY 2004 |
|---------|---------|---------|---------|---------|
| 95%     | 95%     | 95%     | 90%     | 85%     |

Supplemental payments represent the difference, if any, between the payments made by the
MCO to the FQHC/RHC and the payments the FQHC is entitled to under the Act.

In order to qualify for a supplemental payment, the FQHC/RHC is required to demonstrate that
its reasonable costs for treating Medicaid recipient are not being met by the MCO. Once this
has been demonstrated, the Medicaid agency is required to make the supplemental payment.

Federal Financial Participation (FFP) is available for the supplemental payments, although in the case of Puerto Rico no additional funds in excess of the congressionally mandated cap are available. Nonetheless, Puerto Rico is not relieved of the obligation to make these payments.

In accordance with the above, you must immediately amend section 4.19 B of your Medicaid State Plan to indicate that the Commonwealth will provide supplemental payments to those FQHCs/RHCs that subcontract with managed care organizations and whose reasonable costs of caring for Medicaid beneficiaries are not being met by the managed care organization. Such amendment must be received in our office no later than August 15, 2000.

We will provide you with whatever technical assistance you need to amend your state plan and to comply with the provisions of the law. We understand that the HRSA will assist the FQHCs/RHCs in the preparation of cost reports.

If you have any questions, please contact Julio Alejarino at 212-264-3904 or Doretha Howard at 212-264-3984. Thank you for your cooperation in this matter.

Sincerely,

Sue Kelly
Associate Regional Administrator
Division of Medicaid and State Operations

**Department of Health and Human Services**

# OFFICE OF
# INSPECTOR GENERAL

## Physician Incentive Plan Reporting for
## Medicare + Choice Organizations



**JANET REHNQUIST**
**Inspector General**

**April 2002**
**OEI-05-00-00010**

# OFFICE OF INSPECTOR GENERAL

**http://www.oig.hhs.gov/**

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The OIG's Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations in order to reduce waste, abuse, and mismanagement and to promote economy and efficiency throughout the Department.

## *Office of Evaluation and Inspections*

The OIG's Office of Evaluation and Inspections (OEI) conducts short-term management and program evaluations (called inspections) that focus on issues of concern to the Department, the Congress, and the public. The findings and recommendations contained in the inspections reports generate rapid, accurate, and up-to-date information on the efficiency, vulnerability, and effectiveness of departmental programs.

## *Office of Investigations*

The OIG's Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties. The OI also oversees State Medicaid fraud control units which investigate and prosecute fraud and patient abuse in the Medicaid program.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. The OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within the Department. The OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops model compliance plans, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

# EXECUTIVE SUMMARY

## PURPOSE

To assess Physician Incentive Plan (PIP) reporting by Medicare + Choice organizations.

## BACKGROUND

The managed care organizations' use of physician incentives raised public and Congressional concerns about the potential for underutilizing appropriate medical services and discouraging needed hospitalizations and referrals to specialists. In response, Congress banned Medicare + Choice managed care organizations from linking physician incentives to reducing or limiting necessary medical services to specific Medicare patients in managed care programs. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), issued regulations on physician incentives in 1996. Under these regulations, Medicare + Choice managed care organizations can make no specific payment, directly or indirectly, to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to any particular enrollee and must provide stop-loss coverage for providers who face substantial financial risk in treating Medicare beneficiaries. In 1997, CMS required that each Medicare + Choice managed care organization annually report all contractual arrangements with physicians, provider groups and intermediate entities in order to determine compliance with the regulations.

## FINDINGS

### The CMS physician incentive information collected from managed care organizations focuses on financial risk and stop-loss coverage for providers

By design, the data CMS collects is limited to determining the adequacy of stop-loss coverage for providers. The physician incentive plan law requires that physicians who might be at substantial financial risk in treating beneficiaries have appropriate stop-loss coverage. The CMS characterizes Medicare + Choice managed care organization incentive arrangements as either compliant or non-compliant with reporting regulations based on a formula using the amount of stop-loss coverage and the number of Medicare beneficiaries they treat, called patient panel size. The current process is not designed to detect whether needed services are being restricted or otherwise affecting the access to medically necessary services.

**The information is incomplete, unreliable, and inconsistent**

The physician incentive data CMS does collect is incomplete, inaccurate, and inconsistent. Some managed care organizations do not report all of their contracting arrangements. Few managed care organizations routinely verify the information that downstream providers give them for physician incentive plan reporting. Likewise, CMS does not routinely verify the data managed care organizations submit. The CMS regional offices do not have access to and do not review any intermediate entity subcontracts during their biennial Medicare + Choice onsite reviews.

**Medicare + Choice managed care organizations and their providers report that the physician incentive plan reporting process is burdensome and costly**

Many Medicare + Choice managed care organizations and their providers expend considerable time and financial resources in annually reporting physician incentive plan data to CMS. Managed care organizations with 22 Medicare + Choice contracts reported that their direct physician incentive plan reporting expenses averaged nearly $25,000 in 2001.

**Both CMS and managed care organizations already collect information which could help determine if incentive arrangement problems exist**

Managed care organizations collect information that measures consumer satisfaction, access to care, and quality of care. They also have information about incentives with providers relating to utilization and quality targets. While CMS is not required to collect this data, it would assist CMS regional office staff in meeting the requirements in the onsite managed care monitoring guide relating to quality, access and utilization. The CMS is currently developing a data-driven system that will provide a more comprehensive view of managed care organizations' activities, including physician incentives.

---

## RECOMMENDATION

**The CMS should replace the current reporting system with other approaches that are more effective and less burdensome**

The CMS should terminate the current reporting process which represents a considerable expense of funds, staff, and computer time for Medicare + Choice managed care organizations. Eliminating this process would greatly reduce the reporting burdens for managed care organizations and their physicians. Instead of the current annual managed care organization reporting of stop-loss coverage, CMS could:

- ► require attestations regarding physician payment incentives in all managed care organizations and downstream provider contracts;

- ► require appropriate stop-loss coverage for all managed care organizations, including downstream providers where incentives are involved;

- ► periodically verify, during onsite reviews, the accuracy of attestations and presence of stop-loss coverage and ensure that managed care organization incentives tied to financial goals do not violate the law; and,

- ► identify data already collected that may suggest if health care quality and utilization are affected by physician payment incentives.

## AGENCY COMMENTS

We received comments on this report from CMS.  They concur with our recommendation and are modifying the PIP regulations to reduce administrative burden on Medicare + Choice managed care organizations.  The CMS is also continuing to implement quality improvement assessments that more directly measure health care quality and access in a managed care setting.  Their comments can be found in Appendix D.  Additionally, technical comments were provided by CMS and were incorporated where appropriate.

# TABLE OF CONTENTS

PAGE

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FINDINGS**

CMS Collects Incentive Information Related to Stop-Loss Coverage . . . . . . . . . . . . . . . . . . . . 6

Incentive Data Collected Is Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Incentive Reporting Is A Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Other Data Which Is Already Available Could Be Helpful . . . . . . . . . . . . . . . . . . . . . . . . . 9

**RECOMMENDATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**APPENDICES**

A: Glossary of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B: CMS Physician Incentive Plan Reporting Instructions to Managed Care Organizations . . . . . . 17

C: Other Quality Targets Managed Care Organizations Pay Providers Incentives For . . . . . . . . . 32

D: CMS Comments on this Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**ACKNOWLEDGMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# I N T R O D U C T I O N

## PURPOSE

To assess Physician Incentive Plan (PIP) reporting by Medicare + Choice organizations.

## BACKGROUND

### Medicare Managed Care

The Balanced Budget Act of 1997 established the Medicare + Choice program which expanded the types of managed care entities that could contract with the Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), to provide health care services to Medicare beneficiaries. All health plans participating in the Medicare + Choice program receive a monthly per capita reimbursement and are responsible for providing all necessary services to enrollees. The CMS requires all Medicare + Choice managed care organizations to provide access to a sufficient number of providers, including physicians, to ensure beneficiaries have adequate access and continuity of care. The managed care organizations decide whether to hire salaried providers or contract for providers' services using fee-for-service, capitation, or other reimbursement methods. If a managed care organization pays fee-for-service to providers, the providers themselves face no financial risk in treating beneficiaries, and there is no financial incentive for providers to withhold any medical services to individuals or restrict referrals to non-managed care organizations' providers for out-of-plan treatment. However, under other arrangements, providers may be at financial risk depending on the terms of their contracts. (Appendix A contains a glossary of managed care terms used in this report.)

### Risk Transfer

Managed care organizations transfer financial risk to providers through certain contractual arrangements. Common types of risk transfer arrangements include capitation, percent of premium, withholds, and bonuses. Capitation is a set dollar payment per patient per unit of time (usually monthly) that is paid to cover a specified set of services and administrative costs without regard to the actual number of services provided. A percent of premium is a predetermined percentage of overall revenue from beneficiary premiums. A withhold is a percentage of payment or set dollar amount that managed care organizations deduct from a provider's payment, and that may or may not be returned, depending on whether specific predetermined factors are met. Similarly, a bonus is a payment a provider receives beyond any salary, fee-for-service payments, capitation or returned withhold, depending on whether specific predetermined factors are met. Any of these incentives may be used to encourage

compliance with hospital or pharmacy utilization targets, o
from patient satisfaction surveys.

