**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al*. ) | |
| ) | |
| *Individual Plaintiffs*, ) | |
| ) | |
| v.    ) | **Case No. 1:07-cv-1034 (RMC)** |
| ) | |
| U.S. Department of Health and Human ) | |
| Services,    ) | |
| and    ) | |
| ) | |
| Michael Leavitt, Secretary ) | |
| U.S. Department of Health and Human ) | |
| Services    ) | |
| ) | |
| *Defendants*.    ) | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, plaintiffs Concilio de Salud de Loiza, Inc. and Junta del Centro de Salud Comunal Dr. Jose S. Belaval, Inc. hereby submit this Motion for Preliminary Injunction.

To the extent that this Court is concerned about granting plaintiffs' September 24, 2007 Motion for Partial Summary Judgment, plaintiffs proffer this preliminary injunction motion in order to allow plaintiffs an opportunity for immediate relief pending resolution of the entire case on the merits. This preliminary injunction motion is based on the violations of statute set forth in plaintiffs' September 24, 2007 Motion for Partial Summary Judgment, the December 20, 2007 Opposition to Defendant's Cross-Motion for Summary Judgment and the facts set forth in the two Declarations of Jose Orlando Colon and Plaintiffs' September 24, 2007 Statement of Facts in Support of Partial Summary

Judgment.

Because the supporting memorandum sets forth material violations of the Medicaid statute in relation to the prior approval requirement and Medicaid managed care requirements, plaintiffs' motion meets the standard for preliminary injunction set forth in *United States v. City and County of San Francisco*, 310 U.S. 16, 31, 60 S.Ct. 749, 751 (1940);  *Sierra Club v. Coleman*, 405 F. Supp. 53, 54 (D.D.C. 1975); *Securities Industry Association v. Board of Governors of Federal Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986) pertaining to a violation of statute.[1]

The Secretary's infringement of sections 1903(m) and 1932 of the Social Security Act creates an instance where preliminary injunction must be granted.  In *United States v. City and County of San Francisco*, the Supreme Court granted an injunction preventing San Francisco from selling rights to distribute power to a private utility for a specific grant of land.  *United States v. City and County of San Francisco*, 310 U.S. 16, 31, 60 S.Ct. 749, 751 (1940).  The court awarded the injunction without performing the customary balancing of equities because such distribution violated a federal statute.  *Id*. According to the court, "equitable doctrines…do not militate against the capacity of a court of equity as a proper forum in which to make a declared policy of Congress effective."  *Id*.

---

[1]  In *Securities Industry Association v. Board of Governors of Federal Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986), Judge Joyce Hens Green specifically noted that while a Supreme Court decision that followed *U.S. v. San Francisco* held that a finding of a statutory violation did not lead automatically to the issuance of an injunction, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S. Ct. 1798, 1803-4, 72 L. Ed. 2d 91 (1982), the critical question for the Court to determine is whether an injunction "is essential 'to make a declared policy of Congress effective'."  *Securities Industry Assoc*., 628 F. Supp. at 1443-3.  Judge Green held that Congress had already "dictated the balance of equities" and as such the Court need not look further.

The *U.S. v. San Francisco* holding was further applied in D.C. District Court.  In *Sierra Club v. Coleman*, the District Court granted preliminary injunction against construction by the Federal Highway Administration that was in violation of the National Environmental Policy Act.  *Sierra Club v. Coleman*, 405 F. Supp. 53, 54 (D.D.C. 1975).  According to the court "when federal statutes have been violated, it has been the long-standing rule that a court should not inquire into traditional requirements for equitable relief."  *Id*. (quoting *Atchison, Topeka, and Santa Fe Railway Co. v. Callaway*, 382 F. Supp. 610, 623 (D.D.C. 1974).  The District Court went a bit further in *Securities Industry Association v. Board of Governors of Federal Reserve System* by holding "where federal statutes are violated, the guiding principle for determining the propriety of equitable relief is whether an injunction is necessary to effectuate the congressional purpose behind the statute."  *Securities Industry Association v. Board of Governors of Federal Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986).

By failing to properly pre-approve the HMO contracts in accordance with section 1903(m), the Secretary has violated federal law.  *See* 42 U.S.C. § 1396b(m)(2)(A)(iii).  This leads to further violation of federal law in the form of section 1932, which requires 1903(m) compliance.  *See* 42 U.S.C. § 1396u-2.  These violations call for preliminary injunction because such action "is necessary to effectuate the congressional purpose behind the statute[s]."  *Securities Industry Association*, 628 F. Supp. at 1443.  Congress instituted the prior approval condition of 1903(m) to strengthen disclosure requirements that are in place to ensure federal funds are properly used.  H.R. Rep. No. 99-727, at 123 (1986).  Preliminary injunction is necessary here to protect the "financial integrity of the program."  *Id*. at 122.  Overall, balancing of equities for granting preliminary injunction

is not necessary here because the Secretary violated federal statutes. *City and County of San Francisco*, 310 U.S. at 31, 60 S.Ct. at 751; *Sierra Club*, 405 F. Supp. at 54. The Secretary's violation of 1903(m) and 1932 requires preliminary injunction to protect the congressional purpose behind these federal laws. *Securities Industry Association*, 628 F. Supp. at 1443.

Plaintiffs also meet the traditional four-part test for preliminary injunction requiring: (i) likelihood of success on the merits; (ii) irreparable harm to the moving party; (iii) no harm to the non-moving party; and (iv) service to the public interest. *See, e.g., Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1977); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977). The numerous violations of the Medicaid statute set forth in the accompanying memorandum support the likelihood of success on the merits. Plaintiff health centers and the patients whose interests they represent (see Plaintiffs' Memorandum in Support of Partial Summary Judgment at 27-28; 42 C.F.R. § 51c.304(b)) have suffered and continue to suffer irreparable harm not only in terms of the impairment of the health centers' financial circumstances through these violations, but also in relation to patients' ability obtain FQHC services - - a mandatory service under the Medicaid program. 42 U.S.C. §§ 1396d(a)(2)(C), 1396a(a)(10)(A), and 1396d(l)(2)(A). There would be no harm to HHS in correcting the violations of statute and the public interest would clearly be served by requiring HHS to compel the Commonwealth's compliance and ensuring that the plaintiff health centers can continue to serve their patients and receive the level of payments federal law requires.

A proposed order is submitted herewith.

Pursuant to Local Rule 7(f), plaintiffs respectfully request an oral hearing as to this motion.

