

A MILLIMAN GLOBAL FIRM

**Milliman** USA

*Consultants and Actuaries*

One Pennsylvania Plaza, 38th Floor
New York, NY 10119
Tel +1 212 279.7156
Fax +1 212 629.5657
www.milliman.com

July 30, 2004

Mr. Enrique Vicens
Executive Director
Puerto Rico Health Insurance Administration
Post Office Box 195661
San Juan, Puerto Rico 00919-5661

**Re: Actuarial Documentation for Fiscal Year 2005 Capitation Rates**

Dear Mr. Enrique:

The Puerto Rico Health Insurance Administration (PRHIA) contracted with Milliman to develop actuarially sound capitation rates for use during the July 1, 2004 through June 30, 2005 contract period, or Fiscal Year 2005 (FY2005). In determining the FY2005 capitation rates for the Reforma managed care population, Milliman reviewed trend, utilization, average charges, encounter data, eligible data, and health plan financial reports. Adjustments were made where appropriate. Projected annual expenditures under the FY2004 contracts are $1,338,000,000. Projected annual expenditures under the FY2005 contracts are $1,443,000,000. These projected expenditures do not take into account the direct contracting rates which are outside the scope of this memorandum. The weighted capitation rate increase for this period, based on current enrollment, is 8.0% percent on a per member per month (PMPM) basis. The following is an explanation of the assumptions and any changes in methodologies that occurred when calculating the FY2005 capitation rates.

*Background*
In 1993, Puerto Rico implemented mandatory managed care for the Reforma population. For the next several years, rates increased significantly. During this period, the renewal rates were driven by the managed care organization's (MCOs) requested rate increases. Increasing budgetary constraints combined with the double-digit rate increases for the Reforma program led to an in-depth evaluation of the capitation rates for FY2002.

Before setting the FY2002 capitation rates, PRHIA contracted with consultants to review the historical claims for the Reforma program and determine an actuarially sound capitation rate. Capitation rates since FY2002 have been developed based on the historical claims and expected trends.

For FY2005, PRHIA has contracted with three MCOs and two mental/behavioral health organizations (MBHOs).

Mr. Enrique Vicens                    - 2 -                          July 30, 2004

### *Overview of Rate Development Methodology - Base Year Utilization and Cost Data*
The primary data source for the FY2005 rates is historical cost and utilization data for the Reforma program. This is provided by monthly claims information submitted by the MCOs and MBHOs to the Commonwealth in addition to the pharmacy claims submitted by MC-21, the pharmacy benefit management company (PBM). This is consistent with the source data for the FY2004 rates. We had available medical claims data for claims incurred during the period July 1, 2001 through February 28, 2004. Pharmacy claims data was available for claims incurred during the period July 1, 2001 through April 30, 2004. Financial statements of the MCOs and MBHOs were reviewed to test the consistency of the data. The base year utilization and cost data are based only upon services covered under the State Plan and provided to Medicaid-eligible individuals.

The base year definition varies by carrier due to the data issues, such as data completeness and stability, associated with each carrier. The base year was defined as follows:

Humana (East, Southeast): July 2003 – February 2004
Triple S (North, Metro North, Southwest) – July 2003 – December 2003
MCS (San Juan, West, Northwest) – January 2003 – December 2003

FHC (West, Southwest, Southeast) – July 2003 – February 2004
ASP (San Juan, East, North, Northeast, Metro North) – January 2003 – December 2003

Due to recent increases in prescription drug PMPM costs for mental health, actual pharmacy claims for January 2004 through April 2004 were also reviewed for the MBHOs. This information was compared to the projected FY2005 costs and adjustments to the trend were made as deemed appropriate.

A review of the base year data did not identify fluctuations due to catastrophic claims or special needs populations. Therefore, no cost-neutral data smoothing adjustments were made.

Each HMO has some component of claims which are capitated and not included in the claims data. Financial statement information was used to estimate the claims expense associated with these capitated claims. Additionally, the MBHOs use a staff model and the medical claims data is not stable. For the MBHOs, we relied on the financial statement data combined with the pharmacy claims data.

### *Unpaid Claim Adjustment*
The next step in the rate calculation process was the adjustment of the claims data for claims incurred but unpaid, hereinafter called the incurred but not reported (IBNR). Based on a review of the Reforma claim lag triangles, we determined completion factors by the claim incurral month. The claims data by incurral month was divided by a completion factor to reflect the ultimate incurred claims for that month. The difference between the base claims (from the base data) and the ultimate incurred claims are the IBNR claims.

Mr. Enrique Vicens                    - 3 -                                    July 30, 2004

*Trend to FY2005*
The claim expense data was trended to FY2005. The trend factors recognize changes in cost per service and utilization of health care services from the base period to the following contract period. Separate trends were developed for major service categories as shown in Exhibit A. A combination of sources including non-Puerto Rico Medicaid trend data, historical trends in Puerto Rico, and regional and national economic outlook were relied upon to determine a reasonable trend. Please see attached Exhibit A for the trends used.

*Program Change During FY04*
PRHIA indicated to the MCOs and MBHOs that financial constraints would result in the following actions:

- Rate increases would not be granted for increases in provider reimbursement after mid-2004.
- The prescription drug formulary would be frozen for FY2005. If a change to the formulary is deemed to be necessary in FY2005, the capitation rates will be adjusted based on an actuarial analysis regarding the impact of the change.

The impact of the above actions is reflected in the trend assumptions.

*Establishment of Rate Category Groupings*
There are eight distinct regions for the capitation rates: East, Southeast, West, North, San Juan, Northeast, Metro North, and Southwest. These regions have distinct utilization and cost patterns and the capitated rates reflect these regional variations. Medical services within a region are provided by one MCO and one MBHO. As the regions reflect large stable populations, age, gender, and eligibility category were not differentiated between in the capitation rate development.

*Loading for Administration and Underwriting Profit*
For the final managed care capitation rates, we assumed a loading for administration and profit of 10%. This is consistent with the recent historical loading and within the expectations of the MCOs and MBHOs serving the Puerto Rico Reforma population.

If you have any questions, please call me at (646) 473-3211.

Sincerely,

Susan E. Pantely, FSA, MAAA
Consulting Actuary

SES/kt

H:\PRH01-SEP-ASES\fy05\correspondence\actuarialdocumentation.doc

## Actuarial Certification for Administracion de Seguros de Salud
### Reforma Premium Rates

I, Susan E. Pantely, Consulting Actuary, am an employee for the firm of Milliman. I am a Member of the American Academy of Actuaries and meet its Qualifications Standards for issuing Actuarial Statements of Opinion for health benefit ratemaking. I have been retained by the Administracion de Seguros de Salud ("ASES") with regard to the development of premium rates for the Reforma program, Puerto Rico's Medicaid program, fiscal year 2005 rates.

In developing ASES's rates, I relied on information provided to me by ASES representatives including:

• Information regarding provider reimbursement,

• Experience utilization for the Reforma program,

• Membership,

• Expected administrative expenses, and

• Historical claims experience for Reforma program.

The analyses and results herein are dependent upon the accuracy of the data that we received and on representations as provided by management representatives. The data was used without verification or audit but was reviewed for general reasonableness and consistency.

The attached premiums were developed based upon utilization and cost data that are derived from the Reforma population. Adjustments were made to smooth data and adjustments to account for factors such as medical trend inflation, incomplete data, and utilization. Adjustments to smooth data means adjustments made, by cost-neutral methods, to compensate for distortions in costs, utilization, or the number of eligibles. Separate rates were developed by locality/region. Separate rates were not developed by eligibility category or age/gender. There is only one HMO per region and an analysis of historical eligibles showed immaterial changes to the age/gender and eligibility categories from year to year. Therefore, a composite rate by region was determined to be actuarially sound.

The attached premium rates for ASES have been established in accordance with generally accepted actuarial principles and practices and the rates are not excessive, inadequate, or unfairly discriminatory. The premium rates are appropriate for the populations to be covered and the services to be furnished under the contract. The premium rates developed are actuarially sound and adhere to 42 CFR 438.6(c).

