**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al*. | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-1034 (RMC)** |
| | ) | |
| **U.S. Department of Health and Human** | ) | |
| **Services,** *et al* | ) | |
| | ) | |
| **Defendants.** | ) | |

**REPLY TO DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

The more defendants (hereinafter "HHS") attempt to justify their eighteen (18) year failure to ensure that the Puerto Rico Medicaid program implemented the provisions of the Medicaid statute protecting Federally-qualified health centers ("FQHCs"),[1] the more foolish their arguments become.  The FQHC protections within the Medicaid program were enacted into law in 1989.  They required FQHCs to be paid 100 percent of their "reasonable costs" in providing services to Medicaid beneficiaries.  For as long as these protections have been in effect, Puerto Rico's Medicaid program has failed, completely, to comply with them.  This has not been a matter of a good faith effort falling short or a technical argument over some facet of how FQHC payments must be calculated.  It is instead the utter absence of any attempt whatsoever on the part of the Commonwealth's Medicaid program to comply.

---

[1] As the Court well knows, Section 330 Public Health Service Act (42 U.S.C. § 254(b)) health centers/grantees are automatically FQHCs.  The FQHC protections in the Medicaid statute were designed for these entities.

Those protections were amended in 1990 to require Medicaid managed care organizations[2] ("MCOs") to pay FQHCs the same 100 percent of reasonable costs for the services the FQHCs provided to the Medicaid beneficiaries assigned to the particular MCO.[3] The obligation of MCOs to pay FQHCs was changed in 1997 to require those entities to pay FQHCs "not less than the rates paid for a similar set of services provided by a non-FQHC. . ." (Ex. at 1). The 1997 law required the State to make up the difference between those payments and 100 percent of an FQHC's reasonable cost reimbursement (which the law described as "supplemental" payment, but in health care vernacular is termed "wraparound"). These MCO/HMO/FQHC requirements were not implemented by Puerto Rico and still have not been. CMS has presided over this utter absence of Puerto Rico's compliance with any facet of the Medicaid statute's FQHC protections and never once taken an "enforcement" action to obtain such compliance.

The "prosecutorial discretion" HHS argues for in this case accordingly is the discretion to continue to do nothing to correct Puerto Rico's violations of those FQHC protections. It is also to argue for a judicial license to continue to support such violations by paying Puerto Rico federal Medicaid funds in the face of a law that could not be more clear in requiring that such

---

[2] The term "managed care organizations" or "MCOs" in current law refers to certain types of entities that are eligible to receive prepaid capitated (comprehensive risk) contracts to provide services to Medicaid beneficiaries. *See* 42 U.S.C. § 1396b(m)(1). Puerto Rico's MCOs are all (with perhaps one or two exceptions not applicable here) one of such types of entities -- health maintenance organizations or "HMOs".

[3] There is a good discussion of this requirement in an attachment to an August 20, 1998 State Medicaid Director letter ("SMDL") from a senior HHS official in what was then the Health Care Financing Administration ("HCFA") and now is the Centers for Medicare and Medicaid Services ("CMS"). A copy of the SMDL is attached as Ex. A.

payments not be made if they go to MCOs/HMOs that fail to pay FQHCs what federal law requires.[4]

As stated in 42 U.S.C. § 1396b(m)(2)(A) (from which we remove inapplicable language):

> . . .no payment shall be made. . .to a State with respect to payments incurred by [the State] for payment of [capitations] for services provided by [a managed care organization ("MCO")]. . .unless –
>
> * * *
>
> (iii) such services are provided. . .in accordance with a contract. . .under which [the capitated] payments are made on an actuarially sound basis and under which the Secretary must provide prior approval. . .
>
> * * *
>
> (ix) such contract provides that, in the case of an [MCO] that has entered into a contract for the provision of services with a Federally-qualified health center. . ., that the [MCO] shall provide payment that is not less than the level and amount of payment which the [MCO] would make for the services if the services were furnished by a provider which is not a Federally-qualified health center. . .
>
> * * *
>
> (xii) such contract, and the [MCO] complies with the applicable requirements of section 1396u-2 of this title.

Regarding the foregoing requirements that "no payment shall be made unless" "the Secretary. . .provide[s] prior approval", HHS' implementing regulations at 42 C.F.R. 438.806 (again with inapplicable language removed) state as follows:

---

[4] FQHCs *need* the support of HHS and the courts to make certain State Medicaid program honor these federal law protections.  Unlike private medical providers, FQHCs *must* legally have contracts with State Medicaid programs.  Under 42 U.S.C. § 254b(k)(3)(E)(i)(I).  Accordingly, health centers/FQHCs lack any bargaining power in negotiating payment terms with Medicaid State agencies or Medicaid MCOs.  When, as is the case here, the only contracts they are offered are on a take-it-or-leave-it basis they have no choice but to take the contract.

§ 438.806 **Prior Approval** (a) *Comprehensive Risk Contracts.*[5]

* * *

(2) The contract meets all of the requirements of section [1396b](m)(2)(A), the applicable requirements of section [1396u-2] of the Act, the implementing regulations on this part.
(b) *MCO contracts.*  Prior approval by CMS is a condition for FFP…[6]
(c) FFP is not available in an MCO contract that does not have prior approval from CMS under paragraph (b) of this section.

It is this utterly nondiscretionary duty of *prior approval* before payments are made that HHS by its own admission has been violating.[7]  This case accordingly does not deal with issues of unreviewable, or prosecutorial, discretion because HHS has no discretion to make a payment "unless" (as the law states) the statutory pre-conditions to such a payment are met.  There are as well no relevant review or appeal processes to which States are statutorily entitled because no such review or appeal processes attach to the duty not to make any payments required by § 1396b(m)(2)(A).

---

[5] These are the risk based capitated contracts for the full array of Medicaid services that go to the MCOs and must receive prior approval under the above statutory requirements. *See* 42 C.F.R. § 438.2 (definition) and § 438.6(b).

[6] FFP is shorthand for Federal financial participation.

[7] HHS' February 5, 2008 Notice of Filing of its "conditional approval" of current managed care contracts illustrates the problem with its absurd position in this case that "prior approval" does not have to be "prior" at all.  The conditional approval requires refunds of beneficiary co-payments improperly imposed on the incredibly poor people who make up Puerto Rico's Medicaid population.  The refunds will only go to those beneficiaries who request one.  Puerto Rico is not even being required to issue a "public" notice, which presumably translates into no notice of the entitlement to receive refunds.  And, heaven only knows what proof will be required by the Medicaid program that the co-pay was made.  Even more intriguing is CMS' apparent confidence that this condition and other conditions of "CMS' 'prior' approval will be met. Regardless, CMS' attempt in the Notice (on 2) to take this further violation of the prior approval out of this case is unavailing.  The individual plaintiffs and their status as Board members of plaintiff FQHCs to represent the medical interests of all persons in their communities clearly entitled to continue to challenge HHS' continuing payments without prior approval because the co-payments at issue directly affect them as Medicaid recipients and those they represent who also are such recipients.

## II. ARGUMENT

**A.     Summary**

Our basic arguments in this case boil down to these:

1. At the present time, HHS is making payments to Puerto Rico's Medicaid program that are being used to pay HMOs under contracts for which the statutorily required "prior approval" has not been given.

2. As an incident to the foregoing, HHS already has improperly made payments to support those unapproved contracts.

3. As a further incident, HHS' position in this case makes it clear that such payments, without the required approval having been made, will continue.[8]

4. Certain of the conditions for prior approval are not being and were not being met:

a.   Payments to FQHCs are not being and have never been made as statutorily required.

b.   Payments under the risk contracts imposed on FQHCs (and private doctor groups) exceed the risk limits in the statute and regulations.

c.   Other conditions for prior approval, including compliance with relevant conditions of 42 U.S.C. § 1396u-2, are not (and never have been) present.

HHS has responded to these arguments in two ways.  It has challenged the FQHC and individual plaintiffs' right to bring this case and have it decided in the manner they request.  It also has delivered specific responses to the statutory/regulatory arguments.  This reply first deals with those specific responses.

---

[8] Indeed CMS' just discussed new "conditional approvals" makes such continued payments a certainty because the conditions call for continued actions.

**B.**    <u>**HHS' Violations of Statutory and Regulatory Requirements**</u>

    1.    <u>No Prior Approval As Required Under 42 U.S.C. § 1396b(m)(2)(A) Has Been Made</u>.

HHS' first argument in response to plaintiffs' contentions of statutory violations begins at page

11 of Defendant's Reply.  As we observed in the introductory section of this reply, the prior

approval requirement is unambiguous and the regulations supporting it are equally unambiguous

that no payment can be made to support a managed care contract unless there has been "prior

approval" based on the enumerated statutory conditions.

> [W]e have stated time and time again that courts must presume that
> what a legislature says in a statute is what it means and means in a
> statute what it says there.

*Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 ____, 126 SCt.

2455, 2459 (2006).

    HHS' *post hoc* view in this case is that payments can be made before the contract is

actually approved.  Under that view, a State could be given federal funds to support an HMO

contract that never comes into compliance or is out of compliance until day 364 of the contract.

Congress' "no payment unless prior approval" language would be completely undone if either of

those situations arose.

    The issue here is not only money.  Under 42 U.S.C. § 1396u-2(a)(1)(A)(i)(I), the freedom

of choice to which Medicaid beneficiaries are legally entitled may be taken away once HHS

determines the contract meets the requirements of §  1396b(m).  If HHS pays the State without

actual prior approval may those rights be taken away?  The answer has to be yes.  There would

be no point to giving a State, funding needed to keep a managed care system going and not be

able to compel beneficiaries to use it.  Certainly as long as HHS insists its interpretation of the

statutory prior approval requirement as not meaning "prior" is correct, the States will presume

(and reasonably be able to do so) that the § 1396u-2(a)(1)(A)(i)(I) contract meeting § 1396b(m) requirement has been met.

HHS' counter (at 14-15) to a point we made in a prior filing that the prior approval language emerged from a situation where serious problems in Medicaid care had taken place and Congress wanted to assure against a repeat by heading that problem (and others) off through prior approval is indecipherable.  Apparently, HHS does not understand that actual "prior approval" heads off big problems, and that this was Congress' goal in explaining the problem that led to its desire for an actual prior approval requirement.  Nor does HHS even concede that "prior approval" has a specific meaning when it argues that "neither the statute nor the regulation [sic] define what is meant by "*prior* approval" (emphasis in original) and goes on to say that "Congress could have stated that Secretarial approval is required prior to the payment of any FFP, but did not."  As our statutory breakdown in the introductory section to this reply shows, the answer to this is simply "yes it did; the problem is that you don't like it and won't do it."

2.  The FQHC MCO Payment Requirement Is Being Violated

On page 16, HHS addresses our argument that Puerto Rico's MCOs and MCO contracts do not comply with the FQHC payment requirement in 42 U.S.C. § 1396b(m)(2)(A)(ix).  As to the actual language in the Puerto Rico-MCO contracts that support HHS' argument in this regard, HHS, on page 17, claims that payment requirement is met by contract language stating "that MCOs [HMOs] will pay FQHCs the same as non-FQHCs for the services they provide" even though the language in the HMO contract (quoted by HHS on page 17) neglects to include language stating that the payment will be "for the services" the FQHCs provide.

