# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Concilio de Salud Integral de Loiza, Inc., *et al.*   )
   )
     **Plaintiffs,**   )
   )
      **v.**   )    **Case No. 07-1034 (RMC)**
   )
**U.S. Department of Health and Human**   )
  **Services,** *et al*   )
   )
     **Defendants.**   )

## REPLY TO DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (CORRECTED)

### I.  INTRODUCTION

The more defendants (hereinafter "HHS") attempt to justify their eighteen (18) year failure to ensure that the Puerto Rico Medicaid program implemented the provisions of the Medicaid statute protecting Federally-qualified health centers ("FQHCs"),[1] the more foolish their arguments become. The FQHC protections within the Medicaid program were enacted into law in 1989. They required FQHCs to be paid 100 percent of their "reasonable costs" in providing services to Medicaid beneficiaries. For as long as these protections have been in effect, Puerto Rico's Medicaid program has failed, completely, to comply with them. This has not been a matter of a good faith effort falling short or a technical argument over some facet of how FQHC payments must be calculated. It is instead the utter absence of any attempt whatsoever on the part of the Commonwealth's Medicaid program to comply.

---

[1] As the Court well knows, Section 330 Public Health Service Act (42 U.S.C. § 254(b)) health centers/grantees are automatically FQHCs. The FQHC protections in the Medicaid statute were designed for these entities.

Those protections were amended in 1990 to require Medicaid managed care
organizations[2] ("MCOs") to pay FQHCs the same 100 percent of reasonable costs for the
services the FQHCs provided to the Medicaid beneficiaries assigned to the particular MCO.[3]
The obligation of MCOs to pay FQHCs was changed in 1997 to require those entities to pay
FQHCs "not less than the rates paid for a similar set of services provided by a non-FQHC. . ."
(Ex. at 1).  The 1997 law required the State to make up the difference between those payments
and 100 percent of an FQHC's reasonable cost reimbursement (which the law described as
"supplemental" payment, but in health care vernacular is termed "wraparound").  These
MCO/HMO/FQHC requirements were not implemented by Puerto Rico and still have not been.
CMS has presided over this utter absence of Puerto Rico's compliance with any facet of the
Medicaid statute's FQHC protections and never once taken an "enforcement" action to obtain
such compliance.

The "prosecutorial discretion" HHS argues for in this case accordingly is the discretion to
continue to do nothing to correct Puerto Rico's violations of those FQHC protections.  It is also
to argue for judicial license to continue to support such violations by paying Puerto Rico federal
Medicaid funds in the face of a law that could not be more clear in requiring that such payments
not be made if they go to MCOs/HMOs that fail to pay FQHCs what federal law requires.[4]

| Deleted: a |

---

[2] The term "managed care organizations" or "MCOs" in current law refers to certain types of
entities that are eligible to receive prepaid capitated (comprehensive risk) contracts to provide
services to Medicaid beneficiaries. *See* 42 U.S.C. § 1396b(m)(1).  Puerto Rico's MCOs are all
(with perhaps one or two exceptions not applicable here) one of such types of entities -- health
maintenance organizations or "HMOs".

[3] There is a good discussion of this requirement in an attachment to an August 20, 1998 State
Medicaid Director letter ("SMDL") from a senior HHS official in what was then the Health Care
Financing Administration ("HCFA") and now is the Centers for Medicare and Medicaid Services
("CMS").  A copy of the SMDL is attached as Ex. A.

[4] FQHCs *need* the support of HHS and the courts to make certain State Medicaid program honor
these federal law protections.  Unlike private medical providers, FQHCs *must* legally have

2

As stated in 42 U.S.C. § 1396b(m)(2)(A) (from which we remove inapplicable language):

> . . .no payment shall be made. . .to a State with respect to payments incurred by [the State] for payment of [capitations] for services provided by [a managed care organization ("MCO")]. . .unless –
>
>                  * * *
>
> (iii) such services are provided. . .in accordance with a contract. . .under which [the capitated] payments are made on an actuarially sound basis and under which the Secretary must provide prior approval. . .
>
>                  * * *
>
> (ix) such contract provides that, in the case of an [MCO] that has entered into a contract for the provision of services with a Federally-qualified health center. . ., that the [MCO] shall provide payment that is not less than the level and amount of payment which the [MCO] would make for the services if the services were furnished by a provider which is not a Federally-qualified health center. . .
>
>                  * * *
>
> (xii) such contract, and the [MCO] complies with the applicable requirements of section 1396u-2 of this title.

Regarding the foregoing requirements that "no payment shall be made unless" "the Secretary. . .provide[s] prior approval", HHS' implementing regulations at 42 C.F.R. 438.806 (again with inapplicable language removed) state as follows:

> § 438.806 **Prior Approval** (a) *Comprehensive Risk Contracts.*[5]

---

contracts with State Medicaid programs. 42 U.S.C. § 254b(k)(3)(E)(i)(I). Accordingly, health centers/FQHCs lack any bargaining power in negotiating payment terms with Medicaid State agencies or Medicaid MCOs. When, as is the case here, the only contracts they are offered are on a take-it-or-leave-it basis they have no choice but to take the contract.

[5] These are the risk based capitated contracts for the full array of Medicaid services that go to the MCOs and must receive prior approval under the above statutory requirements. *See* 42 C.F.R. § 438.2 (definition) and § 438.6(b).

`Deleted: Under`

* * *

(2) The contract meets all of the requirements of section [1396b](m)(2)(A), the applicable requirements of section [1396u-2] of the Act, the implementing regulations on this part.

(b) *MCO contracts*. Prior approval by CMS is a condition for FFP...[6]

(c) FFP is not available in an MCO contract that does not have prior approval from CMS under paragraph (b) of this section.

It is this utterly nondiscretionary duty of *prior approval* before payments are made that HHS by its own admission has been violating.[7] This case accordingly does not deal with issues of unreviewable, or prosecutorial, discretion because HHS has no discretion to make a payment "unless" (as the law states) the statutory pre-conditions to such a payment are met. There are as well no relevant review or appeal processes to which States are statutorily entitled because no such review or appeal processes attach to the duty not to make any payments required by § 1396b(m)(2)(A).

## II. ARGUMENT

### A.  Summary

Our basic arguments in this case boil down to these:

---

[6] FFP is shorthand for Federal financial participation.

[7] HHS' February 5, 2008 Notice of Filing of its "conditional approval" of current managed care contracts illustrates the problem with its absurd position in this case that "prior approval" does not have to be "prior" at all. The conditional approval requires refunds of beneficiary co-payments improperly imposed on the incredibly poor people who make up Puerto Rico's Medicaid population. The refunds will only go to those beneficiaries who request one. Puerto Rico is not even being required to issue a "public" notice, which presumably translates into no notice of the entitlement to receive refunds. And, heaven only knows what proof will be required by the Medicaid program that the co-pay was made. Even more intriguing is CMS' apparent confidence that this condition and other conditions of CMS "prior" approval will be met. Regardless, CMS' attempt in the Notice (on 2) to take this further violation of the prior approval out of this case is unavailing. The individual plaintiffs and their status as Board members of plaintiff FQHCs to represent the medical interests of all persons in their communities clearly entitled to continue to challenge HHS' continuing payments without prior approval because the co-payments at issue directly affect them as Medicaid recipients and those they represent who also are such recipients.

| Deleted: " |
| Deleted: ' |

4

1.   At the present time, HHS is making payments to Puerto Rico's Medicaid program that are being used to pay HMOs under contracts for which the statutorily required "prior approval" has not been given.

