## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CONCILIO DE SALUD INTEGRAL DE LOIZA, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 07-1034 (RMC)

## MEMORANDUM OPINION

Two federally-qualified health centers ("FQHCs") in the Commonwealth of Puerto Rico sue the Secretary of the Department of Health and Human Services ("Secretary" or "HHS") to force a change in the Medicaid payment system currently utilized by the Commonwealth. Because the Court is without jurisdiction to hear the matter, the Secretary's Motion to Dismiss [Dkt. # 8] will be granted and all other pending motions denied as moot.

## I. BACKGROUND

### A.    The Medicaid Program

The Medicaid program, under Title XIX of the Social Security Act, is a federal-state cooperative cost-sharing program that provides medical assistance to families and individuals with insufficient income and resources. 42 U.S.C. § 1396 *et seq.* While a State is not obligated to participate in Medicaid, if it does so, it must comply with all applicable federal statutory and regulatory requirements. *Id.* § 1396a; *see also* 42 C.F.R. Part 430 *et seq.* One such requirement is to submit a "State Plan" to the Secretary for approval before implementation. 42 U.S.C. § 1396a.

The Secretary performs this function through the Centers for Medicare and Medicaid Services ("CMS").

Under an approved State Plan, a State (or U.S. Territory, such as Puerto Rico) becomes eligible for federal financial participation ("FFP"), by which HHS reimburses a portion of the State's payments to hospitals and other providers of medical assistance to Medicaid recipients. One distinction between a State and a Territory is that the amount of FFP payable to each Territory in any given fiscal year is capped at specified amounts. 42 U.S.C. § 1308(c). While Medicaid is a federal program and paid for in significant measure with federal funds, the actual provision of medical benefits to those in need occurs entirely by the State under the applicable State Plan. Therefore, within the bounds of the federal requirements, States enter into agreements with providers of services and establish the level of reimbursement paid to providers.

Since the advent of managed care organizations (commonly known as health maintenance organizations ("HMOs")) in the 1990s, States have also been able to provide some or all of the covered medical services by contracting for a prepaid capitation rate or some other risk-based arrangement.[1] The HMO can provide all services itself or contract with various other health care providers to provide services to Medicaid patients in exchange for an agreed-upon payment rate. HHS requires each HMO to provide a grievance procedure whereby, *inter alia*, a health care provider can challenge payments received for service.

HHS provides limited oversight over a State Plan once it is approved. If HHS finds

_____

[1] A "prepaid capitation rate" is a per-participant rate that the State pays before any services are provided; the HMO then runs the risk that the rate will prove insufficient to cover all the costs of providing services and the State runs the risk that the rate will prove to be overly-generous.

that a State is substantially not in compliance with federal statutory or regulatory requirements, it can provide the State with "reasonable notice and opportunity for hearing," 42 U.S.C. § 1396c, and may thereafter, if substantial noncompliance is demonstrated, withhold further payments to the State. *Id.*

## B.    Federally-Qualified Health Centers

Among other requirements, State Plans must offer health center and other ambulatory services to the categorically needy and may offer such services to the medically needy. A FQHC is a not-for-profit entity that provides primary and other health care services to medically under-served populations and that also meets certain other statutory criteria. Entities that receive section 330 Public Health Service grants under 42 U.S.C. § 254b are also considered FQHCs. Plaintiffs here, Concilio de Salud Integral de Loiza, Inc. ("Loiza") and Junta del Centro de Salud Comunal Dr. Jose S. Belaval, Inc. ("Belaval"), are such FQHCs. FQHCs are reimbursed for providing services to Medicare and Medicaid patients; they also get reimbursed by private insurance companies for those patients who have health insurance. These funding streams are supposed to allow FQHCs to allocate section 330 grant dollars to treating those who lack Medicare, Medicaid, or private insurance coverage.