If a provider assumes global risk for treating patients, the
the costs of all the medical services, including hospitaliz
incur.  The CMS considers providers to be at substantia
more of their potential managed care organization reim
make or services they provide.  When this substantial f
Medicare + Choice managed care organizations must
(called stop-loss) that protects providers from serious
Medicare beneficiaries.  Providers with more than 2'
loss coverage requirements, because it is assumed that any risk would be
large patient population.

## Physician Incentive Plans

Many managed care organization contracts with physicians and other providers contain
provisions for transferring risk.  These provisions contain financial or other incentives intended
to influence the practice styles of physicians to achieve specific outcomes or reduce the health
plan's costs.  Incentives may be included in direct contracts between managed care
organizations and physicians or provider groups as well as any subcontracts between these
entities (called downstream providers).

## Law Prohibits Use of Certain Physician Incentive Plan Arrangements

The managed care organization use of physician incentives raised public and congressional
concerns about the potential for underutilizing appropriate medical services and discouraging
necessary hospitalizations and referrals to specialists.  In response to these concerns, Congress
banned Medicare + Choice managed care organizations from linking physician incentives to
reducing or limiting necessary medical services to specific Medicare managed care patients.[1]

Section 1876 of the Social Security Act prohibits managed care organizations from entering
into compensation arrangements with physicians or physician groups that may directly or
indirectly have an effect of reducing or limiting services to individual enrollees.  The managed
care organizations may, however, operate physician incentive plans if they meet the following
requirements:

> No specific payment is made, directly or indirectly, to a physician or physician
> group as an inducement to reduce or limit medically necessary services
> furnished to any particular enrollee.

---

[1] Public Law 99-509, Omnibus Budget Reconciliation Act of 1986, Section 9313(c)

> ► If a physician or physician group is placed at substantial financial risk for referrals, the managed care organization ensures that stop-loss coverage is provided and conducts periodic surveys of enrollees and disenrollees.
>
> ► The managed care organization must provide CMS with descriptive information sufficient to determine compliance with these requirements.

## Regulations Implementing Physician Incentive Plan Law

The CMS informed managed care organizations that the purpose of the final rule implementing the physician incentive plan law is to provide adequate protection to beneficiaries so they have access to necessary and appropriate care.  To implement this law and its subsequent changes, CMS issued several regulations, culminating with major revisions effective in 1996.[2]

Under the 1996 regulations, CMS allows Medicare + Choice managed care organizations to use physician incentives in their contractual arrangements with Medicare providers if certain conditions are met.  The managed care organizations:

> ► cannot curtail access to necessary medical services,
>
> ► must provide stop-loss coverage for managed care organization providers who face substantial financial risk,
>
> ► must conduct surveys of beneficiaries and disenrollees when providers are at substantial financial risk, and,
>
> ► must generally disclose incentive arrangements to Medicare beneficiaries.

Any Medicare + Choice managed care organization violating this regulation faces civil monetary penalties up to $25,000 for each infraction, as well as possible program sanctions.

## Physician Incentive Plan Requirements

Beginning in 1997, CMS required Medicare + Choice managed care organizations to annually report all contractual arrangements involving incentives with physicians and provider groups in order to determine compliance with physician incentive plan regulations.  The regulations specify the kind of information the managed care organizations must report to CMS.  The managed care organizations must report:

> ► whether referrals made by the physician or physician group are covered in the incentive plan;
>
> ► the type of incentive arrangement or the method used to transfer risk (e.g., withhold, bonus, capitation);

---

[2]  42 CFR 422.208, 42 CFR 422.210

- the percent of the withhold or bonus the plan uses (used to determine whether physician or group is at substantial financial risk);
- assurance that the physician or group has adequate stop-loss coverage;
- the patient panel size and pooling method used, if any (also used to determine whether a physician or group is at substantial financial risk); and,
- if the managed care organization is required to conduct an enrollee/disenrollee survey.

These requirements apply to managed care organization direct and indirect contracting arrangements with physicians, provider groups, and intermediate entities. In 1999, managed care organizations representing 352 Medicare + Choice contracts reported over 8,000 incentive arrangements with physicians and providers. Less than half of these arrangements transferred any risk to providers.

### Onsite Review of Physician Incentive Plans and Access to Care

Another method CMS uses to collect information about physician incentive plan compliance is the biennial onsite review of managed care organizations. The CMS regional offices use a structured series of general questions on physician incentives when conducting the biennial onsite managed care organization reviews. These questions focus on physician incentive plan reporting elements and contract language. The CMS regional offices use a structured guide to determine whether managed care organizations meet the required reporting and beneficiary disclosure rules.

In addition, CMS instructs its regional offices to review physician incentive plans in their analysis of access and availability of care for Medicare beneficiaries. They also examine other quality measures in conjunction with physician incentive plans to determine whether underutilization of services may be occurring.

## SCOPE AND METHODOLOGY

We used four methods of data collection in this evaluation. We examined physician incentive plan data submitted to CMS by managed care organizations, sent a fax survey to Medicare + Choice managed care organizations, conducted personal or telephone interviews with staff from CMS headquarters and regional offices, and conducted site visits of a purposive sample of managed care organizations.

First, we examined the 1999 data that managed care organizations provided to CMS to describe the physician incentive plan landscape and to identify the existence of any significant patterns in annual physician incentive plan reporting.

Second, we sent a fax questionnaire to Medicare + Choice plans, representing 252 managed care organization contracts. We excluded Medicare + Choice demonstration

contracts and cost contracts and focused on managed care organization risk plans. The questionnaire contained a mix of open and closed-ended questions regarding the types of physician incentive plan information collected, how accuracy of data is assured, what elements of physician incentive plan arrangements are not reported, what non-contractual methods are used for arranging incentives, and the presence of incentive arrangements with non-primary care staff. We did not request details regarding specific dollar amounts of potential incentives. We received 227 of the 252 surveys, a response rate of 90 percent.

Third, we conducted personal or telephone interviews with staff from CMS headquarters and regional offices responsible for monitoring physician incentive plan information. We used a structured format of both open and closed-ended questions to elicit information about the physician incentive plan data collection process. We asked specific questions about the nature and the detail of physician incentive data they collect and review during the biennial onsite managed care organization reviews. We asked CMS staff about the roles the regional offices play in collecting physician incentive plan data, how they use the physician incentive plan data, and what types of feedback they give to managed care organizations. We gathered information to determine whether adequate mechanisms exist to report questionable incentive arrangements and what actions are taken in those situations. We also asked CMS staff for suggestions about data that could be collected in addition to, or instead of, what is currently being collected to monitor physician incentive plans. We reviewed the monitoring guides CMS offices use in conducting their biennial onsite reviews of Medicare + Choice plans.

Finally, to collect more in-depth information, we conducted onsite visits and performed follow-up interviews to a purposive sample of 38 managed care organizations in 9 metropolitan areas. The metropolitan areas selected represent a diverse cross-section of annual physician incentive plan reporting characteristics. We visited a mix of managed care organizations in these metropolitan areas that CMS determined to be either compliant or non-compliant in their stop-loss arrangements. We visited 38
Medicare + Choice managed care organizations located in Denver, Dallas, Detroit/Ann Arbor, Miami/Ft. Lauderdale, Hartford/New Haven, Los Angeles, San Francisco, Oklahoma City/Tulsa, and Seattle. We conducted all onsite visits in June and July 2000.

During these onsite visits with the managed care organizations, we used a structured discussion guide containing open-ended questions to gather in-depth information about the managed care organizations, the local managed care environment, history of incentive use, and annual physician incentive plan reporting and oversight.

We conducted our review in accordance with the *Quality Standards for Inspections* issued by the President's Council on Integrity and Efficiency.

# FINDINGS

## The CMS physician incentive information collected from managed care organizations focuses on financial risk and stop-loss coverage for providers

The physician incentive plan law requires that physicians who might be at substantial financial risk in treating beneficiaries have appropriate stop-loss coverage. The CMS requires Medicare + Choice managed care organizations to report whether they transfer risk to providers. Of 8,651 incentive arrangements reported to CMS in 1999, 3,306 contracts transferred risk globally (for all medical services delivered) to providers, provider groups, and intermediate entities, and 2,229 contracts transferred risk specifically for referrals. The managed care organizations also report the type of incentive arrangements they have, but do not provide any details of specific proprietary financial arrangements they have with providers.

The CMS characterizes Medicare + Choice managed care organization incentive arrangements as either compliant or non-compliant with reporting regulations based on a formula using the amount of stop-loss coverage and the number of Medicare beneficiaries they treat, called patient panel size. In 1999, CMS determined that 193 (5 percent) out of 3,606 Medicare + Choice arrangements where risk transfer was reported were non-compliant due to inadequate stop-loss coverage. If an arrangement is non-compliant, CMS enters this information into the physician incentive plan database and sends a notice to the managed care organization informing them of the decision. The CMS does not routinely require managed care organizations to take corrective action on these non-compliant arrangements. The CMS acknowledges conducting minimal compliance activities in 1999 due to efforts to implement the new electronic PIP data submission system.