Respectfully submitted,

Date: December 21, 2007

/s/ James L. Feldesman
James L. Feldesman ( D.C. Bar No. 23796)
jfeldesman@ftlf.com
Kathy S. Ghiladi (D.C. Bar No. 435484)
kghiladi@ftlf.com
Robert A. Graham (D.C. Bar No. 450345)
rgraham@ftlf.com

Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C.  20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al*.    ) | |
|    ) | |
| *Individual Plaintiffs*,    ) | |
|    ) | |
| v.    ) | **Case No. 1:07-cv-1034 (RMC)** |
|    ) | |
| U.S. Department of Health and Human    ) | |
| Services,    ) | |
| and    ) | |
|    ) | |
| Michael Leavitt, Secretary    ) | |
| U.S. Department of Health and Human    ) | |
| Services    ) | |
|    ) | |
| *Defendants*.    ) | |

## PROPOSED ORDER GRANTING PRELIMINARY INJUNCTION

Upon consideration of the motion for preliminary injunction filed by plaintiffs

Concilio de Salud de Loiza, Inc. ("Loiza") and Junta del Centro de Salud Comunal Dr.

Jose S. Belaval, Inc. ("Belaval"),the opposition thereto, and the entire record in this case,

the Court hereby finds a preliminary injunction is warranted and ORDERS that:

(1)     the defendant Secretary immediately cease providing federal financial

participation ("FFP) to the Commonwealth of Puerto Rico for any costs associated with

health maintenance care organization ("HMO") contracts that have not been approved;

(2)     the defendant Secretary immediately cease providing FFP to the

Commonwealth of Puerto Rico for any costs associated with HMO contracts that have

been approved, but pursuant to which FQHC payments to the plaintiff health centers are

not being made in accordance with statute.  During the time that this preliminary

injunction is in effect, plaintiff health centers shall have the right to provide services to patients within their catchment area (as defined in 42 C.F.R. § 51c.102(b)) and receive payment directly from the Commonwealth of Puerto Rico's Department of Health (and not the HMO) on a fee-for-service basis in the same manner those payments would have been made had the Commonwealth not opted to use managed care in its Medicaid program under 42 U.S.C. § 1396u-2.   FFP shall be available for all such fee-for-service payments to plaintiff health centers during the time this preliminary injunction is in effect.  Plaintiff health centers shall have the ability to contact patients and potential patients within their catchment area and advise as to the availability and benefits of receiving their health care services from the FQHCs.  The Secretary shall ensure that the Commonwealth makes provision for ensuring that the HMOs operating in the FQHCs' catchment areas do not interfere with the health centers' ability to see and treat such patients.

Date: _____        _____
                              The Honorable Rosemary M. Collyer
                              United States District Court

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al*. | ) | |
| | ) | |
| *Individual Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-1034 (RMC) |
| | ) | |
| U.S. Department of Health and Human Services, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael Leavitt, Secretary | ) | |
| U.S. Department of Health and Human Services | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT
OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

The Medicaid FQHC program was, according to Congress when it legislatively initiated

that program in 1989, designed to ensure that federally funded (under Section 330 of the Public

Health Service Act) health centers (labeled FQHCs for Medicaid purposes)) were fully paid by

the State Medicaid programs for their costs of treating Medicaid beneficiaries rather than the

limited per visit fees the centers were then being paid.  The result sought by Congress was an end

to those limited fees, which forced the centers to subsidize their Medicaid efforts with their

Section 330 grant funds.  Under HHS' derelict oversight of the FQHC requirements, Puerto Rico

not only has not paid those costs, but also allowed the HMOs that manage its Medicaid program

to tax the Puerto Rico health centers each year $38 million, which is $6 million more than the entire amount of the centers' Section 330 grants. *See* Ex. A to Plaintiffs S.J. Motion, at 10, Kelleher report.

Puerto Rico, except for payments ordered by the federal courts to the two plaintiffs herein, itself makes no payments to the FQHCs/health centers for Medicaid services. Its Medicaid program is structured so that all payments for services (if any) to providers of medical care must come from the HMOs. For the purposes of this case, Puerto Rico's delegation of all payment responsibility to the HMOs is not the problem (even though it violates the Medicaid statute). HHS is responsible for reviewing and approving, in advance, State Medicaid contracts with HMOs. One of the requirements on HMOs HHS must decide is met in approving these contracts is to ensure the FQHCs are paid for the particular services they provide to Medicaid beneficiaries. Despite this requirement and despite the undisputed fact that the HHS officials who are responsible for reviewing and approving Puerto Rico's HMO contracts know and knew that the HMOs were taxing instead of paying the FQHCs, they have nonetheless continued to approve the HMO contracts.

HHS' statutory responsibilities to review and approve the HMO contracts is not limited to FQHCs or the patients and communities for which the FQHCs have responsibility under their Section 330 grants. Under federal law, a Medicaid managed care system can exist only if several specific requirements (including the FQHC payment requirement) have been met. Defendant's October 31, 2007 Reply in Support of Motion to Dismiss and Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment (collectively, the "Cross-Motion") makes clear that HHS has not even met the most fundamental of these requirements -- approving Puerto Rico's HMO contracts

*before* it makes any payment to Puerto Rico that will be used (in turn) to pay HMOs.[1]  According to that Cross-Motion, none of the Puerto Rico HMO contracts, beginning July 1, 2006, has yet been approved, much less in accordance with what the law requires.  The same Cross-Motion contains no denial that HHS has been making payments that will, have been or are being used by the Puerto Rico Medicaid program to fund unapproved managed care contracts during this period.  Indeed, HHS argues that it may do so despite the applicable statutory language demanding "prior approval" before any such payment can be made.

Our counter-argument on this point is presented below.  Suffice it to say here that:  (1) the core of HHS' argument is that if it is eventually able to approve those contracts before they expire, the payments already made will have become permissible; and (2) that argument (among its many other failures (discussed later)) ignores the question of what happens if HHS is never able to issue its approval or issues its approval on day 350 of the contract when the HMO finally begins to meet the requirements on which HHS must base its "prior approval".  Whether HHS can get back the money it has already paid questionable.  More importantly, whatever burdens, problems, failings, *etc.* the HMO's violations may have caused beneficiaries or others for whose protections these requirements were enacted are inherently uncorrectable.

Whatever HHS answers may be to these and other questions/issues discussed below, it cannot be that its officials were unaware of what is occurring.  HHS officials have known for as long as any period even remotely relevant to the instant case that the Puerto Rico *Reforma* program does not meet a number of these requirements, including the FQHC payment provision.

---

[1] We take this opportunity to emphasize that our argument concerning HHS' failure to approve those contracts is not confined to the fact that someone in HHS has or has not given some kind of "approval".  The question of whether those approvals, if made, conformed to applicable legal requirements.  Our previous arguments as to the known failures of the Puerto Rico Medicaid program to comply with the basic legal requirements associated with HMO contract approvals were advanced to show that any HHS approvals, if given, were made improperly.