*Susan E. Pantely*

Susan E. Pantely, FSA, MAAA
July 30, 2004
New York, NY

Fiscal Year 2005 Monthly Premium PMPM Rates – Reforma

| Region | Physical Health | Mental Health |
|---|---|---|
| North | $64.21 | $5.34 |
| Metro North | $73.89 | $6.79 |
| Southwest | $63.00 | $4.24 |
| East | $86.11 | $5.45 |
| Southeast | $73.44 | $5.18 |
| West | $64.11 | $5.57 |
| Northeast | $72.74 | $6.15 |
| San Juan | $91.83 | $6.26 |

**Appendix A. PAHP, PIHP and MCO Contracts**
**Financial Review Documentation for At-risk Capitated Contracts Ratesetting**
Edit Date: 7/22/03

State: ____Puerto Rico_____  Type of Program:  Type of Entity:  Type of Review:
Contract Period: __7/1/04-6/30/05_____  ____ 1915(a)(1)(A) voluntary  __X__ MCO  ____ Initial
Contractor: __MCO(Humana,MCS,Triple S)_____  ____ State Plan Amendment  ____ HIO
__X__ Renewal  ____ Amendment
(Put "model" if same for all)  ____ 1915(b) waiver  ____ PIHP  ____ Rates Only
____ 1115 waiver  ____ PAHP
____ Other ____

Reviewer: Reynold Aufraser _____  Date: _____
10/8/04

Rate Checklist Instructions: This checklist is a tool for Regional Offices for use in approving rates under 42 CFR 438.6(c) for all capitated Medicaid managed care programs [1915(A)(1)(A), 1915(b), 1932(a), and 1115] excluding PACE capitated programs. See Attachment 1 to this Appendix for a listing of requirements for capitated rates. PACE capitated programs are still subject to Upper Payment Limit requirements under 42 CFR 460. 182. The PACE specific checklist should be used to approve PACE program rates. This checklist does not replace cost-effectiveness tests for 1915(b) waivers and budget neutrality for 1115 demonstrations. Some items only apply if the State has included a particular population, adjustment, program or policy for the managed care program. For example, if the State includes dual eligibles in its managed care program, the State must follow the regulations and statues outlined in item AA.2.2.