As the Court will recall, Ms. Kelly, the CMS official who reviewed that language, claimed in her declaration (at ¶ 14) that the "assurance required by 42 U.S.C.

§ 1396b(m)(2)(A)(ix) that the HMOs pay FQHCs 'not less than' the amount for *services* if the *services* were furnished by a non-FQHC provider" (emphasis added) was met by the language HHS now quotes on page 17, which fails to mentioned "services".  In that same paragraph (14) of her declaration, Ms. Kelly also stated that "Region II determined that the [HMO] contracts contained the [statutorily] required assurance. . .".  The point is that Ms. Kelly's declaration attests to the fact that Region II's review and approval was confined to what the contract said and to Region II's failure to recognize that the words the contract used did not include the statutory "for the services" language.

The error made by Ms. Kelly and/or her staff has been eclipsed by HHS' *post hoc* rationalization (beginning on 17) that there is nothing legally wrong with the way the HMOs are now paying (or failing to pay) plaintiffs.  HHS begins this defense of the HMOs' conduct by saying that (on 17-18) that there "is no Federal statute or regulation that prohibits [HMOs] from entering into service contracts with FQHCs that require them [the FQHCs] to assume *some* financial risk."  (Emphasis added.)  A footnote (12) graciously adds that if the risk is "substantial," the PIP requirements "may need to be met".  HHS' defense of the HMO continues by asserting (at 18) that § 1396b(m)(2)(A)(ix) " simply states that a state' s contract with an [HMO] must provide an assurance that the [HMO] will pay FQHCs for the provision of services whatever the nature or payment structure for those services may be at a level and amount not less than other, non-FQHC sub-capitated providers."  Section 1396b(m)(2)(A)(ix) certainly does not "state" that there may not even by a "payment" as is the case with plaintiff Loiza or that payment if it occurs at all is based on "risk" as discussed below.

HHS also says that the plaintiffs would be entitled to receive wraparound payments from the Commonwealth's Medicaid program to make them whole to the extent the risk they assume

resulted in a gap between their statutory per visit entitlement under 42 U.S.C. § 1396a(bb) and

what they received (or did not receive) from the HMO.  HHS concludes by insisting that such

wraparound payments have been made.  That HHS, with no evidence in hand, would claim

plaintiffs are receiving wraparound to make them whole when they have demonstrated in this

case that no such payments have been made since the final judgment in plaintiffs' other lawsuits

is appalling.[9]  And when the publicly available docket of that case shows that plaintiffs here,

after final district court opinions and orders applying to both were issued, sought the assistance

of that court to compel payments by the Puerto Rico Medicaid program based on that Court's

final decisions *because the Medicaid program had refused to pay them anything* and were turned

down by the District Court, HHS' argument must be taken as arguably sanctionable because it so

utterly lacks any basis of any kind.

Turning back to the HMO payment the FQHCs here are entitled to receive, HHS'

argument that risk may be imposed on the FQHCs under the controlling statutory language is

utterly meritless.  In the first place, the FQHC payment language is not in any way ambiguous in

requiring a "payment. . .for the services" the FQHC provides.  42 U.S.C. § 1396b(m)(2)(A)(ix).

Recently, the Fourth Circuit analyzed the FQHC payment requirement, describing its language as

"impos[ing] a *floor* on the rates to be paid FQHCs by managed care organizations."  *Three*

*Lower Counties Community Health v. Maryland*, 498 F.3d 294, 305 (4th Cir. 2007).  A risk

contract that results in some payment, no payment or, worse, a debt, as is the case with plaintiff

Loiza, can hardly be a "floor on the *rates* to be paid by managed care organization".

There is no reason here to think that the payment for services language in that section of

the Medicaid statute has any other meaning than payment for services.  Indeed, this was exactly

---

[9] The relevant declarations of José Orlando Colon, along with Mr. Colon's new (third)
declaration filed with this reply, are attached as Ex. B and attest to the absence of payment.

what HHS/CMS thought, when, in 1998, a senior official of CMS (then HCFA), sent a letter to all State Medicaid Directors describing that provision as requiring "that rates of payment between [FQHCs] and [HMOs]. . .be not less than the amount of *payment* for a similar set of *services* with a non-[FQHC]". (Emphasis added.) (Ex. A. at 1.) On the same page, CMS said that the provision "protect[ed] the State against. . .rates that are excessively low in comparison to the *community standard*". *Id.* (Emphasis added.) Risk that results in something, nothing or less than nothing in payments hardly fits CMS' description of the FQHC payment requirement or the purpose of that requirement.

HHS' argument that the risk the HMO contract imposes is within statutory bounds because the FQHCs "are paid by [HMOs] the same amounts that the HMOs pay private doctor groups for similar services" is simply bizarre. Reply at 18. If all the private doctors groups the Medicaid HMOs contract with on the same risk-based terms as the FQHCs received less than nothing for their services as does plaintiff Loiza (the federal statute does say the same "level and amount of payment"), would HHS sit by and allow that State's Medicaid program (somehow) to continue? The answer, of course, is that if CMS knew that all doctor groups acting as primary care providers were being made debtors under the HMOs' contracts, it would years ago have had a task force of persons with skills of all kinds (including the Inspector General and the FBI) taking over the Medicaid program to avert the medical disaster that surely would occur.

Whether the truth is that the doctor groups actually have been able to negotiate different terms than the FQHCs or that such groups are able, and willing, to avoid referrals that FQHCs would consider "medically necessary" is anyone's guess. The point is that HHS does not really believe that everyone receives the same "level and *amount* of *payment*" (emphasis added) the FQHC payment provision requires.

3.    The PIP Requirements Are Being Violated

When HHS responds to our contentions that PIP requirements are being violated and, in apparent wide-eyed innocence, suggests on page 24 it could not have known that an HMO contract's risk, which, in fact, produces no revenue, but instead a loss, must be a PIP violation.[10] HHS cannot be taken seriously. The basic requirement of PIP, after all, is not to induce doctors "to reduce or limit medically necessary services furnished to any individual enrollee." 42 C.F.R. § 427.708(c)(1). If actual doctor/doctor group losses are so great as to make the doctor/doctor group a debtor to the HMO, as is the case with plaintiff Loiza, that basic requirement simply cannot be met.[11] It was in this context that we showed (in our December 20, 2007 Reply (at 15-16)), how the PIP aggregate insurance requirement worked and that, at the very worst, the physician group would still be paid in the absolutely worst case $34.65 out of a capitation of $50.00 per member, per month. Our point was (and is) that this aggregate result is an indication that a *bona fide* PIP plan cannot produce the result that is in fact produced for plaintiffs in this case.

There were and are other reasons why CMS had to have realized that a contract resulting in a debt owed to the HMO by the physician group -- in Puerto Rico's Medicaid program -- was ironclad proof that PIP requirements were being violated. Under HHS regulations, at 42 C.F.R. § 438.6(l), the Puerto Rico HMOs are required, in their "subcontracts" with the FQHCs (under their prime contracts with the Medicaid program), to "fulfill the requirements of this part that are

---

[10] The PIP requirements are imposed by 42 U.S.C. § 1396b(m)(2)(A)(x).

[11] HHS' insinuation that the problem must be that the HMO is not meeting its $10,000 stop loss responsibility is off the mark. *See* Third Colon decl. at ¶¶ 12-13 for details of this stop loss. We do not believe and have no reason to believe that the HMO is failing to implement its stop loss protection. The problem, as described in the Colon declaration at ¶ 12, is that the difference between the FQHC's capitation and the HMO's stop loss is about $9,800 per patient, which means that the FQHCs can lose approximately 54 times the capitation amount (which they can never fully receive any way because it covers other service providers who/which get paid first).

appropriate to the service or activity delegated under the subcontract". As we know, one "service or activity" the Puerto Rico HMO contracts with the FQHCs "delegate" to the FQHCs is the assumption of risk. Under the same regulatory section, § 438.6, and an even earlier section, § 438.2, there are specific prime contract requirements for risk contracts; *i.e.*, § 438.6(l)'s "requirements of this part that are appropriate to the service or activity".

These regulation begin with certain definitions:

1. In § 438.2, the definition of "*Risk Contract*" is:

> Risk contract means a contract under which the contractor --
>
> (1) Assumes risk for the cost of services covered under the contract; and
>
> (2) Incurs loss if the cost of furnishing the services exceeds the payments under the contract.

2. In that same § 438.2, the definition of "*Comprehensive risk contract*" is

> Comprehensive risk contract means a risk contract that covers comprehensive services, that is, inpatient hospital services and any of the following services, or any three or more of the following services:
>
> (1) Outpatient hospital services.
>
> (2) Rural health clinic services.
>
> (3) FQHC services.
>
> (4) Other laboratory and X-ray services.
>
> (5) Nursing facility (NF) services.
>
> (6) Early and periodic screening, diagnostic, and treatment (EPSDT) service.
>
> (7) Family planning services.
>
> (8) Physician services.
>
> (9) Home health services.

12

We know from the Cruz declaration, which HHS, on page 23 refers to and does not challenge, that (again on page 23) "the cost of the risk assigned to [plaintiff] Loiza by its *subcontract with MCS-HMO* exceeded the total amount of capitation payments made to Loiza. . . (Emphasis in HHS Reply).  Thus, based on the above regulatory definitions of risk and comprehensive risk and the fact that plaintiffs' risk in its HMO contracts covers inpatient hospital services and many of the other services listed under the comprehensive risk contract definitions, and the further fact that risk to plaintiffs in their HMO contracts is for the cost of services for which the plaintiffs will incur a loss whenever that cost exceeds the HMO contract's "payments", the subcontract between the HMO and the plaintiffs are for comprehensive risk.

What this means, is that the doctor groups cannot even receive such subcontracts because they are not among the entities listed in § 438.6(b) as being eligible for comprehensive risk contracts.[12]  This alone would demonstrate that the PIP requirements are not being met because risk this severe eliminates the very physician groups PIP is aimed at from receiving a contract in the first place.

Assuming *arguendo* that doctor groups would nonetheless be eligible for the HMO contracts, § 438.6(c) would require the capitation payments to be "actuarially sound" based on actuarial studies and certifications.  Actuarial soundness has not been defined by HHS/CMS, which insists only on a certification of such soundness by an actuary who is a member of the American Academy of Actuaries.  That Academy, in cooperation with CMS, came up with its own definition (although the entire document is described (on page 2) as "nonbinding guidance").  According to the Academy's "Health Practices Counsel Practice Note" (Aug.

---

[12] Plaintiffs are eligible but such eligibility is of no moment because the subcontracts are otherwise unlawful.