2.   As an incident to the foregoing, HHS already has improperly made payments to support those unapproved contracts.

3.   As a further incident, HHS' position in this case makes it clear that such payments, without the required approval having been made, will continue.[8]

4.   Certain of the conditions for prior approval are not being and were not being met:

a.   Payments to FQHCs are not being and have never been made as statutorily required.

b.   Payments under the risk contracts imposed on FQHCs (and private doctor groups) exceed the risk limits in the statute and regulations.

c.   Other conditions for prior approval, including compliance with relevant conditions of 42 U.S.C. § 1396u-2, are not (and never have been) present.

HHS has responded to these arguments in two ways.  It has challenged the FQHC and individual plaintiffs' right to bring this case and have it decided in the manner they request.  It also has delivered specific responses to the statutory/regulatory arguments.  This reply first deals with those specific responses.

**B.      HHS' Violations of Statutory and Regulatory Requirements**

---

[8] Indeed CMS' just discussed new "conditional approvals" makes such continued payments a certainty because the conditions call for continued actions.

5

1. <u>No Prior Approval As Required Under 42 U.S.C. § 1396b(m)(2)(A) Has Been Made.</u>
HHS' first argument in response to plaintiffs' contentions of statutory violations begins at page
11 of Defendant's Reply.  As we observed in the introductory section of this reply, the prior
approval requirement is unambiguous and the regulations supporting it are equally unambiguous
that no payment can be made to support a managed care contract unless there has been "prior
approval" based on the enumerated statutory conditions.

> [W]e have stated time and time again that courts must presume that
> what a legislature says in a statute is what it means and means in a
> statute what it says there.

*Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 \_\_\_\_, 126 SCt.
2455, 2459 (2006).

HHS' *post hoc* view in this case is that payments can be made before the contract is
actually approved.  Under that view, a State could be given federal funds to support an HMO
contract that never comes into compliance or is out of compliance until day 364 of the contract.
Congress' "no payment unless prior approval" language would be completely undone if either of
those situations arose.

The issue here is not only money.  Under 42 U.S.C. § 1396u-2(a)(1)(A)(i)(I), the freedom
of choice to which Medicaid beneficiaries are legally entitled may be taken away once HHS
determines the contract meets the requirements of § 1396b(m).  If HHS pays the State without
actual prior approval may those rights be taken away?  The answer has to be yes.  There would
be no point to giving a State funding needed to keep a managed care system going and not be
able to compel beneficiaries to use it.  Certainly as long as HHS insists its interpretation of the
statutory prior approval requirement as not meaning "prior" is correct, the States will presume

| Deleted: , |

6

(and reasonably be able to do so) that the § 1396u-2(a)(1)(A)(i)(I) contract meeting § 1396b(m) requirement has been met.

HHS' counter (at 14-15) to a point we made in a prior filing that the prior approval language emerged from a situation where serious problems in Medicaid care had taken place and Congress wanted to assure against a repeat by heading that problem (and others) off through prior approval is indecipherable. Apparently, HHS does not understand that actual "prior approval" heads off big problems, and that this was Congress' goal in explaining the problem that led to its desire for an actual prior approval requirement. Nor does HHS even concede that "prior approval" has a specific meaning when it argues that "neither the statute nor the regulation [sic] define what is meant by *prior* approval" (emphasis in original) and goes on to say that "Congress could have stated that Secretarial approval is required prior to the payment of any FFP, but did not." As our statutory breakdown in the introductory section to this reply shows, the answer to this is simply "yes it did; the problem is that you don't like it and won't do it."

  2.  The FQHC MCO Payment Requirement Is Being Violated

On page 16, HHS addresses our argument that Puerto Rico's MCOs and MCO contracts do not comply with the FQHC payment requirement in 42 U.S.C. § 1396b(m)(2)(A)(ix). As to the actual language in the Puerto Rico-MCO contracts that support HHS' argument in this regard, HHS, on page 17, claims that payment requirement is met by contract language stating "that MCOs [HMOs] will pay FQHCs the same as non-FQHCs for the services they provide" even though the language in the HMO contract (quoted by HHS on page 17) neglects to include language stating that the payment will be "for the services" the FQHCs provide.

As the Court will recall, Ms. Kelly, the CMS official who reviewed that language, claimed in her declaration (at ¶ 14) that the "assurance required by 42 U.S.C.

§ 1396b(m)(2)(A)(ix) that the HMOs pay FQHCs 'not less than' the amount for *services* if the *services* were furnished by a non-FQHC provider" (emphasis added) was met by the language HHS now quotes on page 17, which fails to mentioned "services".  In that same paragraph (14) of her declaration, Ms. Kelly also stated that "Region II determined that the [HMO] contracts contained the [statutorily] required assurance. . .".  The point is that Ms. Kelly's declaration attests to the fact that Region II's review and approval was confined to what the contract said and to Region II's failure to recognize that the words the contract used did not include the statutory "for the services" language.

The error made by Ms. Kelly and/or her staff has been eclipsed by HHS' *post hoc* rationalization (beginning on 17) that there is nothing legally wrong with the way the HMOs are now paying (or failing to pay) plaintiffs.  HHS begins this defense of the HMOs' conduct by saying that (on 17-18) that there "is no Federal statute or regulation that prohibits [HMOs] from entering into service contracts with FQHCs that require them [the FQHCs] to assume *some* financial risk."  (Emphasis added.)  A footnote (12) graciously adds that if the risk is "substantial," the PIP requirements "may need to be met".  HHS' defense of the HMO continues by asserting (at 18) that § 1396b(m)(2)(A)(ix) " simply states that a state' s contract with an [HMO] must provide an assurance that the [HMO] will pay FQHCs for the provision of services whatever the nature or payment structure for those services may be at a level and amount not less than other, non-FQHC sub-capitated providers."  Section 1396b(m)(2)(A)(ix) certainly does not "state" that there may not even by a "payment" as is the case with plaintiff Loiza or that payment if it occurs at all is dependent on "risk" as discussed below.