Prior to 2000, FQHCs were reimbursed on a cost-based method; in other words, they received payments equal to the cost of providing services. In that year, Congress amended the Medicaid Act to replace cost-based reimbursement with a prospective payment system ("PPS"), calculated on a per-visit basis. Medicare, Medicaid and SCHIP Benefits Improvement Act of 2000, Pub. L. N. 106-554 (Dec. 21, 2000), codified at 42 U.S.C. § 1396a(bb). This per-visit rate is adjusted each year by the percentage increase in the prior fiscal year's Medicare Economic Index. For those FQHCs that do not receive adequate reimbursement by an HMO, the amended Act requires

the State to pay the differential between the calculated per-visit rate and reimbursements that an

FQHC receives from an HMO. *See* 42 U.S.C. § 1396a(bb)(5) ("In the case of services furnished by

a Federally-qualified health center or rural health clinic pursuant to a contract between the center or

clinic and a managed care entity . . . the State plan shall provide for payment to the center or clinic

by the State of a supplemental payment equal to the amount (if any) by which the amount determined

under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided

under the contract."). It is this so-called "wraparound payment" that is at the heart of this litigation.

C.    *Reforma*

In 1994, the Commonwealth of Puerto Rico instituted a managed care approach to

the delivery of Medicaid services known in the Commonwealth as *Reforma*. Through this program,

the Puerto Rico Department of Health divided the Commonwealth into ten regions and awarded a

contract to a single HMO as the exclusive Medicaid service provider in each region. The

Commonwealth contracts with these private HMOs to provide Medicaid services and pays a fixed

monthly sum per Medicaid patient assigned to that HMO. In return, the HMO agrees to provide all

covered services.[2] The HMOs then subcontract with providers, including FQHCs, to provide care

directly. The HMO earns a profit only if its costs are less than the fixed monthly sum it receives

under *Reforma*. Plaintiffs assert that "[t]he HMOs do not pay FQHCs as they are required to do

under the Medicaid statute and in fact pay FQHCs, at best, little or nothing and, at worst, charge the

FQHCs for the FQHCs' provision of Medicaid services instead of paying them." Compl. ¶ 44(B).

Plaintiffs acknowledge that their contracts are now with HMOs and not directly with

---

[2]   *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 62 (1st Cir. 2005).

the Commonwealth. *See* Pls.' Opp'n to Motion to Dismiss ("Pls.' Opp'n") at 10 ("The problem

managed care created where FQHC payments are concerned is this: the [HMOs] replace the State

Medicaid agency as the one that contracts with and pays service providers, including FQHCs, for

Medicaid services, and since these entities, all private businesses, expect to pay FQHCs a 'market

rate,' not a special rate uniquely created by federal Medicaid law, those entities, if left to their own

devices, undoubtedly would pay FQHCs amounts they pay others for the same service.").

   In June 2003, Plaintiffs filed suit against the Commonwealth in the U.S. District

Court for the District of Puerto Rico, alleging that Puerto Rico had failed to establish a PPS office

and make required wraparound payments.[3]  Plaintiffs won their suit[4] and, on March 31, 2004, the

District Court entered a preliminary injunction against the Commonwealth, ordering Puerto Rico's

Secretary of Health to make wraparound payments to the FQHCs. *See Rio Grande Cmty. Health*

*Ctr., Inc. v. Rullan*, No. 03-1640, 2004 WL 3202761 (D.P.R. March 31, 2004). The Commonwealth

complied, by both establishing a PPS office and by making wraparound payments to both Plaintiffs.

*See Concilio de Salud Integral de Loiza*, 479 F. Supp. 2d at 250-51.  Loiza wanted the court's

preliminary injunction made permanent, arguing that the Commonwealth "continues to violate the

---

[3]  Plaintiffs sought to include HHS as an interpleader defendant, on the basis that the failure of the Commonwealth to make wraparound payments required them to use their section 330 grant funds, except that HHS might then assert an equitable lien on the section 330 funds. *See Rio Grande Cmty. Health Ctr. v. Rullan*, No. 03-1640, 2006 WL 1514332, at *1 (D.P.R. May 25, 2006).  The motion for interpleader was denied on the grounds that "plaintiffs' concern of a future claim to the Section 330 funds by the federal defendants, is purely conjectural." *Id*.