The CMS provides little feedback to managed care organizations on their physician incentive plan submissions. Only 26 percent (59 of 227) of managed care organizations responding to our survey report having any CMS review of the physician incentive plan data they submitted. Most of these managed care organizations report that CMS regional offices' review occurred during their biennial monitoring process. During our interviews with CMS regional staff, we learned that the degree of oversight of physician incentive plans varies among offices. Two regional offices reported that they did not review the physician incentive plan disclosure during the last biennial monitoring review (one regional office was receiving training at the time of our review). The remainder of the regional offices reported that they reviewed some physician incentive plan data during their most recent biennial review. Several CMS regional staff volunteered that the type of incentive information collected from Medicare + Choice plans is not useful to them in conducting their onsite reviews. The current process is not designed to

detect whether needed services are being restricted or otherwise affecting the access to medically necessary services.

## The information is incomplete, unreliable, and inconsistent

During our onsite visits, managed care organization representatives reported various problems relating to the completion of the annual physician incentive plan disclosure. Although CMS requires disclosure even if incentive arrangements do not exist, three managed care organizations we spoke with report only those arrangements where incentives are involved.

Some managed care organizations report that they have the contracted physicians, groups and other entities complete the physician incentive plan reporting, and these providers do not always understand the terms and definitions used by CMS or the importance of the data. Three managed care organizations told us that some of the terms used in the physician incentive plan disclosure form are confusing and need to be better defined. Most Medicare + Choice plans that contract with intermediate entities (111 of 169 contracts) accept the information that downstream providers gave them for physician incentive plan reporting. A few managed care organizations indicated they would call the downstream provider if a number reported looked questionable.

The CMS only requires intermediate entities to report incentives if they are contained in subcontracting arrangements with physicians or physician groups. Some managed care organizations do not report the details of arrangements intermediate entities have with their subcontracted providers. One managed care organization said they do not report beyond the first tier or the direct contract with the managed care organization. Another said they believed there was a three-tier (contract, subcontract, sub-subcontract) limit in applying the physician incentive plan requirements. Downstream providers may further subcontract with other providers. Another managed care organization said they do not collect incentive data if providers are employed by a provider group or intermediate entity. In this case, the managed care organization does not consider the providers to be downstream providers since the contracting entity employs them. The CMS does not know how many providers in downstream contracts with intermediate entities are involved in treating Medicare + Choice beneficiaries. The CMS regional offices do not have access to and do not review any intermediate entity subcontracts during their biennial Medicare + Choice onsite reviews.

As a result, CMS (or in many cases, the contracting managed care organization) does not know whether the downstream contracts contain incentives that violate the law. In our fax survey, we found that only 31 of 166 Medicare + Choice contracts have language in their contracts with intermediate entities that details what incentives the law prohibits.

We found that managed care organizations frequently offer incentives to intermediate entities, most often for meeting targeted financial goals (78 of 169 managed care

organizations contracts with intermediate entities, or 46 percent). The incentives in managed care organization contracts with intermediate entities refer only to those entities and not to contracts they have with downstream providers.

## Medicare + Choice managed care organizations and their providers report that the physician incentive plan reporting process is burdensome and costly

Medicare + Choice managed care organizations expressed several concerns regarding physician incentive plan reporting. Many volunteered that collecting the information represents a costly and time-consuming burden for their physician providers. Even though many managed care organizations credit CMS for designing an electronic reporting format, all managed care organizations face a physician incentive plan reporting burden, even if their plans do not offer incentives to their providers. Our survey reveals that 24 of 227 managed care organization contracts had no incentives at all in 1999. (Appendix B contains CMS' instructions to managed care organizations for submitting 1999 physician incentive plan data.)

While we did not independently verify their estimates, managed care organizations with 22 Medicare + Choice contracts report that their direct physician incentive plan reporting expenses averaged nearly $25,000 in 2001. These plans report using between 150 and 550 staff hours to collect, consolidate, review for obvious errors, and enter the data, with costs ranging from $30 to $50 per hour. Humana, which operates multiple Medicare + Choice plans, estimates expending 550 hours and $86,000 to gather the necessary physician incentive plan reporting data in 2001.

Some managed care organizations pass the burden of completing the physician incentive plan reporting on to providers. In States like California where physicians may participate in many managed care plans, this burden can be substantial, and as previously noted, may result in inaccurate physician incentive plan reporting. To mitigate the burden on their providers, the California Medicare + Choice plans created the Interagency Coordinated Effort. The Interagency Coordinated Effort makes a single request to providers for physician incentive plan information, secures an attestation of accuracy from the providers, and distributes the results to each managed care organization with which the providers are associated. This effort substantially reduced the "hassle factor" for providers, according to California managed care organizations. However, even this cooperative effort is expensive for managed care organizations. Kaiser Permanente, with mainly salaried physicians in its plan, estimates spending $30,000 to collect and report the calendar year 2001 physician incentive plan data.

# Both CMS and managed care organizations already collect information which could help determine if incentive arrangement problems exist

While the current physician incentive plan reporting serves as a useful reminder to managed care organizations of the need for stop-loss coverage, its effectiveness is limited. The current physician incentive plan reporting does not capture specific information about when or why managed care organizations pay physician incentives or how these incentives may relate to patient care. Nevertheless, data that could help CMS to determine this can be obtained for this purpose.

The Secretary has established a moratorium on new encounter data reporting while the department assesses the priorities and burdens of such reporting requirements. We found several examples where physician incentive data can be related to quality of care which CMS can consider using once the moratorium is lifted. During its onsite reviews, CMS could examine this information for potential outliers or trends, recognizing that not all anomalies in treatment are necessarily related to physician incentives. In the following sections, we identify several types of these data.

## Managed Care Incentives for Meeting Targeted Financial or Utilization Goals

The following table represents information about utilization and referral targets reported to us by managed care organizations which the CMS physician incentive reporting and onsite review process does not collect. The Medicare + Choice managed care organizations identified the number of contracts they had that paid incentives for meeting utilization and referral targets. Utilization goals involve managed care organizations identifying a targeted dollar amount of medical expenditures for a specific time period. If members' use of medical services results in expenditures that equal or exceed the targeted amount, no incentive is paid. Conversely, if the actual medical expenditures are below the target, managed care organizations use this surplus to pay the providers a bonus. Frequently, the managed care organizations and the contractee share this surplus.

| Utilization and Referrals | | | | | |
|---|---|---|---|---|---|
| **Target Areas** | **Contracts with Individual Physicians** | | **Contracts with Physician Groups** | | **Contracts with Intermediate Entities** |
| | Yes | No | Yes | No | Yes | No |
| **Financial Goals** | 44 | 126 | 73 | 109 | 78 | 91 |
| **Utilization Goals** | 24 | 146 | 29 | 153 | 31 | 138 |
| **Emergency Room Utilization** | 32 | 138 | 26 | 156 | 30 | 139 |
| **Hospitalization Utilization** | 39 | 131 | 52 | 130 | 44 | 125 |
| **Referrals to Specialists** | 20 | 150 | 25 | 157 | 26 | 143 |

Targeted utilization incentives may induce providers to withhold necessary medical treatment, hospitalizations, or referrals. To discourage restricting access and utilization of appropriate care, some managed care organizations reported limiting the amount contractees may collect from these types of incentives.

## Linkages Between Physician Incentives and Access to Quality Care

There are several quality indicators CMS currently uses to help determine whether Medicare managed care beneficiaries have access to appropriate medical services. The CMS currently monitors consumer satisfaction, access to care, and quality of care using performance measures such as the Health Plan Employer Data and Information Set, the Medicare Health Outcomes Survey, and the Consumer Assessments of Health Plans Study surveys. The CMS also has developed the Quality Improvement System for Managed Care Standards and Guidelines. These performance measures were developed to strengthen managed care organizations operation and performance in the areas of quality measurement and improvement, and the delivery of health care and enrollee services.

While CMS regional offices review these quality factors in determining whether managed care organizations provide access to quality care for Medicare patients, under the current physician incentive plan reporting process, CMS has not routinely examined these quality or performance measures to help determine if access or underutilization of services are affected by these incentives. Half of the CMS regional offices we surveyed indicated that using multiple sources of information as indicators of potential incentive arrangement problems would be most effective in examining quality of care issues during their onsite reviews. They also felt irregularities revealed by reviewing the nature of the incentives could be a basis for a more extensive onsite review of physician incentive plans. Most thought the physician incentive plan information currently collected should be supplemented with information from other sources in order to be useful. New CMS

onsite review guidelines direct regional offices to link physician incentive plan information with these other sources of quality and access indicators during their reviews.

## Managed Care Incentives for Meeting Targeted Quality Goals

In addition to CMS' physician incentives information, Medicare + Choice managed care organizations routinely gather information to internally monitor their own performance that might also suggest problems with physician incentive plans. For example, some managed care organizations track information such as beneficiary disenrollment rates and underutilization trends as well as maintaining and reviewing beneficiary complaint logs. The physician incentive plan regulations also require Medicare + Choice managed care organizations to conduct consumer satisfaction surveys when their contracts place physicians or physician groups at substantial financial risk. The CMS regional offices do not routinely use these data from Medicare + Choice plans in reviewing the appropriateness of physician incentive plans.