This is why the brunt of HHS' defense is that the contract approval process is merely a checklist exercise permitting those officials to issue approvals solely on what the HMO contracts say, or appear to say, not on what HHS knows to be the case.  Thus, if the contracts or other representations of State Medicaid officials say X will be done, even though HHS knows that Y, which is clearly unlawful, is what is now being done under the same contract language, HHS' position here is that it must approve the contract and make payments that will support the unlawful conduct of which HHS is specifically aware.  This argument, with its possibility/probability of exposing Medicaid beneficiaries to actions detrimental to their health, is as legally illegitimate as it is shameful.

## II.  **POSTURE OF THIS CASE**

### A.    **Plaintiffs' Summary Judgment Motion**

Except for HHS' insistence that in the past it actually and properly approved Puerto Rico's HMO contracts and an unfortunate remark in footnote 12 on page 27 of the Cross-Motion[2], HHS has not disputed any of the material facts on which Loiza and Belaval relied and now relies in their summary judgment argument.  Accordingly, the Court in deciding this case should do so in light of the following "facts" Loiza and Belaval previously advanced:

(1)    That the head of HHS' Section 330 grant program sent a letter to all of the Puerto Rico Public Health Service ("PHS") Act Section 330-funded health centers stating, among other things, that he was "concerned that the [PHS Act Section] 330 grant dollars may be paying for

---

[2] The remark is in footnote 12, page 27 of the Cross-Motion indicates that plaintiffs have entered into their HMO contracts "freely".  A statutory condition of awarding a Section 330 grant is that the applicant health center has or will have a contract for Medicaid services.  42 U.S.C. § 254b(k)(3)(E)(i)(I).  In Puerto Rico that contract is available only from the Medicaid HMOs. HHS is all too aware that plaintiffs in this case have no bargaining power with the HMOs because of this requirement and that the take-it-or-leave-it HMO contract Mr. Colon reports as having been offered to the FQHCs had to be taken, not left, by the plaintiffs.

services…that are beyond the scope of services for which the funds are intended." *See, e.g.,* discussion on pages 16 and 17 of plaintiffs' S.J. memo, SF ¶ 10.[3]

(2)    That the Kelleher report relied on by the head of HHS' Section 330 grant program for this letter referenced in paragraph 1 is accurate.  SF ¶ 10.

(3)    That the declaration of the Director of one of the Puerto Rico *Reforma* program's HMOs (discussed on pages 14 and 15 of our S.J. memo) accurately portrays the contractual obligation imposed on Loiza and Belaval.  SF ¶ 5.

(4)    That as of this time, HHS has yet to approve the contract of *any* of the Medicaid HMOs in Puerto Rico, much less any that contract with Loiza and Belaval.[4]

(5)    That HHS is, and has been, making Medicaid payments to enable Puerto Rico to pay these HMOs.

(6)    That only one HMO in each of Puerto Rico's 10 Medicaid regions (with the possible exception of one of these regions (not Loiza's or Belaval's)) has been and currently is available to provide services to Medicaid beneficiaries, who must enroll with that such a single regional HMO in the region in which they reside in order to receive Medicaid services.  SF ¶ 19.

(7)    That the allegations presented on page 23 of plaintiffs' S.J. memo (¶ 8) are true.

## B.    Defendants' Summary Judgment Motion

The "facts" on which HHS' summary judgment motion rest are all dependent on the Declaration of Sue Kelly (which accompanied HHS' motion).  Much of what the Kelly Declaration presents is legal statement, which we deal with, as necessary, below.  There are nonetheless some facts presented, most notably those describing her office's reviews of Puerto

---

[3] SF refers to the Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment dated September 24, 2007.

[4] For the reasons advanced in our initial memorandum and here, even if those contracts were approved, the approval would be unlawful.

Rico HMO contracts. Her attestation of previous approvals of contracts with the HMO that deals with Loiza and Belaval is supported by a partial copy of a contract during the most recent period of her office's review and approval. The contract is not current, nor is it with the HMO covering Loiza's and Belaval's areas. Her statement in ¶ 15 (p. 5) of her declaration that all the HMO contracts "contain[ed] the same language" is unsupported. Likewise, the back-up documentation for her office's approval of all prior contracts is limited and is not anything close to what her office (at least purportedly) reviews in deciding on an approval. No contracts or other documents in years previous to an end date in 2006 are produced.

Ms. Kelly has presided in Region II (covering Puerto Rico) for all or nearly all of the time the FQHC provisions of the Medicaid statute have been effective. It is on her watch that, according to the attached Second Declaration of Jose Orlando Colon, Exh. A, these provisions have *never* been implemented by Puerto Rico. Furthermore, as Mr. Colon's Second Declaration also attests (at ¶ 4), Ms. Kelly, in a 2000 letter to one of Puerto Rico's senior Medicaid officials, completely whitewashed this FQHC failure (up to that time) by stating (according to Mr. Colon's declaration) incorrectly and without any supporting documentation, that Puerto Rico had met its FQHC payment commitment through in-kind "contributions". Mr. Colon's declaration makes clear that those in-kind contributions fell millions of dollars short of the payments that were required. Ms. Kelly's pronouncement of legal compliance is, when one thinks about it, is utterly and completely wrong, so lacking in any credible support as to be reckless and/or irresponsible.

Between such recklessness and irresponsibility in ignoring Puerto Rico's failure to pay FQHCs as federal law and the absence of supporting documentation for her descriptions of the approval process, we do not and cannot accept as fact *any* statement by Ms. Kelly in her declaration as to what she or her office did, or were required to do. Put simply, HHS' summary

judgment motion is not ripe for decision. Fed. R. Civ. P. 56(c): *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

## C.     <u>Next Steps</u>

There are, for the moment, two categories of issues now to be addressed for the purposes of our summary judgment motion. The first and most obvious one is HHS' acknowledgement that it has not yet approved the contract for the HMO that (in turn) contracts with Loiza and Belaval, and is currently making payments that support that HMO's contract with Puerto Rico. These payments are unauthorized as explained below.

The second category is the various arguments HHS has advanced for its prior approvals of HMO contracts. We presume that HHS believes, as do we, that the current unapproved HMO contracts will likely mirror the most recent such contracts HHS claims it has approved and that the facts we have advanced as to why such approvals should not have been given will remain the facts for the current unapproved version. Accordingly, we stand by our earlier arguments on these facts and address HHS' counter-arguments as to what those facts mean below.

## III.  <u>ARGUMENT</u>

## A.     <u>The Prior Approval Requirement Is Being Violated</u>

Title 42 U.S.C. § 1396b(m)(2)(A)(ii) requires HHS "prior approval" of any Medicaid managed care contract of the kind at issue in this case. This unambiguous requirement -- the words "prior approval" have a very clear meaning -- was enacted in 1986. Not surprisingly, the legislative history of the prior approval requirement completely supports the obvious meaning of the two words. As H.R. Rep. No. 99-727, at 123 (1986), indicates, Congress' focus at the time was on a significant problem that had erupted in Arizona where it was later discovered, after

some Medicaid HMOs had been given contracts, that the HMOS were financially incapable of doing what the contracts required.