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | **Subsection AA.1 – General** | | | | |
| AA.1.0 | 42 CFR 438. 6(c)(2)(i) and (ii) | Overview of ratesetting methodology - The Contract must specify the payment rates and any risk-sharing mechanisms and the actuarial basis for computation of those rates and mechanisms. Specifically, the contract includes: | Contract | | |
| | 42 CFR 438.806 | ___ The rates and the time period for the rates, | Milliman Narrative | | |
| | SMM 2089.2, SMM 2092.8 | ___ The risk-sharing mechanisms, | | | |
| | SMM 2089.1 | ___ The actuarial basis for the computation of those rates and risk-sharing mechanisms (a lay person's description of the general steps the State followed to set rates is sufficient). | | | |
| | | *Rate Development or Update* | | | |
| | | ___ *The State is developing a new rate (RO completes steps A.A.1 - A.A.7).* | | | |
| | | ___ *The State is adjusting rates approved under 42 CFR 438.6(c) (RO completes all of step A.A.1)* | | | |
| AA.1.1 | 42 CFR 438.6(c)(1)(i)(A) and (C) | Actuarial certification -The State must provide the actuarial certification of the capitation rates and payments under the contract. All payments under risk contracts and all risk-sharing mechanisms in contracts must be actuarially sound. Actuarially sound capitation rates means capitation rates that have | Required Documentation | | |
| | 42 CFR 438.6(2)(i) and (ii) | been developed in accordance with generally accepted actuarial principles and practices, are appropriate for the populations to be covered, and the services to be furnished under the contract, and the Actuary must submit a certification, as meeting the requirements of the regulation, by an actuary who meets the practice qualification standards established by the American Academy of Actuaries and follows the practice | Milliman Narrative | | |
| | | | Contract Article 28 | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| AA.1.2 | 42 CFR 438.6(c)(3)<br><br>SMM 2089.2 | standards established by the Actuarial Standards Board. *Note: An Actuary who is a member of the American Academy of Actuaries will sign his name followed by the designation M.A.A.A., meaning a Member of the American Academy of Actuaries. For further information see www.actuary.org/faqs.htm Note: Actuaries can create either rates or rate ranges so long as the methodology (including all assumptions) to get to the actual rates in the contract are specified and meet CMS requirements. If there are instances where actuaries believe that information in their State is required to submit would represent trade secrets or proprietary information, as described in the Freedom of Information Act (FOIA) (5 U.S.C. 552(a)), the information should be identified as such and may be withheld from public disclosure under the provisions of the FOIA.* | | | |
| AA.1.3 | 42 CFR 438.6(c)(4)(iii) | **Projection of expenditures** - The State must provide a projection of expenditures under its previous year's contract (or under its FFS program if it did not have a contract in the previous year) compared to those projected under the proposed contract. | Contract or Documentation<br>Milliman Narrative | | |
| AA.1.5 | 45 CFR 74.43 and Appendix A<br><br>42 CFR 438.6(a)<br><br>42 CFR 438.806(a) and (b) | **Procurement, Prior Approval and Ratesetting** - All contracts must meet the procurement requirements in 45 CFR Part 74. Regardless of the procurement method, the final rates must be in the contract and include documentation and a description of how the resulting contract rates are determined in sufficient detail to address this set of regulatory criteria for each contract. In general, there are two options:<br>— Option 1: State set rates – The rates are developed using a set of assumptions meeting federal regulations that results in a set of rates. Open cooperative contracting occurs when the State signs a contract with any entity meeting the technical programmatic requirements of the State and willing to be reimbursed the actuarially-sound, State-determined rate. Sole source contracting occurs where the state contracts with a single entity to provide a set of services must be documented as meeting the requirements of 42 CFR 438.6(c) under this option.<br>— Option 2: Competitive Procurement — The rates are developed using a set of assumptions meeting federal regulations that results in a range of acceptable bids to determine a bid range for rates. Competitive procurement occurs when entities submit bids and the State negotiates rates within the range of acceptable bids. *A State could also disclose a maximum or minimum acceptable payment and encourage bids below or above that amount.* | Contract or Documentation<br>Milliman Narrative<br>Contract Article 18 | | |
| AA.1.6 | 42 CFR 438.60 | **Limit on payment to other providers** - The State agency must ensure that no payment is made to a provider other than the entity for services available under the contract between the State and the entity, except when these payments are provided for in title XIX of the Act, in 42 CFR, or when the State agency has adjusted the capitation rates paid under the contract to make payments for graduate medical education. *Note: see Step AA.1.8 for GME adjustments.* | Contract or Documentation<br>Contract Articles 2 and 7 | | |
| AA.1.5 | 42 CFR 447.15<br>CFR Part 74<br>42 CFR 438.2<br>42 CFR 438.812(a) | **Risk contracts** – The entity assumes risk for the cost of services covered under the contract and incurs loss if the cost of furnishing the services exceeds the payments under the contract. The entity must accept as payment in full, the amount paid by the State plus any cost sharing from the members. Payments for carrying out contract provisions including incentive payments are medical assistance costs. | State Regulation or Contract<br>Contract Article 12 | | |
| AA.1.7 | 42 CFR 438.6(c)(4)(i) and (ii) | **Rate Modifications** - This section is for use if the State updates or amends rates set under the new regulation at 42 CFR 438.6(c). The State has made program and rate changes that have affected the cost and utilization under the contract. The value and effect of these programmatic service changes on the rates | Milliman | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| | 42 CFR 438.6(c)(2)(i) and (ii) | should be documented. Adjustments for changes in the program structure or to reflect Medical trend inflation are made. Documentation meeting the requirements in step AA.3.0 – AA.3.24 is submitted to the RO for new adjustments. The adjustments include but are not limited to: | Narrative | | |
| | 42 CFR 438.6(c)(1)(i)(A) and (C) | • Medical cost and utilization trend inflation factors are based on historical medical State-specific costs or a national/regional medical market basket applicable to the state and population. Justification for the predictability of the inflation rates is given regardless of the source. Differentiation of trend rates is documented (i.e., differences in the trend by service categories, eligibility category, etc). All trend factors and assumptions are explained and documented. See Step AA.3.9. | | | |
| | 42 CFR 438.6(c)(3) | • Programmatic changes include additions and deletions to the contractor's benefit package, changes in the eligible population, or other programmatic changes in the managed care program (or FFS program that affected the managed care program) made after the last set of rates were set and outlined in the regulation. The State may adjust for those changes if the adjustment is made only once (e.g., if the State projected the effect of a change in the last rate setting, then they must back out that projection before applying an adjustment for the actual policy effect) | | | |
| | 42 CFR 438.6(c)(4)(ii)(A) | | | | |
| | 42 CFR 438.6(c)(1)(B) | | | | |
| | 42 CFR 438.6(c)(3)(ii) and (iv) | CMS allows rate changes (regardless of whether they are reductions or augmentations) and provides FFP in such changes as long as the changes are implemented through either a formal contract amendment or a multi-period contract and continue to meet all applicable statute provisions and regulations. If rate changes are implemented through a contract amendment, the amendment must receive approval by the RO before FFP in any higher payment amounts may be awarded. If the rate change is an anticipated development in a multi-year process, it must also be reviewed by the RO, consistent with guidelines for multi-year contracts. *If the amended rates use new actuarial techniques or different utilization data bases than was used and approved previously, the regional office should complete the entire checklist. Rates approved prior to the release of 42 CFR 438.6 must comply with the regulation by the period specified in the Federal Register.* | | | |
| | SMM 2089.5 | | | | |
| Subsection AA.2 – Base Year Utilization and Cost Data | | | | | |
| AA.2.0 | 42 CFR 438.6(c)(3)(i) and (iv) | **Base Year Utilization and Cost Data** – The State must provide documentation and an assurance that all payment rates are: | Required Documentation | | |
| | | • based only upon services covered under the State Plan (or costs directly related to providing these services, for example, MCO, PIHP, or PAHP administration) | | | |
| | 42 CFR 438.6(c)(1)(i)(B) | • Provided under the contract to Medicaid -eligible individuals. | Milliman Narrative | | |
| | | *In setting actuarially sound capitation rates, the State must apply the following element or explain why it is not applicable: Base utilization and cost data that are derived from the Medicaid population or, if not, are adjusted to make them comparable to the Medicaid population. The base data used were recent and are free from material omission.* | State Plan | | |
| | | *Base data for both utilization and cost are defined and relevant to the Medicaid population (i.e., the database is appropriate for setting rates for the given Medicaid population). States without recent FFS history and no validated encounter data will need to develop other data sources for this purpose. States and their actuaries will have to decide which source of data to use for this purpose, based on which source is determined to have the have the highest degree of reliability, subject to RO approval.* | | | |
| | | *Examples of acceptable databases on which to base utilization assumptions are: Medicaid FFS databases,* | | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| AA.2.1 | 42 CFR 438.6(c)(1)(i)(B)<br>42 CFR 438.6(c)(4)(ii)(B) | Medicaid managed care encounter data, State employees health insurance databases, and low-income health insurance program databases. *Note: Some states have implemented financial reporting requirements of the health plans which can be used as a data source in conjunction with encounter data and would improve on some of the shortcomings of these other specific databases used for utilization purposes. For example, some states now require the submission of financial reports to supplement the encounter data by providing cost data. It would also be permissible for the State to supplement the FFS database and would not need to supplement the data with plan financial information. The State could use the cost and utilization data from a Medicaid FFS database by using FFS cost data.* Note: The CMS RO may approve other sources not listed here based upon the reasonableness of the given data source. The overall intent of these reporting requirements is to collect the same information that is available in the encounter data, but in a more complete and accurate reflection of the true cost of services. Utilization data is appropriate to the Medicaid population. That is, if the utilization assumptions are not derived from recent Medicaid experience, the State should explain and document the source of assumptions and why the assumptions are appropriate to the Medicaid population covered by these proposed rates.<br><br>Service cost assumptions are appropriate for a Medicaid program and the base data was reviewed by the State for similarity with the Medicaid program's current costs. *Note: except in the case of payments to FQHCs that subcontract with entities, which are governed by section 1903(m)(2)(A)(ix), CMS does not regulate the payment rates between entities and subcontracting providers. Payment rates are adequate to the extent that the capitated entity has documented the adequacy of its network.*<br><br>The term "appropriate" means specific to the population for which the payment rate is intended. This requirement applies to individuals who have health care costs that are much higher than the average. Appropriate for the populations covered means that the rates are based upon specific populations, by eligibility category, age, gender, locality, and other distinctions decided by the State. Appropriate to the services to be covered means that the rates must be based upon the State plan services to be provided under the contract. There is no stated or implied requirement that entities be reimbursed the full cost of care at billed charges.<br><br>Medicaid Eligibles under the Contract – All payments under risk contracts and all risk-sharing mechanisms in contracts must be actuarially sound. Actuarially sound capitation rates means capitation rates are appropriate for the populations to be covered and provided under the contract to Medicaid-eligible individuals. The State may either include only data for eligible individuals and exclude data for individuals in the base period who would not be eligible for managed care contract services or apply an appropriate adjustment factor to the data to remove ineligibles if sufficient documentation exists. The explanation and documentation should list the eligibility categories specifically included and excluded from the analysis.<br><br>*Note: for example, if mentally retarded individuals are not in the managed care program, utilization, eligibility and cost data for mentally retarded eligibles should all be excluded from the rates.* | Required Documentation<br>Milliman Narrative | | |
| AA.2.2 | 1905(p)(1-3) | Dual Eligibles (DE) – Some States include capitation payments for DE. Because the statute and CMS policy under 1115 demonstration projects.<br><br>*Note: all references in this checklist to Medicaid eligibles include 1115 expansion populations approved* | Contract or | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
|  | SMM 3490 (ff)<br><br>SMD letter 9/30/00 | specifies that the State may only pay for Medicaid-eligible individuals, those Medicaid payment limits must be observed if the program includes DE. See the Attachment to Appendix A for additional information on Dual Eligibles.<br><br>Only the following groups of DE are entitled to Medicaid Services. If they are included in a capitated managed care contract, they should have a Medicaid rate calculated separately from other DE:<br>■ QMB Plus<br>■ Medicaid (Non QMB and Non SLMB)<br>■ SLMB Plus<br><br>Eligibles and services for beneficiaries in the four non-Medicaid DE categories<br>■ QMB-only<br>■ QDWI<br>■ SLMB-only<br>■ QI-1<br><br>should be specifically excluded from the capitated rates calculated for the 3 DE categories above (QMB Plus, Medicaid (Non QMB and Non-SLMB), and SLMB Plus). If DE beneficiaries in the non-Medicaid four categories are allowed to choose to enroll in capitated managed care, the Medicaid State Agency would continue to be liable for the same Medicare payments (e.g. Medicare fee-for-service premiums) as under FFS. The beneficiary would be liable for any Medicaid services payment because they are not eligible for Medicaid services.<br><br>For QMB-only and QMB-Plus, the State may also need to calculate a separate payment to the capitated organization for Medicare cost-sharing or premium amounts. If the M+C organization charges monthly premiums, Medicaid is liable for payment of monthly M+C premium amounts for QMB categories (QMB-only and QMB Plus) for the basic packages of Medicare benefits only, if so elected in the Medicaid State plan (State Plan preprint page 29, 3.2(a)(1)(i)). Medicaid is also liable for Medicare cost-sharing expenses (deductibles, coinsurance and copayments) for Medicare covered services to the payment amount specified in the Medicaid State plan (Supplement 1 to Attachment 4.19-B). When an M+C organization imposes cost-sharing charges in addition to premiums for Medicare-covered services on their enrollees, the Medicaid agency must pay those costs for QMBs regardless of whether the State elected to include premiums in cost-sharing. No Medicaid services or payments would be included in the payment calculated for the entity. | Contract Article 2 |  |  |
| AA.2.3 | 42 CFR 435.1002(b)<br><br>1903(f)(2)(A)<br><br>SMM 3645 | Spenddown – FFP is not available for expenses that are the recipient's liability for recipients who establish eligibility for Medicaid by deducting incurred medical expenses from income.<br><br>Spenddown is the amount of money that an individual with income over Medicaid eligibility limits must spend on medical expenses prior to gaining Medicaid eligibility. The spenddown amount is equal to the dollar amount the individual's income is over the Medicaid income limit. 42 CFR 435 Subpart D.<br><br>States have two methods for calculating spenddown. Regardless of the option selected by the State, the State should not request federal Medicaid match for expenses that are the recipient's liability. Typically this means that capitated rates must be calculated without including expenses that are the recipient's liability.<br>1. Regular method – The individual client collects documentation verifying that a medical expense has | Contract or Documentation | NA |  |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| AA.2.4 | 42 CFR 438.6(c)(1)(i)(B) <br><br> 42 CFR 438.6(c)(4)(ii)(A) | occurred and submits to the State. States must ensure that capitation rates for individuals with spenddown (both medically needy beneficiaries and beneficiaries with spenddown amounts) are calculated without including expenses that are the recipient's liability. <br><br> 2. Pay-in method - The individual client pays a monthly installment payment to the State equal to the spenddown amount rather than collecting documentation on medical expenses and submitting that documentation to the case worker. The same income and resource standards apply as in the regular method. The State then tracks the client's medical costs to ensure that the costs exceed the spenddown amount. Here the State sets capitation rates to include expenses that are of the recipient's liability and must ensure that the federal government receives its share of the monthly or lump sum payment from the client. | Contract or Documentation | | |
| AA.2.5 | 438.6(e) | State Plan Services only - The State must document that the actuarially sound capitation rates are appropriate for the services to be furnished under the contract and based only upon services covered under the State Plan (or costs directly related to providing these services, for example, MCO, PHP, or PAHP administration). The explanation and documentation should list the services specifically included and excluded from the analysis. Services provided by the managed care plan that exceed the services covered in the Medicaid State Plan may not be used to set capitated Medicaid managed care rates (e.g., 1915(b)(3) waiver services or services outlined in 42 CFR 438.6(e) as referenced in AA.2.5. <br><br> • States using encounter data may base utilization and service costs on non-FFS data adjusting the data to reflect State plan services only. <br><br> • Services not part of the State plan that are unilaterally contractually required or "suggested" (typically authorized as "1915(b)(3) services") may not be used to calculate actuarially sound rates and must be paid out of separate payment rates approved prospectively under the 1915(b) waiver process. <br><br> • EPSDT extended/supplemental services for children are State Plan Approved services and may be built into the capitated rates. <br><br> • 1115(a)(2) services are considered State Plan Services for 1115 populations for the duration of the demonstration and may be built into capitated payments approved through the 1115 demonstration budget neutrality agreement for approved populations only. <br><br> • HCBS waiver services may only be included for capitated contracts under 1915(b)/(c) concurrent waiver or in CMS RO approved 1915(a)(1)(A)/(c) capitated contracts for approved 1915(c) waiver participants. Note: for the purposes of pre-PACE under 1915(a)(1)(A) HCBS services should be included. If the population is a nursing home-certifiable population and eligible for HCBS, the State may consider HCBS as an acceptable service for long-term care managed care. <br><br> • 1915(a)(1)(A) capitated rates must be based on State Plan Approved services only and 1915(c) approved services for 1915(c) participants. <br><br> Note: The inclusion of any additional Medicaid services during the term of a contract could either be handled through a contract amendment or a contract term that provides for the contingency), subject to CMS approval. Amendments must be prior approved by the CMS RO. <br><br> Services that may be covered by a capitated entity out of contract savings - An entity may provide services to enrollees that are in addition to those covered under the State plan, although the cost of these services cannot be included when determining the payment rates. Note: this is different than 1915(b)(3) waiver services which are contractually required by the State. When a State agency decides to contract with an entity, it is arranging to have some or all of its State plan services provided to its Medicaid population | Milliman Narrative <br><br> Article 19 Contract <br><br> Contract | NA | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|