2005)[13] which addresses the Medicaid actuarial soundness requirement on page 8, that definition

is as follows:

> Actuarial Soundness -- Medicaid benefit plan premium rates are
> "actuarially sound" if, for business in the state for which the
> certification is being prepared and for the period covered by the
> certification, projected premiums, including expected reinsurance
> and governmental stop-loss cash flows, governmental risk
> adjustment cash flows, and investment income, provide for all
> reasonable, appropriate and attainable costs, including health
> benefits, health benefit settlement expenses, marketing and
> administrative expenses, any state-mandated assessments and
> taxes, and the cost of capital.

Suffice it to say that the above definition would not apply to the results of the HMO

contract's financial terms of plaintiffs as reported by José Orlando Colon in his three declarations

in this case.  The definition contemplates all costs being covered plus "cost of capital" (or, in

plainer terms, a profit).  Accordingly, the HMO-FQHC contracts are not consistent with "the

requirements. . . appropriate to the service or activity" as § 438.6(l) requires.  PIP requirements

cannot be reasonably assumed to be met in circumstances where other regulations controlling the

financial terms subject to PIP are being violated, especially where those violations result from

failing to pay providers covered by PIP as much as federal law and regulation mandate.

    4.    The Not Less Than Two HMO Requirements of 42 U.S.C. § 1396u-2(a)(3) Applies to

Puerto Rico.

    HHS continues to insist, on pages 24 and 25, that § 1396u-2(a)(3)(A)'s requirement that

Medicaid beneficiaries subject to managed care programs have at least two qualified managed

---

[13] The complete name of the document, which is available from the Academy, is:  *Health
Practice Council Practice Note, August 2005, Actuarial Certification of Rates for Medicaid
Managed Care Program, Developed by the Medicaid Rate Certification Work Group of the
American Academy of Actuaries*.  As the document explains on its first page 1, the work group
was comprised of actuaries with experience in CMS or State Medicaid programs.

care entities to choose from does not apply to Puerto Rico.  As described by HHS in its memorandum supporting its dismissal motion, "[t]he Commonwealth of Puerto Rico is considered a State for purposes of the Medicaid Act, unless other indicated.  42 U.S.C. § 1301(a)(1)"  *See* Dkt. No. 8 at 4.  Section 1301(a)(2)'s explicit language on Puerto Rico's State status in Medicaid (and other programs) is:

> (A) Where used in this Act –
>
>> (1) The term "State", except where otherwise provided, includes. . .the Commonwealth of Puerto Rico. . ."

Section 1396u-2 begins its text (after section titles) at (a)(1)(A) with the following:

> (A) In General.  Subject to the succeeding provisions and notwithstanding paragraph (1)(10)(B), or (23)(A) of Section 1396a(a), a State. . .

Nowhere in § 1396u-2 is Puerto Rico exempted or distinguished from the "States" under the Constitution or in any other manner treated differently from other "States".

HHS fights against the plain meaning of this statutory language (*i.e.,* that Puerto Rico is a State subject to all of § 1396u-2's requirements) by arguing  that § 1396u-2 constitutes an exception to the Medicaid statute's freedom of choice provision in § 1396a(a)(1)(23) [14] and because Puerto Rico is not covered by that provision in the first place, it "has no obligation to meet the conditions set forth in [§ 1396u-2](a)(2)-(5)."

The problems with this argument are several, beginning with the oft-repeated interpretive canon of the Supreme Court that when giving the statutory language its plain meaning results in no absurd consequences, the plain meaning has to be upheld.  *E.g., Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

---

[14] The exemption of Puerto Rico from this section was explicit in that section, and exactly what § 1301(a)(2)'s explicit language contemplates.

Furthermore, HHS' argument would exempt Puerto Rico from the requirements of § 1396u-2(a), which create managed care exceptions for children with special needs and Native Americans, and contain protections regarding enrollment, and termination rights.  In addition, it would necessarily apply to all other requirements in that section, including (b)'s beneficiary protections, (c)'s quality assurance, (d) and (e)'s fraud prohibitions and remedies, and (f)'s timely payment requirements.  We say this because the language in § 1396u-2(a)(1)(A)'s mention of freedom of choice begins with "[s]ubject to the succeeding provisions of this section" not just to the provisions of subsection (a).  There is, as a consequence, no way to separate subsection (a) from other § 1396u-2 subsections and avoid turning HHS' argument here into a wholesale exemption of Puerto Rico from all of § 1396u-2.  To interpret § 1396u-2's language as warranting such an exemption, particularly when § 1396u-2's requirements are incorporated by reference in § 1396b(m)(2)(A)(xii) as one more condition to be met before an HHS payment may be made to a Medicaid managed care entity, would be at complete odds with any and all legitimate canons of statutory interpretation and clearly inconsistent with Congress' intent.

Lastly, we remind the Court of what we argued on this point in our December 20, 2007 Reply (D. 28), at 20-21.  We explained that Puerto Rico's 1975 exemption from Medicaid's freedom of choice requirement was given because Puerto Rico then implemented Medicaid through a government-run health system and that the government-run system ended with the initiation of the *Reforma* program in 1994.  It is a fair assumption that Congress, by 1997, when § 1396u-2 was passed, had become aware of the fact that the reason for Puerto Rico's freedom of choice exemption had vanished and that the absence of any exemption in that section for Puerto Rico is no accident.

**C.**      **A Preliminary Injunction to Remedy Violations In This Case Is Warranted**

As a result of the foregoing material violations of the Medicaid statute in relation to the prior approval requirement and Medicaid managed care requirements, to say nothing of provisions of appropriations law discussed in earlier filings, plaintiffs' motion meets the standard for preliminary injunction set forth in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), *United States v. City and County of San Francisco*, 310 U.S. 16, 31, 60 S.Ct. 749, 751 (1940); *Sierra Club v. Coleman*, 405 F. Supp. 53, 54 (D.D.C. 1975); *Securities Industry Association v. Board of Governors of Federal Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986) pertaining to a violation of statute.

The Supreme Court's observation in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978) that "a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law" could be viewed as a modification of the holding in *U.S. v. San Francisco.* The *Tennessee Valley Authority* Court, however, ultimately decided that the Endangered Species Act of 1973 prohibited completion of a dam because it would either eradicate the known population of an endangered species or destroy its critical habitat even though work on the dam was almost complete and Congress had continued to appropriate significant funds for the project. In so holding, the Court observed that "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities . . . " *Id.* at 194. The Supreme Court in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982) later commented that "[t]he purpose and language of the statute under consideration in the *Tennessee Valley Authority* case, not the bare fact of a statutory violation, compelled that conclusion."

In *Securities Industry Association v. Board of Governors of Federal Reserve System* this Court embraced the *Romero-Barcelo* comment in holding that "where federal statutes are

violated, the guiding principle for determining the propriety of equitable relief is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Securities Industry Assoc. v. Board of Governors of Federal Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986).

By failing to properly pre-approve the HMO contracts in accordance with section 1903(m), the Secretary has violated federal law. *See* 42 U.S.C. § 1396b(m)(2)(A)(iii). This leads to further violation of federal law in the form of § 1396u-2, which requires § 1396b(m) compliance. *See* 42 U.S.C. § 1396u-2(a)(1)(A)(i)(I). These violations call for a preliminary injunction because such action is necessary to "carry out the purpose and language of the statute..." Congress instituted the prior approval requirement of § 1396b(m) to make certain that specific conditions to which that prior approval requirement applied were addressed before funds were committed and those conditions imperiled the program. *See* H.R. Rep. No. 99-727, at 123 (1986). The only way to effectuate the statutory language and its purpose is to prohibit the very payments prohibited by the statute itself.

## 1. **This Court Has Jurisdiction**

This Court has jurisdiction to remedy the numerous violations of the Medicaid statute raised in plaintiffs' motion for partial summary judgment. As an opening matter, the doctrine of sovereign immunity does not apply to "actions by officers beyond their statutory power" or "the manner in which they are exercised are constitutionally void." *Dugan v. Rank*, 372 U.S. 609, 622-23 (1963). Moreover, the Supreme Court has held that the Administrative Procedure Act ("APA") "provides specifically not only for review of 'agency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court because the legislative material elucidating that seminal act manifests a congressional

intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v Gardner*, 387 U.S. 136, 140-141 (1967)(footnote omitted)(addressing presumption favoring judicial review); *see also Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).

Section 706 of the APA requires a finding that the actual choice made by the agency was not "arbitrary, capricious, an abuse of direction, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971).  In order to "make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*.  It is the "whole record" compiled by the agency that serves as the basis for the review required by § 706 of the APA. *Id*. at 419.  *Post hoc* rationalizations "have traditionally been found to be an inadequate basis for review."  In this case, the "whole record" before HHS consists of not only the submissions made by Puerto Rico's Department of Health as part of the contract review and approval process but also the entire eighteen year history of the *Reforma* program, the findings made by HRSA, including the Bohrer letter (attached to the third Colon declaration), the Kelleher Report, and the FQHC payment-related litigation in the Puerto Rico District Court.  This whole record indicates that all the FQHCs grant funds are being appropriated by Puerto Rico's Medicaid program.  The FQHC protections were designed to prevent just that.  HHS cannot stand by and make payments that animate the continued seizure of those grant funds.  If the HMOs begin paying FQHCs as the statute requires, at least some part of this total breakdown of compliance with federal law will be fixed.

### 2.  Standing

To show standing under the APA, 5 U.S.C. § 702, a plaintiff must allege (a) an injury in fact and (b) "that the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute in questions." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).   Another formulation of the standing doctrine uses a tripartite test.  First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is concrete and particularized, and actual or imminent.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)(challenge to a rule promulgated by the Secretary of the Interior).  Second, there must be a "causal connection between the injury and the conduct complained of" and the injury must be fairly traceable to the challenged action of the defendant.  Third, it must be likely that the injury will be redressed by a favorable decision.  *Id.* at 561.   The very purpose of the standing doctrine is to ensure that a plaintiff "has a personal stake in the outcome" sufficient to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions."  *See also Flast v. Cohen*, 392 U.S. 83 (1968); *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Under either formulation of the standing doctrine, it is clear that FQHC and Board plaintiffs have such a personal stake in the outcome of this case - - both in their own right and as providers of health care to their patients.  The FQHCs and Boards' responsibilities under Section 330 and the entitlement of the FQHCs to Medicaid payments from the HMOs make clear that stake.  Section 330 grantees' Boards, "as a group, *represent the individuals being or to be served*…"  42 C.F.R. § 51c.304(b) (emphasis added).  Among the Board's specific duties is to assure "that the center is operating in compliance with applicable Federal…laws and regulations…"  *Id.* at 51c.304(v).  Moreover, Section 330 grantees are required to participate in

the Medicaid and Medicare programs. 42 U.S.C. § 254b(k)(3)(E). Their use of revenue derived

from that participation is strictly limited to actions permitted with Section 330 grant funds or that

"benefit the objectives of the [Section 330] project". 42 U.S.C. § 254b(e)(5)(D). Section 330's

other requirements *vis-à-vis* such participation include:

> mak[ing]…and…continu[ing] to make *every reasonable effort* to
> collect appropriate reimbursement for its costs in providing health
> services to persons who are  [among others, Medicaid and
> Medicare beneficiaries]."