Deleted: based

HHS also says that the plaintiffs would be entitled to receive wraparound payments from the Commonwealth's Medicaid program to make them whole to the extent the risk they assume

resulted in a gap between their statutory per visit entitlement under 42 U.S.C. § 1396a(bb) and

what they received (or did not receive) from the HMO.  HHS concludes by insisting that such

wraparound payments have been made.  That HHS, with no evidence in hand, would claim

plaintiffs are receiving wraparound to make them whole when they have demonstrated in this

case that no such payments have been made since the final judgment in plaintiffs' other lawsuits

is appalling.[9]  And when the publicly available docket of that case shows that plaintiffs here,

after final district court opinions and orders applying to both were issued, sought the assistance

of that court to compel payments by the Puerto Rico Medicaid program based on that Court's

final decisions *because the Medicaid program had refused to pay them anything* and were turned

down by the District Court, HHS' argument must be taken as arguably sanctionable because it so

utterly lacks any basis of any kind.

     Turning back to the HMO payment the FQHCs here are entitled to receive, HHS'

argument that risk may be imposed on the FQHCs under the controlling statutory language is

utterly meritless.  In the first place, the FQHC payment language is not in any way ambiguous in

requiring a "payment. . .for the services" the FQHC provides.  42 U.S.C. § 1396b(m)(2)(A)(ix).

Recently, the Fourth Circuit analyzed the FQHC payment requirement, describing its language as

"impos[ing] a *floor* on the rates to be paid FQHCs by managed care organizations."  *Three*

*Lower Counties Community Health v. Maryland*, 498 F.3d 294, 305 (4th Cir. 2007).  (Emphasis in

original.)  A risk contract that results in some payment, no payment or, worse, a debt, as is the

case with plaintiff Loiza, can hardly be a "floor on the *rates* to be paid by managed care

organization".

---

[9] The relevant declarations of José Orlando Colon, along with Mr. Colon's new (third)
declaration filed with this reply, are attached as Ex. B and attest to the absence of payment.

There is no reason here to think that the payment for services language in that section of the Medicaid statute has any other meaning than payment for services. Indeed, this was exactly what HHS/CMS thought, when, in 1998, a senior official of CMS (then HCFA) sent a letter to all State Medicaid Directors describing that provision as requiring "that rates of payment between [FQHCs] and [HMOs]. . .be not less than the amount of *payment* for a similar set of *services* with a non-[FQHC]". (Emphasis added.) (Ex. A. at 1.) On the same page, the CMS official said that the provision "protect[ed] the State against. . .rates that are excessively low in comparison to the *community standard*". *Id.* (Emphasis added.) Risk that results in something, nothing or less than nothing in payments hardly fits CMS' description of the FQHC payment requirement or the purpose of that requirement.

HHS' argument that the risk the HMO contract imposes is within statutory bounds because the FQHCs "are paid by [HMOs] the same amounts that the HMOs pay private doctor groups for similar services" is simply bizarre. Reply at 18. If all the private doctors groups the Medicaid HMOs contract with on the same risk-based terms as the FQHCs received less than nothing for their services as does plaintiff Loiza (the federal statute does say the same "level and amount of payment"), would HHS sit by and allow that State's Medicaid program (somehow) to continue? The answer, of course, is that if CMS knew that all doctor groups acting as primary care providers were being made debtors under the HMOs' contracts, it would years ago have had a task force of persons with skills of all kinds (including the Inspector General and the FBI) taking over the Medicaid program to avert the medical disaster that surely would occur.

Whether the truth is that the doctor groups actually have been able to negotiate different terms than the FQHCs or that such groups are able, and willing, to avoid referrals that FQHCs would consider "medically necessary" is anyone's guess. The point is that HHS does not really

10

believe that everyone receives the same "level and *amount* of *payment*" (emphasis added) the FQHC payment provision requires.

### 3. The PIP Requirements Are Being Violated

When HHS responds to our contentions that PIP requirements are being violated and, in apparent wide-eyed innocence, suggests on page 24 it could not have known that an HMO contract's risk, which, in fact, produces no revenue, but instead a loss, must be a PIP violation.[10] HHS cannot be taken seriously. The basic requirement of PIP, after all, is not to induce doctors "to reduce or limit medically necessary services furnished to any individual enrollee." 42 C.F.R. § 427.708(c)(1). If actual doctor/doctor group losses are so great as to make the doctor/doctor group a debtor to the HMO, as is the case with plaintiff Loiza, that basic requirement simply cannot be met.[11] It was in this context that we showed (in our December 20, 2007 Reply (at 15-16)), how the PIP aggregate insurance requirement worked and that, at the very worst, the physician group would still be paid in the absolutely worst case $34.65 out of a capitation of $50.00 per member, per month. Our point was (and is) that this aggregate result is an indication that a *bona fide* PIP plan cannot produce the result that is in fact produced for plaintiffs in this case.

There were and are other reasons why CMS had to have realized that a contract resulting in a debt owed to the HMO by the physician group -- in Puerto Rico's Medicaid program -- was ironclad proof that PIP requirements were being violated. Under HHS regulations, at 42 C.F.R.

---

[10] The PIP requirements are imposed by 42 U.S.C. § 1396b(m)(2)(A)(x).

[11] HHS' insinuation that the problem must be that the HMO is not meeting its $10,000 stop loss responsibility is off the mark. *See* Third Colon decl. at ¶¶ 12-13 for details of this stop loss. We do not believe and have no reason to believe that the HMO is failing to implement its stop loss protection. The problem, as described in the Colon declaration at ¶ 12, is that the difference between the FQHC's capitation and the HMO's stop loss is about $9,800 per patient, which means that the FQHCs can lose approximately 54 times the capitation amount (which they can never fully receive anyway because it covers other service providers who/which get paid first).

Deleted:

11

§ 438.6(l), the Puerto Rico HMOs are required, in their "subcontracts" with the FQHCs (under

their prime contracts with the Medicaid program), to "fulfill the requirements of this part that are

appropriate to the service or activity delegated under the subcontract". As we know, one "service

or activity" the Puerto Rico HMO contracts with the FQHCs "delegate" to the FQHCs is the

assumption of risk. Under the same regulatory section, § 438.6, and an even earlier section,

§ 438.2, there are specific prime contract requirements for risk contracts; *i.e.*, § 438.6(l)'s

"requirements of this part that are appropriate to the service or activity".

These regulations begin with certain definitions:

1. In § 438.2, the definition of "*Risk Contract*" is:

> Risk contract means a contract under which the contractor --
>
> (1) Assumes risk for the cost of services covered under the contract; and
>
> (2) Incurs loss if the cost of furnishing the services exceeds the payments under the contract.

2. In that same § 438.2, the definition of "*Comprehensive risk contract*" is

> Comprehensive risk contract means a risk contract that covers comprehensive services, that is, inpatient hospital services and any of the following services, or any three or more of the following services:
>
> (1) Outpatient hospital services.
>
> (2) Rural health clinic services.
>
> (3) FQHC services.
>
> (4) Other laboratory and X-ray services.
>
> (5) Nursing facility (NF) services.
>
> (6) Early and periodic screening, diagnostic, and treatment (EPSDT) service.
>
> (7) Family planning services.

12

(8) Physician services.

(9) Home health services.