[4]  "Subsequent to the wraparound statute's date of effectiveness – January 1, 2001 – the Commonwealth failed to establish a PPS system.  No wraparound payments were thus made by the Commonwealth to any FQHC from January 1, 2001 until March 31, 2004." *Concilio de Salud Integral de Loiza v. Perdomo*, 479 F. Supp. 2d 247, 249 (D.P.R. 2007) (internal citation omitted).

directives of the Medicaid statute pertaining to wraparound payments," *id*. at 248, which Puerto Rico

denied.  After an evidentiary hearing and post-hearing memoranda, the District Court declined

Plaintiffs' request that it make its preliminary injunction permanent.  *Id.* at 250-51.[5]

Plaintiffs filed the instant suit in the District of Columbia on June 11, 2007.  They

allege that HHS has a duty to take action against Puerto Rico or otherwise enforce the Medicaid Act

and HHS regulations that allegedly cover the contracts between the HMOs and FQHCs in the

Commonwealth.  Specifically, they assert that: (1) HHS did not give prior approval to the contracts

between the Commonwealth and the HMOs, Compl., ¶ 46(A); (2) beneficiaries must have certain

disenrollment rights but such rights are nonexistent in Puerto Rico because there is no alternative

HMO to select, *id*. ¶ 46(B); (3) when urgent care is required, beneficiaries have the right to go out

---

[5] As explained by the District Court in Puerto Rico:

> Assuming that the PPS office properly performs its function, there is no
> future guarantee that Commonwealth monies will be available to pay the
> wraparound sums due.  As recognized by Madam Secretary, contrary to
> the States, Puerto Rico receives but a fraction of Medicaid monies from
> the federal government.  Notwithstanding, the Commonwealth is
> required by federal law to comply with the wraparound scheme just as if
> it were a state.  The result is that in the case of Puerto Rico the additional
> monies granted to states by the federal government for wraparound
> payments are unavailable.  These extra sums, in the millions of dollars,
> must then necessarily come from the Commonwealth fisc and be
> approved by the legislature.  For example, in a state, Medicaid matching
> occurs on a fifty-fifty (50-50) basis.  In Puerto Rico it is on a twelve-
> eighty eight (12-88) basis, the Commonwealth having to provide the
> much larger amount.
>
> Plaintiff is concerned that there may come a point in time when Loiza,
> due to the above predicament, is unable to receive wraparound payments.
> Such speculative fear, in and of itself, however, is legally insufficient for
> the court at this time to continue issuing injunctive relief.

*Id*. at 250 (internal citations omitted).

of network for the service they need and the State or HMO must pay the service provider but no such

right exists in Puerto Rico, *id*. ¶ 46(c); (4) the State-HMO contract must require the HMO to pay

FQHCs "not less than the level and amount of payment which the [HMO] would make" but the

contracts do not fulfill this requirement, *id*. ¶ 46(D); (5) risk contracts with physicians must limit the

risk to ensure that they will not refuse treatment and the risk imposed by HMOs in Puerto Rico

violates this principle, *id*. ¶ 46(E); (6) Medicaid beneficiaries must have at least two HMOs from

which to choose and in Puerto Rico they do not, *id*. ¶ 46(G); and (7) Plaintiffs are available to

provide additional services but the HMOs have refused to extend their contracts to cover those

services, *id*. ¶ 46(H).

Plaintiffs ask the Court to direct the Secretary to withhold further federal financial

payments to Puerto Rico. The Secretary responds that the Court is without jurisdiction and that, if

jurisdiction is present, he should be awarded summary judgment.

## II. LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause

lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377

(1994). Because subject matter jurisdiction is an Article III as well as a statutory requirement, "no

action of the parties can confer subject[]matter jurisdiction upon a federal court.'" *Akinseye v.

District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). On a motion to dismiss for lack of subject

matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the

court has subject matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999);

*see also McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936).

Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## B. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). The court must treat the complaint's factual allegations — including mixed questions of law and fact — as true, drawing all reasonable inferences in the plaintiff's favor, *Macharia*, 334 F.3d at 64, 67; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003), and the facts alleged "must be enough to raise a right to relief above the speculative level," *Twombly*, 127 S. Ct. at 1965. But the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In deciding a 12(b)(6) motion, the court may consider only "the facts alleged in the complaint, documents attached as

exhibits or incorporated by reference in the complaint, and matters about which the [c]ourt may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted). However, the court may, in its discretion, consider matters outside the pleadings and thereby convert a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(b); *Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003).

### III. DISCUSSION

As amended by Congress, the Medicaid Act allows States to contract with HMOs to provide Medicaid services. Worried that HMOs would not reimburse FQHCs at rates that would allow them to operate, and that populations already under-served would be grievously harmed, Congress also requires States to make wraparound payments to cover the difference between payments from the HMOs to FQHCs and the required PPS rate. Puerto Rico failed to implement this statutory command until sued and ordered by the District Court of Puerto Rico to do so. It complied. However, the State Plan in Puerto Rico receives significantly fewer federal dollars towards its Medicaid program than do the 50 States. Plaintiffs here state that the Commonwealth has not given them sufficient wraparound payments for prior years, despite the order of the District Court of Puerto Rico, and that they fear that it will not have monies to pay them full wraparound payments in future years. They want the Court to require the Secretary of HHS to stop all federal payments to the Commonwealth's Medicaid Plan and, thus, force a change in payment methodologies. The preferred change, of course, would be to return to a system of full payment of FQHC costs.

The Plaintiffs rely on the Medicaid Act and the Administrative Procedure Act to give this Court jurisdiction to hear their Complaint. However, neither statute accomplishes the task and the Court must dismiss for lack of jurisdiction. The Court lacks subject matter jurisdiction because

Congress has not waived sovereign immunity, Plaintiffs lack standing to bring this suit, and the Secretary's determination as to whether to bring an enforcement action against the Commonwealth is an action committed to agency discretion by law and is not subject to court review.

### A.    Sovereign Immunity

#### 1.    Jurisdiction Based on the Medicaid Act

The Medicaid Act does not provide for a private right of action for health care providers unhappy with private contracts and Plaintiffs' allegations that the Secretary's payments to the Commonwealth's Medicaid program constitute arbitrary action do not independently provide a basis for jurisdiction.  Under the Medicaid Act, if the Secretary concludes that a State is in substantial noncompliance, the Secretary can initiate proceedings to terminate FFP by providing the State with notice and an opportunity for a hearing.  *See* 42 U.S.C. § 1396c; 42 C.F.R. §§ 430.35, 430.42; *Bowen v. Massachusetts*, 487 U.S. 879, 885 (1988).  Thereafter, in the face of a negative decision, the State is entitled to reconsideration by filing an appeal with the HHS Departmental Appeals Board.  42 U.S.C. § 1316(d).  The State may obtain judicial review of a final agency decision.  42 U.S.C. § 1316(a)(3); 42 C.F.R. § 430.38; *see also Bowen*, 487 U.S. at 880.  This express right of action granted to States strongly suggests that the statute and regulations preclude a private right of action by these Plaintiffs, who are providers.

Indeed, this conclusion is underscored by *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984), in which the Supreme Court found that a comprehensive remedial scheme, which gave milk processors a right to judicial review of milk-marketing orders, denied a private cause of action to consumers under the APA.  *Id*. at 346-53.  When a statute provides a "detailed mechanism for judicial consideration of particular issues at the behest of particular persons," judicial review on

behalf of others is "impliedly precluded." *Id*. at 349.  *See also Syntex (USA) Inc. v. United States Patent & Trademark Office*, 882 F.2d 1570, 1573-74 (Fed. Cir. 1989) (competitor could not obtain review of PTO decision favorable to patent holder, who could have obtained review of unfavorable decision; under the "clear, comprehensive statutory scheme, . . . Congress intended to limit appeals from final reexamination decisions to those initiated by patent owners seeking to reverse an unfavorable decision").  States can clearly challenge the Secretary's decision to withhold FFP, 42 U.S.C. § 1316(d), and seek judicial review of any unfavorable outcome.  42 U.S.C. § 1316(a)(3). There is no similar right for providers to challenge the Secretary's decision to continue to pay FFP. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 521 (1990) ("The Medicaid Act contains no comparable provision for private judicial or administrative enforcement.").