For example, the Patient Access and Services table below illustrates the number of Medicare + Choice contracts that managed care organizations reported to us containing incentives for patient access and service targets. (See Appendix C for other quality incentives managed care organizations reported to us). Some managed care organizations give incentives to providers that keep their practice open to new Medicare beneficiaries. Also, some managed care organizations pay incentives to providers achieving both specified financial goals and targeted satisfaction levels. One managed care organization volunteered that it would not pay an incentive if a provider met the financial or utilization goals without meeting a specified level of patient satisfaction.

| Patient Access and Services | | | | | | |
|---|---|---|---|---|---|---|
| Target Areas | Contracts with Individual Physicians | | Contracts with Physician Groups | | Contracts with Intermediate Entities | |
| | Yes | No | Yes | No | Yes | No |
| Increased Hours for Patient Care | 22 | 148 | 10 | 172 | 3 | 166 |
| Patient Satisfaction | 36 | 134 | 28 | 154 | 17 | 152 |
| Accepting New Patients | 26 | 144 | 17 | 165 | 6 | 163 |

The CMS is currently developing a data-driven system that will provide a more comprehensive view of managed care organization activities, including physician incentives. In addition to these quality measures, CMS is also involved in a major national initiative to reduce the administrative burden for health plans by simplifying reporting requirements and data requests.

# RECOMMENDATION

The current CMS process that requires managed care organizations to annually report stop-loss coverage data for some incentive arrangements conveys the importance of risk protection to managed care organizations, providers, and provider groups who disclose this information. The current process is not designed to detect whether needed services are being restricted or otherwise affecting the access to medically necessary services.

We think the physician incentive plan process should be aimed more directly at ensuring Medicare + Choice beneficiaries' access to care. We recognize there is no single measure that captures medical underutilization, limiting referrals to specialists, or otherwise withholding needed medical services. And, while a direct causal link between incentives and access to care would be difficult to establish, measures already used by CMS and managed care organizations could be identified that, either singly or in aggregate, may indicate whether beneficiaries' care is influenced by Medicare + Choice incentive arrangements.

## The CMS should replace the current reporting system with other approaches that are more effective and less burdensome

The CMS should terminate the current reporting process which represents a considerable expense of funds, staff, and computer time. Eliminating the annual physician incentive plan reporting is consistent with CMS' desire to lessen administrative burdens for Medicare + Choice managed care organizations and Medicare providers. We recommend CMS take the following steps to replace the physician incentive plan process.

### Require attestations regarding incentives in all managed care organization and downstream provider contracts

To address congressional concerns that managed care organization incentives may negatively impact Medicare beneficiaries' access to appropriate medical care, CMS could require managed care organizations to obtain and retain attestations from all their contractees that incentives cannot be used to limit access to medically necessary care. These attestations can be made part of the managed care organization contracts with physicians, provider groups, and intermediate entities. Physician groups and intermediate entities should also comply with this requirement, as well as any downstream contracts they may have. The managed care organizations should obtain new attestations only whenever contracts affecting Medicare beneficiaries are changed.

**Periodically verify the accuracy of attestations and presence of stop-loss coverage, including downstream providers where incentives are involved**

> The CMS regional offices could include verification of managed care organization incentive attestations and appropriateness of stop-loss coverage during their managed care organization onsite reviews. During these reviews, if a managed care organization contracts with provider groups or intermediate entities, CMS regional offices could select a sample of downstream provider contracts to review for incentive attestations and stop-loss coverage. In addition, CMS could ensure that any incentives or withholds related to meeting goals for achieving financial, utilization, emergency room, hospitalization, or referral targets do not restrict Medicare beneficiaries' access to needed medical services or quality medical care.

**Identify data already collected by managed care organizations that may indicate if Medicare + Choice beneficiaries are being denied access, services, or referrals as a result of physician incentives**

> The CMS managed care review guide used by regional offices requires examination of utilization reviews and physician incentive plans to ensure that existing practices do not interfere with or cause delays in services. We believe the type of incentive data we collected in our survey from managed care organizations relating to financial and utilization goals could serve as potential leads for CMS regional offices in helping them make these determinations.

> The CMS must also make determinations about the quality of care Medicare + Choice plans provide to Medicare patients. We believe the types of quality incentives these plans identified in our survey may also help CMS in their Medicare + Choice quality decisions. In combination with this data, CMS regional offices could request and review beneficiary complaint logs, underutilization studies, or other data that managed care organizations already maintain that may indicate whether or not providers withhold appropriate medical treatment from beneficiaries as a result of physician incentives.

> This recommendation is consistent with CMS's effort to reduce managed care organizations' administrative burdens in that it recommends the use of data already collected by managed care organizations. The CMS should consider the need to identify appropriate and inappropriate incentives as they formulate a more streamlined approach to data collection and use of the data in evaluating the performance of managed care organizations.

## AGENCY COMMENTS

> We received comments on this report from CMS. Additionally, technical comments were provided and incorporated where appropriate. CMS concurs with our recommendation and are modifying the PIP regulations to reduce administrative burden on Medicare + Choice managed care organizations. CMS is also continuing to implement performance assessments that more directly measure health care quality and access in a managed care setting. Comments can be found in Appendix D.

## Glossary of Terms

All definitions were taken or adapted from the CMS website (except where noted by an asterisk*).

**Bonus** — A payment a physician or entity receives beyond any salary, fee-for-service payments, capitation or returned withhold. Bonuses and other compensation that are not based on referral levels (such as bonuses based solely on quality of care, patient satisfaction or physician participation on a committee) are not considered in the calculation of substantial financial risk.

**CAHPS (Consumer Assessments of Health Plans Study)** — A major national initiative, sponsored by the Agency for Health Care Research and Quality, to develop a set of standardized consumer satisfaction instruments, user manuals, and recommended report formats. Surveys include both a standardized satisfaction survey for enrollees and a disenrollment survey that gathers information from beneficiaries leaving a health plan about their experiences receiving care and their reasons for leaving the plan. The CMS requires all Medicare contracting managed care organizations (MCOs) to participate in the CAHPS surveys.

**Capitation** — A set dollar payment per patient per unit of time (usually monthly) that is paid to cover a specified set of services and administrative costs without regard to the actual number of services provided. The services covered may include a physician's own services, referral services or all medical services.

**Downstream provider*** — Refers to any physician, provider group, or intermediate entity who contracts with these entities to provide medical services to MCO patients. This provider does not contract directly with the Medicare + Choice MCO, it is a subcontractor.

**Global risk*** — Transfers financial risk to the provider for all medical services to a beneficiary.

**HEDIS (Health Plan Employer Data and Information Set)** — Set of standardized performance measures designed to assess the quality of health care and services provided by managed care plans. The HEDIS was developed by the National Committee for Quality Assurance (NCQA) to provide purchasers and consumers with the ability to evaluate the quality of different health plans, and to make their plan decisions based upon demonstrated value rather than simply on cost.

**Intermediate entities** — Entities which contract between an MCO or one of its subcontractors and a physician or physician group, other than physician groups themselves. An IPA is considered an intermediate entity if it contracts with one or more physician groups in addition to contracting with individual physicians.

**HOS (Medicare Health Outcomes Survey)** — Formerly known as Health of Seniors, this HEDIS measure is the first outcomes measure to be used in the Medicare population and represents the largest survey effort ever undertaken by CMS. All managed care plans with Medicare + Choice contracts are participating. It is a longitudinal, self-administered survey which CMS plans to use to focus quality improvement activities, to provide comparative information for beneficiaries to make informed decisions when choosing a health plan, and to assess the performance of health plans and integrate valid and reliable performance measures into the contracting process.

**Panel size** — The number of patients served by a physician or physician group. If the panel is greater than 25,000 patients, then the physician group is not considered to be at substantial financial risk because the risk is spread over the large number of patients. Stop-loss and beneficiary surveys would not be required.

**Percent of premium\*** — Payment a physician or entity receives that is a predetermined percentage of overall revenue from beneficiary premiums.

**Physician group** — A partnership, association, corporation, individual practice association (IPA), or other group that distributes income from the practice among members. An IPA is a physician group only if it is composed of individual physicians and has no subcontracts with other physician groups.

**Physician incentive plan** — Any compensation arrangement at any contracting level between an MCO and a physician or physician group that may directly or indirectly have the effect of reducing or limiting services furnished to Medicare or Medicaid enrollees in the MCO. Managed Care Organizations must report on physician incentive plans between the MCO itself and individual physicians and groups and also between groups or intermediate contracting entities (e.g. Physician-Hospital Organizations) and individual physicians and groups. The MCO only needs to report the details on physician incentive plans between groups and individual physicians if those physicians are placed at substantial financial risk by the group's incentive arrangement.

**Potential payments** — The maximum anticipated total payments (based on the most recent year's utilization and experience and any current or anticipated factors that may affect payment amounts) that could be received if use or costs of referral services were low enough. These payments include amounts paid for services furnished or referred by the physician/group, plus amounts paid for administrative costs. The only payments not included in potential payments are bonuses or other compensation not based on referrals (e.g., bonuses based on patient satisfaction or other quality of care factors).