As Congress explained in that "prior approval" history, it wanted to be certain that such "after the fact" discoveries/problems would be headed off *via* a prior approval requirement. According to Congress, disclosure was necessary to ensure that federal funds were used for their intended purpose. *Id.* at 122. Without disclosure of information pertaining to ownership and control and related party transactions, capitated funds could be "used to pay unnecessary administrative costs or excessive profits to related parties rather than to provide medical care services." *Id.* at 123 (quoting "Arizona Medicaid: Nondisclosure of Ownership Information by Health Plans", GAO/HRD-86-10 (November 1985) at page 10). Disclosure requirements alone, according to Congress, were not sufficient without prior approval. *Id.* The history also described the GAO's discovery of noncompliance (with the disclosure requirements) on a widespread scale, and that the GAO suggested instituting prior approval to "avert nondisclosure problems like those that occurred in Arizona." *Id.* The report went on to state that prior approval was necessary to "tighten[] the [] statutory disclosure requirements." *Id.*

The history of the regulatory prior approval requirement at 42 C.F.R. § 438.806 is consistent with the foregoing statutory history and plain meaning of prior approval. Prior approval is needed for all comprehensive risk contracts, including those with new and currently contracting managed care organizations. 67 *Fed. Reg.* 40989-01 [June 14, 2002]. "FFP is not available for contracts that CMS has not approved." *Id.* Only when a contract is approved may FFP be available for periods in which approval was pending. *Id at 40999.* A contract will not be approved "if it did not meet all the requirements of the law and regulations." *Id.* Furthermore, rates actually used by MCOs "must be part of the contract that is approved by [CMS] as part of

the contract approval process that is a pre-condition for FFP." *Id.* Overall, 42 C.F.R. § 438.806, along with its preamble, makes it very clear that Medicaid managed care contracts must be approved prior to the availability of FFP for participating MCOs. *Id.*

The clearest statement on the flexibility HHS had read into the statutory prior approval requirement is The following comment received in connection with its 2000 rulemaking as to the managed care requirements in 42 C.F.R. Part 438:

> The requirement for prior approval of a new contract or new contract amendment applies to all comprehensive risk contracts, whether with a new or currently contracting MCO. FFP is not available for contracts that CMS has not approved. However, once we approve a contract, FFP is available for any period during which an approvable contract was under review.

67 *Fed. Reg.* 40999. The latitude afforded by the rulemaking as to the meaning of prior approval is only to make payment for periods before the approval once and only if such approval is granted, not the bizarre payment-in-advance-even-though-the-law-may-be-currently-violated-interpretation HHS proposes is legally okay.

That HMO payments are now being made and that HHS has not approved any HMO contract currently in effect is shown in HHS' Cross-Motion at Ex. A., Kelly Decl. ¶ ¶13, 17.[5] Beyond our assumption stated previously that Puerto Rico will continue to do as it has *vis-a-vis* the HMOs, HHS has offered nothing to support any notion that Puerto Rico is now operating its managed care program in accordance with the Medicaid statute. Indeed, it is not even apparent that defendant is in possession of all of the current HMO contracts because the only contract appended to defendant's Cross-Motion was an exception of a contract between Humana Health Plans of Puerto Rico, Inc. ("Humana") and the Commonwealth for the contract period ending

---

[5] Ms. Kelly's Declaration further states, "Region II [of CMS] is in the process of reviewing the contracts and supporting certifications for the contract period July 1, 2006 through June 20, 2008." Kelly Decl. at ¶ 17.

June 30, 2006.[6]  As previously mentioned, Humana is not the HMO that contracts with the plaintiff health centers in this case.  It is certainly more than curious that HHS has failed to supply a currently contract with the HMO that has entered into a contract with the plaintiffs in support of its Cross-Motion.

HHS excuses its failure to approve the current HMO contracts by arguing (at 24, n. 9) that "prior" approval does not actually mean "prior."  For several reasons, including how HHS has in the past interpreted "prior approval", this is an interpretation that is plainly incorrect.  According to the Cross-Motion, the "prior approval" provision in 42 U.S.C. § 1396b(m)(2)(A)(iii) means that it must approve Puerto Rico's managed care contracts "prior" to the final award of federal financial participation ("FFP") for a given contract period, not prior to the first day of a contract period or at least prior to making a payment to a State to fund its HMO contracts (which, as previously discussed, is HHS' stated position in regulatory history).  Defendant's Cross-Motion at 24, n. 9.  There is nothing in the plain language of the statute, however, that would lead anyone to believe that by using the word "prior" Congress did not mean anything other than the ordinary meaning of the word.   Indeed, the structure of the statute reinforces the notion that in order to curtail Medicaid beneficiaries' rights by placing them in a managed care system, the contract between a State and an MCO must be approved in advance.

It is well-established that an agency is bound to follow its own rules, regulations, policies, and procedures, even where they operate to inconvenience the government.  *See e.g. National Family Planning and Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992); *see also Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (agency must "supply a reasoned analysis" for changing policies).  The

---

[6] *See* Kelly Decl. at ¶ 14 (identifying Humana contract) and Att. 4 thereto (the Humana contract itself).

statutory language is clear, and the legislative and regulatory history behind the language clearly indicates that "prior" meant "prior". Payments before prior approval is given is prohibited by federal law and HHS' payments to Puerto Rico violate that law.

## B.     FQHC Payment Requirement

**T**here is undisputed evidence in this case that Section 330 funds are being used to pay for the obligations that should rightfully be paid for by the State Medicaid program -- according to Congress when, in 1989, it amended the Medicaid statute for the specific purpose of ensuring against such augmentation of Medicaid funding.

> To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is comprising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.