**Subsection AA.3 – Adjustments to the Base Year Data**

| AA.3.0 | 42 CFR 438.6(c)(3)(i) and (iv) | *through that entity. The State has not modified the services that are covered under its State plan, nor is it continuing to pay, on a FFS basis, for each and every service to be provided by the entity. Further, entities have the ability to provide services that are in the place of, or in addition to, the services covered under the State plan, in the most efficient manner that meets the needs of the individual enrollee. These additional or alternative services do not affect the capitation rate paid to the entity by the State. The capitation rates should not be developed on the basis of these services. The State determines the scope of State plan benefits to be covered under the managed care contract, and sets payment rates based on those services. This does not affect the entities right, however, to use these payments to provide alternative services to enrollees that would not be available under the State plan to beneficiaries not enrolled in the entity. Section 1915(b)(3) waiver authority that allows a State to share savings resulting from the use of more cost-effective medical care with beneficiaries by providing them with additional services.* | | | |

| | | **Adjustments to the Base Year Data** - The State made adjustments to the base period to construct rates to reflect populations and services covered during the contract period. These adjustments ensure that the rates are predicable for the covered Medicaid population. | | | |

| | | All regulatory referenced adjustments are listed in 3.1 through 3.14. | Milliman Narrative | | |

| | | **Adjustments must be mutually exclusive and may not be taken twice. States must document the policy assumptions, size, and effect of these adjustments and demonstrate that they are not double counting the effects of each adjustment. The RO should check to ensure that the State has contract clauses (or State Plan Amendments), where appropriate, for each adjustment.** | Contract or Documentation | | |

| | | Sample Adjustments to the Base Year that may increase the Base Year:<br>• Administration (Step AA.3.2)<br>• Benefit, Programmatic and Policy change in FFS made after the claims data tape was out (Step AA.3.1)<br>• Claims completion factors (Step AA.3.2)<br>• Medical service cost trend inflation (Step AA.3.3)<br>• Utilization due to changes in FFS utilization between the Base Year and the contract period. Changes in utilization of medical procedures over time is taken into account (Step AA.3.3)<br>• Certified Match provided by public providers in FFS<br>• Cost-sharing in FFS is not in the managed care program<br>• FFS benefit additions occurring after the extraction of the data from the MMIS are taken into account<br>• One-time only adjustment for historically low utilization in FFS program of a State Plan Approved benefit (i.e., denial)<br>• Patient liability for institutional care will be charged under this program<br>• Payments not processed through the MMIS<br>• Price increase in FFS made after the claims data tape was out | | | |