42 U.S.C. § 254b(k)(3)(F) (emphasis added). Clearly the failure of Medicaid programs to make

proper FQHC payments and the limits that failure place on an FQHC's ability to provide services

is something in which the FQHCs and their Boards have a stake.

### 3. Prosecutorial Discretion Is Not At Issue

As previously emphasized, prosecutorial discretion is the exception to the general

presumption of reviewability unless the statute authorizing agency action evidences a "clear and

convincing" intent to preclude judicial review. *Abbott Laboratories v. Gardner*, 387 U.S. 136,

140 (1967). This presumption of judicial review obtains to one "suffering legal wrong because

of agency action, or adversely affected or aggrieved by agency action with the meaning of the

relevant statute" (APA, 5 U.S.C. § 702), except to the extent that a statute precludes relief or the

action is "committed to agency discretion by law." 5 U.S.C. § 701(a). One case in this Circuit is

markedly similar to the situation confronting HHS in Puerto Rico where HHS is making

payments for all Medicaid matters, not just managed care contract costs. In that case, the

Government argued that enforcement of Title VI was a matter committed to agency discretion

and judicial review of issues relating to such enforcement (or non-enforcement) was therefore

lacking. That case rejected that argument and held that where there is a "general policy which is

in effect an abdication of statutory duty" reliance on prosecutorial discretion is unavailing:

> A final important factor distinguishing this case from the
> prosecutorial discretion cases cited by HEW is the nature of the
> relationship between the agency and the institutions in questions.
> HEW is actively supplying segregated institutions with federal
> funds, contrary to the expressed purposes of Congress.  It is one
> thing to say the Justice Department lacks the resources necessary
> to locate and prosecute every civil rights violator; it is quite
> another to say HEW may affirmatively continue to channel federal
> funds to defaulting schools.  The anomaly of this latter assertion
> fully supports the conclusion that Congress's clear statement of an
> affirmative enforcement duty should not be discounted.

*Adams v. Richardson,* 480 F. 2d 1159, 1162 (D.C. Cir. 1973).  The Court also stated that its

purpose in exercising judicial review was "to assure that the agency properly construes its

statutory obligations, and that the policies it adopts and implements are consistent with those

duties and not a negation of them."  *Id*. at 1163-4.[15]  To allow HHS to continue funding to Puerto

Rico would make the Court complicit in such a "negation".

### III. CONCLUSION

A preliminary injunction here is warranted, as is the final relief earlier sought.  Without

such relief, HHS will continue to support the violations of 42 U.S.C. § 1396b(m)'s preconditions

to payments and to the unlawful taking of the FQHCs' grant funds in violation of the Medicaid

statute's FQHC payment requirements.

Respectfully submitted,


Date: February 15, 2008                    /s/ James L. Feldesman
                                           James L. Feldesman ( D.C. Bar No. 23796)
                                           jfeldesman@ftlf.com
                                           Kathy S. Ghiladi (D.C. Bar No. 435484)
                                           kghiladi@ftlf.com
                                           Robert A. Graham (D.C. Bar No. 450345)
                                           rgraham@ftlf.com

---

[15] It is also relevant to note here that, as to redressability, plaintiffs need show only that a
favorable decision is likely to redress their injury; they need not show that a favorable decision
will inevitably redress their injury.  *Lujan*, 504 U.S. at 2136.

Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C.  20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiffs*



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**Health Care Financing Administration**

Center for Medicaid and State Operations
7500 Security Boulevard
Baltimore, MD 21244-1850

April 20, 1998

Dear State Medicaid Director:

This letter is one of a series that provides guidance on the implementation of the Balanced Budget Act of 1997 (BBA). The purpose of this letter is to provide initial guidance on changes in Federally Qualified Health Center (FQHC) and Rural Health Clinic (RHC) requirements stemming from BBA. In addition, we are including (as an attachment) a section which clarifies certain managed care contracting and cost-based reimbursement issues that were in effect prior to the BBA provisions.

**New Reimbursement Provisions**

**Supplemental Payments**

For services furnished on or after October 1, 1997, FQHCs and RHCs are entitled to reasonable cost-based reimbursement as subcontractors of section 1903(m) organizations. States are required to make supplemental payments, at least on a quarterly basis, for the difference between the rates paid by a 1903(m) organization (such as an HMO or HIO) to an FQHC or RHC and the reasonable cost of FQHC or RHC subcontracts with the 1903(m) organization. Beginning in Fiscal Year 2000, the difference States will be required to pay begins to phase-down from 100 percent; specifically, 95 percent of reasonable cost in FY 2000, 90 percent in FY 2001, 85 percent in FY 2002, and 70 percent in FY 2003.

The issue of election of cost-based reimbursement for these specific contractual arrangements (between FQHCs/RHCs and 1903(m) organizations) is a moot point since, beginning October 1, 1997, the election process is no longer required. Before States assess the need for a supplemental payment, States should work with FQHCs and RHCs to determine what the reasonable cost levels are for each FQHC/RHC expected to participate in the program. Then, based upon the State's assessment of whether or not the rate negotiated between the FQHC or RHC and the 1903(m) organization covers the FQHC's or RHC's reasonable costs, a supplemental payment may or may not be triggered.

**Prohibition of Delegation of Supplemental Payment Requirement to MCOs**

Section 4712(b) of BBA requires States to make up the difference, if any, between the amounts paid FQHCs or RHCs by MCOs with which they have a contractual relationship, and the amount the FQHC or RHC would have received under the reasonable cost-based reimbursement provision contained in section 1902(a)(13)(C)(I) of the Social Security Act. The language in that section specifically requires States to make these supplemental payments. It is our conclusion that this requirement cannot and should not be delegated to an MCO, and that each State must determine any differences in payment and make up these amounts.

**Development of Comparison Rates**

Section 4712(b)(2) requires that rates of payment between FQHCs/RHCs and MCOs shall not be less than the amount of payment for a similar set of services with a non-FQHC/RHC. The intention of this provision is to ensure that managed care entities negotiate rates of payment with FQHCs and RHCs that are comparable to the rates paid to similar providers that do not have an FQHC or RHC designation and thereby protects the State against negotiated rates that are excessively low in comparison to the community standard.

There are two issues that are relevant here in terms of comparison rates: 1) How does the State determine what the FQHC's/RHC's costs are in order to assess whether or not there is a need for a supplemental payment; and 2) How does the State make a determination of whether the level of payment between the MCO and FQHC/RHC is not less than the rates paid for a similar set of services provided by a non-FQHC/RHC?

On the first issue, States already have in place, as part of their existing State Plans, approved methodologies for determining an FQHC's/RHC's costs (and, as noted earlier, these costs should be determined in advance of assessing the need for a supplemental payment). If a State chooses to develop an alternative methodology for the purposes of BBA, it may do so but it must also submit a State Plan Amendment. The State payment system for the supplemental payments may utilize prospectively determined rates or may pay interim rates subject to reconciliation. Irrespective of the type of payment method utilized, the rates must cover the FQHC's/RHC's reasonable costs.

On the second issue, a State has the flexibility to develop its own methodology for determining whether rates paid by MCOs to FQHCs/RHCs are not less than to other similar providers of services.

**Phase-Out of Cost-Based Reimbursement**

Beginning in fiscal year 2000 (as noted above), as part of a phase-out of cost-based reimbursement, levels of reimbursement will be reduced both for FQHCs/RHCs participating in fee-for-service (unrestricted or as PCCM providers), and those receiving supplemental payments as HMO or HIO subcontractors. In addition, cost-based reimbursement requirements consistent with BBA remain in effect for primary care case management programs until fiscal year 2000, at which point the statutory phase-out provisions become effective. Further, FQHC cost-based provisions as required by BBA are applicable in States that have both PCCM and MCO programs. States may, at their option, continue to provide reasonable cost-based reimbursement beyond this point in time, but are not required to do so.

**Prohibition of Requirement for Higher Payments By MCOs**

Under the pre-BBA law, States were allowed to delegate the requirement for cost-based reimbursement to MCOs. While section 4712(b)(2) of BBA places a floor on payments, it does not put a ceiling on payments (the law is silent). While the literal text of BBA does not impose an upper limit on what a State may require an MCO to pay FQHC/RHC contractors, we recognize that permitting States to impose such requirements could result in access problems and have the opposite impact on MCO-FQHC/RHC contracting arrangements than what was intended by Congress. (That is, Congress intended to encourage contracting between FQHCs/RHCs and MCOs and to remove financial barriers to this contracting.) Therefore, it is our conclusion that States cannot impose any requirement on MCOs for payments to FQHCs/RHCs other than those contained in 4712(b)(2).

**Alternative Reimbursement Agreements**

Based upon a review of the BBA FQHC/RHC reimbursement provisions, it is our conclusion that these provisions preclude any alternative reimbursement arrangements (between a State, 1903(m) organizations, and FQHCs and RHCs, or any combination thereof) that are inconsistent with the requirements of BBA. In other words, HCFA will not approve any FQHC/RHC reimbursement arrangements that do not meet the requirements of section 4712(a), (b), and (c).

**Effective Dates**

Unlike other BBA provisions that are effective with contracts beginning on or after October 1, 1997, the FQHC/RHC provisions under BBA affect contracts that existed prior to October 1, 1997 (e.g., July 1, 1997 - June 30, 1998) by applying to services furnished on or after October 1, 1997. All contracts (between the State and MCO and the MCO and FQHC/RHC) which this affects should be appropriately amended to reflect all the relevant changes in FQHC/RHC law and policy as noted above.

If you have any questions, please contact Sidney Trieger at (410) 786-6612 or Matt Barry at (410) 786-1176.


Sincerely,

  /s/

Sally K. Richardson
Director
Center for Medicaid and State Operations


Attachment


cc:

Dr. Earl Fox, HRSA Administrator  HCFA Regional Administrators  PHS Regional Administrators  Jennifer Baxendell, NGA  Lee Partridge, APWA  Joy Wilson, NCSL  National Association of Community Health Centers  State Health Commissioners  HCFA Press Office

**ATTACHMENT**

## FQHC Contracts and Cost-Based Reimbursement: Pre-October 1, 1997

Prior to the effective date of the FQHC provisions contained in BBA, the rules surrounding FQHC access and cost-based reimbursement were governed by statute (section 4704(b) of OBRA 1990 amended sections 1903(m)(2)(A) and 1905(a)(2)(C)) and through HCFA policy that was issued on February 8, 1996. It is the intent of this policy statement to provide further guidance on these "old" FQHC rules in the event there are outstanding or unresolved issues with potential retroactive (pre-October 1, 1997) implications.