We know from the Cruz declaration, which HHS, on page 23 refers to and does not challenge, that (again on page 23) "the cost of the risk assigned to [plaintiff] Loiza by its *subcontract with MCS-HMO* exceeded the total amount of capitation payments made to Loiza. . . (Emphasis in HHS Reply). Thus, based on the above regulatory definitions of risk and comprehensive risk and the fact that plaintiffs' risk in its HMO contracts covers inpatient hospital services and many of the other services listed under the comprehensive risk contract definitions, and the further fact that the risk to plaintiffs in their HMO contracts is for the cost of services for which the plaintiffs will incur a loss whenever that cost exceeds the HMO contract's "payments", the subcontract between the HMO and the plaintiffs are for comprehensive risk.

What this means is that the doctor groups cannot even receive such subcontracts because they are not among the entities listed in § 438.6(b) as being eligible for comprehensive risk contracts.[12] This alone would demonstrate that the PIP requirements are not being met because risk this severe eliminates the very physician groups PIP is aimed at from receiving a contract in the first place.

Assuming *arguendo* that doctor groups would nonetheless be eligible for the HMO contracts, § 438.6(c) would require the capitation payments to be "actuarially sound" based on actuarial studies and certifications. Actuarial soundness has not been defined by HHS/CMS, which insists only on a certification of such soundness by an actuary who is a member of the American Academy of Actuaries. That Academy, in cooperation with CMS, came up with its own definition (although the entire document is described (on page 2) as "nonbinding

**Deleted:** ,

---

[12] Plaintiffs are eligible but such eligibility is of no moment because the subcontracts are otherwise unlawful.

13

guidance"). According to the Academy's "Health Practices Counsel Practice Note" (Aug. 2005)[13] which addresses the Medicaid actuarial soundness requirement on page 8, that definition is as follows:

> Actuarial Soundness -- Medicaid benefit plan premium rates are "actuarially sound" if, for business in the state for which the certification is being prepared and for the period covered by the certification, projected premiums, including expected reinsurance and governmental stop-loss cash flows, governmental risk adjustment cash flows, and investment income, provide for all reasonable, appropriate and attainable costs, including health benefits, health benefit settlement expenses, marketing and administrative expenses, any state-mandated assessments and taxes, and the cost of capital.

Suffice it to say that the above definition would not apply to the results of the HMO contract's financial terms of plaintiffs as reported by José Orlando Colon in his three declarations in this case. The definition contemplates all costs being covered plus "cost of capital" (or, in plainer terms, a profit). Accordingly, the HMO-FQHC contracts are not consistent with "the requirements. . . appropriate to the service or activity" as § 438.6(l) requires. PIP requirements cannot be reasonably assumed to be met in circumstances where other regulations controlling the financial terms subject to PIP are being violated, especially where those violations result from failing to pay providers covered by PIP as much as federal law and regulation mandate.

On more point on PIP: Medicaid managed care regulations at 42 C.F.R. § 438.210(e) summarize and synthesize, and make binding, the end result the PIP rules are designed to avoid.

. . .compensation to [providers] that conduct utilization management activities [*i.e.*, are at risk for the cost of other services

---

[13] The complete name of the document, which is available from the Academy, is: *Health Practice Council Practice Note, August 2005, Actuarial Certification of Rates for Medicaid Managed Care Program, Developed by the Medicaid Rate Certification Work Group of the American Academy of Actuaries.* As the document explains on its first page 1, the work group was comprised of actuaries with experience in CMS or State Medicaid programs.

14

for which they make referrals] is not structurered so as to provide incentives for the [providers] to deny, limit, or discontinue medically necessary services to any enrollee.

We ask the Court to read ¶ 16 of the Third Colon declaration (and those that precede it) to assess whether this ultimate condition on the imposition of risk is being met under the FQHC plaintiffs' HMO contracts.

4.   The Not Less Than Two HMO Requirements of 42 U.S.C. § 1396u-2(a)(3) Applies to Puerto Rico.

HHS continues to insist, on pages 24 and 25, that § 1396u-2(a)(3)(A)'s requirement that Medicaid beneficiaries subject to managed care programs have at least two qualified managed care entities to choose from does not apply to Puerto Rico. As described by HHS in its memorandum supporting its dismissal motion, "[t]he Commonwealth of Puerto Rico is considered a State for purposes of the Medicaid Act, unless other indicated. 42 U.S.C. § 1301(a)(1)" *See* Dkt. No. 8 at 4. Section 1301(a)(2)'s explicit language on Puerto Rico's State status in Medicaid (and other programs) is:

(A) Where used in this Act –

(1) The term "State", except where otherwise provided, includes. . .the Commonwealth of Puerto Rico. . ."

Section 1396u-2 begins its text (after section titles) at (a)(1)(A) with the following:

(A) In General.  Subject to the succeeding provisions and notwithstanding paragraph (1)(10)(B), or (23)(A) of Section 1396a(a), a State. . .

Nowhere in § 1396u-2 is Puerto Rico exempted or distinguished from the "States" under the Constitution or in any other manner treated differently from other "States".

HHS fights against the plain meaning of this statutory language (*i.e.,* that Puerto Rico is a State subject to all of § 1396u-2's requirements) by arguing  that § 1396u-2 constitutes an

15

exception to the Medicaid statute's freedom of choice provision in § 1396a(a)(1)(23) [14] and because Puerto Rico is not covered by that provision in the first place, it "has no obligation to meet the conditions set forth in [§ 1396u-2](a)(2)-(5)."

The problems with this argument are several, beginning with the oft-repeated interpretive canon of the Supreme Court that when giving the statutory language its plain meaning results in no absurd consequences, the plain meaning has to be upheld. *E.g., Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Furthermore, HHS' argument would exempt Puerto Rico from the <u>other </u>requirements of § 1396u-2(a), which create managed care exceptions for children with special needs and Native Americans, and contain protections regarding enrollment, and termination rights.  In addition, it would necessarily exempt Puerto Rico from all other requirements in that section, including (b)'s beneficiary protections, (c)'s quality assurance, (d) and (e)'s fraud prohibitions and remedies, and (f)'s timely payment requirements.  We say this because the language in § 1396u-2(a)(1)(A)'s mention of freedom of choice begins with "[s]ubject to the succeeding provisions of this section" not just to the provisions of subsection (a).  There is, as a consequence, no way to separate subsection (a) from other § 1396u-2 subsections and avoid turning HHS' argument here into a wholesale exemption of Puerto Rico from all of § 1396u-2.  To interpret § 1396u-2's language as warranting such an exemption, particularly when § 1396u-2's requirements are incorporated by reference in § 1396b(m)(2)(A)(xii) as one more condition to be met before an HHS payment may be made to a Medicaid managed care entity, would be at complete odds with any and all legitimate canons of statutory interpretation and clearly inconsistent with Congress' intent.

| **Deleted:** apply to |

---

[14] The exemption of Puerto Rico from this section was explicit in that section, and exactly what § 1301(a)(2)'s explicit language contemplates.