Because the Medicaid Act does not provide for suits against the Secretary by direct providers of health care, it cannot be said to have waived sovereign immunity for this suit.

2.      Jurisdiction Based on the Administrative Procedure Act

Similarly, Plaintiffs may not rely on the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706 for jurisdiction in this case.

The APA is not an independent grant of subject matter jurisdiction. *See Your Home Visiting Nurses Servs., Inc. v. Shalala*, 525 U.S. 449, 457-58 (1999) ("[W]e have long held that [the APA] is not an independent grant of subject-matter jurisdiction.") (citing *Califano v. Sanders*, 430 U.S. 99 (1977)).  Rather, it waives the federal government's sovereign immunity in certain actions brought under the general federal question jurisdictional statute, 28 U.S.C. § 1331.  Although the APA embodies a "basic presumption of judicial review," *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), this is just a presumption, and under § 701(a)(2), agency action is not subject to judicial

review to the extent that such action is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (citing *Block*, 467 U.S. at 349). Further, the APA authorizes only a challenge to a "final" action of an "agency." 5 U.S.C. §§ 701(a), 704. Under the APA, an action is "final" insofar as it is not a "preliminary, procedural, or intermediate agency action or ruling." *Id*. § 704. The "core question" for determining finality is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will *directly* affect the parties." *Dalton v. Specter*, 511 U.S. 462, 470 (1994) (emphasis added).

      Plaintiffs first invoke the APA to argue that the Secretary's payments to the Commonwealth's Medicaid managed care program constitute an "agency action" that is "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with the law." Pls.' Opp'n at 12. However, the APA's "arbitrary and capricious" standard, *see* 5 U.S.C. § 706(2)(A), "cannot be sufficient by itself to provide the requisite 'meaningful standard' for courts to apply in evaluating the legality of agency action." *Lunney v. United States*, 319 F.3d 550, 559 n.5 (2d Cir. 2003) (citing *Heckler*, 470 U.S. at 829-30). Indeed, "[i]f agency actions could be challenged as 'arbitrary and capricious,' without reference to *any* other standard, then § 701(a)(2)'s limitation on APA review would amount to no limitation at all, and nothing would ever be 'committed to agency discretion by law.'" *Lunney*, 319 F.3d at 559 n.5.

      Plaintiffs further invoke the APA in requesting that the Secretary cease payments to Puerto Rico. *See* Pls.' Opp'n at 13 ("The APA also provides ample authority for the remedies plaintiffs seek [because] it authorizes the reviewing court to . . . set aside agency action, findings, and conclusions it determines to have violated the APA's requirements."). Requests for broad injunctive relief under the APA have been rejected by the Supreme Court. In *Lujan*, the Court held:

"Respondent cannot seek wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The Court not only rejected the notion that a request for a broad injunction is proper under the APA, the Court also expressed its disapproval of court-initiated systemic change:

> Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediately threatened effect. . . . Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole program to be revised by the agency in order to avoid the unlawful result that the court discerns. But it is assuredly not as swift or as immediately far- reaching a corrective process as those interested in systemic improvement would desire. Until confided to us, however, more sweeping actions are for the other branches.

*Id*. (internal quotations omitted).