**QISMC (Quality Improvement System for Managed Care Standards and Guidelines)** — Key tools for use by CMS and States in implementing the quality assurance provisions of the Balanced Budget Act of 1997, as amended by the Balanced Budget Refinement Act of 1999. For Medicare, the QISMC document is equivalent to a program manual. As such, the document represents CMS' administrative interpretation of the Medicare + Choice requirements relating to an organization's operation and performance in the areas of quality measurement and improvement and the delivery of health care and enrollee services. The standards and guidelines are derivatives of the regulatory requirements, and are necessary to implement them

**Referral services** — Any specialty, inpatient, outpatient or laboratory services that are ordered or arranged, but not furnished directly. Situations may arise where services not normally considered referral services will need to be considered referral services for purposes of determining if a physician/group is at substantial financial risk. Also, if a physician group contracts with an individual physician or another group to provide services which the initial group cannot provide itself, any services referred to the contracted physician/group should be considered referral services.

**Stop-loss coverage** — Used to ensure that providers face only certain financial limits in treating Medicare managed care beneficiaries. The CMS considers $5,000 for outpatient services and $30,000 for inpatient treatment to be reasonable stop-loss limits. Without stop-loss protections, providers treating one or more high cost patients could face catastrophic financial repercussions.

Organizations whose contracts or subcontracts place physicians or physician groups at substantial financial risk must ensure that those providers have either aggregate or per-patient stop-loss protection. The aggregate stop-loss protection requires coverage of at least 90 percent of the costs of referral services that exceed 25 percent of potential payments. The per-patient stop-loss protection requires coverage of 90 percent of the costs of referral services that exceed specified per-patient limits.

**Substantial financial risk** — An incentive arrangement that places the physician or physician group at risk for amounts beyond the risk threshold, if the risk is based on the use or costs of referral services. The CMS considers providers to be at substantial financial risk when 25 percent or more of their potential MCO reimbursement depends on referrals they may make or services they may provide.

**Withhold** — A percentage of payments or set dollar amounts that are deducted from a the service fee, capitation or salary payment, and that may or may not be returned, depending on specific predetermined factors.

## HCFA PIP reporting instructions to MCOs

### MEDICARE MANAGED CARE ORGANIZATIONS
### PHYSICIAN INCENTIVE PLAN DISCLOSURE INSTRUCTIONS

**General Instructions for Submission:** Hard copy Physician Incentive Plan (PIP) Disclosure is required only for new applicants for Medicare+Choice Contracts, except for Private Fee For Service Plans or non-network Medicare Savings Account Plans. Organizations that already hold a Medicare contract with HCFA will benefit from disclosing electronically. (see PIP Requirements for 1999 on HCFA's web site: *www.hcfa.gov/medicare/physincp/pip-info.htm*)

A hard copy disclosure must be included in the completed application, as directed within the application form. The disclosure should represent physician incentive arrangements for providers within the Managed Care Organization's (MCO) network at the time the application is submitted. A Medicare PIP disclosure includes:

*   The disclosure **Cover Sheet** - This sheet should be the *first page of the PIP submission.*
*   **PIP Disclosure Form** - This form may be duplicated as many times as necessary to capture all of the arrangements in effect amongst the applicant's provider contractors and subcontractors.

**Using the HCFA PIP Worksheet:** The PIP Worksheet should be used as a guide in determining if there is substantial financial risk in any provider arrangement and to assist the MCO in entering data on the disclosure form. MCOs may modify the Worksheet for their internal use as long as the necessary information is captured that will document the data upon audit by regulators. Generally, a separate Worksheet should be used for each type of contractual relationship. Reproduce as many of these forms as needed. Do not submit the Worksheets, but retain them for review by regulators.

The MCOs should analyze the data from different providers to determine whether information from the same type of contracting entity can be aggregated for disclosure to regulators.

MCOs need to determine if they have received all information from their contractors down to the level of physicians, even if the providers bear no risk or there is no substantial financial risk.

*   An intermediate entity should report arrangements with its medical groups and the medical groups' physicians. Even if there is no substantial financial risk between the MCO and the intermediate entity, the lower levels must be disclosed.
*   A medical group should report arrangements with its physicians, even if there is no substantial financial risk between the MCO and the medical group.

Enter the information from the Worksheet on the appropriate lines on the Disclosure Form after checking the specific contractual relationship being disclosed.

**Using the PIP Disclosure Form:** At the top of the Disclosure Form, *print the name* of the MCO, give the Medicare contract number, and the reporting year.

Nine contractual relationships are listed. Disclose one type of relationship on each Form you complete. Submit as many Forms as you need to represent all of the arrangements that serve the MCO's Medicare enrollees.

(1) _____ MCO to physician group
(2) _____ MCO to intermediate entity
(3) _____ MCO to individual physician
(4) _____ Intermediate entity to physician group
(5) _____ Intermediate entity to physician
(6) _____ Physician group to physician group
(7) _____ Physician group to physician
(8) _____ Physician to physician
(9) _____ Intermediate entity to intermediate entity

Each submission from an MCO must include contractual relationships (1), (2) or (3), but MCOs may have multiple arrangements and need all three. Then the MCO must disclose the subcontracting arrangements to the level of the physician. All disclosures relating to one hierarchy of contracts should be stapled together. The hierarchies are:

Selection of:     **(1) _____ MCO to physician group requires a disclosure of:**
        (7) _____ Physician group to physician OR (6) _____ Physician group to physician group
        If (6) is selected, you **must** have (7) to disclose incentives to physicians
        There can be selection of: (8) _____ Physician to physician [this is not required]

Selection of:     **(2) _____ MCO to intermediate entity requires disclosure of :**
        (4) _____ Intermediate entity to physician group OR
        (5) _____ Intermediate entity to physician OR
        (9) _____ Intermediate entity to intermediate entity
        The intermediate entity can have multiple contracting arrangements.

        If (4) is selected, you **must** have (7) to disclose incentives to physicians
        If (9) is selected, you **must** have (4) or (5) to disclose incentives to subcontractors
        There can be selection of: (8) _____ Physician to physician [this is not required]

Selection of:     **(3) _____ MCO to individual physician does not require any subcontract.**
        There can be selection of: (8) _____ Physician to physician [this is not required]

*Single or aggregate disclosure:* The Disclosure Form may reflect a *single* incentive arrangement if that is a unique arrangement. However, MCOs should *aggregate* information on one Form for contractual arrangements that are substantially the same and the stop-loss requirements are the same.

        For example, if an MCO contracts with 100 medical groups under a very similar capitation payment that does not pass referral risk to the groups, the MCO should check category one on the Disclosure Form and disclose all 100 on one Form. If 55 medical groups do not pass risk to their doctors and these 55 groups have a total of 450 physicians under this no risk compensation, then the MCO should check category 7 on a new Disclosure Form and disclose all 450 on the Form. Similarly, the MCO should disclose the physician group-physician incentive arrangements for the other 45 groups, aggregating those physicians who are placed at substantially the same risk and who have the same stop loss requirements, if the risk exceeds the SFR cutoff. Staple together all the forms that relate to the 100 medical groups.

*Entering the information*: After checking the relationship you are disclosing, follow the directions below.

1.  On line 1.A., give the name of a single provider (e.g., the intermediate entity, physician group, or individual physician) when this is the party who receives payment under the provider contract to which the Disclosure Form applies.

    On line 1.B., give the <u>number</u> of aggregated providers whose arrangements are being disclosed. (See the discussion above.) Do not send lists of provider names. For example, if #1 is selected, then give the # of physician groups.

    Line 1.C. asks for disclosure of Federally Qualified Health Centers and Rural Health Clinics (FQHC/RHCs). Please distinguish FQHC/RHCs by using a separate Disclosure Form to report each FQHC/RHC, however you may aggregate those with substantially the same incentive arrangements. If the MCO is owned or controlled by a consortium of FQHC/RHCs or has FQHC/RHCs in its network, be sure to indicate this on the cover sheet.

    Line 1.D. applies only to physicians of medical groups (selection of #7 contracting type) and asks for a breakout of the number of physicians who are members of the group and those who independently contract with the group. Members are typically owners, partners, or employees of the medical group.

    If either arrangement with providers that are intermediate entities (IE) is selected on the Disclosure Form (either #2 or #9), complete items 1.A - 1.C only since stop loss requirements do not apply to intermediate entities (IE). However, fully complete disclosures for IE's relationships with provider groups and their physicians (#4 <u>and</u> #7) and IE with individual physicians (#5) because stop loss requirements apply to these levels.

2.  Question 2 identifies whether the incentive arrangement transfers <u>any</u> risk. A capitation payment is considered a transfer of risk for this question, even if the capitation is for services provided only by the contracting physician or physician group. [This information is found on Question 2a of the Worksheet.]

    *Check "yes"or "no"* as applicable. If "no" is checked, then this disclosure is complete. If "yes" is checked, identify the type of risk transfer; then go to Question 3.

    Risk transfer choices are: "capitation, bonus, withhold, percent of premium or other." *Check the appropriate choice* or choices; more than one choice should be checked if the arrangement has features of each type of risk-sharing.