H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.[7]

---

[7] Defendant's Cross-Motion failed to address in any form Congress's specific concern that the PHS grant program should not wind up subsidizing Medicaid. In federal appropriations law it is recognized that when Congress enacts grant legislation and provides appropriations to fund the grants, it is exercising the spending power conferred upon it by the Constitution. Executive agencies are prohibited from augmenting those appropriations from other sources without specific statutory authority. *See* 31 U.S.C. § 1301(a) (restricting use of appropriated funds to their intended purposes); *see also* HHS' duties under the U.S. Constitution and the Antideficiency Act, 42 U.S.C. § 1341. "When Congress makes an appropriation, it is telling the agency that it cannot operate beyond the level it can finance under its appropriation[, and to] permit an agency to operate beyond this level with funds derived from some other source without specific congressional sanction would amount to a usurpation of the congressional prerogative." Government Accountability Office, *Principles of Federal Appropriations Law*, Vol. II at 6-103. "Another way of stating the augmentation rule is that when Congress appropriates funds for an activity, the appropriation represents a limitation Congress has fixed for that activity, and all expenditures for that activity must come from that appropriation absent express authority to the contrary." *Id.* at 6-155. Defendant's Cross-Motion acknowledged (at 21, n. 7) the general principles underlying the Anti-Deficiency Act, but failed to see its relevance to Congress' legislative history when it first enacted FQHC payment protections. The relevance is obvious. According to the Kelleher report (at 10) HHS and Puerto Rico together are taking (or allowing to be taken) $32 million of PHS Act funds to pump up Puerto Rico's Medicaid program, which has a specific appropriations limit. 42 U.S.C. § 1307(f)(1) and (g)(1) of the Social Security Act. Obviously, this $32 million subsidy to another federal program is an Anti-Deficiency Act

Furthermore, the HMO contract with plaintiffs cannot conceivably be thought to pay centers the "level[s] and amount[s]. . .the entity would make for the [FQHC] *services*, if the *services* were furnished by" another party than an FQHC.  (Emphasis added.)  The payment clearly contemplated by that language is clearly a direct payment for services provided and certainly not a risk-based deal which results in the FQHCs going into debt by providing Medicaid services.  The contract does not fulfill this requirement.

With respect to this subsidy, Ms. Kelly attests that, "As part of the process of reviewing Puerto Rico's managed approved managed care contracts, Region II determined that [the HMO] contracts contained the assurance required by 42 U.S.C. § 1396b(m)(2)(A)(ix) that the HMOs pay FQHCs "not less than" the amount for services if the services were furnished by a non-FQHC provider.  The assurance that the HMO will pay FQHCs no less than it pays non-FQHCs on which Ms. Kelly relies can be found in the attached contract provisions between Puerto Rico and Humana for the contract period ending June 30, 2006, which, according to Ms. Kelly, is identical among all Puerto Rico HMO contracts.  Kelly declaration at ¶ 14.

Ms. Kelly's statement is close to what the statute says.  It is also close to the language of the checklist (Atts. 1 and 2 to Ms. Kelly's Decl.) on which she relies, the checklist, on page 10, A A.3.9, states that "[t]he [managed care] entity must pay FQHCs. . .no less than it pays non-FQHC [sic]. . .for similar services."  Although we would argue that (at least) the checklist should copy the statute, the important point of both Ms. Kelly's and the checklist's language is that the payment to the FQHC must be no less than what the HMO would pay for the same or similar (the checklist only refers to "similar") *services* (emphasis added) from a non-FQHC.  Ms. Kelly's

violation.

conclusion that the Humana contract meets her or the checklist's description of the necessary

magic language, is incorrect.

That Humana contract provision referred to by Ms. Kelly provides that:

> The ADMINISTRATION [ASES] may build [*sic*] only the FFS
> rate schedule or an actuarially equivalent rate for services rendered
> by FQHC and RHCs when applicable. The ADMINISTRATION
> may not include the FQHC/RHC encounter rate, cost settlement, or
> prospective payment amounts. INSURER must pay FQHCs and
> RHCs no less than it pays non-FQHCs and non-RHCs.

Att. 4 to Def.'s Cross Motion at Article XIX, ¶ 8 (pp. 97-98). The contract language does not

refer to services or payment for services, and no wonder. As the Cruz declaration acknowledges

and the Kelleher report discloses, the HMO contracts do not pay for the services the FQHCs

render. Puerto Rico and its HMOs have carefully crafted the contract language that is addressed

to the FQHC requirement to mask their violation of that requirement, and succeeded in fooling

Ms. Kelly, whose desire to be fooled is apparent from the fact that she was willing to ignore the

true nature of the FQHC payment provision of which she was independently aware.

## C.    <u>Lack of Compliance with PIP Requirements</u>

The above argument regarding the HMOs' non-payments to FQHCs is directly relevant

to our argument in this case that HHS approval of the Puerto Rico HMO contracts would be

improper under 42 U.S.C. 1396b(m) because they violate the PIP requirements at 42 U.S.C.

§ 1396b(m)(2)(A)(x). HHS argues that past approvals of the HMO contracts' PIP-related

provisions are authorized, referencing (in part) paragraph 15 of the Kelly declaration. In an

earlier paragraph in her declaration (¶ 11), Ms. Kelly avers that she uses a checklist "to assess

whether" the HMO contracts at issue "are approvable. . ." Presumably, her review of the

contract's PIP provisions as described in ¶ 15 relied on that checklist.

In any event, Ms. Kelly refers to the PIP clause in the Humana contracts as "an assurance that the HMO will meet the PIP requirements. . .  That clause provides as follows:

> The ADMINISTRATION may build [sic] only the FFS rate schedule or an actuarially equivalent rate for services rendered by FQHC and RHCs when applicable.  The ADMINISTRATION may not include the FQHC/RHC encounter rate, cost settlement or prospective payment amounts.  INSURER must pay FQHCs and RHCs no less than it pays non-FQHCs and non-RHCs.

The relevant connection between FQHC payments and PIP arises in a footnote, which insists that that we have not shown the HMO payments are different than what the HMO is paying the IPA.  Footnote 12, pages 27, of the Cross-Motion.  The relevance of the PIP requirements to this case lies is this argument that the FQHC payments being made by the HMO are lawful because they are the same as the HMO is making to IPA doctor groups, which are unarguably covered by PIP.

In Section 1396b(m)(2)(A)(x), the PIP requirement provides that risk contracts must limit the risk to ensure (among other things) that the physician/group will not fail to treat or refer a patient because of the risk imposed.  Under that section and 42 C.F.R. § 438.6(h), a Medicaid HMO may not enter into a risk arrangement with a health provider such as an FQHC unless the arrangement meets the requirements described in 42 U.S.C. § 1395mm(i)(8) and regulations issued thereunder for physician incentive plans, or PIPs.[8]  Considering that the providers only way to limit the risk Puerto Rico's HMOs impose, the PIP's main purpose is clearly being violated  The same violation is immediately apparent from what the PIP regulations require.

---

[8] 42 U.S.C. § 1395mm(i)(8) is incorporated by referenced into § 1396b(m)(2)(A)(x)) and the regulations promulgated thereunder, at 42 C.F.R. § 417.478.

The Cruz declaration admits that the cost of the risk assigned to Loiza by the HMO contract exceeded the entire amount of capitation payments made to Loiza.  As also described in the Kelleher Report:

> Probably the most significant defect of the HMO contracts is that there is no guarantee of any payment to the HCO[9].  Risk is unlimited and the FQHC can be asked to pay the HMO even as it provides services to the HMO's members.  As noted above in the "government" section, all other providers are paid their negotiated fees.  Primary care groups are, by design, last in line and many receive nothing in return for the services they provide.