| | | Sample Adjustments to the Base Year that may adjust the Base Year downward:<br>• Benefit deletions in the FFS Program occurring after the extraction of the data from the MMIS are taken into account (Step AA.3.1)<br>• Cost-sharing in managed care in excess of FFS cost-sharing | | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| | | • Disproportionate Share Hospital Payments (Step AA.3.5)<br>• Financial Experience Adjustment<br>• FQHC/RHC payments<br>• Graduate Medical Education (Step AA.3.8)<br>• Income Investment Factor<br>• Indirect Medical Education Payments (Step AA.3.8)<br>• Managed Care Adjustment<br>• PCCM Case Management Fee<br>• Pharmacy Rebates<br>• Post-pay recoveries (TPL) if the State will not collect and allow the MCE to keep TPL payments (Step AA.3.6)<br>• Recoupments not processed through the MMIS<br>• Retrospective Eligibility costs (Step AA.3.4)<br><br>Cost-neutral Adjustments:<br>• Data smoothing for data distortions and individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims including risk-sharing and reinsurance (Step AA.5.0)<br><br>*Note: The CMS RO must review all changes for appropriateness to the data selected by the State (e.g., if the State is using encounter data, then adjustments for FFS changes may not be appropriate). Some adjustments are mandatory. They are noted as such.*<br><br>*All adjustments must be documented. Adjustments must be mutually exclusive and may not be taken twice. States must document the policy assumptions, size, and effect of each adjustment. The RO should check to demonstrate that they are not double counting the effects of each adjustment, where appropriate, for each ensure that the State has contract clauses (or State Plan Amendments), where appropriate, for each adjustment.* | | | |
| AA.3.1 | 42 CFR 438.6(c)(1)(B) | Benefit Differences. - Actually sound capitation rates are appropriate for the services to be furnished under the contract. The State must document that actuarially sound capitation rates payments are based only upon services covered under the State Plan. *Differences in the service package for the Base Period data and the Medicaid managed care covered service package are adjusted in the rates. Documentation of assumptions and estimates is required for this adjustment.* | Required Documentation<br><br>Contract Article 19 | | |
| AA.3.2 | 42 CFR 438.6(c)(4)(ii)(A)<br>42 CFR 438.6(c)(4)(ii)(A)<br>42 CFR 438.6(c)(3)(ii) | Administrative cost allowance calculations. - The State must document that an adjustment was made to the rate to account for MCO, PIHP or PAHP administration. Only administrative costs directly related to the provision of Medicaid State Plan approved services to Medicaid-eligible members are built into the rates. *Documentation of assumptions and estimates is required.* | Required Documentation<br><br>Milliman Narrative | | |
| | 42 CFR 438.812 | In order to receive Federal reimbursement, administrative costs are subject to all applicable Medicaid administrative claiming regulations and policies. Medicaid pays for the administration of Medicaid services to Medicaid beneficiaries covered under the contract. The following examples are not all inclusive. | Contract Article 16 | | |
| | Family Planning FMAP | • Public entities cannot build in administrative costs to pay for non-Medicaid administration or services such as education, prisons, or roads, bridges and stadiums using the administrative cost in capitated | | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| | 1903(a)(5) and 42 CFR 433.10(c)(1)<br><br>Financial Management Review Guide #20 Title XIX Family Planning Services (See page 1 of this guide for a complete list of statutory and regulatory references)<br><br>7/3/01 SMD Letter<br><br>Indian Health Service facility FMAP 1905(b) and 42 CFR 433.10(c)(2) | rates.<br>• Administrative costs for State Plan approved services can only be claimed for services to be delivered to Medicaid beneficiaries under the contract (not for 1915(b)(3) services. Administration costs in contract must be allocated to the appropriate programs (e.g. public health must pay for the administration of public health services to non-Medicaid eligibles). CMS provides FFP only for the administration of Medicaid services to Medicaid beneficiaries covered under the contract.<br>• Regular Medicaid matching rules apply. See 42 CFR 438.812 which states that all payments under a risk contract are medical assistance costs (FMAP rate) and which requires an allocation for non-risk contracts between service costs and administrative costs. Separate administrative costs under the State Plan should not be placed under a capitated contract in order for the State to draw down the FMAP (50-80%) rate rather than the administrative rate (50%). Examples of this include: survey and certification costs or other administrative costs not associated with the plan's provision of contractually-required covered State Plan services to Medicaid enrollees. Separate administrative contracts including this administration can be written for capitated entities that will be matched at 50% by the federal government. *Note: Family planning and Indian health services enhanced matching FMAP rates and rules do apply to family planning and Indian health services in capitated contracts. For family planning, the State must document the portion of its rates that are family planning consistent with the CMS Title XIX Financial Management Review Guide #20 Family Planning Services, especially Exhibit A. Please refer to the 7/3/01 SMD letter regarding the need for timely filing of claims.*<br>• Paperwork costs, such as time spent writing up case notes, associated with face-to-face contact with an eligible member is already included in the direct service cost and should not be built into the capitated rates again. Medicaid State agencies should also not pay separately for this administration. This occurs when an entity contracts with a public entity to provide services. The public entity provides the direct services and then bills the State Medicaid agency or the entity for administration associated with the direct services. Schools are providing the primary examples of this practice. This could also occur if an entity builds in additional administrative costs associated with direct service that have already been built into the direct service rates to providers.<br><br>*Note: CMS does not have established standards for risk and profit levels but does allow reasonable amounts for risk and profit to be included in capitated rates.* | | | |
| AA.3.3 | 42 CFR 438.6(c)(3)(ii) | Special populations' adjustments – Specific health needs adjustments are made to make the populations more comparable. The State may make this adjustment only if the population has changed since the utilization data tape was produced (e.g., the FFS population has significantly more high-cost refugees) or the base population is different than the current Medicaid population (e.g., the State is using the State employees health insurance data). The State should use adjustments such as these to develop rates for new populations (e.g., SCHIP eligibles or 1115 expansion eligibles). The State should document why they believe the rates are adequate for these particular new populations. | Contract or Ratesetting Documentation | NA | |
| AA.3.4 | 42 CFR 438.6(c)(3)(ii) and (iv) | Eligibility Adjustments – The actuary analyzed the covered months in the base period to ensure that member months are parallel to the covered months for which the entities are taking risk. Adjustments are often needed to remove from the base period covered months -- and their associated claims -- that are not representative of months that would be covered by an entity. For example, many newborns are retrospectively covered by FFS Medicaid at birth, and will not enroll in an entity (even in mandatory enrollment programs) until a few months after birth. Because the costs in the first months of life are very | Contract or Ratesetting Documentation Milliman Narrative | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| AA.3.5 | 1923(i) BBA 4721(d) | high, if retrospective eligibility periods are not removed from the base period the state could be substantially over-estimating entities' average PMPM costs in the under-1 age cohort. Similar issues exist with the mother's costs when the delivery is retrospectively covered by FFS Medicaid, and with retrospective eligibility periods in general. | Contract or Documentation NA | | |
| AA.3.6 | 42 CFR 433 Sub D 42 CFR 447.20 SMM 2089.7 | *DSH Payments (contracts signed after 7/1/97)* – DSH payments may not be included in capitation rates. The State must pay DSH directly to the DSH facility. | Contract Contract Articles 4,36 | | |
| AA.3.7 | 42 CFR 447.58 | *Third Party Liability (TPL)* – The contract must specify any activities the entity must perform related to third party liability. The Documentation must address third party liability payments and whether the State or the entity will retain TPL collections. Rates must reflect the appropriate adjustment (i.e., if the entity retains TPL collection the rates should be adjusted downward or if the State collects and retains the TPL the rates should include TPL). | Contract or Documentation | | |
| AA.3.8 | SMM 2089.8 | *Copayments, Coinsurance and Deductibles in capitated rates* – If the State uses FFS as the base data to set rates and the State Medicaid agency chooses not to impose the FFS cost-sharing in its pre-paid capitation contracts with entities, the State must calculate the capitated payments to the organization as if those cost sharing charges were collected. For example, if the State has a $2 copayment on FFS beneficiaries for each pharmacy prescription, but does not impose this copayment on any managed care member, the State must add back an amount to the capitated rates that would account for the lack of copayment. *Note: this would result in an addition to the capitated rates.* | NA | | |
| AA.3.9 | 42 CFR 438.60 | For 1115 expansion beneficiaries only, if the state uses FFS as the base data to set rates and imposes more deductibles, coinsurance, co-payments or similar charges on capitated members than the State imposes on its fee-for-service beneficiaries, the State must calculate the rates by reducing the capitation payments by the amount of the additional charges. *Note: this would result in a reduction to the capitated rates.* | Contract or Documentation | | |
| AA.3.9 | 1903(m)(2)(A)(ix) 1902(bb) | *Graduate Medical Education (GME)*: If a State makes GME payments directly to providers, the capitation payments should be adjusted to account for the aggregate amount of GME payments to be made on behalf of enrollees under the contract (i.e., the State should not pay the entity for any GME payments made directly to providers). States must first establish actuarially sound capitation rates prior to making adjustments for GME.