As stated in the February 1996 policy, appropriate contract language between the State and the managed care organization (MCO) and between the MCO and the FQHC will help to assure the receipt of cost-based reimbursement under managed care. The absence of such contractual language providing for cost reimbursement for FQHC services has been at the heart of most of the issues HCFA had to address over the past few years on FQHC policy. Typically, when FQHCs contracted for other than reasonable cost-based reimbursement, the contracts did not specify that the FQHCs waived their right to reasonable cost-based reimbursement; rather, they reflected the negotiated agreed upon payment rates. In some instances, FQHCs questioned the binding nature of their signed contracts, and whether the contracts could have been amended at the point in time which the FQHC wishes to elect reasonable cost-based reimbursement. Our guidance on this specific issue is:

The terms and conditions of contractual agreements which were entered into between FQHCs and managed care organizations are binding upon both parties. To assure that all parties in the contracting process were fully informed of the terms and conditions, including provisions surrounding cost-based reimbursement, the State should have included language in its contracts with MCOs on this (and any other) specific issue. Further, a decision (a signed contract) to contract for payments other than reasonable cost is binding on both parties (absent any additional measures by the State to reimburse FQHCs) and the contracts do not need to have specific language specifying that an FQHC is withdrawing its right to reasonable cost reimbursement. By signing such contracts, an FQHC is deemed to have waived its rights to cost-based reimbursement.

An additional concern involves the timing of the reasonable cost election for FQHCs which previously elected otherwise. Specifically, does the new election take place at the next contract renewal period, or if the original contracts provide for a redetermination of rates, can it take place at the time of the redetermination? Our guidance on this specific issue is:

If, during the course of an existing contract, an FQHC exercised its right to cost reimbursement (in writing), payments constituting cost should have then been applied at the next contract renewal or if the existing contracts had a clause where rates were redetermined (other than for automatic items such as cost-of-living adjustments or inflation), at the time of redetermination. This assumes that the FQHC negotiated appropriate contract terms at this point in time.

Where concerns remain over a State's implementation of these policies prior to October 1, 1997, HCFA is willing to consider such instances on a case-by-case basis. In such situations, HCFA strongly recommends that any such case be documented to the maximum extent possible since any HCFA decision would be based on a review and assessment of the relevant paper trail (e.g., contracts, letters between parties).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Concilio de Salud Integral de Loiza, Inc., et al.    )
                                                     )
            Plaintiffs,                              )
                                                     )
      v.                                             )    Case No. 07-1034 (RMC)
                                                     )
Michael Leavitt, Secretary, et al.                   )
U.S. Department of Health and Human                  )
 Services                                            )
200 Independence Avenue, S.W.                        )
Washington, D.C. 20201                               )
                                                     )
            Defendants.                              )

## THIRD DECLARATION OF JOSE ORLANDO COLON

I, Jose Orlando Colon, declare under penalty of perjury as follows:

### I.    INTRODUCTION

1.      My name is Jose Orlando Colon.  I am a Certified Public Accountant performing accounting, auditing and financial consulting services in the Commonwealth of Puerto Rico.

2.      This is my third declaration in this case.  My previous declarations were filed as exhibits to plaintiffs' September 27, 2007 partial summary judgment and memorandum in support thereof (first declaration) and plaintiffs' December 2007 reply and opposition (second declaration).  Copies of both are attached for the Court's convenience.  In those earlier declarations, especially the first, I described my background, including my credentials as a Certified Public Accountant ("CPA"), my years of working for health centers/Federally-qualified health centers ("FQHCs") as both an auditor and financial advisor, my experience with respect to the managed care plans and contracts between such plans and FQHCs in Puerto Rico's Medicaid program, and my management of a health center/FQHC in New York City.  This third

declaration, as was the case with my prior declarations, is based on that experience and those qualifications.

3.     This declaration was requested by plaintiffs' counsel, who asked me for further information regarding the facts and circumstances of Puerto Rico's Medicaid program and its impact on FQHCs. The following paragraphs of this declaration set forth his requests and my response.

4.     <u>REQUEST</u>:    In your first declaration (at ¶ 11) you stated that the managed care contracts Puerto Rico's HMOs were imposed on the Puerto Rico FQHCs on a "take it or leave it" basis and (at ¶ 5) left the FQHCs with no way of controlling the risk those contracts imposed other than to not make referrals to other health care providers for services those FQHCs' Medicaid patients needed. Could you please provide more detail concerning why you made this statement?

5.     <u>RESPONSE (¶¶ 5-14)</u>: The statement was based on several factors. As an initial matter, the contracts the HMOs give the FQHCs are *not* for payments for the services the FQHCs provide. They are instead entirely risk-based. As further described below, to the extent the FQHCs receive any actual "payment" under these contracts, it is only because the costs of services of other health care providers for which the FQHCs are made responsible (the "risk") under the HMO contracts turn out to be less than the available "capitation".

6.     As a practical matter, the only means of controlling the risk of loss by an entity that is financially responsible for paying the costs of certain persons' medical services that are provided by other entities or persons are:  (1) by careful negotiation of the terms of its payment obligations toward those other providers; (2) scrutinizing vouchers from those other providers to make certain those providers' billings are consistent with the payment terms negotiated; and (3)

limiting referrals to those other providers to avoid those costs altogether. As I explained in ¶ 5 of my first declaration, the FQHCs have absolutely no role in negotiating such terms or reviewing or making such payments. Those functions are performed by the HMOs and only the HMOs. Thus, by process of elimination, the FQHCs are limited to not making referrals as their only means of controlling costs for which they bear the risk the HMOs' contracts impose.

7.      In this regard, counsel asked me to check on whether the plaintiffs under their HMO contracts make referrals for hospital services. I did check and now want to make clear that the plaintiffs do not make hospital referrals, except to emergency rooms. Otherwise, all referrals to hospitals are made by specialists and sub-specialists (to whom the plaintiffs do make referrals).

8.      There is, of course, one other avenue available to doctor groups in the situation confronting the plaintiff FQHCs in this case to deal with the risk the HMO contract imposes on them -- refuse to accept the contract. That avenue, however, is not available to FQHCs. I am advised by counsel in this case that my understanding that Section 330 Public Health Service Act grantees must have contracts with Medicaid programs for services to Medicaid beneficiaries is correct. In Puerto Rico, for an FQHC to be able to provide its services to Medicaid patients, it must have a contract with a Medicaid HMO. As a result, the plaintiffs in this case cannot refuse to accept the take-it-or-leave-it HMO contracts they now have. I should add that one FQHC/Section 330 grantee, the Rio Grande health center, did refuse the HMO contract on the advice of a senior HHS official in a letter that is described in the next paragraph of this declaration. Because Puerto Rico's Medicaid program has been merged with other health programs for the poor in the *Reforma* program, most of the patients Section 330 grantees must serve are controlled by the Medicaid HMOs, which contract for Medicaid and other *Reforma*

3

patients in the same transaction and on the same terms. When Rio Grande refused to accept the HMO contract as the HHS official's letter indicated it should so, it lost its patient base. Even though there was a shortage of other primary care providers in the Rio Grande area, the HMO refused to assign its *Reforma* patients to Rio Grande and because Rio Grande no longer could refer those patients to other than doctors within the HMO's network, Rio Grande lost most of them and its Section 330 grant funding was thereafter removed. The lesson of what happened to Rio Grande as a result of its refusal to accept the HMO's contract has not been lost on the other Puerto Rico FQHCs.

9.      In that first declaration, I also commented on the impact of the risk the HMO contracts imposed on those centers. That impact, as I then mentioned (in ¶ 5), was to cause plaintiff Loiza to lose money on every enrollee the HMO assigned to it and would soon place Belaval in a similar situation. In reviewing that comment today, I do not believe I did justice to how pernicious this risk truly is. I say this because I was recently given a copy of a letter[1] written in 2000 by an HHS official, who at the time headed up a division within HHS' Bureau of Primary Care (within HHS' Health Resources and Services Administration). That division was responsible for HHS' management of the Section 330 Public Health Service Act health center grants program. The letter describes the risk more specifically than I had done in that declaration.

10.     My response to Question 8 (¶ 10) in the first declaration was to the effect that I had reason (but provided no supporting documentation because I had none) to believe CMS was aware of how the Puerto Rico FQHCs were being treated financially (both by the

---

[1] A copy of that letter is attached. My references herein to the official who wrote the letter are to "Admiral Bohrer". He held the rank of Admiral in the Public Health Service Commissioned Corps. The letter was recently discovered by a doctor who worked at the Section 330 center that was the subject of the letter. I knew the letter existed but had been unable to find a copy.

4

Commonwealth and the HMOs). The 2000 letter from Admiral Bohrer makes it apparent that CMS was made fully aware of the risk type contract the HMOs foisted on the FQHCs as well as the extent of that risk. I say this because Admiral Bohrer's letter, on page 2, states that he was going to share it with HCFA, now CMS, officials. The letter's copy list on the same page includes a CMS official in Region II. Furthermore, as my discussion in the following paragraphs demonstrates, the Bohrer letter aptly described what the risk was. Accordingly, my previously stated belief that CMS has had specific knowledge of what the HMOs and Commonwealth were (not) doing in the way of payment to the FQHCs is now confirmed. Indeed, it shows that such specific knowledge began at least as early as eight (8) years ago.

11.     Returning to the risk the HMOs have imposed and continue to impose on the FQHCs, it is exactly what the Bohrer letter describes (with some differences in amounts). (For the sake of simplicity, my description of that risk herein uses the amounts stated in the Bohrer letter.) To start with, under the HMO-FQHC contracts, the FQHCs (theoretically) receive a capitation payment, each month, (again I am using Admiral Bohrer's figures) of $15.21 for each patient the HMO has assigned to the FQHC's care. The FQHCs do not and (in 2000) did not receive the $15.21 capitation. It was only actually paid in the very early days of managed care. Several years prior to 2000 the payments stopped and the HMOs began to withhold than to make the HMOs' payments to the (other than FQHC) providers whose services and costs were covered by that capitation payment. Puerto Rico's Medicaid program (as I believe other Medicaid managed care programs do) requires the HMOs to assign their enrollees to a primary care provider, who/which then (as is the case with FQHCs) itself provides primary and certain other care to those enrollees. The primary care provider also makes referrals of those enrollees to many of the other doctors and institutions that provide Medicaid services.

5

12.    The HMOs' contracts with the FQHCs assign the FQHCs such primary care responsibilities.  Regarding the providers other than the FQHCs who/which perform services to enrollees assigned to the FQHCs, the FQHCs', with only a stop-loss of $10,000 per enrollee, per year, are made financially responsible under the HMOs' contracts for all of such other providers' costs.[2]  The stop-loss protection afforded the FQHCs by the HMOs is the HMOs' assumption of responsibility for individual enrollee costs above $10,000, per year.  Accordingly, if costs incidental to the care for which the $15.21 per month, or $182.52 per year, capitation is available exceed that capitation, the FQHCs are liable for the difference, up to $10,000.  In simple terms, this means that the plaintiffs in this case with respect to that enrollee capitation have an annual risk of $10,000 (stop loss) minus $182.52 (total yearly capitation), or $9,817.48.  Thus, in exchange for a payment of anything that may be left over after the other providers' services covered by that $182.52 are paid for, the FQHCs are exposed to a possible liability of $9,817.48 for each of the enrollees the HMOs assign to them.