16

Lastly, we remind the Court of what we argued on this point in our December 20, 2007 Reply (D. 28), at 20-21. We explained that Puerto Rico's 1975 exemption from Medicaid's freedom of choice requirement was given because Puerto Rico then implemented Medicaid through a government-run health system and that the government-run system ended with the initiation of the *Reforma* program in 1994. It is a fair assumption that Congress, by 1997, when § 1396u-2 was passed, had become aware of the fact that the reason for Puerto Rico's freedom of choice exemption had vanished and that the absence of any exemption in that section for Puerto Rico is no accident.

**C.      A Preliminary Injunction to Remedy Violations In This Case Is Warranted**

As a result of the foregoing material violations of the Medicaid statute in relation to the prior approval requirement and Medicaid managed care requirements, to say nothing of provisions of appropriations law discussed in earlier filings, plaintiffs' motion meets the standard for preliminary injunction set forth in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), *United States v. City and County of San Francisco*, 310 U.S. 16, 31, 60 S.Ct. 749, 751 (1940); *Sierra Club v. Coleman*, 405 F. Supp. 53, 54 (D.D.C. 1975); *Securities Industry Association v. Board of Governors of Federal Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986) pertaining to a violation of statute.

The Supreme Court's observation in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978) that "a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law" could be viewed as a modification of the holding in *U.S. v. San Francisco*. The *Tennessee Valley Authority* Court, however, ultimately decided that the Endangered Species Act of 1973 prohibited completion of a dam because it would either eradicate the known population of an endangered species or destroy its critical habitat even

17

though work on the dam was almost complete and Congress had continued to appropriate significant funds for the project. In so holding, the Court observed that "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities . . . " *Id.* at 194. The Supreme Court in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982) later commented that "[t]he purpose and language of the statute under consideration in the *Tennessee Valley Authority* case, not the bare fact of a statutory violation, compelled that conclusion."

In *Securities Industry Association v. Board of Governors of Federal Reserve System* this Court embraced the *Romero-Barcelo* comment in holding that "where federal statutes are violated, the guiding principle for determining the propriety of equitable relief is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Securities Industry Assoc. v. Board of Governors of Federal Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986).

By failing to properly pre-approve the HMO contracts in accordance with § 1396b(m), the Secretary has violated federal law. *See* 42 U.S.C. § 1396b(m)(2)(A)(iii). This leads to further violation of federal law in the form of § 1396u-2, which requires § 1396b(m) compliance. *See* 42 U.S.C. § 1396u-2(a)(1)(A)(i)(I). These violations call for a preliminary injunction because such action is necessary to "carry out the purpose and language of the statute. . . ." Congress instituted the prior approval requirement of § 1396b(m) to make certain that specific conditions to which that prior approval requirement applied were addressed before funds were committed and those conditions imperiled the program. *See* H.R. Rep. No. 99-727, at 123 (1986). The only way to effectuate the statutory language and its purpose is to prohibit the very payments prohibited by the statute itself.

**Deleted:** section 1903(m)

18

### 1. **This Court Has Jurisdiction**

This Court has jurisdiction to remedy the numerous violations of the Medicaid statute raised in plaintiffs' motion for partial summary judgment. As an opening matter, the doctrine of sovereign immunity does not apply to "actions by officers beyond their statutory power" or "the manner in which they are exercised are constitutionally void." *Dugan v. Rank*, 372 U.S. 609, 622-23 (1963). Moreover, the Supreme Court has held that the Administrative Procedure Act ("APA") "provides specifically not only for review of 'agency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court because the legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v Gardner*, 387 U.S. 136, 140-141 (1967)(footnote omitted)(addressing presumption favoring judicial review); *see also Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).

Section 706 of the APA requires a finding that the actual choice made by the agency was not "arbitrary, capricious, an abuse of direction, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). In order to "make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* It is the "whole record" compiled by the agency that serves as the basis for the review required by § 706 of the APA. *Id.* at 419. *Post hoc* rationalizations "have traditionally been found to be an inadequate basis for review." In this case, the "whole record" before HHS consists of not only the submissions made by Puerto Rico's Department of Health as part of the contract review and approval process but

19

also the entire eighteen year history of the *Reforma* program, the findings made by HRSA, including the Bohrer letter (attached to the Third Colon declaration), the Kelleher Report, and the FQHC payment-related litigation in the Puerto Rico District Court.  This whole record indicates that all the FQHCs' grant funds are being appropriated by Puerto Rico's Medicaid program.  The FQHC protections were designed to prevent just that.  HHS cannot stand by and make payments that animate the continued unlawful seizure of those grant funds.  If the HMOs begin paying FQHCs as the statute requires, at least some part of this total breakdown of compliance with federal law will be fixed.

Deleted: third

### 2.  Standing

To show standing under the APA, 5 U.S.C. § 702, a plaintiff must allege (a) an injury in fact and (b) "that the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute in questions."  *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).  Another formulation of the standing doctrine uses a tripartite test.  First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is concrete and particularized, and actual or imminent.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)(challenge to a rule promulgated by the Secretary of the Interior).  Second, there must be a "causal connection between the injury and the conduct complained of" and the injury must be fairly traceable to the challenged action of the defendant.  Third, it must be likely that the injury will be redressed by a favorable decision.  *Id.* at 561.  The very purpose of the standing doctrine is to ensure that a plaintiff "has a personal stake in the outcome" sufficient to "assure that concrete adverseness which sharpens the presentation of

20

issues upon which the court so largely depends for illumination of difficult . . . questions." *See also Flast v. Cohen*, 392 U.S. 83 (1968); *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Under either formulation of the standing doctrine, it is clear that FQHC and Board plaintiffs have such a personal stake in the outcome of this case - - both in their own right and as providers of health care to their patients. The FQHCs and Boards' responsibilities under Section 330 and the entitlement of the FQHCs to Medicaid payments from the HMOs make clear that stake. Section 330 grantees' Boards, "as a group, *represent the individuals being or to be served...*" 42 C.F.R. § 51c.304(b) (emphasis added). Among the Board's specific duties is to assure "that the center is operating in compliance with applicable Federal...laws and regulations..." *Id.* at 51c.304(v). Moreover, Section 330 grantees are required to participate in the Medicaid and Medicare programs. 42 U.S.C. § 254b(k)(3)(E). Their use of revenue derived from that participation is strictly limited to actions permitted with Section 330 grant funds or that "benefit the objectives of the [Section 330] project". 42 U.S.C. § 254b(e)(5)(D). Section 330's other requirements *vis-à-vis* such participation include:

> mak[ing]...and...continu[ing] to make *every reasonable effort* to collect appropriate reimbursement for its costs in providing health services to persons who are [among others, Medicaid and Medicare beneficiaries]."