The question of applicability of the APA is tied to the question of the standing. *See Syntex*, 882 F.2d 1570. "Whether one looks at the question raised here as a matter of subject matter jurisdiction or lack of standing, the result is the same. In cases such as this where a plaintiff asserts a procedural entitlement from a federal statute or implementing regulations, the District of Columbia Circuit has advised: 'The standing and reviewability inquiries tend to merge. A plaintiff cannot claim standing based on violation of an asserted personal statutory-created procedural right when Congress intended to grant that plaintiff no such right.'" *Id*. at 1573 (quoting *Banzhaf v. Smith*, 737 F.2d 1167, 1170 (D.C. Cir. 1984)); *see also In re Long-Distance Telephone Svc. Fed. Excise Tax Refund Litigation*, 501 F. Supp. 2d 34 (D.D.C. 2007) ("If the plaintiff is suing under the APA, the

-13-

plaintiff must show that the alleged injury falls within the zone of interests that the statute on which

the plaintiff bases the complaint seeks to protect."); *Rural Water Dist. No. 3 v. Owasso Public Works*

*Auth.*, 2007 U.S. Dist. LEXIS 61033, at * 8-9 (D. Okla. Aug. 20, 2007) ("The party invoking federal

jurisdiction . . . must, in addition to constitutional standing, satisfy the APA's requirement that only

persons adversely affected or aggrieved by agency action within the meaning of a relevant statute

bring suit to challenge a final agency action.") (internal quotations omitted).  As explained more fully

*infra*, the Medicaid Act does not provide for rights of review from non-States, and Plaintiffs do not

have standing to challenge the Secretary's actions.

### B.    Standing

The Plaintiffs are unhappy with the payment terms of their contracts with the relevant

HMOs and with the wraparound payments they have received from the Commonwealth.[6]  They want

HHS to withhold all federal funding for Medicaid for Puerto Rico to force a change in these

relationships.   However, no action by the Secretary caused Plaintiffs' alleged harms and their

requested remedy would not necessarily redress them.   Thus, Plaintiffs have no standing to pursue

this suit.

### 1.    Injury and Traceability

To meet Article III's standing requirements, a party must show at an "irreducible"

minimum, (1) a direct and palpable injury; (2) that can fairly be traced to the action or inaction of

the defendant; and (3) that is likely to be redressed if the relief sought is granted.  *Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 560-61 (1992).  Assuming that Plaintiffs have been harmed as they allege,

---

[6]  Plaintiffs report that they have received no wraparound payments since the District
Court in Puerto Rico dissolved its preliminary injunction, in March 2007.  It seems that they
should return to that court to complain.

they do not allege facts that demonstrate "a causal connection between the injury and the conduct complained of . . ., [*i.e.,* an] injury . . . [that is] 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Id*. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  Here, Plaintiffs allege that their contracts with the HMOs are illegal because the Secretary did not review and approve the contracts between Puerto Rico and the HMOs.  The Plaintiffs do not connect these dots: approval of the contracts between Puerto Rico and the HMOs, timely or not, does not make the Secretary responsible for the terms of the subcontracts between the HMOs and the FQHCs.  The Secretary is neither a party to the subcontracts nor does he have statutory authority to approve or disapprove them.

        In response, Plaintiffs complain that "[t]he HMOs do not pay FQHCs as they are required to do under the Medicaid statute . . . ." Pls.' Opp'n at 13.  They note that they were advised, in 2002, by the Associate Administrator of HHS's Health Services and Resources Administration to "consider not renewing any future contracts since the HMOs have structured a program that essentially transfers financial risk for most health center costs to the federally-funded health centers in Puerto Rico."  *Id*. at 16.  Since the Commonwealth had approved the contracts between the FQHCs and the HMOs, the HMOs refused to renegotiate.   Plaintiffs warn that the use of Public Health Service Section 330 grant monies to support Puerto Rico's Medicaid system is exactly contrary to Congress's intent.  They also cite the HHS promise that it would disallow FFP if an HMO failed to pay an FQHC properly.  *See* Pls.' Opp'n at 25-26 (citing 66 Fed. Reg. 6228, 6372-73 (Jan. 19, 2001)) ("If an [HMO] fails to comply with [42 U.S.C. § 1396b(m)(2)(A)(ix)] by not paying at least what it pays other providers, [HHS] would disallow Federal financial participation (FFP) in

payments under the [HMO's] contract.  Thus, the [FQHC] requirements in question are self-implementing and fully enforceable.")).