    A choice of "Other" is provided if a combination of the four types of risk arrangement does not define the arrangement. For the purpose of this Disclosure Form, the obligation for the provider to fund deficits is considered as a "withhold." A bonus for low utilization of referral services is considered to be risk transference.

    The risk-sharing arrangement may be described briefly on the Disclosure Form, particularly if 'other' is selected. [This information is found on Question 3 of the Worksheet.]

3.  Question 3 identifies whether risk is transferred for referrals. [This information is found on Question 2b of the Worksheet.] *Check "yes"or "no"* as applicable. A bonus for low utilization of hospital, specialist or other services is considered to be a risk for referral services. If "no" is checked, then this disclosure is complete. If "yes" is checked, go to Question 4 to identify the type of risk transfer.

4.  Question 4 identifies the type of risk-sharing arrangement. [This information is found on Question 3 of the Worksheet.]  See #2 above for instructions on identifying risk arrangements.

5.  The percentage of risk *attributable to referrals only* should be stated in Question 5.  This percentage corresponds to the "% Of Total Compensation At Risk For Referrals" from Question 3 of the Worksheet.  If the percentage is equal to or below 25 %, the arrangement is not considered to be at substantial financial risk and this disclosure is complete.  If above 25 percent, proceed to Question 6.

6.  Information for Question 6, about the number of patients, is found on Question 1 of the Worksheet.  Specific criteria must be met before pooling is allowed, as stated in regulations. Any entity that meets all five criteria (below) required for the pooling of risk will be allowed to pool that risk in order to determine the amount of stop-loss required by the regulation.  If the number of patients is 25,000 or fewer, then go to Question 7.  If greater than 25,000, the disclosure is complete.

  (1)  Pooling of patients is otherwise consistent with the relevant contracts governing the compensation arrangements for the physician or group (i.e., no contracts can require risk be segmented by MCO or patient category);
  (2)  The physician or group is at risk for referral services with respect to each of the categories of patients being pooled;
  (3)  The terms of the compensation arrangements permit the physician or group to spread the risk across the categories of patients being pooled (i.e., payments must be held in a common risk pool);
  (4)  The distribution of payments to physicians from the risk pool is not calculated separately by patient category (either by MCO or by Medicaid, Medicare, or commercial); and
  (5)  The terms of the risk borne by the physician or group are comparable for all categories of patients being pooled.

  Note that pooling and stop-loss requirements applicable to a group cannot be extended to a subcontracting level.  For example:
  • A physician group has greater than 25,000 patients that meet pooling criteria.
  • This group contracts with another physician group, which has 25,000 or fewer patients and bears risk for referrals above 25%.

  The first group is exempt from stop-loss requirements; the second group must comply with stop-loss requirements and the MCO must comply with survey requirements.

7.  For Question 7, note the type and the levels or thresholds of the stop-loss insurance if stop-loss coverage for the physician group or physician is required.

  Check the type of stop-loss, aggregate, individual per patient, or other coverage, and give the threshold as a *dollar amount*. Also, briefly describe the stop-loss coverage.  If there is more than one threshold level, note that there are multiple levels and include an explanation.  If "O" for other arrangements is checked or there are arrangements that merit explanation, describe the coverage ( attach a sheet for additional space).

  A description should include whether the coverage is:
  (1)  Combined (professional and institutional);
  (2)  Broken down into institutional, professional and other components;
  (3)  The deductible, co-insurance percentage, maximum liability/pay-out by the policy;
  (4)  Whether the stop-loss coverage applies to all costs or only the cost of referral services; and

(5)    Any other key features of the coverage.

This information is found in Question 5 of the Worksheet.

If providers can be aggregated because of the similarity of risk arrangements, the MCO should sort the providers by stop loss requirements and then use a separate Disclosure Form for each requirement.  For example: 100 groups exceed the 25% risk threshold; 50 have a patient pool exceeding 25,000 (under a very similar risk arrangement); 25 have a patient pool of between 1,001 and 5,000  (under a very similar risk arrangement); and another 25 of these groups have a patient pool of between 8,001 and 10,000.  The MCO should use three Disclosure Forms to represent the groups that aggregate into three stop loss requirements.

**NOTE**: For guidance and clarification on determining substantial financial risk, pooling of risk, and stop loss requirements, see HCFA's extensive 1997 PIP Qs & As document, available at HCFA's web site.

<u>PUBLIC REPORTING BURDEN:</u>

"According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.  The valid OMB control number for this information collection is 0938-0700. The time required to complete this information collection is estimated to average 100 hours per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection.  If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: HCFA, P.O. Box 26684, Baltimore, Maryland 21207 and to the Office of the Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C.  20503."

HCFA will accept copies of state-mandated submissions in lieu of the Disclosure Form if such submissions include all the necessary elements of information as required by HCFA and statute.  MCOs may maintain records supporting the Disclosure Forms in any format, as long as these records sufficiently document the disclosure information the MCO submits and are available for inspection by appropriate regulators.

**Cover Sheet**

**Managed Care Organization (MCO) Disclosure Compliance Package
Under the Physician Incentive Regulation
Submitted to Health Care Financing Administration (HCFA)
or State Medicaid Agencies (SMA)**

**Name of MCO** _____

**Medicare Contract #H** _____        (PIP applies to Medicare+Choice, except for PFFS and non-
                                              network MSA, and §1876 cost-based contractors)

**MCO is owned/controlled by a Federally Qualified Heatlh Center or Rural Health Clinic (FQHC/RHC) or
consortium of FQHC/RHCs or includes FQHC/RHCs in its network:**

                 **YES** _____    **NO** _____

**Printed Name of MCO Contact Person** _____        **Phone #** _____

**This represents our organization's disclosure compliance package submitted to HCFA or SMA.  I certify
that the information made in this disclosure is true, complete and current to the best of my knowledge,
information  and belief and is made in good faith.**

**Printed Name of CEO** _____

**Signature of CEO** _____        **Date:** _____

**Note:**     **Please include this Cover Sheet as the first page of the MCO
Disclosure Compliance Package.**

OMB No. 0938-0700

# PHYSICIAN INCENTIVE PLAN DISCLOSURE FORM

Managed Care Organization (MCO) Name: _____

Contract Number:  H# _____

Reporting year _____

**CHECK ONE** - Use this  Disclosure Form to disclose the incentive arrangement between the first party (in the list below) that makes payments under a provider contract to the second party (underlined on the list below) for services to the MCO's Medicare (or Medicaid) enrollees. Repeat forms as many times as needed to capture the various levels of contractual relationships. [1] For simplicity, "provider" is used here to refer to the second party.  See instructions under "Single or aggregate disclosure" for aggregating either the first or second party. [2]

(1) _____ MCO to <u>physician group</u>             (2) _____ MCO to <u>intermediate entity</u>

(3) _____ MCO to <u>individual physician</u>        (4) _____ Intermediate entity to <u>physician group</u>

(5) _____ Intermediate entity to <u>physician</u>   (6) _____ Physician group to <u>physician group</u>

(7) _____ Physician group to <u>physician</u>       (8) _____ Physician to <u>physician</u>

(9) _____ Intermediate entity to <u>intermediate entity</u>

1.     **The provider(s) named or counted should be the underlined provider in the line you checked above.**

  A.    Name of Provider: _____

      Give name if <u>one</u> provider arrangement is being disclosed on this form.

   - OR -

  B.    Number of Providers:  _____

      Give # of providers who are aggregated on this form; e.g., if #1 is selected, then give the # of groups; physician groups can be aggregated if risk arrangements are substantially the same and stop loss requirements are the same.

1. C.    Is provider an FQHC/RHC?  Yes _____;  No _____

      If providers are aggregated, see instructions for disclosing FQHCs.

1. D.    If #7 above is selected, give number of physicians who are:

      Members (e.g. owners, employees) of the group #_____;  Contracted with the group  #_____

      These numbers must equal the number of physicians given in I.B.

NOTE:  If either #2 or #9 is checked above, this form is complete since stop loss requirements do not apply to intermediate entities (IE).  However, be sure to complete disclosures for the IE's relationships with provider groups and their physicians (#4 <u>and</u> #7) and with individual physicians (#5) because stop loss requirements apply to these levels.

2.  Is risk transferred to the provider?   Yes _____;  No _____
    Note:  A bonus for low utilization of referral services is considered to be risk transference.
    If YES, check all the risk transfer methods with the provider and go to question 3.

    Capitation _____; **Bonus** _____; **Withhold** _____;  **Percent of Premium** _____;  **Other** _____
    Note:  Consider the obligation for the provider to fund deficits as a "withhold".
    Describe briefly:


3.  Is risk transferred for referrals?  Yes _____;  No _____
    Note:  A bonus for low utilization of hospital, specialist or other services is considered to be a risk for
    referral services.
    If YES, then proceed to next question.

4.  Check all the referral risk transfer methods with the provider and go to question 5.

    Capitation _____; **Bonus** _____; **Withhold** _____;   **Percent of Premium** _____;  **Other** _____
    Note:  Consider the obligation for the provider to fund deficits as a "withhold".
    Describe briefly:


5.  What percent of the total potential payment is at risk for referrals:  _____%
    If above 25% proceed to question 6; if 25% or below you have completed this disclosure.