Ex. A to Plaintiffs' Summary Judgment Motion, Kelleher Report at 8-9; see also Complaint ¶ 46; Cruz Declaration (Ex. B to Plaintiffs' Summary Judgment Motion), HRSA letter (Ex. A to Plaintiffs' Summary Judgment Motion) and SF ¶¶ 5, 7-8 (Colon Decl.).

The risk described by the Cruz declaration and Kelleher report clearly violates 42 C.F.R. § 422.208, the central regulatory provision describing PIP (in the Medicare program).  Under § 422.208(c)(2):

> If the physician incentive plan places a physician or physician group at substantial financial risk (as determined under paragraph (d) of this section) for services that the physician or physician group does not furnish itself, the MA organization must assure that all physicians and physician groups at substantial risk have either aggregate or per-patient stop-loss protection in accordance with paragraph (f) of this section.

Under subsection (f)(2)(i) (referenced in the foregoing quotation), there must be, for any physician group with a PIP contract, "aggregate stop-loss protection [which] must cover 90 percent of the costs of referral services that exceed 25 percent of potential payments."  The meaning of this dense language can be easily illustrated.

---

[9] As explained in the Kelleher Report (at 5, second bullet point), HCO is a term used in the Commonwealth of Puerto Rico to denote "at-risk providers."

Assume the Puerto Rico IPA or FQHCs they are paid $50 per member, per month by the HMO in "capitation", which must cover the payments to all other providers. As the Cruz declaration and Kelleher report states, the entire $50 is at risk for the cost of such other services. Likewise, that $50 is the full amount of "potential payments" as the regulations describe that term. Accordingly, under § 422.208(f)(2)(i) the payment to which the regulatory limits would be applied would be that $50. The stop loss protection required would be $50 minus 25 percent of $50, or $12.50, which when deducted from $50 equals $38.50. Ninety percent of $38.50 would be $34.65. The least the IPAs and FQHCs could net from their $50 capitations would be this amount.

Stated otherwise, were PIP-required protections in place in Puerto Rico's Medicaid program, it would be impossible for an IPA or FQHC to owe the HMO more than all of its HMO payments. Yet, both the Cruz declaration and Kelleher report state that this is exactly what takes place. The overall protection required to be afforded under the PIP regulations is accordingly nonexistent.

Clearly, FQHCs cannot be receiving the payment for services from an HMO contemplated by Section 1903(m) if the payment is unlawfully low for the non-FQHC IPAs to which the FQHC payments are compared (by HHS). Ms. Kelly knew or should have known that the HMO contracts with Loiza and Belaval would violate this PIP protection. She apparently (from HHS argument in this case) was willing to assume that whatever the FQHCs were (not) being paid was the same as the IPAs. She, therefore, had to realize that the PIP requirements were being violated.

The importance of HMOs adhering to the PIP protections is obvious. Unless they do, the doctors and others who accept the unlawful risk will have an enormous financial incentive not to

refer (in this case) Medicaid patients for other care.  Unlike FQHCs, which have Section 330 grant funds to fall back on when they are not paid by the HMO, the private doctor groups functioning as IPAs do not.  This Court may, and should, take judicial notice that these groups will not provide services for nothing or less than nothing as the FQHCs have been doing.

This, of course, means that the IPAs may be presumed to be not referring patients in need of the additional services from other doctors, *etc*.  It further means that what Puerto Rico Medicaid beneficiaries derive by being assigned to an FQHC, not a doctor group IPA, for their basic services is not just the extra benefits and care FQHCs provide, but also an avoidance of exposure to a situation where their health is jeopardized because of an IPA's unwillingness or financial inability to refer when medically indicated.  As attested to in the two Colon declarations (September 24, 2007 Declaration of José Orlando Colon at ¶¶ 7-9; Exhibit A hereto at ¶ 5), potential patients of Loiza and Belaval are being forced or manipulated into receiving Medicaid care through doctor group IPAs.  The potential harm being done to them, to say the least, is of extreme importance and value.

One last point:  HHS insists that FQHCs are not covered by the PIP protections (*e.g.*, Cross-Motion, fn.14, p.28).  In so doing, HHS is proffering an unjustified *post hoc* rationalization.  HHS' prior interpretation is that the PIP provisions are applicable to FQHCs. This is evident from an April 2002 HHS Office of Inspector General issuance entitled "Physician Incentive Plan Reporting for Medicare + Choice Organizations" (attached hereto as Exhibit B). According to the PIP reporting instructions to the MCOs, one item of information that must be disclosed is the identity of Federally-qualified health centers.  Ex. B at 19, instruction for Line 1.C.  If FQHCs were not covered by the PIP provisions, there would be no reason to identify them in the form.

**D.**    **Lack of Actuarially Sound Payment Rates**

Section 1396b(m)(2)(A)(iii) requires that rates paid to HMOs must be "actuarially

sound". The rates being paid the HMOs are not actuarially sound. We say this because of the

non-payment of FQHCs that is now occurring. If some of the payment being made to the HMOs

is intended to be given to the FQHCs, the rates are obviously too high and actuarially unsound

because the HMOs are pocketing that portion of the payment. If the payment rates fail to include

an amount for FQHC payment they are likewise actuarially unsound because they fail to account

for payments the HMOs are required by law to make -- and exacerbate the non-FQHC payment

problem. Additionally, the requisite actuarial findings and certifications required by regulation,

at 42 C.F.R. § 438.6, are lacking. Ms. Kelly testified that ". . . we determined that Puerto Rico's

rates and certifications for those [prior] contract periods met the required standards, we approved

the contracts for those periods . . . " Kelly Decl. at ¶ 14. The actuarial information that 42

C.F.R. §438.6(c)(4)[10] requires the Commonwealth to submit to CMS is not included in the

contract materials submitted by Ms. Kelly for any contract period and we have reason to believe

such information was submitted.

**E.**    **Freedom of Choice**

Section 1903(m)(2)(A)(vi) requires that Medicaid managed care contracts permit

beneficiaries to terminate enrollment. 42 U.S.C. § 1396(m)(2)(A)(vi). Furthermore, 42 U.S.C.

§ 1396u-2 added a complementary requirement -- that a State must provide beneficiaries with a

choice of at least two managed care entities in which to enroll. 42 U.S.C. § 1396u-2(a)(3). The

---

[10] 42 C.F.R. §438.6(c)(4) requires the Commonwealth to provide CMS with such information as:
the actuarial certification of the capitation rates, an assurance that all payments rates are based
only upon services covered under the State Medicaid plan, and an explanation of any incentive
arrangements or stop-loss, reinsurance "or any other risk-sharing methodologies under the
contract." None of this information was submitted in support of defendant's Cross-Motion.