CMS permits such payments only to the extent the capitation rate has been adjusted to reflect the amount of the GME payment made directly to the hospital. States making payments to providers for GME costs under an approved State plan must adjust the actuarially sound capitation rates to account for the aggregate amount of GME payments to be made directly to hospitals on behalf of enrollees covered under the contract. These amounts cannot exceed the aggregate amount that would have been paid under the approved State plan for FFS. This prevents harm to teaching hospitals and ensures the fiscal accountability of these payments. | Contract Article 19 | | |
| AA.3.10 | 42 CFR 438.6(c)(3)(i) | *FQHC and RHC reimbursement* – The State may build in only the FFS rate schedule or an actuarially equivalent rate for services rendered by FQHCs and RHCs. The State may NOT include the FQHC/RHC encounter rate, cost-settlement, or prospective payment amounts. The entity must pay FQHCs and RHCs no less than it pays non-FQHC and RHCs for similar services. In the absence of a specific 1115 waiver, the entity cannot pay the annual cost-settlement or prospective payment. | NA | | |
| | 42 CFR 438.6(c)(3)(ii) | *Medical Cost/Trend Inflation* – Medical cost and utilization trend inflation factors are based on historical medical State-specific costs or a national/regional medical market basket applicable to the state and | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| AA.3.11 | 42 CFR 438.6(c)(3)(ii) and (iv) | population.    All trend factors and assumptions are explained and documented.<br><br>*Note: This also includes price increases not accounted for in inflation (i.e., price increases in the fee-for-service or managed care programs made after the claims data tape was cut). This adjustment is made if price increases are legislated by the Legislature. The RO must ensure that the State "inflates" the rate only once and does not double count inflation and legislative price increases. The RO must ensure that program price increases since the rates were originally set are appropriately made.* | | | |
| AA.3.12 | 42 CFR 438.6(c)(4)(ii)<br><br>42 CFR 438.6(c)(3)(iv)<br><br>42 CFR 438.6(c)(1)(i)(B) | Utilization Adjustments - Generally, there are two types of Utilization adjustments are possible: utilization differences between base data and the Medicaid managed care population and changes in Medical utilization over time.<br><br>• Base period differences between the underlying utilization of Medicaid FFS data and Medicaid managed care data assumptions are determined. These adjustments increase or decrease utilization to levels that have not been achieved in the base data, but are realistically attainable CMS program goals. States may pay for the amount, duration and scope of State plan services that States expect to be delivered under a managed care contract. Thus, States may adjust the capitation rate to cover services such as EPSDT or prenatal care at the rate the State wants the service to be delivered to the enrolled population. The RO should check to ensure that the State has a contract clause for using mechanisms such as financial penalties if service delivery targets are not met or incentives for when targets are met.<br>*Note: an example of this adjustment is an adjustment to Medicaid FFS data for EPSDT where FFS beneficiaries have historically low EPSDT utilization rates and the managed care contract requires the entity to have a higher utilization rate. The State should have a mechanism to measure that the higher utilization occurs and the RO should verify that this measurement occurs.*<br><br>• A change in utilization of medical procedures over time is taken into account. Documentation is required if this adjustment is made. The State should document 1) The assumptions made for the change in utilization.  2) How it came to the precise adjustment size.  3) That the adjustment is a unique change that could not be reflected in the utilization database because it occurred after the base year utilization data tape was cut. Examples may include: major technological advances (e.g., new high cost services) that cannot be predicted in base year data (protease inhibitors would be acceptable, a new type of aspirin would not be acceptable).<br><br>*Note: These adjustments can be distinguished from each other. The first is utilization change stemming from historic under- or over-utilization that is being corrected solely by the implementation of this program.  Historic access problems in FFS Medicaid programs may be addressed through this adjustment. The second is a one time only non-recurring utilization change because of a unique utilization change projected to occur (for which did occur) after the base year data tape was produced.*<br><br>Utilization and Cost Assumptions – The State must document that the utilization and cost assumptions for a voluntary program were analyzed and adjusted to ensure that they are appropriate for the populations to be covered if a healthier or sicker population voluntarily chooses to enroll (compared to the population data on which the rates are set). The State must document that utilization and cost assumptions that are appropriate for individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims, using risk adjustment, risk-sharing or other appropriate cost-neutral methods.<br>*Note: this analysis is needed whenever the population enrolled in the managed care program is different than the data for which the rates were set (e.g., beneficiaries have a choice between a fee-for-service* | Contract or Documentation<br><br>Milliman Narrative<br><br>Milliman Narrative<br><br>Milliman Narrative | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| AA.3.13 | 42 CFR 435.725 (Categorically Needy)<br>42 CFR 435.832 (Medically Needy) | *program (PCCM) and a capitated program (MCO) and the rates are set using FFS data).*<br>**Post-Eligibility Treatment of Income (PETI)** *(This applies for NF, HCBS, ICF-MR, and PACE beneficiaries in capitated programs where PETI applies only.)   If the State Plan or waiver requires that the State consider post-eligibility treatment of income for institutionalized beneficiaries, the actual rate paid to the capitated entity would be the rate for the member minus any patient liability for that specific enrolled member. The State should calculate the client participation amount specifically for each member using the FFS methodology.* | Contract or Documentation | | |
| AA.3.14 | 42 CFR 438.6(c)(3)(ii) | *Patient liability is a post-eligibility determination of the amount an institutionalized Medicaid beneficiary is liable for the cost of their care. It is also called client participation, cost of care, PE, and post-eligibility treatment of income. 42 CFR 435 Subpart H.   Client participation should not be used to reduce total costs for all participants. Client participation should be assessed individually, reducing the individual rate paid to the capitated entity, not computed in aggregate and reducing all capitation payments. If the MMIS data tape is cut to reflect only the amount the Medicaid agency paid providers, then patient liability for cost of care must be added back to the rate to determine the total cost of care for an individual. The actual rate paid to the capitated entity would be the rate for the member minus any patient liability for that specific enrolled member. The capitated entity would then need to collect the patient liability from the enrolled member.* | NA | | |
| | | **Incomplete Data Adjustment** -- The State must adjust base period data to account for incomplete data.  When fee-for-service data is summarized by date of service (DOS), data for a particular period of time is usually incomplete until a year or more after the end of the period.  In order to use recent DOS data, the Actuary must calculate an estimate of the services ultimate value after all claims have been reported.  Such incomplete data adjustments are referred to in different ways, including, "lag factors," "incurred but not reported (IBNR) factors," or incurring factors.  If date of payment (DOP) data is used, completion factors are not needed, but projections are complicated by the fact that payments are related to services performed in various former periods.  *Documentation of assumptions and estimates is required for this adjustment.* | Milliman Narrative | | |
| | | An Option under 42 CFR 435.725(f) - The State can use a projection of expenses for a prospective period not to exceed 6 months to calculate client participation.  This option requires the State to reconcile estimates with incurred expenses.  Even with this option, the State must reduce the capitation rate to exclude expenses that are of the recipient's liability. This procedure ensures that the federal government does not pay more than its share of costs. | Contract or Documentation | | |
| **Subsection AA.4 - Establish Rate Category Groupings** | | | | | |
| AA.4.0 | 42 CFR 438.6(c)(3)(ii)<br><br>FR 6/14/02 p41001 | **Establish Rate Category Groupings (All portions of subsection AA.4 are mandatory)** -- The State has created rate cells specific to the enrolled population. *The rate category groupings were made to construct rates more predictable for future Medicaid populations' rate setting.  The number of categories should relate to the contracting method.  Rate cells need to be grouped based upon predictability so entities do not have incentives to market and to enroll one group over another. Multiple rate cells should be used whenever the average costs of a group of beneficiaries greatly differ from another group and that group can be easily identified. Note: The State must document that similar cost categories are grouped together to improve predictability.  For example, rate cells may be combined if there is an insufficient number of enrollees in any one category to have statistical validity.* | Contract or Documentation<br>Milliman Narrative | | |
| AA.4.1 | 42 CFR 438.6(c)(3)(iii)(B) | **Age** - Age Categories are defined.  If not, justification for the predictability of the methodology used is given. | Contract or Documentation | | |

| Item # | Legal Cite | Subject | Where Located | Met or N/A | Comments |
|---|---|---|---|---|---|
| AA.4.2 | 42 CFR 438.6(c)(3)(ii)(C) | Gender - Gender Categories are defined. If not, justification for the predicability of the methodology used is given | Narrative | | |
| AA.4.3 | 42 CFR 438.6(c)(3)(ii)(D) | Locality/Region - Locality/region Categories are defined. If not, justification for the predicability of the methodology used is given | Contract or Documentation Narrative | | |
| AA.4.4 | 42 CFR 438.6(c)(3)(iii)(E) | Eligibility Categories - Eligibility Categories are defined. If not, justification for the predicability of the methodology used is given. | Contract or Documentation Narrative | | |
| **Subsection AA.5 – Data Smoothing, Special Populations and Catastrophic Claims** | | | | | |
| AA.5.0 | 42 CFR 438.6(c)(3)(ii), (iii) and (iv) | Data Smoothing (All portions of subsection AA.5 are mandatory) - The State has examined the data for any distortions and adjusted in a cost-neutral manner for distortions and special populations. Distortions are primarily the result of small populations, special needs individuals, access problems in certain areas of the State, or extremely high-cost catastrophic claims. Costs in rate cells are adjusted through a cost-neutral process to reduce distortions across cells to compensate for distortions in costs, utilization, or the number of eligibles. This process adjusts rates toward the statewide average rate. The State must supply an explanation of the smoothing adjustment, an understanding of what was being accomplished by the adjustment, and demonstrate that, in total, the aggregate dollars accounted for among all the geographic areas after smoothing is basically the same as before the smoothing.

The State has taken into account individuals with special health care needs and catastrophic claims. These populations should only be included if they are an eligible, covered population under the contract. Claim costs and utilization for high cost individuals (e. g., special needs children) in the managed care program are included in the rates. | Contract or Ratesetting, Documentation | | |
| AA.5.1 | 42 CFR 438.6(c)(3)(iv) | Special Populations and Assessment of the Data for Distortions – Because the rates are based on actual utilization in a population, the State must assess the degree to which a small number of catastrophic claims might be distorting the per capita costs. Other payment mechanisms and utilization and cost assumptions that are appropriate for individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims, using risk adjustment, risk-sharing, or other appropriate cost-neutral methods may be necessary.