13.    The foregoing is only part one of the FQHCs' total risk.  Part two is their risk for institutional services, mainly hospital.  As Admiral Bohrer's letter indicates, however, the FQHCs receive no payment whatsoever for this second risk.  Under part one's capitation, there is at least the possibility that the FQHCs will actually be paid something.  Part two offers no such possibility.  Part two in effect is stop-loss insurance by the FQHCs for the HMOs costs that exceed a "pool" of funds ($20.34 per enrollee per month is the figure in the Bohrer letter) the HMOs create for themselves to meet the costs of the part two services.  If the particular HMO does not spend out that pool by the end of the year, the HMO keeps the balance.  If it is spent

---

[2] There may be, depending on the HMO, a few limited services that are excluded from this risk.

out, the FQHCs' are responsible for all costs above the pool amount up to the previously described $10,000 per enrollee, per year loss limit.

14.    The foregoing part one and part two risks forced on the FQHCs are separate and apart from one another. I have been told that each such risk has been independently devised by actuaries to apply to the costs of the specific (and separate) services under each risk. Whether either risk is the outgrowth of actuarial calculations (or sound actuarial calculations)[3] is certainly questionable, considering the extent to which the risk affects the plaintiffs in this case.

15.    What convinces me that the part one and part two risks are independent of one another is the HMO contract received by another Puerto Rico FQHC, Gurabo Community Health Center, Inc, for which I have performed, and am performing, services. The HMO contract for this FQHC is different from the contract used by the HMO that contracts with the plaintiffs in this case. In that other HMO's contract with Gurabo, the FQHC is made responsible only for the part one risk.[4] It bears no responsibility for the part two risk. There appears to be no difference between the services within the part two risk of this other HMO and the part two risk in the HMO contracts with the plaintiffs here. As a result I believe that my description above of the part two risk as stop loss insurance and only stop loss insurance is correct.

16.    When I take into consideration the fact that the plaintiff FQHCs have no control over the terms of the HMOs' contracts with other providers for which they are financially responsible, the second fact that the plaintiff FQHCs have no control over payments to those other providers, the third fact that the HMOs require the plaintiffs to insure the HMOs for a

---

[3] Although I have assisted a number of the FQHCs in their dealings with the HMOs, I was never provided, nor did the HMO-FQHC contracts themselves provide, any actuarial material (calculations, reports, *etc.*) concerning the part one and part two risks (or any other aspect of those contracts).

[4] The part one risk is slightly reduced by risk sharing arrangements for a few services.

substantial portion of the risk the HMOs take under their contracts with the Commonwealth (and for which the HMOs are licensed), the fourth fact that the FQHCs' exposure exceeds any possible payments they could earn by $9,817.48 per enrollee, per year (which is roughly 54 times the amount of the part one capitation), the fifth fact that the plaintiffs have lost money by accepting the HMOs' contracts and have never been paid anything close to the fees for services the HMOs pay other providers (for which the FQHCs are liable), the sixth fact that the plaintiff FQHCs under their Section 330 grants must have contracts with the Puerto Rico HMOs, and the seventh fact that the HMOs contracts with the plaintiff FQHCs are non-negotiable (take it or leave it), I conclude, and believe I do so reasonably, that the FQHCs' *only* means of protecting themselves against this HMO contract risk is not to make any referrals to other providers.  I also, even more importantly, conclude that the foregoing factors and the way the HMO contract's financial terms are structured is such that the FQHC would (without Section 330 grant funds to fall back on) not just make medically needed referrals but also take any other measures it could to avoid dealing with patients whose conditions, if diagnosed, would necessitate referrals.  When the risk of loss is actually so great that a doctor or doctor group (or FQHC) will become a debtor by making medically necessary referrals to other providers, the impact of that risk is rather obvious.  Without Section 330 grant funds to fall back on, the plaintiffs here would long ago have been forced out of business by the cost of the "risk" under their HMO contracts or to practice very bad medicine.

17.    REQUEST:  Please advise whether there are any changed circumstances since your earlier declarations in this case that would affect the applicability or accuracy of what you stated in those declarations.

18.    <u>RESPONSE</u>: (¶¶ 16-18).  With one exception explained below, there has been no

such change of circumstance since my prior declarations.  Among other things, the plaintiffs still

have received no wraparound payments.

19.    That exception stems from the determinations of Puerto Rico's Medicaid office

that were filed in this case through a December 21, 2007 Notice to the Court.  Those

determinations were evidence of the fact that the Puerto Rico Medicaid office, (purportedly)

acting under the authority of 42 U.S.C. § 1396a(bb)(5)(A) (which requires and describes FQHC

wraparound), has determined that "the amount of the payments provided under the [HMO]

contract[s]" as stated in § 1396a(bb)(5)(A) which should be subtracted from sums otherwise

owed by the Medicaid program to the FQHCs, will be the above-described per enrollee, per

month capitation and stop-loss pool in the FQHC-HMO contracts.

20.    I want to be certain the Court understands fully what this determination signifies.

As I explained above, neither the plaintiff FQHCs in this case nor the other FQHCs in Puerto

Rico ever receive anything from the HMOs risk contracts resembling what they would be paid

on a fee for service basis.  Admiral Bohrer's $15.21 capitation and $20.34 pool are simply not

"payments".  At most, any actual payment derived from those two items would be a small

portion of the $15.21 capitation that is left over after all the other service providers covered by

that $15.21 are paid.  The FQHCs payment guarantee under § 1396a(bb) is the FQHC's per visit

rate multiplied by its number of Medicaid visits.  In managed care this payment guarantee is

fulfilled *after* a State Medicaid program first subtracts whatever the FQHC has already been paid

for its services by the HMO.  Accordingly, assume the FQHC's per visit rate X visits = $10,000,

but the HMO already has paid the FQHC $5,000 for those visits.  The State would only owe the

FQHC the balance -- $5,000.  Under Puerto Rico's decision to treat the $15.21 capitation and

$20.34 pool as such HMO "payments" this is what happens. Puerto Rico computes an FQHC's per visit rate X visits, which is the previously used $10,000. It then deducts the $15.21 capitation and $20.34 pool, regardless of the fact that the FQHC has not been paid that sum and never will be. Assuming that sum equals the previously used $5,000, the FQHC is then paid $10,000 minus this $5,000 phantom payment. As it turns out for most of the FQHCs, including plaintiffs, this subtraction of a phantom payment completely eliminates any possible wraparound payment. In other words the subtracted phantom payment is inevitably greater than Puerto Rico's calculation of the FQHC per visit rates times visits guarantee.

     21.   REQUEST: As you know, we have argued in this case that the HMOs' payment obligation to the FQHCs which, as stated in 42 U.S.C. § 1396b(m)(2)(A)(ix), derives from "a contract for the provision of services with" an FQHC and is to be a "payment that is not less than the level and amount of payment. . .the [HMO] would make for the services if the services were furnished by a [non-FQHC] provider" must be a fee for service payment, not the risk contract the Puerto Rico HMOs impose on the FQHCs. Assuming our interpretation of this language is correct, are there fee for service arrangements between other providers and the Medicaid HMOs for the services the FQHCs provide under their Medicaid contracts (or fee schedules for such arrangements) that could be used to ascertain what the FQHCs' fee for services should be under § 1396b(m)(2)(A)(ix).

     22.   RESPONSE: Yes there are. First, the HMOs routinely enter into fee for service contracts for the same (or many of the same) services the FQHCs provide in Medicaid with numerous doctors and doctor groups other than FQHCs. Second, the same HMOs manage commercial health plans and in doing so contract on a fee for service basis with numerous providers for the identical services the FQHCs provide in Medicaid. Third, in this case HHS has

argued that the contracts between Puerto Rico's Medicaid program and the HMOs requires the HMOs to "reimburse out-of-network providers for services provided in situations where in-network providers are" unavailable. Defendant's October 31, 2007 Reply in Support of Motion to Dismiss and Memorandum, at 28 (D. 19). This argument was directed toward the requirement in 42 U.S.C. § 1396b(m)(2)(A)(vii). I am unaware that such out-of-network care actually is available, but assuming the HMOs are fulfilling this requirement, they necessarily would be paying the out-of-network providers a fee for those providers' services. Whatever those fees or fee schedules might be , they would be one more example of what the FQHCs' fees for services should be under § 1396b(m)(A)(ix).

2 - 15 - 08
_____
Date

_____
Jose Orlando Colon

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Concilio de Salud Integral de Loiza, Inc., et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 07-1034 (RMC) |
| | ) |
| Michael Leavitt, Secretary, et al. | ) |
| U.S. Department of Health and Human | ) |
| Services | ) |
| 200 Independence Avenue, S.W. | ) |
| Washington, D.C. 20201 | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF JOSE ORLANDO COLON

I, Jose Orlando Colon, declare under penalty of perjury as follows:

1.      My name is Jose Orlando Colon.  I am a Certified Public Accountant performing accounting and auditing services in the Commonwealth of Puerto Rico.

2.      The information presented below is based on personal knowledge, experience in dealing with and acting on behalf of Federally-qualified health centers ("FQHCs") in Puerto Rico and work on matters relating to Puerto Rico's *Reforma* program for clients other than FQHCs.  For more than 20 years, I have audited numerous FQHCs in Puerto Rico.  Those annual audits have been conducted in accordance with federal law, including audit requirements under Section 330 of the Public Health Service Act (from which Puerto Rico's FQHCs derive grant funding) and the Single Audit Act.  I have, additionally, provided financial advice to virtually all of the FQHCs in Puerto Rico.  I also, for approximately one year, was in charge of a health center in New York City, which was in the process of being merged with another larger center.

3.    The remainder of this declaration is designed to answer questions put to me by lead counsel in the above-captioned case.

4.    **QUESTION 1 -- Are the two health center plaintiffs in this case -- Loiza and Belaval -- currently receiving payment for the services they are providing under Puerto Rico's Medicaid program?** The answer to this question is no.  Although the District Court in Puerto Rico in the case of *Rio Grande Community Health Center, Inv. V. Rose Perez Perdomo, Secretary, Department of Health,* Case No. 03-1640 ("Rio Grande") issued final orders for payment to both FQHCs, the FQHCs are not currently being paid by the Medicaid program.  Both FQHCs submitted payment requests to the office within the Puerto Rico Department of Health designated to review and approve FQHC payments after the District Court's final order (as to each).  They followed that office's procedure, but utilized the payment formula the District Court's orders required.  Both FQHCs were refused payment by that office.  Loiza's most recent payment request was for second quarter 2007.  Belaval's most recent request was also for second quarter 2007.  The District Court, for reasons that I do not understand, has refused to enforce its payment orders on those two FQHCs' behalf.  Unless these FQHCs obtain judicial relief, there is no reason to believe they will receive payments based on the District Court's final orders.