42 U.S.C. § 254b(k)(3)(F) (emphasis added). Clearly the failure of Medicaid programs to make proper FQHC payments and the limits that failure places on an FQHC's ability to provide services is something in which the FQHCs and their Boards have a stake.

### 3. Prosecutorial Discretion Is Not At Issue

As previously emphasized, prosecutorial discretion is the exception to the general presumption of reviewability unless the statute authorizing agency action evidences a "clear and convincing" intent to preclude judicial review. *Abbott Laboratories v. Gardner*, 387 U.S. 136,

140 (1967). This presumption of judicial review obtains to one "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action with the meaning of the relevant statute" (APA, 5 U.S.C. § 702), except to the extent that a statute precludes relief or the action is "committed to agency discretion by law." 5 U.S.C. § 701(a). One case in this Circuit is markedly similar to the situation confronting HHS in Puerto Rico where HHS is making payments for all Medicaid matters, not just managed care contract costs. In that case, the Government argued that enforcement of Title VI of the Civil Rights Act was a matter committed to agency discretion and judicial review of issues relating to such enforcement (or non-enforcement) was therefore lacking. That case rejected that argument and held that where there is a "general policy which is in effect an abdication of statutory duty" reliance on prosecutorial discretion is unavailing:

> A final important factor distinguishing this case from the prosecutorial discretion cases cited by HEW is the nature of the relationship between the agency and the institutions in questions. HEW is actively supplying segregated institutions with federal funds, contrary to the expressed purposes of Congress. It is one thing to say the Justice Department lacks the resources necessary to locate and prosecute every civil rights violator; it is quite another to say HEW may affirmatively continue to channel federal funds to defaulting schools. The anomaly of this latter assertion fully supports the conclusion that Congress's clear statement of an affirmative enforcement duty should not be discounted.

*Adams v. Richardson*, 480 F. 2d 1159, 1162 (D.C. Cir. 1973). The Court also stated that its purpose in exercising judicial review was "to assure that the agency properly construes its statutory obligations, and that the policies it adopts and implements are consistent with those

duties and not a negation of them." *Id.* at 1163-4.[15]  To allow HHS to continue funding to Puerto

Rico would make the Court complicit in such a "negation".

### III. CONCLUSION

A preliminary injunction here is warranted, as is the final relief earlier sought.  Without

such relief, HHS will continue to support the violations of 42 U.S.C. § 1396b(m)'s preconditions

to payments and to the unlawful taking of the FQHCs' grant funds in violation of the Medicaid

statute's FQHC payment requirements.

Respectfully submitted,

Date: February 19, 2008

/s/ James L. Feldesman
James L. Feldesman ( D.C. Bar No. 23796)
jfeldesman@ftlf.com
Kathy S. Ghiladi (D.C. Bar No. 435484)
kghiladi@ftlf.com
Robert A. Graham (D.C. Bar No. 450345)
rgraham@ftlf.com

Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C.  20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiffs*

---

[15] It is also relevant to note here that, as to redressability, plaintiffs need show only that a favorable decision is likely to redress their injury; they need not show that a favorable decision will inevitably redress their injury. *Lujan*, 504 U.S. at 2136.

23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Concilio de Salud Integral de Loiza, Inc., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 07-1034 (RMC) |
| | ) | |
| Michael Leavitt, Secretary, et al. | ) | |
| U.S. Department of Health and Human | ) | |
| Services | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201 | ) | |
| | ) | |
| Defendants. | ) | |

## THIRD DECLARATION OF JOSE ORLANDO COLON (CORRECTED)

I, Jose Orlando Colon, declare under penalty of perjury as follows:

### I.     INTRODUCTION

1.     My name is Jose Orlando Colon.  I am a Certified Public Accountant performing accounting, auditing and financial consulting services in the Commonwealth of Puerto Rico.

2.     This is my third declaration in this case.  My previous declarations were filed as exhibits to plaintiffs' September 27, 2007 partial summary judgment and memorandum in support thereof (first declaration) and plaintiffs' December 2007 reply and opposition (second declaration).  Copies of both are attached for the Court's convenience.  In those earlier declarations, especially the first, I described my background, including my credentials as a Certified Public Accountant ("CPA"), my years of working for health centers/Federally-qualified health centers ("FQHCs") as both an auditor and financial advisor, my experience with respect to the managed care plans and contracts between such plans and FQHCs in Puerto Rico's Medicaid program, and my management of a health center/FQHC in New York City.  This third

declaration, as was the case with my prior declarations, is based on that experience and those qualifications.

3.      This declaration was requested by plaintiffs' counsel, who asked me for further information regarding the facts and circumstances of Puerto Rico's Medicaid program and its impact on FQHCs. The following paragraphs of this declaration set forth his requests and my response.

4.      REQUEST:   In your first declaration (at ¶ 11) you stated that the managed care contracts Puerto Rico's HMOs were imposed on the Puerto Rico FQHCs on a "take it or leave it" basis and (at ¶ 5) left the FQHCs with no way of controlling the risk those contracts imposed other than to not make referrals to other health care providers for services those FQHCs' Medicaid patients needed. Could you please provide more detail concerning why you made this statement?

5.      RESPONSE (¶¶ 5-14): The statement was based on several factors. As an initial matter, the contracts the HMOs give the FQHCs are *not* for payments for the services the FQHCs provide. They are instead entirely risk-based. As further described below, to the extent the FQHCs receive any actual "payment" under these contracts, it is only because the costs of services of other health care providers for which the FQHCs are made responsible (the "risk") under the HMO contracts turn out to be less than the available "capitation".

6.      As a practical matter, the only means of controlling the risk of loss by an entity that is financially responsible for paying the costs of certain persons' medical services that are provided by other entities or persons are: (1) by careful negotiation of the terms of its payment obligations toward those other providers; (2) scrutinizing vouchers from those other providers to make certain those providers' billings are consistent with the payment terms negotiated; and (3)

2

limiting referrals to those other providers to avoid those costs altogether.  As I explained in ¶ 5 of my first declaration, the FQHCs have absolutely no role in negotiating such terms or reviewing or making such payments.  Those functions are performed by the HMOs and only the HMOs. Thus, by process of elimination, the FQHCs are limited to not making referrals as their only means of controlling costs for which they bear the risk the HMOs' contracts impose.

7.    In this regard, counsel asked me to check on whether the plaintiffs under their HMO contracts make referrals for hospital services.  I did check and now want to make clear that the plaintiffs do not make hospital referrals, except to emergency rooms.  Otherwise, all referrals to hospitals are made by specialists and sub-specialists (to whom the plaintiffs do make referrals).