Despite the argument, Plaintiffs can identify no action or inaction by HHS that affects the terms of their contracts with the HMOs.  Plaintiffs' complaint is with the HMOs, not HHS. There is nothing in Plaintiffs' alleged injury that is fairly traceable to federal action.

2.     Redressability

Plaintiffs also fail to meet the third element of standing: their injury must be redressable by the court order they seek.  *See Lujan*, 504 U.S. at 555, 560-61.  While Plaintiffs opine that withholding FFP from Puerto Rico will cause the Commonwealth to change its managed-care program or return to the traditional fee for medical services basis on which Medicaid began, any such changes might not relieve Plaintiffs' financial distress.  The woes of which Plaintiffs complain arise from the terms of their subcontracts with the HMOs; there is no necessary connection between HHS withholding FFP and the HMOs releasing Plaintiffs from their onerous contracts.

There is no doubt that the Secretary could terminate FFP if HHS found that Puerto Rico, after the opportunity for a hearing and appeal, were in substantial noncompliance with Medicaid requirements.  Should that occur, Puerto Rico might respond in a variety of ways, not just the two identified by Plaintiffs.  The only certainty from this speculative situation would be that the poorest of the Commonwealth's citizens would have an even more difficult time obtaining health care.

C.     **Prosecutorial Discretion**

Longstanding case law demonstrates that the decision whether to take an enforcement action against the Commonwealth, which is the remedy Plaintiffs seek, is committed to agency

-16-

discretion by law and is unreviewable by the Court.  As the Supreme Court held in *Heckler v. Chaney*:

> [A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.  This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement.

470 U.S. 821, 831 (1985) (internal citations omitted).  This same analysis applies to the Secretary's decisions on enforcing the Medicaid program requirements.  *See Phoenix Baptist Hosp. & Med. Ctr. v. United States*, 937 F.2d 452, 453 (9th Cir. 1991) (Secretary has discretion as to whether to withdraw FFP); *Steele v. Magnant*, 796 F. Supp. 1143, 1151 (N.D. Ind. 1992).  When enforcement is committed to an agency's discretion as it is here, neither Plaintiffs nor the Court can require the Secretary to take action; only Congress can require a specific exercise of discretion.

Plaintiffs seek to avoid this result by arguing that the Secretary did not give prior approval to the contracts between Puerto Rico and its HMOs so that any federal monies sent to the Commonwealth are *ultra vires*.  "There is no prosecutorial discretion," they argue, "that permits the agency to ignore its legal duties in the context of this case where payments made in the face of such violations are prohibited by the law."  Pls.' Opp'n at 24.  There are three problems with Plaintiffs' argument.  First, the Secretary's discretion extends to whether the Commonwealth is noncompliant and, if so, what action to take; Plaintiffs' own conclusion that Puerto Rico has violated the terms of the Medicaid Act may be informative but is not controlling.  Second, the Plaintiffs are wrong factually.  The Secretary avers that HHS did review and approve the Commonwealth-HMO

contracts.[7]  Third, Plaintiffs' point is irrelevant: they take issue with the subcontracts between the

HMOs and Plaintiffs, not the contracts between the HMOs and Puerto Rico.

     **D.**     **Plaintiffs' Motion for Partial Summary Judgment**

     Even if Plaintiffs could establish jurisdiction, they could not prevail on their Motion

for Partial Summary Judgment.  *See* Dkt. # 15 (included as part of Plaintiffs' Opposition to

Defendant's Motion to Dismiss).