6.  Number of MCO patients served by the provider **or** the number of pooled patients, if patients can be pooled
    (see criteria for pooling in the instructions).  Check one category:

    **A** __ 1-1,000; **B** __ 1,001-5,000; **C** __ 5,001-8,000; **D** __ 8,001-10,000; **E** __ 10,001- 25,000; **F** __ 25,000+

    If number is 25,000 or below, answer #7.  If the number exceeds 25,000, you have completed this
    disclosure.

7.  State the type and amount of stop loss insuring the physician group and/or physician:

    <u>Type</u>: Aggregate _____; Individual _____; Other _____ (describe)

    <u>Threshold</u>: Professional $_____ ; Institutional $_____ ; Combined $_____
    Describe briefly:

*DO **NOT** SUBMIT THESE FORMS TO HEALTH CARE FINANCING ADMINISTRATION OR STATE MEDICAID AGENCIES. MCO OR OTHER ENTITY COMPLETING FORM SHOULD RETAIN WORKSHEET AND HAVE IT AVAILABLE FOR REGULATORS IN THE EVENT OF AN AUDIT.*

## HCFA PHYSICIAN INCENTIVE PLAN WORKSHEET

Note:    Each Worksheet should reflect a single incentive arrangement or an aggregate of multiple arrangements that are the same or similar.

The Worksheet should be completed for the contractual arrangements that will be in effect on January 1 of the disclosure year.

## General Information:

_____
(Print name of entity completing this Worksheet - the first entity in the line checked below)

This Worksheet is being completed to describe the incentive arrangement between (check one below):

(1) _____ Managed Care Organization (MCO) to physician group
(2) _____ MCO to intermediate entity
(3) _____ MCO to individual physician
(4) _____ Intermediate entity to physician group
(5) _____ Intermediate entity to physician
(6) _____ Physician group to physician group
(7) _____ Physician group to physician
(8) _____ Physician to physician
(9) _____ Intermediate entity to intermediate entity

Specify parties to contract: _____
                              (the first entity in the line checked above)

and _____
        (the entity underlined in the line checked above)

**[NOTE: If Worksheet covers multiple contracts, name parties on a separate attachment.]**

For the purposes of the regulation, the following definitions should be used:

**Intermediate Entity** = a physician-hospital organization ("PHO"), integrated delivery system, or individual practice association ["IPA"] that subcontracts with physician groups or with another IPA.

**Physician Group** = a partnership, association, corporation, or other group that distributes income from the practice among members, or an IPA that contracts with individual physicians.

NOTE:   If either #2 or #9 is checked above, stop loss requirements do not apply to intermediate entities (IE). Therefore, such entities may skip to the end of the worksheet and complete the signature and date information. However, be sure to complete disclosures for IE's relationships with provider groups and their physicians (#4 and #7) and with individual physicians (#5) because stop loss requirements apply to these levels.

> Physician Group Member Panel Size: *Estimated members as of contract year being disclosed.*

1.)    State below the breakdown of total members served under the incentive arrangement(s) to which this Worksheet applies by patient type (e.g. Medicare, Medicaid, and commercial). Note: A physician group can pool to arrive at the total number of MCO members to which this Worksheet applies if the criteria described in the HCFA Disclosure Guidance or Disclosure Instructions are met. If pooling is used, attach an explanation of how it was done to the Worksheet.

Total Commercial members    _____
Total Medicare members    _____
Total Medicaid members    _____

Total    _____

Note: If the total Member Panel Size for commercial, Medicare and/or Medicaid exceeds 25,000, complete Worksheet questions 2-4, then skip to the end of the Worksheet and provide signature and date information. Retain the Worksheet for your records.

> Physician Incentive Plan Information:

|  | Medicare | Medicaid |
|---|---|---|
| 2a.) Does the payment arrangement transfer risk? For example, bonuses, withholds, and capitation (whether or not for referral services) transfer risk. Fee-for-service arrangements without withholds or bonuses do not transfer risk. | YES_____  NO _____ | _____  _____ |
| 2b.) Does the physician incentive plan (e.g., capitation, withholds, or bonuses) cover services not furnished by the physician or physician group? | YES_____  NO _____ | _____  _____ |

(Note: Bonuses or withhold arrangements based on utilization or cost factors are included in these compensation arrangements. Bonus arrangements based solely on quality or access factors are not considered.)

**If response to 2a or 2b is NO, skip to last page and complete information about person completing form.**

3.)    If you answered YES to Question 2b, please check below the type or types of incentive(s) and fill in the percentage(s) where indicated and applicable.  Note: If the contract does not limit the amount of risk for referral services to a set percentage, insert "100" as the percentage.  Maximum compensation is defined as the maximum dollar amount that a physician or physician group might receive for either direct or referral services, or their administration.  It does not include bonuses that are not related to referral levels.  Maximum compensation means maximum possible theoretical compensation without regard to historical experience.

---

**Medicare Arrangements:**

line 1_____**Withhold**        _____% Withhold        [where percent of withhold = $\dfrac{\text{maximum possible withhold \$\$}}{\text{maximum compensation \$\$}}$

]

line 2_____**Bonus**        *____% Bonus        [where percent of bonus   = $\dfrac{\text{maximum possible bonus \$\$}}{\text{maximum compensation \$\$}}$  ]

　　　　*    *Do not include bonuses based on quality or access in either the calculation of maximum possible bonus or the maximum compensation.*

line 3_____**Capitation**        _____% Capitation  [where percent of capitation = $\dfrac{\text{maximum capitation \$ entity is potentially liable for referral services}}{\text{maximum compensation \$\$}}$  ]

_____% Of Total Compensation At Risk For Referrals (add lines 1, 2& 3)

IF % OF TOTAL COMPENSATION AT RISK FOR REFERRALS > 25% ,
THIS IS SUBSTANTIAL FINANCIAL RISK

*Maximum compensation* = maximum $ amount that might be received.

The following information is requested of you on a voluntary basis.  Bonuses unrelated to referral levels are not to be included in the determination of the referral risk percentage, but HCFA would like to learn more about their use in order to judge whether they should be included in the calculation in future years.

line 4 _____**Quality bonuses** _____%   [where percent of bonus = $\dfrac{\text{maximum possible quality bonus \$\$}}{\text{maximum compensation \$\$}}$        ]

---

**Medicaid Arrangements:**

line 1 ___**Withhold**        ___% Withhold        [where percent of withhold = <u>maximum possible withhold $$</u>
                                                                              maximum compensation $$

]

line 2 ___**Bonus**        *___% Bonus      [where percent of bonus   =   <u>maximum possible bonus $$</u>
                                                                              maximum compensation $$   ]

        *        *Do not include bonuses based on quality or access in either the calculation of maximum
                possible bonus or the maximum compensation.*

line 3 ___**Capitation**        ___% Capitation  [where percent of capitation
                                    =  <u>maximum capitation $ entity is potentially liable for referral services</u>
                                        maximum compensation $$ ]

                ___% Of Total Compensation At Risk For Referrals (add lines 1, 2& 3)

        IF % OF TOTAL COMPENSATION AT RISK FOR REFERRALS > 25% ,
                THIS IS SUBSTANTIAL FINANCIAL RISK

        *Maximum compensation* = maximum $ amount that might be received.

The following information is requested of you on a voluntary basis.  Bonuses unrelated to referral levels are not to
be included in the determination of the referral risk percentage, but HCFA would like to learn more about their use
in order to judge whether they should be included in the calculation in future years.

line 4 ___**Quality bonuses** ___%   [where percent of bonus = <u>maximum possible quality bonus $$</u>
                                                                              maximum compensation $$        ]

Note:  If no substantial financial risk is being transferred to providers who provide services to Medicare or Medicaid enrollees,
complete the date and signature information at the end of the Worksheet.