Commonwealth's managed care contracts violate this provision in that there is only one HMO available within each of Puerto Rico's 10 regions.  Defendant contends (at 29) "[t]o the extent Plaintiffs allege that CMS has failed to ascertain that Puerto Rico's managed care contracts contain any other required provisions, including compliance with the applicable requirements of 42 U.S.C. § 1396u-2, they are [] in error."  In making this argument, Defendant states *via* footnote 15 that "Puerto Rico is statutorily exempt from the 'freedom of choice' requirement, among others, by a provision of the Medicaid Act codified at 42 U.S.C. § 1396a(a)(23)."  Defendant cites the declaration of Sue Kelly in making this contention, which states:

> The Medicaid Act contains a provision, codified at 42 U.S.C. § 1396a(a)(23), which exempts Puerto Rico from the "freedom of choice" requirement in 42 U.S.C. § 1396-2(a)(3)(A) and 42 C.F.R. § 438.52 to provide Medicaid beneficiaries with a choice of at least two MCOs in which to enroll.  Kelly Decl. ¶ 7.

While Ms Kelly references § 1396a(a)(23), she does not show how or why the provision takes effect to exempt the Commonwealth from having to meet the two HMO minimum requirement in § 1396u-2(a)(3).  In fact, the plain language of 42 U.S.C. § 1396a(a)(23) and 42 U.S.C. § 1396u-2(a) shows just the opposite.  Section 1396u-2(a)(1) requires compliance with all the paragraphs of that section, "notwithstanding" 42 U.S.C. § 1396a(a)(23)(A).  Only if such compliance exists may Medicaid beneficiaries be transferred into managed care.  42 U.S.C. § 1396u-2(a)(1).

The remainder of 42 U.S.C. § 1396a(a)(23) not covered by the "notwithstanding" provides no additional authority to exempt Puerto Rico from § 1396u-2's two HMO minimum requirement.  Section 1396a(a)(23)(B) states that the enrollment of a person in a Medicaid MCO "shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title [referring to family planning services and

supplies], except as provided in subsection (g) of this section and 1396n of this title [concerning compliance with State plan provisions], except that this paragraph shall not apply in the case of Puerto Rico. . . " 42 U.S.C. § 1396a(a)(23)(B). This remaining language clearly focuses on freedom of choice of providers for family planning services/supplies, rather than choice of managed care entities. *Id.*

There is more than a bit of irony to Sue Kelly's use of Puerto Rico's exemption from § 1396a(a)(23)'s requirements. Puerto Rico was initially afforded the exception because it had a public health care system in place prior to Medicaid "which it was felt was important to preserve." H.R. Rep. No. 94-327, at 428 (1975). In order to maintain this system, which covered many individuals not eligible for Federal matching, "Puerto Rico [] stretched [its] coverage by limiting application of the freedom-of-choice provision so that certain kinds and types of services are paid for only if the public providers are used." *Id.* Furthermore, freedom of choice was "limited to services of generalists, a very few specialists, and some routine laboratory and x-ray services." *Id.* Puerto Rico preservation of this system made full scale freedom of choice "inappropriate." *Id.*

The reason behind this exemption has vanished. "Health Reform greatly changed the health care landscape in Puerto Rico." (Ex. A to Plaintiffs' Summary Judgment Memorandum at 1.) As such, "the Commonwealth transferred the responsibility of providing health services for Medicaid eligible beneficiaries from the public to the private sector." *Id.* Sue Kelly further described this shift from public services in July 2000 by stating:

> Prior to health care reform, under the fee for service Medicaid Program, [FQHCs/RHCs] received in-kind payments in the form of staff and space from the Department of Health and thus, their costs for serving Medicaid beneficiaries were being met. Since the implementation of health care reform, the centers have had to compete for managed care subcontracts on the same basis as all other

20

clinics and no longer receive in-kind payments from the Department of Health.
(Ms. Kelly's July 2000 letter to Roberto Hernandez) (attached to Ex. A hereto).

F.      **Plaintiffs Have the Requisite Authority to Bring This Case and Obtain the Relief**
        **They Seek**

Defendants' contention that Plaintiffs lack standing to sue under the standards set forth in

*Lujan v. Defenders of Wildlife, et al.*, 504 U.S. 555 (1992), is without merit.  Defendants assert

that, because "CMS has no authority over the contracts that HMOs enter into with health care

providers, including Plaintiffs," none of Plaintiffs' harms arising out of those contracts are

"traceable to the actions of the CMS."  *See* Defendant's Cross-Motion at 17 (citing Kelly Decl. at

¶ 9).

As an initial matter, HHS' position is contrary to long-standing CMS policy.  What HHS

overlooks is the fact that its Medicaid program -- by that program's own account - - *does*

regulate agreements between HMOs and FQHCs.  Although CMS has generally disclaimed the

authority to "regulate the payment rates between MCOs and subcontracting providers," it

specifically acknowledged managed care subcontracts with FQHCs as an area in which Congress

has vested HHS with oversight responsibility.  *See* Centers for Medicare and Medicaid Services,

"Medicaid Program; Medicaid Managed Care: New Provisions - - Final Rule," 67 *Fed. Reg*.

40998 (2002) ("[O]ther than in the case of FQHCs, the Congress has not established any

standards for payments to subcontractors."); *see also* Health Care Financing Administration,

"Medicaid Program; Medicaid Managed Care; Final Rule," 66 *Fed. Reg*. 6236 (2001) ("The only

instances in which the statute provides authority to regulate payments by MCOs to

subcontractors are the physician incentive plan . . . , and the requirement . . . that payments by

MCOs to FQHCs. . . be no less than rates paid to similar subcontractors providing a similar range

of services.").

Moreover, it is only by virtue of HHS' exercise of § 1396b(m) its contract approval authority that a State may delegate the operation of its Medicaid program to an MCO.  Indeed, the *sine qua non* for any State availing itself of the "managed care option" under 42 U.S.C. § 1396u-2 is review and approval of the State's managed care contract(s) by HHS.  *See* 42 U.S.C. § 1396b(m)(2)(A); 42 C.F.R. § 438.806.  If HHS does not approve a State contract with an HMO, the State is only precluded from later claiming FFP for costs under that contract.  The State must still fulfill its State Plan obligations through a non-managed care scheme, and may claim FFP for its costs in that connection.

The foregoing makes clear that there is, in fact, the causal connection between HHS' conduct and Loiza's and Belaval's injuries necessary for standing in this case.  Loiza and Belaval would not be forced to operate under a system that fails to compensate them properly -- much less at all -- for their costs in caring for Medicaid patients *but for* HHS' endorsement and/or continued financial support for that system.  Similarly, were HHS to withhold its approval for the Puerto Rico FQHCs contracts with their HMOs, Loiza and Belaval would be able to seek reimbursement directly from the Commonwealth of Puerto Rico through the prospective payment mechanism required under 42 U.S.C. §§ 1396a(bb)(1)-(4).  In other words, not only are the harms that plaintiffs suffer "fairly traceable" to HHS' actions, but the elimination or reversal of those actions would effectively remedy plaintiffs' harms by permitting them to pursue payment through alternative means.  Plaintiffs thus satisfy both the "fairly traceable" and "redressability" prongs of *Lujan v. Defenders of Wildlife*.