If no distortions or outliers are detected by the actuary, a rate setting method that uses utilization and cost data for populations that include individuals with chronic illness, disability, ongoing health care needs, or catastrophic claims will meet requirements for special populations without additional adjustments, since the higher costs would be reflected in the enrollees' utilization. States must document their examination of the data for outliers and smooth appropriately.

The fact that the costs of these individuals are included in the aggregate data used for setting rates will not account for the costs to be incurred by a contractor that, due to adverse selection or other reasons, enrolls a disproportionately high number of these persons. CMS requires some mechanism to address this issue. Most entity contracts currently use either stop-loss, risk corridors, reinsurance, health status-based risk. | Milliman Narrative | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| | | adjusters, or some combination of these cost-neutral approaches. | | | |
| | | *Note: The RO should verify that this assessment occurred and that distortions found were addressed in 5.2.* | | | |
| AA.5.2 | 42 CFR 438.6(c)(1)(iii) | *Cost-neutral data smoothing adjustment* – If the State determines that a small number of catastrophic claims are distorting the per capita costs then at least one of the following cost-neutral data smoothing techniques must be made. | Contract or Documentation | | |
| | 42 CFR 438.6(c)(3)(ii) and (iv) | Cost neutral means that the mechanism used to smooth data, share risk, or adjust for risk will recognize both higher and lower expected costs and is not intended to create a net aggregate gain or loss across all payments. | | | |
| | SMM 2089.6 | Actuarially sound risk sharing methodologies will be cost neutral in the aggregate. How that is determined, however, will differ based on the type of mechanism that is used. A stop-loss mechanism will require an offset to capitation rates under the contract, based on the amount and type of the stop-loss. Health status-based risk adjustment may require an adjustment to the capitation rate for all individuals categorized through the risk adjustment system, but the aggregate program impact will still be neutral. CMS will recognize that any of these mechanisms may result in actual payments that are not cost neutral, in that there could be changes in the case mix or relative health status of the enrolled population. As long as the risk sharing or risk adjustment system is designed to be cost neutral, it would meet this requirement regardless of unforeseen outcomes such as these resulting in higher actual payments. | Milliman Narrative | | |
| | | The mechanism should be cost neutral in the aggregate. How that is determined, however, will not merely add additional payments to the contractors' rates, but will have a negative impact on other rates, through offsets or reductions in capitation rates, so that there is no net aggregate assumed impact across all payments. A risk corridor model where the State and contractor share equal percentages of profits and losses beyond a threshold amount would be cost neutral. | | | |
| | | **Data Smoothing Techniques:** | | | |
| | | — Provision of stop loss, reinsurance, or risk-sharing (See 6.0) | | | |
| | | — Catastrophic Claims Adjustment – The State must identify that there are outlier cases and explain how the costs associated with those outlier cases were separated from the rate cells and then redistributed across capitation payment cells in a cost-neutral, yet predictive manner. | | | |
| | | — Small population or small rate cell adjustment – The State has used one of three methods: 1) The actuary has collapsed rate cells together because they are so small, 2) the actuary has calculated a statewide per member per month for each individual cell and multiplied regional cost factors to that statewide PMPM in a cost-neutral manner, or 3) the actuary bases rates on multiple years data for the affected population weighted so that the total costs do not exceed 100% of costs (e.g., 3 years data with most recent year's data weighted at 50%, 2nd most recent year's data weighted at 30% and least recent year weighted at 20%). | | | |
| | | — Mathematical smoothing – The actuary develops a mathematical formula looking at claims over a historical period (e.g., 3 to 5 years) that identifies outlier cost averages and corrects for skewed distributions in claims history. The smoothing should account for cost averages that are higher and lower than normal in order to maintain cost-neutrality. | | | |
| | | — Maternity Kick-Payment (Per delivery rate) – Non-delivery related claims were separated from | | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment |
|---|---|---|---|---|---|
| AA.5.3 | 42 CFR 438.4(c)(1)(iii)<br><br>42 CFR 438.6(c)(3)(iii) and (iv) | delivery related claims. The non-delivery related claims were sorted into categories of service and used to base the managed care capitation payments. Delivery-related costs were removed from the total final paid claims calculations. The State developed a tabulation of per-delivery costs only. The State reviewed the data for accuracy and variance. The State develops a single, average, per-delivery maternity rate across all cohorts and across all regions unless variance warrants region-specific per-delivery maternity rates. Some states also have birth kick payments to cover costs for a newborn's birth (Per newborn rate).<br><br>— Applying other cost-neutral actuarial techniques to reduce variability of rates and improve average predictability. If the State chooses to use a method other than the catastrophic claims adjustment or a small population or small rate cell adjustment, the State explains the methodology. The actuary assisted with the development of the methodology, the approach is reasonable, the methodology was discussed with the State, and an explanation and documentation is provided to CMS. | | | |
| | | Risk-Adjustment — The State may employ a risk adjustment methodology based upon enrollees' health status or diagnosis to set its capitated rates. If the State uses a statistical methodology to calculate diagnosis-based risk adjusters they should use generally accepted diagnosis groupers. The RO should verify that:<br><br>• The State explains the risk assessment methodology chosen<br>• Documents how payments will be adjusted to reflect the expected costs of the disabled population<br>• Demonstrates how the particular methodology used is cost-neutral<br>• Outlines periodic monitoring and/or rebasing to ensure that the overall payment rates do not artificially increase, due to providers finding more creative ways to classify individuals with more severe diagnoses (also called upcoding or diagnosis creep).<br><br>Risk-adjustment must be cost-neutral. *Note: for example, risk-adjustment cannot add costs to the managed care program. Risk adjustment can only distribute costs differently amongst contracting entities.* | NA | NA | |
| Subsection 6.0 – Stop Loss, Reinsurance, or Risk-sharing arrangements | | | | | |
| AA.6.0 | 42 CFR 438.6(c)(4)(iv)<br><br>42 CFR 438.6(c)(5)(i)<br><br>42 CFR 438.6(c)(2)(ii) | Stop Loss, Reinsurance, or Risk-sharing arrangements (8.0 is mandatory if the State chooses to offer one of these options) *(State Optional Policy)* — The State must submit an explanation of state's reinsurance, stop loss, or other risk-sharing methodologies. These methodologies must be computed on an actuarially sound basis. *Note: If the State utilizes any of the three risk-sharing arrangements, please mark the applicable method in 8.1, 8.2, or 8.3. For most contracts, the three options are mutually exclusive and a State will use only one technique per contract. If a State or contract uses a combination of methodologies in a single contract, the State must document that the stop loss and risk-sharing do not cover the same services simultaneously. Plans are welcome to purchase reinsurance in addition to State-provided stop loss or risk-sharing, but CMS will not reimburse for any duplicative costs from such additional coverage.* | NA | | |
| | | The contract must specify any risk-sharing mechanisms, and the actuarial basis for computation of those mechanisms. *Note: In order for the mechanism to be approved in the contract, the State or its actuary will need to provide enough information for the reviewer to understand both the operation and the financing of the risk sharing mechanism.* | | | |
| | | Capitation rates are based upon the probability of population costing a certain rate. Even if the entity's | | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| | | premium rates are sufficient to cover the probable average costs for the population to be served, the entity is always at risk for the improbable – two neonatal intensive care patients and one trauma victim in its first 100 members, or an extraordinarily high rate of deliveries. A new entity, with a small enrollment to spread the risk across, could be destroyed by one or two adverse occurrences if it were obliged to accept the full liability. | | | |
| | | FFP is not available to fund stop loss and risk-sharing arrangements on the provision of non-State Plan services. | | | |
| AA.6.1 | 42 CFR 438.6(c)(4)(iv) | **Commercial Reinsurance** – The State requires entities to purchase commercial reinsurance. The State should demonstrate that the contractor has ensured that the coverage is adequate for the size and age of the entity. | Contract | | |
| AA.6.2 | 42 CFR 438.6(c)(5)(i) | **Simple stop loss program** – The State will provide stop-loss protection by writing into the contract limits on the entity's liability for costs incurred by an individual enrollee over the course of a year (either total costs or for a specific service such as inpatient care). Costs beyond the limits are either entirely or partially assumed by the State. The entity's capitation rates are reduced to reflect the fact that the State is assuming a portion of the risk for enrollees. | NA | | |
| SMM 2089.6 | | ■ The State has included in its documentation to CMS the expected cost to the State of assuming the risk for the high cost individuals at the chosen stop-loss limit (also called stop-loss attachment point). | Contract Articles 12,19 | | |
| | | ■ An explanation of the State's stop loss program includes the amount/percent of risk for which the State versus entity will be liable. | | | |
| | | ■ The State has explained liability for payment. In some contracts, the entity is liable up to a specified limit and partially liable for costs between that limit and some higher number. The State is wholly liable for charges above the higher limit. If there is shared risk rather than either the State or the entity entirely assuming the risk at a certain point, the State and State determine whether the services will be reimbursed at Medicaid rates, at the entities' rates, or on some other basis. The State must specify which provider rates will be used to establish the total costs incurred so that the entity clearly knows whether the reinsurance will pay (i.e., the attachment point is reached). | | | |
| AA.6.3 | 42 CFR 438.6(c)(4)(iv) | ■ The State has deducted a withhold equal to the actuarially expected cost to the State of assuming the risk for high cost individuals. The State pays out money based on actual claims that exceed the stop loss limit (i.e., above the attachment point). | Contract | | |
| | 42 CFR 438.6(c)(5)(i) and (ii) | ■ The State has documented whether premiums will be developed by rate cell or on a more aggregated basis. | NA | | |
| | 42 CFR 438.6(c)(1)(v) | **Risk corridor program** – Risk corridor means a risk sharing mechanism in which States and entities share in both profits and losses under the contract, outside of a predetermined threshold amount, so that after an initial corridor in which the entity is responsible for all losses or retains all profits, the State contributes a portion toward any additional losses, and receives a portion of any additional profits.