A.    **QUESTION 2 -- Did the District Court's payment orders award full compensation to the two FQHCs as required by the FQHC payment provisions in the Medicaid statute?** Again, the answer to this question is no.  For both FQHCs, the District Court issued orders that did not comport with those payment provisions as I understand them.  (I assume for this purpose that the orders are based on the Court's prior payment formula.  Our counsel suggests that even this is not clear.)  In the first place, the orders provided payment based on an assumption that each FQHC's Medicaid enrollment was 56.5% of its total number of

2

*Reforma* enrollees. (*Reforma* is Puerto Rico's managed care program aimed at the Medicaid population and certain other poor residents.) Both centers treat far more Medicaid patients than the arbitrarily assumed 56.5%. A second problem with the District Court's payment orders is that they provide for an arbitrary 30% reduction in payments that would otherwise be due. Finally, they make no adjustments for inflation, even though the law requires such adjustments. I describe the 30 percent reduction as "arbitrary" because the District Court has never provided a rationale for imposing it, and despite numerous attempts by counsel to remove it, the District Court has continued to utilize it (even though the Court, for some preliminary injunctive orders, did not impose it, but stated no specific reason as to why, other than to imply that it was in the nature of punishment for the failure to make payment in the first place).

5.    **QUESTION 3 -- Do the Puerto Rico HMOs pay the FQHCs the amounts to which they are entitled by virtue of the Medicaid statute?** The answer to this question again is no. Section 1396b(m)(2)(A)(ix), of Title 42 of the United States Code provides that a Medicaid managed care entity (such as Puerto Rico's HMOs) that contracts with an FQHC "shall provide payment [to the FQHC] that is not less than the level and amount of payment which the [HMO] would make for the [FQHC] services if the services were furnished by a provider which is not a Federally-qualified health center..." As I understand that provision, the payment the Medicaid HMO has to make would be that which it would have to make for the specific FQHC services the FQHC provided under the HMO's contract to another provider than the (or an) FQHC. In short, the required payment is a direct payment for the specific services provided.

    None of the Puerto Rico HMOs, including the HMO that contracts with the plaintiffs in this case, makes such payment or enters into contracts with the FQHCs that call for such payments. Instead, as the Complaint in this case reflects, the HMOs enter into risk-based

3

contracts with the FQHCs pursuant to which the FQHCs are given a monthly fee, or "capitation",

per enrollee from which the FQHC and providers of services other than FQHC services must be

paid. These other services are those provided by specialists, hospitals, radiological clinics,

independent laboratories, *etc.* In essence, the contract turns the FQHCs into mini insurance

companies for virtually all of the services Puerto Rico provides to the Medicaid beneficiaries the

FQHCs are assigned. However, unlike insurance companies, the HMO, not the FQHC,

negotiates and enters into the contracts with those service providers. These other providers also

submit invoices for payment directly to the HMO, not the FQHC. The FQHC has no say in

approving payments to those other providers, nor does it have any say as to the terms of the

contract the HMOs enters into with those other providers.

There are several results of this risk-based contracting approach: (1) the FQHCs only

control over the risk aspect of the contracts is not to refer patients to other providers. (Except for

emergencies (and certain other isolated situations), the primary care function the FQHCs perform

puts them in the position where, unless they refer the enrollees to another provider, the HMO

will not pay for any services the enrollee receives from another provider), and (2) to the extent

they benefit from their HMO contracts, it is because there is something left over for them after

their capitations are used to pay the other providers' claims (or plaintiff Belaval's situation,

described below).

In the case of plaintiff Loiza, the payouts of funds to the other providers are greater than

Loiza's total capitation payments. Thus, Loiza literally loses money for every enrollee assigned

to its care. In the case of Belaval, it has been paid something, but only because Belaval also

contracts for certain specialty services for which the HMO pays a fee for service rate. (In effect,

Belaval becomes another provider, receives a separate fee contract from the HMO (from is basic

4

contract) for those services and then refers to itself.)  The irony is that when Belaval receives a

payment for such other services, the payment amount is deducted from its basic capitation under

its original contract.  In effect, therefore, Belaval is paying itself for the specialty service.

Belaval's payments from the HMO have been shrinking.  It is my belief that Belaval soon will be

in Loiza's position where it will actually lose money for every enrollee the HMO assigns to its

care.

6. **QUESTION 4 -- Is the contract the FQHC plaintiffs receive for basic services

from the *Reforma* HMO the same one the HMOs enter into with private doctor groups or

IPAs (independent physician associations) for such basic services?**  Yes.  It is the same.

However, the doctor groups have no Section 330 grant to fall back on when the HMO effectively

fails to pay them for their services.  Accordingly, unlike the FQHCs, which (fortunately) ignore

the financial consequences of referrals and make them where medically indicated, the groups

tend to withhold referrals in all but extreme cases.

7. **QUESTION 5 -- Is the *Reforma* HMO referring all enrollees in Belaval's

service area to Belaval?**  No.  The HMO, according to reports made to Belaval by recent

*Reforma* enrollees who sought to be assigned to Belaval for primary care (and other services), is

refusing to make assignments to Belaval.

8. **QUESTION 6 -- Can plaintiffs serve enrollees outside their service area (or

in their area, but assigned to another provider)?**  No.  The HMOs do not permit their

enrollees to obtain care from other primary care providers than the one to which the enrollee is

assigned.  This is even true where the enrollee shows up at an FQHC and seeks care for a

problem that could not have been anticipated and reports that his/her assigned provider has told

him/her that it (or he/she) has no time to see the patient that day.  If the FQHC sees and treats the

enrollee anyway, and all of them will and do, the HMO will not pay them for the service. (There is no provision for payment by the Commonwealth in such a situation.)

9.    **QUESTION 7 -- Have *Reforma* HMOs refused to contract with FQHCs?**

Yes. I know of at least two cases where FQHCs sought contracts for their service areas or portions of their service areas and were refused by the HMO. Because there is only one *Reforma* HMO with which to contract,[1] the FQHCs were effectively disqualified from serving Medicaid patients in those areas. At least one of these FQHCs asked the Health Department to direct the HMO to contract with the center. The Department advised that it had no authority to so direct the HMO.

10.    **QUESTION 8 -- Are CMS and the Puerto Rico Department of Health (the State Medicaid agency) aware of the manner in which the FQHCs are being paid?** I know the Department of Health is fully aware of how the FQHCs are being paid, not just because of the *Rio Grande* lawsuit (and other legal actions other FQHCs have brought regarding their HMO contracts) but also because I attempted to secure for the FQHCs different contractual arrangements before any of the FQHCs brought any legal actions over their HMO contracts. I dealt with, among others, Department of Health officials and complained to them about the effect of the contracts the HMOs were imposing on the FQHCs. Those officials refused to provide any assistance to me and told me that they had no authority to tell the HMOs how to contract with FQHCs. As to CMS, I know that the Bureau of Primary Health Care within the Department of Health and Human Services' health care financing administration was well aware of how the HMOs were contracting with the FQHCs and the problems those contracts were causing.

---

[1] Of Puerto Rico's 10 regions for *Reforma*, all but one (and then very recently through limited demonstrations) has only one HMO.

6

Indeed, that Bureau, which oversees the Section 330 Public Health Service Act grant program, sent consultant after consultant to Puerto Rico either to analyze the problems that the FQHCs were encountering or to help the FQHCs file requests for payment with the Health Department. It was my understanding that Bureau representatives reported the problems to CMS and sought CMS' help. Obviously, they were unsuccessful because the problems continue.

11.     **QUESTION 9 -- Will the *Reforma* HMOs contract with the FQHCs on any other basis?** No. I have on a number of occasions, including after the FQHCs were told (in 2002) by a HRSA official to modify the contracts and remove the risk, asked the HMOs to issue different contracts to the FQHCs. I was told each time that the contracts, as written, were "take it or leave it" and that the HMOs would not modify them.

    I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

_9-24-2007_
Date

Jose Orlando Colon

7

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., *et al.* | ) | |
| | ) | |
| *Individual Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-1034 (RMC) |
| | ) | |
| U.S. Department of Health and Human Services, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Michael Leavitt, Secretary U.S. Department of Health and Human Services | ) | |
| | ) | |
| *Defendants.* | ) | |

## SECOND DECLARATION OF JOSÉ ORLANDO COLON, CPA

I, Jose Orlando Colon, declare under penalty of perjury as follows:

1.      My name is José Orlando Colon.  I am a Certified Public Accountant performing accounting and auditing services in the Commonwealth of Puerto Rico.

2.      This constitutes my second declaration in support of the plaintiffs in this action. My background was presented in the earlier declaration.  I have been asked by counsel for plaintiffs (Mr. Feldesman) to respond to four further questions he has put to me.  They are:

> (1) In a letter dated July 20, 2000 from Sue Kelly of CMS Region
>
> II (New York) to a senior official in Puerto Rico's Medicaid
>
> department (copy attached), among other things, Ms. Kelly states
>
> that "[p]rior to health care reform under the fee for service
>
> Medicaid program [of Puerto Rico], [the FQHCs] received in-kind
>
> payments in the form of staff and space from the Department of

Health and thus, their costs for serving Medicaid beneficiaries were being met." Do you know whether the foregoing statement by Ms. Kelly is true and/or whether there is any credible support for it?

(2) Are services provided by the Loiza health center in the Rio Grande area adequate to fulfill the needs of the Medicaid beneficiaries in that area for FQHC services?

(3) To the best of your knowledge, has Puerto Rico ever paid FQHCs the sums to which the Medicaid statute entitles them to receive for the services they provide to Medicaid beneficiaries?

(4) Is the Kelleher report relevant to Loiza's and Belaval's payment circumstances and, if so, how?

My answers to the foregoing questions are presented in succeeding paragraphs of this declaration.

3.    Regarding Mr. Feldesman's first question, during the period of time covered by Ms. Kelly's statement in her July 20, 2000 letter, I served as independent auditor for various FQHC centers (for at least three years). In addition, during that same period, I provided financial management assistance to a number of other centers. I believe that I am in a position to respond accurately to Ms. Kelly's statement as a result of this experience.

4.    Ms. Kelly's statement is erroneous. The value of the staff and space that were provided to various Section 330 funded health centers during the period covered by her statement never approached the sums to which the centers would have been entitled had they been properly paid for 100 percent of their reasonable costs as the Medicaid statute then required.

2

Furthermore, I know of no audit or other financial report that would have analyzed or addressed the value of these in-kind "contributions" and compared that value to what the Medicaid program should have then been paying the FQHCs. Stating it otherwise, I know of no evidence of any sort on which a federal official could rely for the statement of Ms. Kelly. One final observation: one of the plaintiffs in this case, Junta del Centro de Salud Comunal Dr. José S. Belaval, Inc. ("Belaval"), for the entire period covered by Ms. Kelly's statement was located in San Juan (it still is) and did not even occupy a Commonwealth facility or otherwise deal with the Commonwealth in regard to the Medicaid program because the responsibility for the program in San Juan was then delegated to the San Juan Municipality. Belaval did then occupy a San Juan-owned facility. For another purpose than this legal action, I looked into the in-kind value of that facility (and any free services Belaval was provided by San Juan). Even the most generous valuation of those "contributions" fell millions of dollars short of what Belaval should have been paid as an FQHC for its services to Medicaid beneficiaries.