8.    There is, of course, one other avenue available to doctor groups in the situation confronting the plaintiff FQHCs in this case to deal with the risk the HMO contract imposes on them -- refuse to accept the contract.  That avenue, however, is not available to FQHCs.  I am advised by counsel in this case that my understanding that Section 330 Public Health Service Act grantees must have contracts with Medicaid programs for services to Medicaid beneficiaries is correct.  In Puerto Rico, for an FQHC to be able to provide its services to Medicaid patients, it must have a contract with a Medicaid HMO.  As a result, the plaintiffs in this case cannot refuse to accept the take-it-or-leave-it HMO contracts they now have.  I should add that one FQHC/Section 330 grantee, the Rio Grande health center, did refuse the HMO contract on the advice of a senior HHS official in a letter that is described in the next paragraph of this declaration.  Because Puerto Rico's Medicaid program has been merged with other health programs for the poor in the *Reforma* program, most of the patients Section 330 grantees must serve are controlled by the Medicaid HMOs, which contract for Medicaid and other *Reforma*

3

patients in the same transaction and on the same terms. When Rio Grande refused to accept the HMO contract as the HHS official's letter indicated it should so, it lost its patient base. Even though there was a shortage of other primary care providers in the Rio Grande area, the HMO refused to assign its *Reforma* patients to Rio Grande and because Rio Grande no longer could refer those patients to other than doctors within the HMO's network, Rio Grande lost most of them and its Section 330 grant funding was thereafter removed. The lesson of what happened to Rio Grande as a result of its refusal to accept the HMO's contract has not been lost on the other Puerto Rico FQHCs.

9.      In that first declaration, I also commented on the impact of the risk the HMO contracts imposed on those centers. That impact, as I then mentioned (in ¶ 5), was to cause plaintiff Loiza to lose money on every enrollee the HMO assigned to it and would soon place Belaval in a similar situation. In reviewing that comment today, I do not believe I did justice to how pernicious this risk truly is. I say this because I was recently given a copy of a letter[1] written in 2000 by an HHS official, who at the time headed up a division within HHS' Bureau of Primary Care (within HHS' Health Resources and Services Administration). That division was responsible for HHS' management of the Section 330 Public Health Service Act health center grants program. The letter describes the risk more specifically than I had done in that declaration.

10.     My response to Question 8 (¶ 10) in the first declaration was to the effect that I had reason (but provided no supporting documentation because I had none) to believe CMS was aware of how the Puerto Rico FQHCs were being treated financially (both by the

---

[1] A copy of that letter is attached. My references herein to the official who wrote the letter are to "Admiral Bohrer". He held the rank of Admiral in the Public Health Service Commissioned Corps. The letter was recently discovered by a doctor who worked at the Section 330 center that was the subject of the letter. I knew the letter existed but had been unable to find a copy.

4

Commonwealth and the HMOs). The 2000 letter from Admiral Bohrer makes it apparent that CMS was made fully aware of the risk type contract the HMOs foisted on the FQHCs as well as the extent of that risk. I say this because Admiral Bohrer's letter, on page 2, states that he was going to share it with HCFA, now CMS, officials. The letter's copy list on the same page includes a CMS official in Region II. Furthermore, as my discussion in the following paragraphs demonstrates, the Bohrer letter aptly described what the risk was. Accordingly, my previously stated belief that CMS has had specific knowledge of what the HMOs and Commonwealth were (not) doing in the way of payment to the FQHCs is now confirmed. Indeed, it shows that such specific knowledge began at least as early as eight (8) years ago.

11.     Returning to the risk the HMOs have imposed and continue to impose on the FQHCs, it is exactly what the Bohrer letter describes (with some differences in amounts). (For the sake of simplicity, my description of that risk herein uses the amounts stated in the Bohrer letter.) To start with, under the HMO-FQHC contracts, the FQHCs (theoretically) receive a capitation payment, each month, (again I am using Admiral Bohrer's figures) of $15.21 for each patient the HMO has assigned to the FQHC's care. The FQHCs do not and (in 2000) did not receive the $15.21 capitation. It was only actually paid in the very early days of managed care. Several years prior to 2000 the payments stopped and the HMOs began to withhold than to make the HMOs' payments to the (other than FQHC) providers whose services and costs were covered by that capitation payment. Puerto Rico's Medicaid program (as I believe other Medicaid managed care programs do) requires the HMOs to assign their enrollees to a primary care provider, who/which then (as is the case with FQHCs) itself provides primary and certain other care to those enrollees. The primary care provider also makes referrals of those enrollees to many of the other doctors and institutions that provide Medicaid services.

5

12.    The HMOs' contracts with the FQHCs assign the FQHCs such primary care responsibilities.  Regarding the providers other than the FQHCs who/which perform services to enrollees assigned to the FQHCs, the FQHCs', with only a stop-loss of $10,000 per enrollee, per year, are made financially responsible under the HMOs' contracts for all of such other providers' costs.[2]  The stop-loss protection afforded the FQHCs by the HMOs is the HMOs' assumption of responsibility for individual enrollee costs above $10,000, per year.  Accordingly, if costs incidental to the care for which the $15.21 per month, or $182.52 per year, capitation is available exceed that capitation, the FQHCs are liable for the difference, up to $10,000.  In simple terms, this means that the plaintiffs in this case with respect to that enrollee capitation have an annual risk of $10,000 (stop loss) minus $182.52 (total yearly capitation), or $9,817.48.  Thus, in exchange for a payment of anything that may be left over after the other providers' services covered by that $182.52 are paid for, the FQHCs are exposed to a possible liability of $9,817.48 for each of the enrollees the HMOs assign to them.

13.    The foregoing is only part one of the FQHCs' total risk.  Part two is their risk for institutional services, mainly hospital.  As Admiral Bohrer's letter indicates, however, the FQHCs receive no payment whatsoever for this second risk.  Under part one's capitation, there is at least the possibility that the FQHCs will actually be paid something.  Part two offers no such possibility.  Part two in effect is stop-loss insurance by the FQHCs for the HMOs costs that exceed a "pool" of funds ($20.34 per enrollee per month is the figure in the Bohrer letter) the HMOs create for themselves to meet the costs of the part two services.  If the particular HMO does not spend out that pool by the end of the year, the HMO keeps the balance.  If it is spent

---

[2] There may be, depending on the HMO, a few limited services that are excluded from this risk.

out, the FQHCs' are responsible for all costs above the pool amount up to the previously
described $10,000 per enrollee, per year loss limit.

14.     The foregoing part one and part two risks forced on the FQHCs are separate and
apart from one another. I have been told that each such risk has been independently devised by
actuaries to apply to the costs of the specific (and separate) services under each risk. Whether
either risk is the outgrowth of actuarial calculations (or sound actuarial calculations)[3] is certainly
questionable, considering the extent to which the risk affects the plaintiffs in this case.

15.     What convinces me that the part one and part two risks are independent of one
another is the HMO contract received by another Puerto Rico FQHC, Gurabo Community Health
Center, Inc, for which I have performed, and am performing, services. The HMO contract for
this FQHC is different from the contract used by the HMO that contracts with the plaintiffs in
this case. In that other HMO's contract with Gurabo, the FQHC is made responsible only for the
part one risk.[4] It bears no responsibility for the part two risk. There appears to be no difference
between the services within the part two risk of this other HMO and the part two risk in the
HMO contracts with the plaintiffs here. As a result I believe that my description above of the
part two risk as stop loss insurance and only stop loss insurance is correct.