     Plaintiffs' main contention for why they are entitled to summary judgment is that

HHS did not give pre-approval to the contracts between the Commonwealth and the HMOs.  *See* 42

U.S.C. § 1396b(m)(2)(A)(iii) (under the Medicaid Act, a State's Medicaid managed care program

must be provided in accordance with a contract between the State and the managed care entity "under

which prepaid payments to the entity are made on an actuarially sound basis and under which the

Secretary must provide prior approval").  Plaintiffs rely on an interrogatory response submitted in

*Rio Grande* by someone from the Commonwealth in their assertion that there was no pre-approval

for the contracts.  The Court finds that Plaintiffs' evidence does not establish this point[8] and instead

credits the evidence put forth by HHS showing that the Secretary, through CMS, in fact has and does

review and provide prior approval for Puerto Rico's contracts with the Medicaid HMOs.

     1.     <u>HHS's Review of Managed Care Contracts</u>

     HHS's affidavit from CMS details the review of Puerto Rico's Medicaid managed

---

     [7] The Secretary asserts that CMS gave prior approval to these contracts, *see* Def.'s Reply at 23; Ex. A (Declaration of Sue Kelly ("Kelly Decl.")) ¶¶ 9-13.

     [8] *See* Pls.' Ex. E (Interrog. Resp. No. 14).  The interrogatory response pertains to approval of rates paid by HMOs to providers, not Puerto Rico to the HMOs.  However, the "prior approval" provision in 42 U.S.C. § 1396b(2)(A)(iii) deals with contracts between the State and the HMOs – not between HMOs and providers.

care contracts by the CMS Region II office in New York ("CMS-RO"). *See* Kelly Decl. ¶¶ 9-13. Ms. Kelly, an Associate Regional Administrator of the CMS, has been responsible for federal oversight of State Medicaid programs in the region including Puerto Rico from March 1998 until the present. *Id*. ¶ 3. Ms. Kelly attests that CMS-RO did not approve Puerto Rico's contracts with Medicaid HMOs until it was satisfied that the approved contracts for each contract period met the standards required by statute and regulation. *Id*. ¶ 13. The CMS-RO reviews Puerto Rico's proposed contracts within 45 calendar days of receipt. *Id*. ¶ 12. If the CMS-RO determines that there should be changes to the contracts, it notifies the Commonwealth. *Id*. Or, if the contract can be approved, the CMS-RO sends a confirming approval letter to the Commonwealth after clearance by the Office of Secretary Notification.

CMS-RO takes several steps to determine whether managed care contracts may be approved, including whether the capitation rates submitted by the Commonwealth are actuarially sound[9] per the regulatory guidelines. *Id*. ¶ 11; Att. 1 (CMS Checklist for Managed Care Contract Approval); Att. 2 (Appendix A – Financial Review Documentation for At-Risk Capitated Contracts Ratesetting). Once it is determined that Puerto Rico's rates and certifications for contract periods meet the required standards, the CMS-RO approves the contracts and affords full FFP to the Commonwealth's program.

HHS argues that the CMS-RO "did not approve Puerto Rico's contracts with Medicaid HMOs until it was satisfied that the approved contracts for each contract period met the standards required by statute and regulation [provided for by 42 U.S.C. § 1396b(m)(2)(A)]." Kelly

---

[9] "Actuarially sound" capitation rates are those that have been developed in accordance with generally accepted principles and practices. *See* 42 C.F.R. § 438.6(c); Kelly Decl., Att. 2.

Decl. ¶ 13.  Plaintiffs do not present relevant evidence to contradict this determination.  The Court

is satisfied that HHS has properly conducted prior approvals of the contracts.  Thus, if the Court had

jurisdiction, it would deny Plaintiffs' Partial Motion for Summary Judgment and grant Defendant's

Cross-Motion for Summary Judgment.

## IV.  CONCLUSION

Because the Court lacks jurisdiction to grant relief in this case, Defendant's Motion

to Dismiss [Dkt. # 8] will be granted.  All other pending motions will be denied as moot.  A

memorializing order will be issued with this Memorandum Opinion.


_____/s/_____
ROSEMARY M. COLLYER
United States District Court

Date: March 12, 2008

-20-