## Stop-Loss Information:  Fill in if % Of Total Compensation At Risk for Referrals Is > 25%

If incentive arrangements place either a physician or physician group at substantial financial risk, there must be aggregate or per patient stop-loss protection.  Aggregate stop-loss protection must cover 90% of the costs of referral services that exceed 25% of potential payments.  Per patient coverage may be through either single combined coverage, or through separate coverage for institutional and professional services. Per patient stop-loss protection must cover at least 90% of the referral costs that exceed the following threshold, or attachment point, amounts:

| Panel Size | Single Combined Limit | Separate Institutional Limit | Separate Professional Limit |
|---|---|---|---|
| 1-1000 | $ 6,000 | $10,000 | $3,000 |
| 1,001 - 5000 | $30,000 | $40,000 | $10,000 |
| 5,001 - 8,000 | $40,000 | $60,000 | $15,000 |
| 8,001 - 10,000 | $75,000 | $100,000 | $20,000 |
| 10,001 - 25,000 | $150,000 | $200,000 | $25,000 |
| > 25,000 | none | none | none |

4.) Name of carrier/entity(s) through which stop-loss is provided:

_____    ____

Is this carrier/entity:

stop-loss carrier

____    MCO
____    intermediate entity
____    physician

_____    ____

Is this carrier/entity:

stop-loss carrier

____    MCO
____    intermediate entity
____    physician

5.) Describe the stop-loss coverage that covers the incentive arrangement(s) that is being reported on this Worksheet,  for:

|  | Medicare | Medicaid |
|---|---|---|
| (A) *Professional services*: | | |
| Deductible | _____ | _____ |
| Co-insurance percent | _____ | _____ |
| Maximum liability | _____ | _____ |

*Does this cover (check one below):*

| | | Medicare | Medicaid |
|---|---|---|---|
| Individual Physicians | YES | _____ | _____ |
| | NO | _____ | _____ |
| Physician Group(s) | YES | _____ | _____ |
| | NO | _____ | _____ |

| | | Medicare | Medicaid |
|---|---|---|---|
| *Is this stop-loss coverage:* | | | |
| Per patient | YES | _____ | _____ |
| | NO | _____ | _____ |
| Aggregate | YES | _____ | _____ |
| | NO | _____ | _____ |

For professional services, describe the services
or nature of costs covered under the stop-loss,
including any exclusions,  variations in coverage
amounts, and whether the stop-loss coverage applies
to all costs or only referral costs.  (If additional
space is required for this response, attach
additional pages.)

| | | Medicare | Medicaid |
|---|---|---|---|
| (B) *Hospital/Institutional Services:* | | | |
| Deductible | | _____ | _____ |
| Co-insurance percent | | _____ | _____ |
| Maximum liability | | _____ | _____ |

*Does this cover:*

| | | Medicare | Medicaid |
|---|---|---|---|
| Individual Physicians | YES | _____ | _____ |
| | NO | _____ | _____ |
| Physician Group(s) | YES | _____ | _____ |
| | NO | _____ | _____ |

*Is this stop-loss coverage:*

| | | Medicare | Medicaid |
|---|---|---|---|
| Per patient | YES | _____ | _____ |
| | NO | _____ | _____ |
| Aggregate | YES | _____ | _____ |
| | NO | _____ | _____ |

For hospital/institutional services, describe the
services or nature of costs covered under the
stop-loss, including any exclusions,  variations in
coverage amounts, and whether the stop-loss
coverage applies to all costs or only referral costs.
(If additional space is required for this response,
attach additional pages.)

|  | Medicare | Medicaid |
|---|---|---|
| **(C) *Combined (Professional and Institutional):*** | | |
| Deductible | _____ | _____ |
| Co-insurance percent | _____ | _____ |
| Maximum liability | _____ | _____ |

*Does this cover:*

|  |  | Medicare | Medicaid |
|---|---|---|---|
| Individual Physicians | YES | _____ | _____ |
|  | NO | _____ | _____ |
| Physician Group(s) | YES | _____ | _____ |
|  | NO | _____ | _____ |

*Is this stop-loss coverage:*

|  |  | Medicare | Medicaid |
|---|---|---|---|
| Per patient | YES | _____ | _____ |
|  | NO | _____ | _____ |
| Aggregate | YES | _____ | _____ |
|  | NO | _____ | _____ |

For combined forms of stop-loss, describe the   _____
services or nature of costs covered under the    _____
stop-loss, including any exclusions,  variations  _____
in coverage amounts, and whether the stop-loss   _____
coverage applies to all costs or only referral costs.  _____
(If additional space is required for this response,  _____
attach additional pages.)                        _____

## Date and Signature Information

Printed name and title of person who completed the Worksheet: _____

Name of organization/employer of person listed above: _____

Telephone:_____

Date: _____

I certify that the information made in this disclosure is true, complete and current to the best of my knowledge and belief and is made in good faith.

_____
Signature

DO NOT SUBMIT THESE FORMS TO HEALTH CARE FINANCING ADMINISTRATION OR STATE MEDICAID AGENCIES.  MCO OR OTHER ENTITY COMPLETING FORM SHOULD RETAIN WORKSHEET AND HAVE AVAILABLE FOR REGULATORS IN THE EVENT OF AN AUDIT.

# Other Quality Targets Managed Care Organizations Pay Providers Incentives For

Our survey found some managed care organizations collect additional information about quality and access goals in addition to data related to financial targets. The CMS does not collect this information in its physician incentive plan reporting. The managed care organizations pay incentives for meeting goals in areas that we broadly categorized as preventive care services and disease management and other quality measures. Many Medicare + Choice managed care organizations use multiple incentive areas in their contracts with providers.

The following two tables represent each of the broad categories describing the quality goals managed care organizations reported to us. In each category there are specific incentive targets that managed care organizations use in contracts with individual physicians, physician groups, or intermediate entities. Since managed care organizations can use multiple types of incentives in their contracts, a single managed care organization contract can be represented more than once in each table.

The Preventive Care Services and Disease Management table shows the first category for which managed care organizations reported offering incentives. No managed care organizations reported using incentives for providing services to particular ethnic groups. However, incentives to treat or screen for specific illnesses (e.g., diabetes) may indirectly affect the health and well-being of particular ethnic groups.

| Preventive Care Services and Disease Management | | | | | | |
|---|---|---|---|---|---|---|
| **Target Areas** | **Contracts with Individual Physicians** | | **Contracts with Physician Groups** | | **Contracts with Intermediate Entities** | |
| | Yes | No | Yes | No | Yes | No |
| **Treating Chronic Illnesses** | 29 | 141 | 24 | 158 | 21 | 148 |
| **Immunizations** | 21 | 149 | 21 | 161 | 18 | 151 |
| **Diabetes Eye Exams** | 18 | 152 | 24 | 158 | 21 | 148 |
| **Cancer Screening** | 20 | 150 | 25 | 157 | 21 | 148 |
| **Hypertension Screening** | 16 | 154 | 16 | 166 | 13 | 156 |
| **Preventive Care Goals** | 25 | 145 | 30 | 152 | 27 | 142 |
| **Services for Particular Ethnic Groups** | 0 | 170 | 0 | 182 | 0 | 169 |

The following table demonstrates that managed care organizations target areas like continuing education to encourage providers to remain knowledgeable in current medical practices and technology. The managed care organizations reward providers for medical charts thoroughness to help ensure records are current and organized. Thorough medical records facilitate quality medical care and also allow other managed care organizations providers to obtain accurate medical information to appropriately treat beneficiaries.

| Other Quality Indicators | | | | | | |
|---|---|---|---|---|---|---|
| Target Areas | Contracts with Individual Physicians | | Contracts with Physician Groups | | Contracts with Intermediate Entities | |
| | Yes | No | Yes | No | Yes | No |
| **Continuing Education** | 28 | 142 | 21 | 161 | 19 | 150 |
| **Medical Charts Thoroughness** | 21 | 149 | 12 | 170 | 2 | 167 |

# CMS Comments on this Report

 DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

**DATE:**     MAR 14 2002

**TO:**     Janet Rehnquist
Inspector General

**FROM:**     Thomas A. Scully
Administrator

**SUBJECT:**     Office of Inspector General (OIG) Draft Report: *Physician Incentive Plan
Reporting for Medicare+Choice Organizations* (OEI-05-00-00010)

Thank you for the opportunity to review and comment on the above-referenced draft report
concerning physician incentive plan (PIP) reporting for Medicare+Choice (M+C) organizations.

The Centers for Medicare & Medicaid Services (CMS) staff has decided to modify the PIP
reporting system requirements in order to reduce the administrative burden on M+C
organizations. When the PIP requirements were enacted, the Congress expressed concern that
financial incentives could lead to physicians hesitating to provide needed referral services. Our
decision to modify the reporting requirements may raise concerns that this modification could
lead to a reduction in the quality of care provided to, and received by beneficiaries. However,
we have taken a number of steps to improve the quality of care provided by M+C organizations,
such as the collection of Health Plan Employer Data Information Sets and the Consumer
Assessment of Health Plans Survey. We have also implemented a number of other quality
improvement projects. These improved quality assessments provide direct measures of quality
and access that could eliminate the need to receive annual reports on PIP arrangements. In
addition, this proposed approach would be consistent with reporting requirements of private
accrediting organizations, such as the National Committee for Quality Assurance which only
reviews incentive plans when investigating quality of care problems.

The CMS concurs with OIG's recommendation that the current PIP reporting system be replaced
with other approaches that are more effective and less burdensome. Therefore, we have
informed the M+C organizations that 2002 PIP disclosure is delayed until further notice. We are
working to modify the PIP regulations at 42 CFR 422.208/210 in order to reduce the
administrative burden on M+C organizations.

We appreciate the effort that went into this report and the opportunity to review and comment on
the issues it raises. We look forward to working with OIG on this and other issues pertinent to
M+C organizations.

Attachment

# ACKNOWLEDGMENTS

This report was prepared under the direction of William C. Moran, Regional Inspector General for Evaluation and Inspections in Chicago and Natalie Coen, Deputy Regional Inspector General.  Other principal Office of Evaluation and Inspections staff who contributed include:

Joe Penkrot, *Project Leader*

Marco A. Villagrana, *Lead Analyst*

Erin Guay, *Program Analyst*

Tricia Fields, *Program Analyst*

Linda Frisch, *Program Specialist*

Tricia Davis, *Program Specialist*