Defendants are simply wrong in their further argument that there is no jurisdiction or application of the APA because the Medicaid statute sets forth a comprehensive (and, presumably, exclusive) remedial scheme.  The various sources of authority on which HHS relies

22

for this proposition refer only to a State's right to seek reconsideration and appeal of a secretarial determination of non-compliance with a State Plan requirement or a "disallowance" of a claim for FFP under 42 C.F.R. Part 430, neither of which is relevant to this lawsuit. There is no notice and administrative appeal provision - - much less one that allows for review of approvals/disapprovals of HMO contracts - - in the CMS Medicaid managed care regulations similar to those in 42 U.S.C. § 1396c and 42 C.F.R. §§ 430.35, 430.38.  In fact, the HHS Departmental Appeals Board has expressed doubt as to whether its jurisdiction would extend to Medicaid-related disputes beyond those set forth in Part 430. *See Appeal of Connecticut Department of Social Services*, DAB Decision No. 1983 at 18 (June 29, 2005) (DAB authority over Medicaid matters "is confined, by regulation, to a review of CMS's 'disallowance' determination").

As we have stated previously, the 42 U.S.C. § 1396b(m) prior approval of managed care contracts authority is one, and possibly the only, instance where HHS is thrust into the midst of directly overseeing and approving a State's administration of a facet of the State's Medicaid program.  HHS actions in regard to this authority are simple.  If HHS finds in advance that the § 1396b(m) requirements are met may payments may go forth.  No rights of hearing or appeal, *etc.* attend to an HHS refusal to approve an HMO contract.

Finally, as to the basic issue of jurisdiction, Plaintiffs complaint properly references federal question and other statutory jurisdiction provisions.  Manifestly, whether HHS has made approvals and/or payments as federal law requires is a "federal question".

## G.     HHS Payments of Medicaid Funds to Puerto Rico to be Used for HMO Contracts Violates the APA

In *Motor Vehicle Mfrs. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 41 (1983), the U.S. Supreme Court provided clear criteria to be applied in determining whether an agency has acted

in a manner that is "arbitrary, capricious, and an abuse of discretion or otherwise contrary to law."  That case contains the seminal analysis of Administrative Procedure Act (5 U.S.C. § 706(2)(A)), that is directly relevant to assessing HHS' actions (and inaction) in this case:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, *entirely failed to consider an important aspect of the problem*, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  (citations omitted) (emphasis added).

The Supreme Court further admonished that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id. (quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).  An agency must be accountable for its decision-making, which means that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 645 (1986).[9]  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 91 L.Ed. 1995, 67 S. Ct. 157 (1947).  Further, this Circuit has opined that "[f]undamental principles of administrative law require that agency action be 'based on a consideration of the relevant factors.'"  *U.S. Telecom Association v. FCC*, 227 F. 3d 450, 461 (D.C. Cir. 2000), quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

     Here, HHS has failed to consider all of the information before it and readily available to

---

[9] Moreover, the "mere fact that there is 'some rational basis within the knowledge and experience of the [regulators] under which they 'might have concluded' that the regulation was necessary to discharge their statutorily authorized mission will not suffice to validate agency decisionmaking."  *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 627 (citations omitted).

it concerning the FQHC payment and other violations in the Commonwealth's Medicaid managed care program.  The record before HHS simply cannot support any finding that the past or current HMO contracts are approvable given what HHS knows about the way the program actually works and, among other things, fails to make FQHC payments.

No amount of magic language in the contracts can make HHS rationally disregard everything else that it knows about the Commonwealth's *Reforma* program.  The case law addressing a State's reliance on HHS Medicaid plan approval is also relevant in this regard.  It has been well-established that a State cannot assert HHS approval of its State plan as a defense to charges that its Medicaid plan fails to meet federal requirements. In *New Jersey Ass'n of Health Care Facilities v. Gibbs*, 838 F. Supp. 881, 896 (D.N.J. 1993), for example, the Court noted that "there is a presumption that a state will engage in a *bona fide* finding process before it makes assurances to HCFA that required findings have been made,"*quoting AMISUB v. Colorado*, 879 F. 2d, 789, 797 (10th Cir. 1989).[11]  In *Gibbs*, the Court found that a presumption of validity based solely on HCFA's "cursory approval" was unwarranted because no analysis of the bases underlying the assurances had been made.  *Gibbs*, 838 F. Supp. at 899.  Similarly, in *Erie County Geriatric Center v. Sullivan*, 952 F. 2d 71, 81 (3rd Cir. 1991), the Third Circuit found that the State of Pennsylvania's assurance to HCFA concerning the reasonableness and adequacy of reimbursement to eligible facilities "was merely a hollow recitation of the wording of the Medicaid statute."  HHS, in other words, has an affirmative obligation to look behind the contracts it is required by statute to review and prior approve, especially where it has reason to know that those contracts do not accurately reflect what is occurring, or in the case of the

---

[11] At issue in *Gibbs* was the reasonableness of Medicaid payment rates for nursing home facilities under the "Boren Amendment" which requires states to submit certain assurances to HCFA (now CMS) which must be supported by findings that the rates comply with Boren standards.  *Gibbs*, 838 F. Supp. at 895.

Humana FQHC payment clause, where the contract language is facially incomplete and HHS knows exactly how the clause is being interpreted and implemented.

At the very least, HHS knows that the Puerto Rico HMOs do not pay FQHCs as the Medicaid statute requires and violate the PIP protections in that statute.  And, even (perhaps) worse, HHS is making payments when there has been no "prior approval" as the statute demands.  HHS payments to Puerto Rico to support the Commonwealth's Medicaid HMO contracts are clearly arbitrary and capricious and a violation of the law.

Respectfully submitted,


Date: December 20, 2007                    /s/ James L. Feldesman
                                           James L. Feldesman ( D.C. Bar No. 23796)
                                           jfeldesman@ftlf.com
                                           Kathy S. Ghiladi (D.C. Bar No. 435484)
                                           kghiladi@ftlf.com
                                           Robert A. Graham (D.C. Bar No. 450345)
                                           rgraham@ftlf.com

                                           Feldesman Tucker Leifer Fidell LLP
                                           2001 L Street, N.W., Second Floor
                                           Washington, D.C.  20036
                                           (202) 466-8960 (telephone)
                                           (202) 293-8103 (facsimile)

                                           *Attorneys for Plaintiffs*