If risk corridor arrangements result in payments that exceed the approved capitation rates, these excess payments will not be considered actuarially sound to the extent that they result in total payments that exceed the amount Medicaid would have paid, on a fee-for-service basis, for the State plan services actually furnished to enrolled individuals, plus an amount for entity administrative costs directly related to the | | | |

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comments |
|---|---|---|---|---|---|
| AA.7.0 | **Subsection AA.7.0 – Incentive Arrangements** | | | | |
| | 42 CFR 438.6(c)(4)(iv) | **Incentive Arrangements (9.0) is mandatory if the State chooses to implement an incentive (State Optional Policy)** – Incentive arrangement means any payment mechanism under which an entity may receive additional funds over and above the capitation rates it was paid for meeting targets specified in the contract. | NA | NA | |

provision of these services.

The State agrees to share in both the aggregate profits and losses of an entity and protect the entity from aggregate medical costs in excess of some predetermined amount. To the extent that FFP is involved, CMS will also share in the profits and losses of the entity.

In this instance, the State and CMS must first agree upon the benchmark point up to which federal match will be provided. Federal matching is available up to the cost of providing the same services under a non-risk contract (i.e., the services reimbursed on a Medicaid fee-for-service basis plus an amount for entity administrative costs related to the provision of those services). See 447.362. States typically require entities to adopt the Medicare cost-based entity principles for the purposes of calculating administrative costs under this model.

*Note: For this example, let's say the payment is $100 and there are 10 members expected to enroll. The total capitated payment CMS will match is $1,000.*

- *The State and the entity must then agree on the amount of risk to be shared between them (e.g., 5% or the risk corridor is between $950 and $1,050).*
- *The entity must calculate its overall costs at the end of the year and submit them to the State.*
- *Scenario 1, the entity costs are $950: In this example, the entity's profits are within the risk corridor of $950 to $1,050, so the entity keeps the entire amount of capitated payments and no adjustment is made.*
- *Scenario 2, the entity costs are $1,050: In this example, the entity's loss is within the risk corridor, so the entity keeps the entire amount of the capitated payment and no adjustment is made.*
- *Scenario 3, the entity costs are $850: In this example, the entity profit is outside of the risk corridor, so the entity must pay the State the amount of the excess profit or $100.*
- *Scenario 4, the entity costs are $1,150: In this example, the entity loss is outside of the risk corridor, so the State must pay the entity the amount of the excess loss or $100.*

*Please note: FFP is not available for amounts in this contract over the fee-for-service cost of providing these services. In order to compute the fee-for-service cost of providing services, the State must "price" the capitated entity's encounter data through the State's fee-for-service MMIS system. Amounts exceeding the cost of providing these services through a non-risk contract are not considered actuarially sound. The State must "price" the encounter data for entities with open ended risk-corridors (meaning there is no limit to the State's liability) when the entity exceeds the aggregate of actuarially sound rates x member months by more than 25%. In practice the RO may require the "pricing" of encounter data whenever evidence suggests that the entity should be profit sharing below the threshold. In this example, if the fee-for-service and entity administrative cost of providing these services were $1,100, then FFP would only be available up to $1,100. See 42 CFR 447.362 or Step AA.1.8 of this checklist.*

| Item # | Legal Cite | Subject | Where Located | Met or NA | Comment(s) |
|---|---|---|---|---|---|
| | 42 CFR 438.6(c)(5)(iii) and (iv) | The State must include an explanation of the State's incentive program. Payments in contracts with incentives may not exceed 105% of the approved capitation payments attributable to the enrollees or services covered by the incentive arrangement, since such payments will not be considered actuarially sound. | | | |
| | SMM 2089.3 42 CFR 438.6(c)(2)(i) | The State must document that any payments under the contract are actuarially sound, are appropriate for the populations covered and services to be furnished under the contract, and based only upon services covered under the State Plan to Medicaid-eligible individuals (or costs directly related to providing these services, for example, MCO, PIHP, or PAHP administration). | | | |
| | 42 CFR 438.6(c)(1)(iv) 42 CFR 438.6(c)(4)(ii) | • All incentives must utilize an actuarially sound methodology and based upon the provision of approved services to Medicaid eligible beneficiaries. • Incentives cannot be renewed automatically and must be for a fixed time period. • The incentive cannot be conditioned upon intergovernmental transfer agreements. • Incentives must be available to both public and private contractors. *Note: Reinsurance collections from reinsurance purchased from a private vendor (See 8.1) and State provided stoploss (8.2) are actuarially calculated to be cost-neutral and should not considered to be "incentives" or included in these payments.* | | | |

**Attachment to Appendix A, PAHP, PIHP, and MCO Contracts**
**MEDICARE/MEDICAID**
**DUAL ELIGIBLE CATEGORIES**
**(EACH MEDICAID CATEGORY IS ENTITLED TO MEDICARE)**

| Eligibility Category | Medicaid Benefits | Cost Limit to Medicaid (if any) | Provider | Medicaid Liability for Services |
|---|---|---|---|---|
| QMB only | Medicare premiums, deductibles, and coinsurance (crossover) No Medicaid services | Full Medicare | Medicare | QMB rates for Medicare deductibles and coinsurance Includes any M+C premiums if the State has chosen to cover in the State Plan on page 29. |
| QMB PLUS (QMB + Medicaid) | Medicare premiums, deductibles, and coinsurance (crossover) Medicaid services | Full Medicare + Medicaid | Medicare / Medicaid | QMB rates for Medicare deductibles and coinsurance Medicaid rates for Medicaid only services |
| MEDICAID (Non QMB and Non SLMB) | Medicare Part B premiums (optional for medically needy) Medicaid services | $58.70 + Medicaid | Medicare / Medicaid | No liability for Medicare deductibles and coinsurance Difference between Medicare payment and Medicaid rates for Medicaid services Includes any M+C premiums if the State has chosen to cover in the State Plan on page 29. |
| SLMB only | Medicare Part B premiums No Medicaid services | $58.70 | Medicare | No liability for Medicare deductibles and coinsurance |
| SLMB PLUS (SLMB + Medicaid) | Medicare Part B premiums Medicaid services | $58.70 + Medicaid | Medicare / Medicaid | No liability for Medicare deductibles and coinsurance Difference between Medicare payment and Medicaid rates for Medicaid services |
| QDWI (Not otherwise eligible for Medicaid) | Medicare Part A premiums | $316 http://www.medicare.gov/Basics/Amounts2002.asp | Medicare | No liability for Medicare deductibles and coinsurance |
| QI (Not otherwise eligible for Medicaid) | All or part of Medicare Part B premiums | QI – $58.70 | Medicare | No liability for Medicare deductibles and coinsurance Effective January 1, 2003, the QI-2 benefit is no longer authorized and states should provide notice to the QI-2 beneficiaries of the termination action to be taken, consistent with the rules on advance notice at 42 CFR 431.211. States were required to pay beneficiaries $3.91 per month toward the Medicare Part B premiums for QI-2s through December 31, 2002. |