5.    As to Mr. Feldesman's second question, there is a problem in the Rio Grande area for Medicaid beneficiaries who wish or might wish to receive FQHC services. The way in which the Puerto Rico Medicaid program now works is for the single HMO that covers a particular region to assign IPA numbers to the particular doctor groups (known as "IPAs") (or FQHCs, which are also labeled "IPAs") that the HMO contracts with to treat Medicaid beneficiaries in a particular community. I have been advised that for the Rio Grande area, even though Loiza has a responsibility under its Section 330 grant to cover that area, Loiza has been unable to obtain an IPA number and that Medicaid beneficiaries/enrollees of the HMO serving that area are all assigned to two or three IPAs that have numbers authorizing them to provide services in the Rio Grande community.

3

6.    Notwithstanding Loiza's inability to secure an IPA number for Rio Grande, it has a small presence in Rio Grande and has somewhere (as has been reported to me) around two to three thousand Medicaid patients who have been assigned by the HMO to that small presence. However, in dealing with the HMO, Loiza continues to use the IPA number it has been assigned for the Loiza community, which technically (as the *Reforma* program is administered) does not make it eligible to supply services in another community, in this case, Rio Grande. Notwithstanding this, as a practical matter, if a beneficiary goes to the HMO and specifically asks to be treated by Loiza, the HMO apparently will assign the enrollee to Loiza's operation in Rio Grande.

7.    Of the approximately 12,000 patients who had been seen by the Rio Grande health center, which formerly received a Section 330 award and served the Rio Grande area, as noted above, only somewhere between two and three thousand are now receiving FQHC services from Loiza, the only FQHC serving Rio Grande.  The reality is that most of the people who might want to receive FQHC services are not sophisticated and do not have a sufficient awareness of how to cope with a managed care system to know enough or have the ability to make a specific request to the Medicaid HMO to be assigned to Loiza.  Moreover, many do not realize that Loiza has supplanted the Rio Grande health center as an FQHC or what the advantages of FQHC services, such as inexpensive drugs, even are.  What happens with most of them is that they receive notification from the HMO indicating that if they do not select one of the two or three IPAs to be their primary care provider, they will be "defaulted" by the HMO to one of the them.  Most do not respond at all and are thereafter assigned to one of the two or three IPAs by the HMO.  Even for those that respond, because they are given a choice of only two or three such IPAs and are unaware of Loiza's presence (and the informal process now being

4

employed that allows them to be assigned to Loiza on specific request), they will select one of the two or three IPAs.

8.      As to Mr. Feldesman's third question, I can state categorically that the Medicaid FQHC payment requirements have never been complied with in Puerto Rico. Until federal lawsuits were brought by the two plaintiffs in this case, the Puerto Rico Medicaid office had never made an FQHC payment. No such payments, right now, are being made. And because the HMO contracts with the FQHCs impose undue risk, the FQHCs never receive any sums close to what a fee for service payment system, even at a ridiculously low $10 to $10 per visit rate, would be.

9.      Finally, the Kelleher report (issued by David Kelleher, a consultant to the head of the HHS Bureau of Primary Health Care (within HRSA) that administers the Section 330 grant program) is relevant because it corroborates the fact that the Section 330-funded health centers in Puerto Rico are receiving zero or less than zero for their services to the enrollees of the *Reforma* program. Using the Kelleher report, I can give this Court an idea of what this loss currently means to Loiza and Belaval. At present, these centers together have approximately 17,000 *Reforma* HMO patients. Assume the two centers' Medicaid patients are but one-half of this total (in Loiza's and Belaval's litigation against Puerto Rico, Puerto Rico has argued that the figure is 56.5 percent).[1] Then assume that the two centers losses are at the lowest end of Mr. Kelleher's reported individual centers' losses (on page 4), or $11.47 per enrollee, per month. This means annual losses of $11.47 X 12 months, or $137.64 per enrollee, per year. Then, multiply that figure by 8,500 (1/2 of the 17,000 *Reforma* population the centers are seeing). The result is a

---

[1] Puerto Rico's figure significantly understates the true Medicaid populations in these centers, and that issue, among others, is now on appeal to the First Circuit Court of Appeals.

combined loss for both centers of $1,116,940.  This extremely modest calculation based on the

Kelleher report is the result of the risk contracts the HMO has imposed on Loiza and Belaval.


December 20, 2007                              /s/ José Orlando Colon
Date                                          José Orlando Colon, CPA

6

DEC 20,2007 11:36   JOSEOCOLONCPA             000-000-00000                    page 2

figure by 8,500 (1/2 of the 17,000 *Reforma* population the centers are seeing). The result is a combined loss for both centers of $1,116,940. This extremely modest calculation based on the Kelleher report is the result of the risk contracts the HMO has imposed on Loiza and Belaval.

12 -20- 07
Date

José Orlando Colon, CPA



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Refer to

DMSO:JA

JUL 2 0 2000

Health Care
Financing Administration

Region II
Federal Building
26 Federal Plaza
New York, NY 10278

Roberto Hernandez, Director
Office of Economic Assistance to the Medically Indigent
Department of Health
Commonwealth of Puerto Rico
Box 70184
San Juan, Puerto Rico 00936

Dear Mr. Hernandez:

As we discussed on June 6, 2000 and on other occasions, the Primary Care Association of Puerto Rico and the Health Resources and Services Administration (HRSA) have raised questions about why the Commonwealth of Puerto Rico does not make "wrap around" payments to Federally Qualified Health Centers/Rural Health Clinics (FQHCs/RHCs) that subcontract with managed care organizations (MCOs) to provide services to Medicaid beneficiaries.  Prior to health care reform, under the fee for service Medicaid program, these centers received in-kind payments in the form of staff and space from the Department of Health and thus, their costs for serving Medicaid beneficiaries were being met.  Since the implementation of health care reform, the centers have had to compete for managed care subcontracts on the same basis as all other clinics and no longer receive in-kind payments from the Department of Health.  They do, however, have the protection of the Social Security Act, as amended by the Balanced Budget Act of 1997 and the Balanced Budget Refinement Act of 1999, with respect to the recovery of the reasonable costs they incur in serving Medicaid beneficiaries.

Section 1902(a)(13)(C)(ii) of the Social Security Act (the Act), as amended by the Balanced Budget Act of 1997 and the Balanced Budget Refinement Act of 1999, requires States to make supplemental payments (at least quarterly) to FQHCs/RHCs that subcontract with MCOs to assure that FQHCs/RHCs receive payments that they are entitled to under the Act (100 percent of reasonable cost or the following phase down percentage as specified in the State Plan):

| FY 2000 | FY 2001 | FY 2002 | FY 2003 | FY 2004 |
|---------|---------|---------|---------|---------|
| 95%     | 95%     | 95%     | 90%     | 85%     |

Supplemental payments represent the difference, if any, between the payments made by the MCO to the FQHC/RHC and the payments the FQHC is entitled to under the Act.

In order to qualify for a supplemental payment, the FQHC/RHC is required to demonstrate that its reasonable costs for treating Medicaid recipient are not being met by the MCO.  Once this has been demonstrated, the Medicaid agency is required to make the supplemental payment.

Federal Financial Participation (FFP) is available for the supplemental payments, although in the case of Puerto Rico no additional funds in excess of the congressionally mandated cap are available. Nonetheless, Puerto Rico is not relieved of the obligation to make these payments.

In accordance with the above, you must immediately amend section 4.19 B of your Medicaid State Plan to indicate that the Commonwealth will provide supplemental payments to those FQHCs/RHCs that subcontract with managed care organizations and whose reasonable costs of caring for Medicaid beneficiaries are not being met by the managed care organization. Such amendment must be received in our office no later than August 15, 2000.

We will provide you with whatever technical assistance you need to amend your state plan and to comply with the provisions of the law. We understand that the HRSA will assist the FQHCs/RHCs in the preparation of cost reports.

If you have any questions, please contact Julio Alfarino at 212-264-5904 or Doretha Howard at 212-264-3924. Thank you for your cooperation in this matter.

Sincerely,

Sue Kelly
Associate Regional Administrator
Division of Medicaid and State Operations



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
<u>BUREAU OF PRIMARY HEALTH CARE</u>


Public Health Service

Health Resources and
    Services Administration
Bethesda MD 20814

MAY 26 2000

Luis Medina
Executive Director
Rio Grande Community Health Center
Calle Pimental y Castro #200
P.O. Box 786
Rio Grande. Puerto Rico 00745

Dear Mr. Medina:

Enclosed is the contract review report for the managed care contact between Rio Grande
Community Health Center (Rio Grande) and La Cruz Azul de Puerto Rico, Inc. (Cruz Azul).
The report points out many areas of the contract. some of which are outlined below; which
are disadvantageous to the health center. As presently written, we definitely recommend that
Rio Grande <u>not</u> sign this contract due to the potentially serious, negative effect upon the
health center's financial stability and operations, and due to the unusual personal liability of
the executive director and physician staff incorporated into the terms of the contract.

The following are major problems cited in the report which negatively affect the health
center:

1.     The report indicates that the contract places the health center at risk for most medical
       and hospital services.  The health center receives a capitation of $15.21 per member
       per month (pmpm) which covers not only primary care services, but also outpatient
       and inpatient (professional fee component) referrals. emergency room visits in and
       out of the geographic area, c-sections, normal deliveries, and many other services.
       Also. inpatient bed and ancillary costs, pharmacy, same day surgeries, and other
       expenses are to be paid out of a risk pool funded at $20.34 pmpm.  If actual expenses
       exceed the amounts set aside in the pool and contingency funds, the health center
       would have to draw on its reserves to pay the loss.  These contract terms. and. what
       appears to be a very low level of reimbursement for services provided, severely
       threaten the center's financial viability.  In most cases, health centers should only
       take risk for primary care and other services which they directly manage and control.

2.     The report states that the center's executive director and all center doctors personally
       guarantee the fulfillment of the obligations of the contract.  This provision personally
       threatens the center's executive director and physician staff with financial liability.  If
       the center did not have financial reserves to cover losses under the contract, the
       executive director and doctors would be liable.  This provision is not acceptable

*2b*

Page 2 - Luis Medina

since the health center corporate legal entity, not its employees or consultants, is liable for its own legal obligations. Such personal liability also negatively impacts the center's ability to retain and recruit personnel for these positions.

3.  In the case of a dispute between the center and Cruz Azul or between the center and a provider, Cruz Azul may unilaterally withhold capitation payments from the center. This may put a severe strain on the center's cash flow and jeopardize stability.

4.  Cruz Azul has the right to transfer members from the health center to another provider without any limitations if Cruz Azul determines such transfer is in the best interests of Cruz Azul or its members. This leaves the center totally at the mercy of Cruz Azul.

The report references other areas in the contract which also are detrimental to the health center or need clarification. Again, we recommend the Rio Grande not sign this contract. In addition, due to the seriousness of the issues raised in the report, we are sharing this letter and the report with officials at the Health Care Financing Administration.

If you have any questions concerning this matter, please contact Jack Egan, Chief, Rural Health Branch on (301) 594-4339.

Sincerely yours,

Richard C. Bohrer
Director
Division of Community and
Migrant Health

Enclosure

cc:  Angel Braña, M.D.
     Rhoda Abrams, HRSA
     Mike Fiore, HCFA
     Louis Schiro, HCFA Region II
     Ron Moss, HRSA Region II
     Sandra Garcia, ACSPPR