16.     When I take into consideration the fact that the plaintiff FQHCs have no control
over the terms of the HMOs' contracts with other providers for which they are financially
responsible, the second fact that the plaintiff FQHCs have no control over payments to those
other providers, the third fact that the HMOs require the plaintiffs to insure the HMOs for a

---

[3] Although I have assisted a number of the FQHCs in their dealings with the HMOs, I was never
provided, nor did the HMO-FQHC contracts themselves provide, any actuarial material
(calculations, reports, *etc.*) concerning the part one and part two risks (or any other aspect of
those contracts).

[4] The part one risk is slightly reduced by risk sharing arrangements for a few services.

7

substantial portion of the risk the HMOs take under their contracts with the Commonwealth (and

for which the HMOs are licensed), the fourth fact that the FQHCs' exposure exceeds any

possible payments they could earn by $9,817.48 per enrollee, per year (which is roughly 54 times

the amount of the part one capitation), the fifth fact that the plaintiffs have lost money by

accepting the HMOs' contracts and have never been paid anything close to the fees for services

the HMOs pay other providers (for which the FQHCs are liable), the sixth fact that the plaintiff

FQHCs under their Section 330 grants must have contracts with the Puerto Rico HMOs, and the

seventh fact that the HMOs contracts with the plaintiff FQHCs are non-negotiable (take it or

leave it), I conclude, and believe I do so reasonably, that the FQHCs' *only* means of protecting

themselves against this HMO contract risk is not to make any referrals to other providers.  I also,

even more importantly, conclude that the foregoing factors and the way the HMO contract's

financial terms are structured is such that the FQHC would (without Section 330 grant funds to

fall back on) not just refrain from making medically needed referrals but also take any other

**Deleted:** make

measures it could to avoid dealing with patients whose conditions, if diagnosed, would

necessitate referrals.  When the risk of loss is actually so great that a doctor or doctor group (or

FQHC) will become a debtor by making medically necessary referrals to other providers, the

impact of that risk is rather obvious.  Without Section 330 grant funds to fall back on, the

plaintiffs here would long ago have been forced out of business by the cost of the "risk" under

their HMO contracts or to practice very bad medicine.

      17.   <u>REQUEST</u>:  Please advise whether there are any changed circumstances since

your earlier declarations in this case that would affect the applicability or accuracy of what you

stated in those declarations.

18.    RESPONSE: (¶¶ 16-18).  With one exception explained below, there has been no

such change of circumstance since my prior declarations.  Among other things, the plaintiffs still

have received no wraparound payments.

19.    That exception stems from the determinations of Puerto Rico's Medicaid office

that were filed in this case through a December 21, 2007 Notice to the Court.  Those

determinations were evidence of the fact that the Puerto Rico Medicaid office, (purportedly)

acting under the authority of 42 U.S.C. § 1396a(bb)(5)(A) (which requires and describes FQHC

wraparound), has determined that "the amount of the payments provided under the [HMO]

contract[s]" as stated in § 1396a(bb)(5)(A) which should be subtracted from sums otherwise

owed by the Medicaid program to the FQHCs, will be the above-described per enrollee, per

month capitation and stop-loss pool in the FQHC-HMO contracts.

20.    I want to be certain the Court understands fully what this determination signifies.

As I explained above, neither the plaintiff FQHCs in this case nor the other FQHCs in Puerto

Rico ever receive anything from the HMOs risk contracts resembling what they would be paid

on a fee for service basis.  Admiral Bohrer's $15.21 capitation and $20.34 pool are simply not

"payments".  At most, any actual payment derived from those two items would be a small

portion of the $15.21 capitation that is left over after all the other service providers covered by

that $15.21 are paid.  The FQHCs payment guarantee under § 1396a(bb) is the FQHC's per visit

rate multiplied by its number of Medicaid visits.  In managed care this payment guarantee is

fulfilled *after* a State Medicaid program first subtracts whatever the FQHC has already been paid

for its services by the HMO.  Accordingly, assume the FQHC's per visit rate X visits = $10,000,

but the HMO already has paid the FQHC $5,000 for those visits.  The State would only owe the

FQHC the balance -- $5,000.  Under Puerto Rico's decision to treat the $15.21 capitation and

9

$20.34 pool as such HMO "payments" this is what happens. Puerto Rico computes an FQHC's

per visit rate X visits, which is the previously used $10,000. It then deducts the $15.21

capitation and $20.34 pool, regardless of the fact that the FQHC has not been paid that sum and

never will be. Assuming that sum equals the previously used $5,000, the FQHC is then paid

$10,000 minus this $5,000 phantom payment. As it turns out for most of the FQHCs, including

plaintiffs, this subtraction of a phantom payment completely eliminates any possible wraparound

payment. In other words the subtracted phantom payment is inevitably greater than Puerto

Rico's calculation of the FQHC per visit rates times visits guarantee.

     21.   <u>REQUEST</u>: As you know, we have argued in this case that the HMOs' payment

obligation to the FQHCs which, as stated in 42 U.S.C. § 1396b(m)(2)(A)(ix), derives from "a

contract for the provision of services with" an FQHC and is to be a "payment that is not less than

the level and amount of payment. . .the [HMO] would make for the services if the services were

furnished by a [non-FQHC] provider" must be a fee for service payment, not the risk contract the

Puerto Rico HMOs impose on the FQHCs. Assuming our interpretation of this language is

correct, are there fee for service arrangements between other providers and the Medicaid HMOs

for the services the FQHCs provide under their Medicaid contracts (or fee schedules for such

arrangements) that could be used to ascertain what the FQHCs' fee for services should be under

§ 1396b(m)(2)(A)(ix).

     22.   <u>RESPONSE</u>: Yes there are. First, the HMOs routinely enter into fee for service

contracts for the same (or many of the same) services the FQHCs provide in Medicaid with

numerous doctors and doctor groups other than FQHCs. Second, the same HMOs manage

commercial health plans and in doing so contract on a fee for service basis with numerous

providers for the identical services the FQHCs provide in Medicaid. Third, in this case HHS has

argued that the contracts between Puerto Rico's Medicaid program and the HMOs requires the

HMOs to "reimburse out-of-network providers for services provided in situations where in-

network providers are" unavailable.  Defendant's October 31, 2007 Reply in Support of Motion

to Dismiss and Memorandum, at 28 (D. 19).  This argument was directed toward the requirement

in 42 U.S.C. § 1396b(m)(2)(A)(vii).  I am unaware that such out-of-network care actually is

available, but assuming the HMOs are fulfilling this requirement, they necessarily would be

paying the out-of-network providers a fee for those providers' services.  Whatever those fees or

fee schedules might be , they would be one more example of what the FQHCs' fees for services

should be under § 1396b(m)(A)(ix).


_____            _____

Date                               Jose Orlando Colon

11